UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

KNOXVILLE DIVISION

| | |
|---|---|
| MARILYN MOORE, RYAN and LAURA SPADO, CYNTHIA LOVELESS, and ELLEN and LARRY GILLILAND, individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>v.<br><br>WESTGATE RESORTS, LTD., L.P. a/k/a WESTGATE RESORTS, LTD., CENTRAL FLORIDA INVESTMENTS, INC., WESTGATE RESORTS, INC., WESTGATE MARKETING, LLC, WESTGATE VACATION VILLAS, LLC, and CFI RESORTS MANAGEMENT, INC.<br><br>             Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## **INTRODUCTION**

Defendants, various entities associated with the Westgate Smoky Mountain Resort in Gatlinburg, Tennessee, use a high-pressure scheme that involves convincing prospective purchasers to buy into its vacation timeshare program while failing to disclose material and legally required information to buyers.  Through this scheme, Defendants (a) fail to provide legally required disclosures and (b) fail to provide purchasers with adequate access to their timeshares, as follows:

> A.      Westgate fails provide customers with legally required disclosures.

1344504.22

Specifically:

1.     Westgate fails to adequately train and supervise its sales agents, fails to provide them with disclosures to give to prospective customers, and encourages them to lie to customers in the context of high-pressure sales pitches.

2.     Westgate relies on its closing agents to provide written disclosures, but then provides them with a closing folio to use that contains a "secret pocket" where the closing officers can conceal legally required disclosures about the purchasers' rights, including their statutory right to rescind their purchase.

B.     Westgate fails to provide purchasers adequate access to their timeshares. Specifically:

1.     Westgate fails to adequately disclose to purchasers that their timeshare interest will be subject to a "floating use" plan.

2.     Westgate fails to adequately describe to purchasers the terms of the "floating use" plan.

3.     Westgate's "floating use" plan fails to provide purchasers reasonable access to their timeshares.

As a result of the common scheme, Westgate owners are left paying thousands of dollars in purchase price, upgrade costs, and annual maintenance fees, all on timeshare units they are frequently unable to use as advertised, and rarely, if ever, are able to use as reasonably expected.

Westgate's aggressive business model relies on one essential premise: it makes money by *selling* shares in property units, not by customers *using* the weeks they have purchased in those units.  In fact, Westgate has a strong incentive to sell as many ownership shares as possible in a

- 2 -

piece of property. It can then further increase its profits by limiting owners' use of the units so

they can be rented out by Defendants for additional profit or used by Defendants as sample units

to sell timeshare properties to new buyers. In this way, Westgate profits many times by selling

and overselling various interests in one piece of property: it can sell it repeatedly at a premium,

rent it repeatedly, and repeatedly use it as a tool to induce new sales—sometimes all at once.

Defendants uniformly fail to disclose material facts to buyers and, as a result, fail to deliver what

buyers reasonably expect, all in violation of Tennessee common law and statutory law.

## JURISDICTION AND VENUE

1.      Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act,

28 U.S.C. § 1332(d), because Plaintiffs and many members of the proposed Plaintiff Class are

citizens of states different from Westgate's home state of Florida, and the aggregate amount in

controversy exceeds $5,000,000, exclusive of interest and costs. The Court also has

supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a

substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this

District. Westgate conducts substantial business in this District, has marketed, advertised, and

sold timeshare properties in this District, and has caused harm to Class Members residing in this

District.

3.      Any purported forum selection clause in the contract at issue in this case is invalid

and unenforceable, to the extent that the contract at issue in this case, and/or each portion

thereof, resulted from misrepresentation, fraudulent inducement, duress, abuse of economic

power, or other unconscionable means. The forum-selection clause at issue here is a contract of

- 3 -

1344504.22

adhesion that Plaintiffs and members of the proposed class had no opportunity to negotiate, and requiring Plaintiffs and members of the class to litigate in Defendants' choice of forum would be unjust.

## PARTIES

### A. **Plaintiffs**

4.     Plaintiff Marilyn Moore is an individual resident of Goodlettsville, Tennessee.

5.     Plaintiffs Ryan Spado and Laura Spado are individual residents of Anderson, South Carolina.

6.     Plaintiff Cynthia Loveless is an individual resident of Murfreesboro, Tennessee.

7.     Plaintiffs Ellen and Larry Gilliland are individual residents of Jacksonville, Florida.

### B. **Defendants**

8.     Defendants are Westgate Resorts, Ltd., L.P., Central Florida Investments, Inc., Westgate Resorts, Inc., Westgate Marketing, LLC, Westgate Vacation Villas, LLC, and CFI Resorts Management, Inc. (collectively referred to herein as "Westgate"[1])

9.     Defendant Westgate Resorts, Ltd., L.P. ("Westgate Resorts, Ltd.") is an active limited partnership formed and operating in Florida under the name Westgate Resorts, Ltd., with an initial filing date of April 14, 1999, a principal office of 5601 Windhover Drive, Orlando, Florida 32819.  Its Tennessee registered agent is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

---

[1] Plaintiffs allege claims against all Defendants as alter egos of one another, as explained more fully herein.  To the extent any Defendant had a discrete, distinguishable role in causing the injuries alleged herein, such information is exclusively in Defendants' possession.

- 4 -

1344504.22

10.    At all times relevant to this lawsuit, Westgate Resorts, Ltd. operated the Westgate Smoky Mountain Resort at Gatlinburg (the "Resort"), at 915 Westgate Resorts Road, Gatlinburg, Tennessee 37738.  Westgate Resorts, Ltd.'s Tennessee control number is 000369233.

11.    Westgate Resorts, Inc. is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819.  It is the general partner of Westgate Resorts, Ltd.

12.    Central Florida Investments, Inc. ("CFI") is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819.  On its website, Westgate Resorts, Ltd. states that it operates as a subsidiary of CFI.

13.    CFI Resorts Management, Inc. ("CFI Resorts Management") is a Florida corporation with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819. It is the managing entity that manages the Resort.

14.    Westgate Vacation Villas, LLC is a Florida limited liability company with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819.  It is the general manager of Westgate Resorts, Ltd.

15.    Westgate Marketing, LLC is a Florida limited liability company with its principal place of business at 5601 Windhover Drive, Orlando, FL, 32819.  It is the Tennessee real estate broker of Westgate Resorts, Ltd.  Westgate Marketing, LLC's Tennessee control number is 000520057, and its Tennessee real estate license number is 261450.  Westgate Marketing, LLC conducts marketing for the Resort.

16.    CFI, CFI Resorts Management, Westgate Resorts, Inc., and Westgate Vacation Villas, LLC all have the same President/Secretary, David A. Siegel, and the same

- 5 -

1344504.22

Treasurer/Chief Financial Officer, Thomas F. Dugan.

17.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to Plaintiffs and injured Plaintiffs.

18.     At all times herein mentioned, Defendants and each of them, were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

19.     There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

- 6 -

1344504.22

## FACTUAL ALLEGATIONS

**A.**    **The Timeshare Industry**

      **1.**    **Repeated Sales of the Same Property Drive the Booming U.S. Timeshare Industry**

20.     The U.S. timeshare industry was founded in the early 1970s, a period of economic stagnation and soaring energy costs, when hotel and resort developers struggled to sell full ownership condominium properties. Instead of selling an actual condominium, developers realized, they could sell "ownership shares" to many customers, each of which theoretically gives an owner the right to use the property (or a similar property) for certain amounts of time per year.

21.     This simple notion—dividing one condominium or resort property into "ownership shares" and selling it over and over again, to dozens of different buyers—is the fundamental concept that has given rise to the profitable modern timeshare industry. By selling a vacation timeshare unit incrementally, a timeshare developer makes far more money than if it sold the same unit to one buyer for the market price. As an illustration, a timeshare developer can build 150 condominiums, each of which might sell for $200,000 on the open market; using a timeshare approach, the developer could sell two-week timeshares in each unit, for a total of 26 "timeshares," for, say, $20,000 each. By using the timeshare scheme, the developer's investment brings a return of $520,000—2.6 times greater than the $200,000 it would have grossed selling to one buyer. (Westgate takes this scheme several steps farther: it sells many more than 26 timeshares in each unit, exponentially increasing its profits while knowing that the unit will rarely or never be available for purchasers to use them.)

22.     Timeshare business is booming. In 2015, approximately 9.2 million American

1344504.22

households owned timeshares. There were 1,547 timeshare resorts in the United States, with approximately 200,720 units available to be divided up and sold repeatedly. The timeshare industry sold $8.6 billion worth of timeshares to consumers in 2015, with an average sales price of $22,240 and average maintenance fees of $920. *See* Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, *available at* http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howard-nusbaum.pdf; see also Gretchen Morgenson, "The Timeshare Hard Sale Comes Roaring Back," *New York Times*, January 24, 2016, *available at* https://www.nytimes.com/2016/01/24/business/diamond-resorts-accused-of-using-hard-sell-to-push-time-shares.html.

23.     The industry is currently experiencing a period of substantial growth. Timeshare sales volume has increased by more than 33% since 2011, the industry reports, an average of 7% annually. In the most recent year for which data is available, sales volume rose from $8.6 billion in 2015 to $9.2 billion in 2016, a nearly seven percent increase. This is part of a seven-year growth trend: in 2015, sales volume increased by nearly 9%, the second-largest percentage increase since the housing market collapse of 2008 caused the Great Recession.

24.     While privately held corporations like Westgate exist in the timeshare marketplace, the sector is increasingly dominated by large, often publicly traded corporations that depend on the industry's inflated profit margins.

25.     These corporations, including Westgate, also loan money to consumers to finance the purchase. They then convert the timeshare promissory notes into securities that are rated and sold in the financial markets. In 2017, for example, Westgate issued $132,500,000 and $42,500,000 in Class A and Class B "Timeshare Collateralized Notes," respectively. This year,

- 8 -

Westgate issued another $197,850,000 in secured timeshare notes. Since 1992, it has sold approximately $3.4 billion in notes in the securitization market.

## 2. The Westgate Timeshare Business Model Invites Fraud

26. The timeshare industry's record profits are driven by sales of ownership shares, not its customers' use and enjoyment of their properties. In fact, a timeshare business makes money every time someone makes a down payment or monthly payment on a timeshare, including paying steep annual "maintenance fees," but when people use the properties, it prevents the timeshare developer from renting that property to another customer or using it to entice a prospective purchaser to buy a timeshare. Selling units to new customers and selling nicer units to existing customers is the lifeblood of the timeshare industry.

27. The timeshare business has been a breeding ground for fraudulent sales tactics like those employed by Westgate as detailed herein. Since its founding in the early 1970's, the industry has relied on "sneaky come-ons" to trap consumers in "multihour presentations complete with high-pressure sales tactics." Consumer Reports, "The Timeshare Comes of Age," Feb. 23, 2016, *available at* http://www.consumerreports.org/travel/the-timeshare-comes-of-age/. In recent years, lawsuits and news reports have documented "high pressure sales tactics involving deliberate lies and misrepresentations to get people to buy more timeshare 'points.'" New York Times, "My Soul Feels Taller: A Whistleblower's $20 Million Vindication," https://www.nytimes.com/2016/11/25/business/my-soul-feels-taller-a-whistle-blowers-20-million-vindication.html. Among the tactics used by one prominent timeshare business: "TAFT" days, where employees were encouraged to "Tell Them Any Frigging Thing" to make a sale, as long as they didn't put it in writing. *Id*.

- 9 -

28.     Furthermore, the industry relies on owners' inability to resell their timeshare properties, despite telling prospective buyers that they are purchasing an asset that will only appreciate in value.  Across the industry, timeshare companies refuse to buy back timeshare properties from customers who no longer wish to own them.  As Diamond Resorts, a major industry player, noted in an annual financial filing, if the resale market "were to become more organized and liquid," the resulting availability of vacation units "could adversely affect our sales and our sales prices."  Gretchen Morgenson, "The Timeshare Hard Sale Comes Roaring Back," *New York Times*, January 24, 2016, *available at* https://www.nytimes.com/2016/01/24/business/diamond-resorts-accused-of-using-hard-sell-to-push-time-shares.html.  Not only are some timeshare businesses known for fraudulent sales tactics, once they convince owners to purchase a property, they trap them in a valueless resale market, leaving them with few options but to continue making their monthly mortgage and maintenance fee payments.

29.     Timeshare businesses also profit from the significant "maintenance fees" they charge each owner.  These fees are supposed to pay for property taxes, landscaping, management, and insurance, and must be paid by the owner even after the full purchase payment is satisfied.  Consumer Reports, "The Timeshare Comes of Age," Feb. 23, 2016, *available at* http://www.consumerreports.org/travel/the-timeshare-comes-of-age/.  To the timeshare industry, these maintenance fees are a profit center, and the leading vacation timeshare trade group celebrates that maintenance fees have increased 4% percent per year on average since 2010.  In 2015, the average timeshare owner paid $920 in maintenance fees per property.  *See* Howard Nusbaum, "Local Perspective on the Global Timeshare Industry," September 21, 2016, *available at* http://www.rdoconference.org/wp-content/uploads/2016/09/a-global-perspective-howard-

- 10 -

1344504.22

nusbaum.pdf; *see also* American Resort Development Association, "A Look At Timeshare" Infographic, http://vacationbetter.org/wp-content/uploads/2015/07/aif_15SOI-Infographic_7.14.15.jpg.

### 3. Government Regulators Have Begun Cracking Down on Fraud By Timeshare Companies, Including Westgate

30.     In recent years, regulators in jurisdictions across the United States have begun enforcing consumer protection laws against the timeshare industry:

- Tennessee Attorney General Herbert H. Slatery III announced a $3 million settlement with timeshare company Festiva due to fraudulent and deceptive tactics that violated the Tennessee Consumer Protection Act, https://www.tn.gov/attorneygeneral/news/pr16-04;

- New York Attorney General Eric Schneiderman halted sales at the Manhattan Club in New York due to allegedly fraudulent sales practices, citing "high-pressure sales tactics" and a "bait-and-switch timeshare scheme," https://ag.ny.gov/press-release/ag-schneiderman-announces-court-order-barring-sales-manhattan-club-timeshare-hotel;

- Diamond Resorts International has been sued by owners' groups at multiple resorts, including Diamond Monarch, Hawaii at Poipu, and ILX, alleging fraud and intimidation, Courthouse News Service, "Timeshare Giant Wants Class Action Dumped," January 7, 2016, *available at* https://www.courthousenews.com/timeshare-giant-wants-class-action-dumped/; Timesharing Today, "Diamond Resorts Hit With Lawsuit by Poipu Point

- 11 -

1344504.22

Owners," May/June 2012, *available at* http://www.tstoday.com/
members/magazine/issue123/7-poipu%20point.pdf; and Courthouse News
Service, "Couple Claim Timeshare Group Rolled Them," March 12, 2015,
*available at* https://www.courthousenews.com/couple-claim-timeshare-group-
rolled-them/.

31.     Federal authorities have begun cracking down on timeshare businesses, including

Westgate specifically.  The U.S. Consumer Financial Protection Bureau ("CFPB") has recently

investigated Westgate, according to the CFPB's recent decision regarding a civil investigative

demand,

> to determine whether persons involved in the sale and financing of
> timeshares have engaged in, or are engaging in, acts or practices in
> violation of Sections 1031 and 1036 of the [Consumer Financial
> Protection Act], 12 U.S.C. §§ 5531 and 5536, the Fair Debt
> Collection Practices Act, 15 U.S.C. §§ 1692, et seq., the Electronic
> Funds Transfer Act, 15 U.S.C. § 1693 et seq., the Fair Credit
> Billing Act (FCBA), 15 U.S.C. § 1666 et seq., their implementing
> regulations, or any other Federal consumer financial law.

Decision and Order, *In the Matter of Westgate Resorts, Ltd*., 2015-MISC-WESTGATE

RESORTS, LTD-0001, (U.S. Consumer Financial Protection Bureau March 11, 2016) *available*

*at* http://files.consumerfinance.gov/f/201603_cfpb_decision-and-order-on-petition-by-westgate-

resorts-ltd-to-modify-or-set-aside-civil-investigative-demand.pdf

32.     And the Tennessee Court of Appeals recently affirmed (with modification) a

punitive damages award in a case filed by Tennessee timeshare owners against Westgate for

defrauding them and hiding required disclosures from them.  *See Overton v. Westgate Resorts,*

*Ltd., L.P*., No. E2014-00303-COAR3CV, 2015 WL 399218, at *7 (Tenn. Ct. App. Jan. 30, 2015)

("Westgate engaged in intentional and fraudulent conduct and that Westgate willfully violated

- 12 -

both the Tennessee Time-share Act and the Tennessee Consumer Protection Act."), *appeal denied* (June 15, 2015), *cert. denied*, 136 S. Ct. 486 (2015), *available at* http://tncourts.gov/sites/defauslt/files/overton.pdf.

**B. Westgate's Failure to Disclose Material Facts to Timeshare Purchasers**

33. To effectuate its scheme detailed herein, Westgate uses high-pressure sales tactics to induce prospective purchasers to buy into its vacation timeshare program while failing to disclose material and legally required information to them. Among other material omissions, Westgate's scheme includes the following elements:

a. In Tennessee, a timeshare estate is an interest in real property, and a timeshare use is a contractual right of exclusive occupancy. Timeshare sales and closing agents are licensed by the State and are required to be supervised by a managing or principal broker. As part of their scheme, Defendants fail to adequately train or to supervise their sales agents, and, in fact, encourage their sales agents to utilize high-pressure sales tactics which violate the Tennessee Timeshare Act, the Tennessee Real Estate Broker Licensing Act, and the common law.

b. The Tennessee Timeshare Act and the regulations of the Tennessee Real Estate Commission require timeshare developers and sales agents to deliver various disclosures to timeshare purchasers. As part of their scheme, Defendants provide their sales and closing agents with a folio to give to purchasers with the purchasers' documentation; however, the folios provided by the Defendants contain a "secret pocket" which Defendants know that their sales and closing agents often use to conceal the required disclosures, including disclosures regarding the purchaser's statutory right to rescind their purchase, in violation of Tennessee Code Tenn.

- 13 -

1344504.22

Code. Ann. § 66-32-112(9);

        c.     The Tennessee Time-Share Act and the Tennessee Real Estate Broker Licensing Act contemplate that purchasers of a timeshare should receive clear and accurate information about their purchase. As part of their scheme, the Defendants fail to adequately disclose to purchasers that they are not purchasing a share in a specific unit but are instead buying into a "floating use plan"; they fail to adequately disclose how the "floating use plan" actually works; and they fail to adequately disclose that the Defendants may delay delivery of a deed to the purchasers for a period of years;

        d.     As part of their Scheme, the Defendants fail to disclose to purchasers that because Westgate oversells and artificially restricts the availability of Resort properties (by, for example, renting the properties to non-owners, using the properties as model units, selling to purchasers when no unites are available to be deeded, and closing units for maintenance), they will not be able to use their timeshare purchase as advertised or as would be reasonably expected – or sometimes at all – in violation of the Tennessee Time-Share Act's requirements that timeshare developers must disclose restrictions on use or occupancy, develop and use reasonable arrangements to manage the timeshare program, and avoid making misleading or deceptive representations about it.

     34.     Westgate sales agents pressure purchasers to sign a series of complex and misleading legal documents; only months later, when the new timeshare owners attempt to reserve vacation time in "their" unit, do they learn that Westgate sold them something entirely different than what Westgate told them they had purchased.

     35.     Westgate specifically trains its sales agents to make misrepresentations and

1344504.22

omissions during the sales process. Westgate Resorts Vice President Richard Siegel has been captured on video telling sales agents to "lie" in order to complete a sale: "You should own at least one week yourselves—and if you don't, lie and say you do! Don't let these people leave here without buying something! Something!" he said. "100% of the people we are talking to are—it's not a nice word, but we call 'em mooches. They're coming in for a sales presentation on their vacation for a free gift. So we train our sales people on how to take someone greedy like that and get them to buy today. We do 100% of our sales on the first day . . . . They will not buy today if they don't get a 'great deal' [making air quotes]—if they don't *believe* that they're getting a great deal…. Timesharing you sell every unit 52 times because you sell it by the week."[2]

1.   <u>**Westgate Uses High-Pressure Sales Tactics to Trick Consumers into Making Purchases They Do Not Understand**</u>

36.    To effectuate their scheme, Westgate agents approach vacationers on the street, in restaurants, and at other public areas in and around Gatlinburg and Pigeon Forge, Tennessee. They offer them free tickets to local attractions, discounts on timeshare purchases, and vouchers for free meals in order to entice them to take a tour of the Resort.

37.    Once these vacationers arrive at the Resort for the tour, Westgate agents subject them to a high-pressure sales pitch—in some instances lasting as long as eight hours—designed to ensure that they do not leave without purchasing a timeshare property. Westgate agents attempt to persuade prospective purchasers by telling them that a timeshare is cheaper than paying for future vacations, but that they must act immediately in order to take advantage of

---

[2] *The Queen of Versailles* (2012), excerpt available at https://www.youtube.com/watch?v=W9G9RD5fnsw .

supposedly discounted prices.

38.     As one of several hundred of online commenters said about the "WESTGATE

SCAM":

> The place was beautiful but they trick you into thinking they are
> giving you a tour and turned into a 3-hour high-pressure sales pitch
> in a tent. Finally, we agreed to the lowest deal 3 hours later. We
> were never getting out of there without agreeing.

Consumer Affairs, "Westgate Resorts," https://www.consumeraffairs.com/travel/westgate.html.

39.     The high-pressure sales tactics do not stop once Westgate completes a sale:

existing owners face constant pressure from Westgate agents and employees to upgrade to nicer

units.  For example, Westgate assigns owners a "concierge," supposedly to assist them with

booking and other transactions, but in fact the concierge is a sales person who pressures owners

to "upgrade" their prior purchase—selling back their initial property and purchasing a nicer,

larger, or deluxe property.

40.     Westgate also pressures timeshare owners to come to an annual "owners'

meeting," which it represents is a mandatory meeting for timeshare owners at the resort.  In

actuality, the owners' meeting is an all-day, one-on-one sales meeting with Westgate agents, who

similarly attempt to pressure timeshare owners to upgrade to a nicer property.  Westgate agents

use the so-called "owners' meeting" to wear down owners by giving them a long, confusing tour

of Resort and urging them to upgrade to a more expensive property at the Resort.

        2.     **Westgate Fails to Tell Owners that They Cannot Reasonably Use and
               Enjoy Their Property**

41.     Westgate represents to prospective purchasers that as timeshare owners, they will

have no difficulty using their timeshare unit whenever they want, provided they book with at

1344504.22

least 24 hours' notice. On its website, Westgate states that owners will enjoy "[a]n easy, flexible floating program where you can choose where, when, and how you want to vacation—the vacation possibilities are endless."

42. In reality, Westgate fails to disclose that timeshare owners are routinely unable to book units in the Resort with as much as 12 months' notice—the earliest Westgate allows owners to reserve the use of their timeshare. Timeshare owners have made repeated attempts to book a stay during their allotted time, only to be told by Westgate officials that there is no availability at the Resort. As a result many Class Members have been entirely unable to use their timeshare property for an entire year.

43. Westgate specifically fails to disclose to purchasers that tens of thousands people own timeshare properties at the 1,004-unit Resort, with some owners "owning" multiple "weeks," limiting each owner's ability to use and enjoy the timeshare property for which he or she paid.

44. Likewise, Westgate fails to disclose to purchasers that it sets aside a substantial number of units in the Resort as vacation rentals, further restricting the supply of units available for timeshare owners to use. In other words, Westgate chooses to rent units out—including the specific units it lists in deeds of sale to timeshare owners—instead of making them available to owners. In some instances, as described more fully below, Westgate has told a timeshare owner that there is no availability in the unit type listed on his or her deed, but the owner then finds the same unit type listed on Westgate's website as a vacation rental, with proceeds going to Westgate. Furthermore, Westgate does not inform purchasers that certain purchasers may not receive a deed, for a period of years, but will still be able to make reservatioins, thereby diluting

- 17 -

1344504.22

the availability for existing owners.

45.     Finally, Westgate does not inform purchasers that it sets aside large numbers of demonstration units for the near-constant tours and sales efforts it uses to generate new timeshare business.  Because the profitability of Westgate's timeshare business largely depends on sales of new and upgraded units, the Resort devotes substantial resources to high-pressure sales tours, during which dozens to hundreds of prospective purchasers are brought each day through many of the nicest timeshare units at the Resort.  None of these units are available to the owners who have legitimately paid for the right access to them.

### 3.      Westgate Fails to Adequately Inform Purchasers that They Are Not Purchasing a Share in a Specific Unit

46.     Westgate sales agents give purchasers the impression that they are purchasing the right to use a specific unit at the Resort.  In actuality, they are participating in Westgate's "Floating Use Plan," which gives owners the right to use a certain type of unit, subject to availability.  And units are rarely, if ever, available to "owners," as advertised or expected.

47.     The purchase documents Westgate drafts and requires purchasers to sign lead them to believe that they are purchasing a share in a specific unit in the property.  For example, a July 5, 2013 Warranty Deed drafted by Westgate and signed by plaintiffs Ryan and Laura Spado states that they have the "right to occupy, pursuant to the Plan," Units 671A and 671B of Building 2067 at the Resort.  However, in the fine print of Westgate's Floating Use Plan, purchasers relinquish their rights to possess and use specific units at the Resort.  Westgate sales agents do not disclose this to purchasers during the high-pressure sales process.

48.     Westgate does not even give owners the right to use similar units at the Resort. Despite making repeated representations in the high-pressure sales pitches that owners can book

- 18 -

1344504.22

their specific unit, or an identical one, for use anytime in the time period purchased, Westgate routinely prevents owners from booking the unit type. In this way, Westgate's "floating use" plan, which it does not adequately describe to timeshare purchasers, fails to provide purchasers reasonable access to their timeshares.

### 4. Westgate Uses a "Secret Pocket" to Conceal Legally Required Disclosures from Purchasers

49. To protect consumers from abusive practices like those employed by Westgate, Tennessee law requires a timeshare developer to make certain disclosures to purchasers, including informing them of their right to rescind the contract after leaving the high-pressure sales pitch. Westgate routinely uses a folio containing a secret pocket that enables its commission-based closing offers to conceal the disclosures so consumers will not find them and try to rescind their purchase.

50. Specifically, the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, *et seq.*, requires a timeshare developer to provide each purchaser a Public Offering Statement. The Public Offering Statement must "fully and accurately disclose" to the purchaser that he or she has the right to rescind the contract within a designated amount of time. Specifically, it must include:

> A statement that within ten (10) days from the date of the signing of the contract made by the purchaser, where the purchaser shall have made an on-site inspection of the time-share project prior to the signing of the contract of purchase, and where the purchaser has not made an on-site inspection of the time-share prior to the signing of the contract of purchase fifteen (15) days from the date of the signing of the contract, the purchaser may cancel the contract for the purchase of a time-share interval from the developer.

Tenn. Code. Ann. § 66-32-112(9). A timeshare purchase contract is voidable until the purchaser

- 19 -

1344504.22

has received the Public Offering Statement.  Tenn. Code Ann §66-32-114.  Corresponding state regulations require that this same rescission language be found on the purchase contract.

51.     It is Westgate's standard practice to give each new purchaser who buys a vacation timeshare at the Resort a black folio.  Generally made of black faux leather, the folio zips shut and has numerous readily visible pockets on the outside and on the inside.  There is room for documents to simply be placed inside without being in any pocket, since the entire folio zips shut.  The black folio contains Westgate's name and logo on the inside.

52.     Notwithstanding Westgate's duty to provide each purchaser a Public Offering Statement and purchase contract disclosing the purchaser's right to rescind, Westgate provides its commission-based closing agents with the folio containing the secret pocket, knowing that those closing agents often withhold and conceal this information from purchasers by hiding it in the secret pocket.  The secret pocket is not readily ascertainable to a reasonable person.

53.     Westgate's commission-based sales representatives routinely do not inform purchasers, including Class Members, that the Public Offering Statement and purchase contract are concealed within the secret pocket.  Therefore, while purchasers have technically been given the Public Offering Statement and purchase contract, they do not know they have it and are not told about their right to rescind.  In this way, Westgate's concealment prevents purchasers from exercising their right to rescind the contract.  *See generally* Paul Brinkmann, "Westgate Resorts denies hiding cancellation documents," Orlando Sentinel (Sept. 30, 2015), *available at* https://www.orlandosentinel.com/business/brinkmann-on-business/os-westgate-resorts-cancellation-20150930-post.html.

- 20 -

1344504.22

**5.** **Because the Resort is Oversold, Westgate Fails to Deliver Deeds to Owners**

54.     Westgate routinely fails to deliver warranty deeds to owners because it sells more timeshare properties than the fractional interests it possesses, leaving it without sufficient deeds to provide owners.

55.     When purchasers buy a timeshare property at the Resort, the warranty deed should be recorded by Westgate with the Sevier County Register of Deeds. Recording the warranty deed protects purchasers from title claims by third parties, and conversely, the failure to properly record the warranty deed leaves purchasers vulnerable to such claims.

56.     Purchasers of timeshare properties at the Resort are told that Westgate will record their Warranty Deed and send them a copy. Westgate agents do not tell purchasers that buried in fine print, Westgate asserts that it can delay assigning a unit and recording the deed for up to three years. Nor does Westgate tell purchasers that in some cases, it has not recorded their deed. As a result, purchasers reasonably believe that their property transaction will be duly recorded, and their real property interest is protected from claims by third parties.

57.     Westgate's routine failure to record warranty deeds further evidences Westgate's pattern and practice of overselling the Resort: it cannot record and deliver deeds because it sells more fractional interests in real property than actually exist. Westgate's attempt to remedy this failure with hidden contract language only demonstrates that Westgate is in the business of defrauding its customers.

**C.**     **Plaintiffs' Allegations of Wrongful Conduct by Westgate**

**1.**     **Ryan and Laura Spado**

58.     Plaintiffs Ryan and Laura Spado first purchased a timeshare at Westgate Smoky

1344504.22

Mountain Resort in July 2008. They paid $10,000, plus a $450 yearly maintenance fee for what the sales representative told them was a unit that included a balcony, and the right to use it for one week every other year. The sales representative did not inform them that when they tried to book their unit, they would have difficulty reserving it or a comparable unit because sufficient units were not available.

59. At the time of their purchase, Westgate agents provided the Spados a black folio that folio zipped shut and had numerous readily visible pockets on the outside and on the inside. Westgate agents did not inform the Spados about the legally required Public Offering Statement, which was concealed in a secret pocket hidden within the black folio. They did not know that the Public Offering Statement was concealed within the secret pocket, nor could they have found it through the exercise of reasonable diligence. Because Westgate officials did not tell the Spados about their right to rescind the contract, nor did Westgate officials inform them about the concealed Public Offering Statement, the Spados did not know about, and could not exercise, their right to rescind the contract.

60. In 2010, the Spados attempted to reserve time in their timeshare unit. Westgate officials told them it was unavailable. Instead, they were placed in another unit that did not have a balcony. A Westgate agent told them that if they wanted a balcony, they would have to upgrade to a different unit—contrary to what the sales representative had told them in 2008 when they believed to have purchased unit that included a balcony. Nonetheless, they followed Westgate's instruction and upgraded in August 2010, purchasing a new unit with a balcony for $6,500 plus a $650 yearly maintenance fee, and the right to use it for one week in every even-numbered year.

- 22 -

1344504.22

61.     In July 2012, Westgate again convinced them to upgrade, this time to a two-bedroom "A-B unit" in order to accommodate their growing family.  Because the Spados had previously been unable to reserve time in their units or an equivalent unit, they specifically asked Westgate sales agent Mike Lewis to confirm that they were buying specific units with specific floor plans.  Lewis confirmed that they were, and personally signed and notarized a copy of the two specific floor plans.  The Spados paid $9,888 plus an $800 yearly maintenance fee to upgrade to the two-bedroom "A-B unit," with the right to use it for one week in every even-numbered year.

62.     The Spados were frequently unable to reserve time in their timeshare.  Despite Westgate agents having assured the Spados that they could reserve "their" unit or one with a matching floor plan, the Resort was almost constantly booked on the dates they wanted to use.  In 2015, they were entirely unable to use their timeshare property because it was entirely unavailable on the dates they were available to visit the Resort.  Westgate never disclosed pre-sale that they could only reserve the timeshare by booking a year in advance—long before their vacation dates were clear.

63.     In July 2016, the Spados visited the resort but were unable to stay in a unit with one of the floor plans they had purchased.  A Westgate official informed them that there was an "error" with the "rate codes" in their closing papers, but that Westgate would fix it by offering them an "unheard of" deal to double what they presently own.  The Spados repeatedly declined, notwithstanding the Westgate agent's repeated offers to drop the price.  Eventually, Westage officials told them they would need to sign new closing papers, including a "Foreclosure and Trade Addendum to Contract for Purchase and Sale," authorizing Westgate to put the Spados in

- 23 -

a different unit in the event an equivalent unit was not available. Westgate officials repeatedly harassed them to sign new closing papers while on vacation, and when they declined to do so, Westgate threatened them with eviction from their unit and informed them that they would stay in a motel next time they visited Gatlinburg.

64.     The Spados have not visited the Resort since this time.

### 2.     Plaintiff Marilyn Moore

65.     Plaintiff Marilyn Moore first purchased a timeshare at Westgate Smoky Mountain Resort in August 2008. She bought a one-bedroom unit that Westgate said she was entitled to use for one week every other year, in even-numbered years. Mrs. Moore was told she would pay $5200 every other year, plus an annual maintenance fee of $400, for this unit. The Westgate agent who closed her sale was named Rob Morris.

66.     During the sales pitch, Westgate representatives told Mrs. Moore that the timeshare unit she was purchasing would be available anytime she wanted to use it, provided she booked more than 24 hours in advance of her stay. Westgate agents told her that as an owner, she would have first priority in booking nights at the timeshare resort, and other Westgate resorts. No one from Westgate ever disclosed that she would be unable to book her unit because Westgate oversold the resort.

67.     At first, she was satisfied with her purchase and was able to reserve time in her timeshare, but over the years that changed. In 2010 and 2011, Mrs. Moore repeatedly attempted to reserve time at the resort on dates that she was available to travel. She was almost always unsuccessful, despite making many attempts to do so.

68.     In 2012, Westgate told Mrs. Moore she was required to attend a mandatory

- 24 -

1344504.22

"owners' meeting" about her property. Unbeknownst to Mrs. Moore, this was not actually a group meeting; instead, it was a series of individual meetings in which Westgate officials intensely pressured Mrs. Moore to buy another timeshare unit. In the high-pressure sales pitch, which lasted all day, Westgate sales representatives assured Mrs. Moore that this would solve the availability problem that prevented her from using her timeshare unit.

69.     After sitting through the high-pressure sales pitch, Mrs. Moore agreed to upgrade to a nicer "1-bedroom deluxe" unit on November 16, 2012. Carol Henderson was the closing agent. At the time of the November 2012 transaction, no one at Westgate adequately disclosed to Mrs. Moore that she was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee her ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; or that she had a right to rescind the contract, as described in the legally required Public Offering Statement.

70.     Indeed, on one or more occasions Westgate actually concealed the Public Offering Statement from Mrs. Moore, and failed to inform her of her right to rescind her purchase contract. Westgate agents did not inform Mrs. Moore about the legally required Public Offering Statement, which was concealed in a secret pocket hidden within the black folio it gave her after she completed her transaction.

71.     Mrs. Moore tried multiple times to book her timeshare unit but it was almost never available. Mrs. Moore complained repeatedly that she was unable to use her timeshare unit as promised. Over the course of her attempts, she received numerous contacts from Westgate officials, all of whom told her that there was no availability.

- 25 -

1344504.22

72.     In 2013, Mrs. Moore attended another mandatory all-day "owners' meeting"—really a sales pitch.  In November 2013, a Westgate "concierge"—who was in actuality a salesperson—told Mrs. Moore that the availability problem would be solved if she upgraded again to another unit.  She agreed to purchase a new timeshare unit for $28,900.  No Westgate official disclosed to Mrs. Moore that she had a right to rescind the contract, as described in the legally required Public Offering Statement, which was itself in a secret pocket hidden within the black folio it gave her after she completed her transaction.

73.     Due to Westgate's concealments, Mrs. Moore was unaware that she had a right to rescind any of these transactions until years later.  On one or more occasions, the disclosure of her right to rescission was hidden within the secret pocket on a disc containing the Public Offering Statement.  No Westgate official informed Mrs. Moore about this disc, or her statutory right to rescind the contracts.

74.     All told, Mrs. Moore has spent in excess of $30,000 for a timeshare unit that she has not been able to use as reasonably expected.

75.     Recently, Mrs. Moore learned that tens of thousands of individuals own timeshare properties at the Resort.  Had Westgate disclosed this fact to Mrs. Moore in 2008, 2012, or 2013, she would not have purchased a timeshare unit.

### 3.     Plaintiff Cynthia Loveless

76.     Plaintiff Cynthia Loveless was subjected to Westgate's high-pressure sales tactics on September 27, 2015.  Westgate sales officials monitored her throughout the several-hours-long sales pitch, even standing outside the restroom in order to prevent her from leaving.  As a result of the high-pressure sales tactics, she became tired and hungry and felt pressured to

- 26 -

1344504.22

comply with Westgate's demands in order to leave the premises.

77. After being subjected to these tactics, Ms. Loveless bought a timeshare unit at the Resort on September 27, 2015. At the time of the transaction, no one at Westgate disclosed to Ms. Loveless that she was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee her ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; or that she had a right to rescind the contract, as described in the legally required Public Offering Statement.

78. Indeed, Westgate actually concealed the Public Offering Statement from Ms. Loveless, and failed to inform her of her right to rescind her purchase contract. Westgate agents did not inform Ms. Loveless about the legally required Public Offering Statement, which was concealed in a secret pocket hidden within the black folio it gave her after she completed her transaction.

79. Due to Westgate's concealments, Ms. Loveless was unaware that she had a right to rescind any of these transactions until years later. The disclosure of the right to rescind was hidden within the secret pocket on a disc containing the Public Offering Statement. No Westgate official ever informed Ms. Loveless about this disc, or her statutory right to rescind the contracts.

80. Ms. Loveless tried multiple times to book her timeshare unit but it was never available, and she has not been able to use the Resort even once. Ms. Loveless complained repeatedly that she was unable to use her timeshare unit as promised, but Westgate officials insisted that she must continue to make monthly payments for her unit, despite her inability to use the unit.

- 27 -

1344504.22

81.     Ms. Loveless attempted to instruct her credit card company to stop making payments to Westgate, but Westgate produced a purported contract between it and Ms. Loveless that purported to authorize monthly payments. The contract contained a signature that was not Ms. Loveless's signature.

82.     Ms. Loveless has paid more $18,000 for her timeshare unit to date but has not been able to utilize it.  She would not have purchased the unit had Westgate disclosed to her that she would not be able to stay in her unit because the Resort was oversold, and/or that she had a right to rescind the contract.

### 4.    **Plaintiffs Ellen and Larry Gilliland**

83.     Plaintiffs Ellen and Larry Gilliland were subjected to Westgate's high-pressure sales pitch in December 2015.  After being subjected to these tactics, the Gillilands bought two timeshare units at the Resort on December 14, 2015.  One was a one-bedroom king suite with a balcony and fireplace, while the other was an adjacent two-bedroom unit with balcony and fireplace, which they intended for their family members to use.    Glenn Brown was the Westgate agent who sold them the timeshare units.

84.     The Gillilands paid full price for these units, and a $3,500 life insurance policy that Mr. Brown sold them as part of the deal.  Westgate officials encouraged the Gillilands to obtain a Westgate Mastercard and use it to make a downpayment of $3,647.  At Westgate officials' direction, the Gillilands allowed Westgate to finance the remainder of the $31,401.03 transaction at a 17.99% interest rate.  Westgate sales representatives told the Gillilands that they would be able to refinance the mortgage at a lower rate when they returned home to Florida.

85.     In fact, banks and credit unions decline to finance "high-risk" timeshare

- 28 -

1344504.22

transactions, and the Gillilands were unable to refinance the mortgage.

86.     At the time of the transaction, no one at Westgate disclosed to the Gillilands that they were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; or that they had a right to rescind the contract, as described in the legally required Public Offering Statement.

87.     Indeed, Westgate actually concealed the Public Offering Statement from the Gillilands, and failed to inform them of their right to rescind her purchase contract.  Westgate agents did not inform the Gillilands about the legally required Public Offering Statement, which was concealed in a secret pocket hidden within the black folio it gave them after they completed their transaction.

88.     Due to Westgate's concealments, the Gillilands were unaware that they had a right to rescind any of these transactions until many months later.  The disclosure of their right to rescission was hidden within the secret pocket on a disc containing the Public Offering Statement.  No Westgate official ever informed the Gillilands about this disc, or their statutory right to rescind the contracts.

89.     When the Gillilands attempted to book their units, they were unable to use the unit types that they believed they had purchased.  Instead they were forced to use lesser units that did not match the descriptions of the units they specifically purchased.  When the Gillilands complained to Westgate representatives about the bait-and-switch, they were directed to meet with a "concierge"—in actuality, a salesperson—named Anna, who put them through another

- 29 -

1344504.22

sales pitch, encouraging them to upgrade to another unit.

90.     On May 24, 2016, they spent approximately $2000 to "upgrade" to new units that purportedly conformed with the representations that had previously been made by Westgate.

91.     The Gillilands would not have purchased the units or the upgrades had Westgate disclosed to them that they would not be able to stay in their unit because the Resort was oversold, and/or that they had a right to rescind the contract.

## CLASS ALLEGATIONS

92.     Pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiffs identified above bring this action on behalf of themselves and all other persons similarly situated.  In particular, they seek to represent a class of:

> All residents of the United States and its territories who purchased from Westgate a "floating use plan" vacation timeshare property at the Westgate Smoky Mountain Resort at Gatlinburg since September 25, 2008.

Excluded from the above definition are: Westgate; each of the companies' officers, directors, and employees; any entity in which one or more of the companies has a controlling interest or which has a controlling interest in one or more of the companies, and that entity's officers, directors, and employees; the judge assigned to this case and his or her immediate family; all expert witnesses in this case; and all persons who make a timely election to be excluded from the class.

Plaintiffs reserve their right to allege additional subclasses as warranted.

A.     **Plaintiffs meet the prerequisites of Rule 23(a)**

93.     Numerosity.  The proposed class contains many thousands of individuals who have purchased timeshare properties at the Resort within the limitations period.  The proposed class are thus so numerous that joinder of all members would be impracticable.

- 30 -

1344504.22

94. <u>Commonality</u>. The answers to questions common to the class will drive the resolution of this litigation. Specifically, resolution of this case will be driven by questions relating to Westgate's representations and statements about its timeshare properties at the Resort, Westgate's representations and statements about the proposed class members' ability to use those properties, Westgate's actions in selling those properties to the proposed class members, and Westgate's actions in making the timeshare properties available for use and enjoyment by the proposed class members.

95. The common questions of law and fact include:

      a.     whether Westgate omitted material information to the proposed class members about the nature of the timeshare purchase transaction;

      b.     whether Westgate omitted material information to the proposed class members about the availability of timeshare properties for booking;

      c.     whether Westgate produced a false impression in order to mislead the proposed class members or to obtain an undue advantage over them;

      d.     whether Westgate owed a duty to the proposed class members to disclose omitted information;

      e.     whether Westgate provided proposed class members a legally adequate timesharing plan;

      f.     whether these omissions were material;

      g.     whether Westgate breached its contracts with the proposed class;

      h.     whether Westgate breached it duty of good faith and fair dealing;

      i.     whether Westgate's policies and procedures limit the proposed class

- 31 -

1344504.22

members' ability to use and enjoy the timeshare properties they own;

j.      whether Westgate adequately provided the proposed class with an up-to-date public offering statement that included, among other things, specific rescission language;

k.      whether Westgate adequately provided the proposed class with a contract that included specific rescission language;

l.      whether Westgate utilized a scheme to encourage its closing officers to conceal required disclosures, including the Public Offering Statement, from the proposed class members by hiding them in the folio, compensating them on a commission basis, and failing to train and supervise them;

m.      whether Westgate's actions were deliberate;

n.      whether Westgate's conduct was part of a pattern and practice within Westgate that was designed to reduce the number of contracts that are rescinded;

o.      whether any false warranties, misrepresentations, and material omissions by Westgate caused the proposed class members' injuries;

p.      whether Westgate fraudulently induced the proposed class members to remain in the contract through the rescission period, and

q.      whether Westgate otherwise defrauded the proposed class members; and

r.      whether Westgate should be required to disgorge profits to the proposed class members.

96.     <u>Typicality</u>.  Plaintiffs have the same interests as all members of the class they seek to represent, and all of Plaintiffs' claims arise out of the same set of facts and conduct as all other members of the class.  Plaintiffs and all proposed class members purchased timeshare units

- 32 -

1344504.22

at the Resort in Gatlinburg, Tennessee.  All of the claims of Plaintiffs and the proposed class members arise out of Westgate's omissions of material facts and other wrongful conduct regarding the nature and availability of the timeshare properties it sold to members of the potential class, and its policies and procedures regarding marketing, selling, and facilitating Plaintiffs' and the proposed class members' use of those properties.

97.     Adequacy.  Plaintiffs will fairly and adequately represent and protect the interest of the proposed class members:  Plaintiffs' interests align with those of the class members, and Plaintiffs have no fundamental conflicts with the class.  Plaintiffs have retained counsel competent and experienced in class action consumer fraud litigation, who will fairly and adequately represent the class.

## B.     **Plaintiffs meet the prerequisites of Rule 23(b)(2)**

98.     Westgate has acted and refused to act on grounds that apply generally to the class, so injunctive relief is appropriate with respect to the entire class.

99.     An injunction should be issued declaring that Plaintiffs and proposed class members have a right to rescind the timeshare purchase.  Westgate should be enjoined from using folders containing secret pockets, utilizing a "delayed closing" deed delivery system that invites fraud, violating the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, *et seq*., continuing to breach the contracts described herein, and specifically from selling timeshare properties while restricting purchasers' ability to use them, failing to disclose that their availability is limited, and failing to disclose that purchasers have a right to rescind their purchase.

- 33 -

1344504.22

### C.     Plaintiffs meet the prerequisites of Rule 23(b)(3)

100.     Predominance and Superiority.  The common questions of law and fact enumerated above predominate over the questions affecting only individual members of the class, and a class action is superior to other methods, for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable.  Westgate has acted in a uniform manner with respect to the Plaintiffs and proposed class members.

101.     Westgate Defendants are sophisticated parties with substantial resources, while proposed class members are not, and prosecution of this litigation is likely to be expensive.  Because the economic damages suffered by any individual class member may be relatively modest compared to the expense and burden of individual litigation, and because individual suits pursuing those damages would burden the courts and take many years to complete, it would be impracticable for the many thousands of proposed class members to seek redress individually for Westgate's wrongful conduct as alleged herein.

102.     The fraudulent conduct and ongoing harm to potential class members described above counsel in favor of swiftly and efficiently managing this case as a class action, which preserves judicial resources and minimizes the possibility of serial or inconsistent adjudications.

103.     Plaintiffs and proposed class members have all suffered and will continue to suffer harm and damages as a result of Westgate's unlawful and wrongful conduct.  Absent a class action, class members will continue to be restricted from using their timeshare properties and incur monetary damages, and Westgate's misconduct will continue without remedy, while its ill-gotten profits will grow at the expense of class members.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

- 34 -

1344504.22

104.     There will be no undue difficulty in the management of this litigation as a class action.

**D.     The proposed class is ascertainable.**

105.     The class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the class.  The class consists of purchasers and owners of Westgate timeshare properties in the floating use plan at the Resort, and class membership can be determined using contracts, deeds, receipts, ownership documentation, communications, and records in Westgate's and other databases.

**STATUTES OF LIMITATION, FRAUDULENT CONCEALMENT, AND ESTOPPEL**

**A.     Discovery Rule**

106.     The causes of action did not accrue until Plaintiffs and Class Members discovered, or could have discovered with reasonable diligence, the facts omitted and/or concealed by Westgate.  Plaintiffs and Class Members had no realistic ability to discern the true nature and value of their timeshare property purchases because Westgate's subsequent actions and omissions defined Plaintiffs' ability to use and enjoy their properties.

**B.     Fraudulent Concealment**

107.     Any applicable statutes of limitation have been tolled by Westgate's knowing, active, and ongoing concealment and denial of the material facts as alleged herein.  Westgate is a sophisticated party with superior knowledge of complex real estate and business transactions. Westgate was and is under a continuous duty to disclose to Plaintiffs and Class Members the material facts alleged herein, and Plaintiffs and Class Members reasonably relied on Westgate's knowing, affirmative, and ongoing concealment.

- 35 -

108.     Plaintiffs and the class have been kept ignorant by Westgate of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

**C.**     **Estoppel**

109.     Westgate was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the timeshare properties and transactions as alleged herein.  That concealment is ongoing.  Plaintiffs and Class Members reasonably relied on Westgate's knowing failure to disclose and/or active concealment of those facts.  Westgate is estopped from relying on any statutes of limitation in defense of this action.  Additionally, Westgate is estopped from raising any defense of laches due to its own conduct as alleged herein.

110.     Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Westgate:

a.     ***Who***: Westgate, including each of the alter ego Defendants identified in this Complaint, and their agents, servants, and employees utilized a scheme to encourage the active concealment of legally required disclosures (including but not limited to the fact that Plaintiffs had a right to rescind the purchase) and other material facts about the timeshare transactions from Plaintiffs and Class Members while simultaneously representing that Plaintiffs could use and enjoy their timeshare units whenever they wished, as alleged above.  Plaintiffs are unaware of, and therefore unable to identify, all the names and identities of those specific individuals at Westgate responsible for such decisions, but they include the specific individuals identified in paragraphs 151-154, and Westgate officials David A. Siegel and Richard Siegel.

b.     ***What***: Westgate knows but fails to adequately disclose to purchasers that:

- 36 -

1344504.22

they are not purchasing a share in a specific unit but are instead buying into a "floating use plan," in which each timeshare owner's fractional interest is diluted many times more than if that person purchased the right to use a particular unit; because Westgate artificially restricts the availability of Resort properties, they will not be able to use an expected Resort property when desired, rendering the "floating use plan" inadequate in violation of Tennessee Code Tenn. Code. Ann. § 66-32-107; Westgate encourages and/or allows its commission-based sales and closing agents to use a "secret pocket" to conceal legally required disclosures about the purchasers' rights, including their statutory right to rescind their purchase, in violation of Tennessee Code Tenn. Code. Ann. § 66-32-112(9); Westgate fails to deliver recorded warranty deeds to owners in a timely fashion, or in some cases at all.

       c.     **When**: Westgate concealed material information starting no later than July 1, 2008, and on an ongoing basis, and continuing to this day, as alleged above. Westgate has not adequately disclosed the truth about the true nature and availability of timeshare properties at the Resort, nor purchasers' legal rights including the right to rescind the transaction and receive a warranty deed, to anyone outside of Westgate. Westgate has never taken any action to inform consumers about the true nature and availability of the timeshare properties at the Resort, or purchasers' rights with respect to the transactions. And when consumers complained to Westgate about the unavailability of properties, Westgate denied any knowledge of or responsibility for the problem, in many cases attempting to sell purchasers new or upgraded timeshare properties.

       d.     **Where**: Westgate concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, in its communications with Plaintiffs and Class Members and made contrary representations about the

- 37 -

1344504.22

nature and availability of the timeshare properties. Plaintiffs are aware of no document, communication, or other place or thing, in which Westgate disclosed the truth about the lack of availability of timeshare properties to anyone outside of Westgate. Even where certain legal disclosures were included in the fine print of a sales contract or other purchase document, the documents themselves were often concealed from Plaintiffs and Class Members by commission-based sales and closing agents through the use of a folio containing a secret pocket and the other high-pressure sales tactics described herein.

e. ***How***: Westgate concealed material information regarding the true nature and availability of the timeshare properties, and purchasers' rights in the transaction, at all times, even though it knew about the lack of availability of timeshare properties due to Westgate's artificial restriction of them, and about the legally required disclosures (including the right to rescind), and knew that this information would be important to a reasonable consumer. Westgate concealed this information by using high-pressure sales tactics, commission-based sales agents, and a black folio containing a secret pocket which closing agents could use so that purchasers would not be able to find material information (including legally required disclosures) relating to their timeshare transaction.

f. ***Why***: Westgate actively concealed material information about the timeshare transactions, the legally inadequate floating use plan, the purchasers' ability to use and enjoy their purchase, and each purchaser's right to rescind the transaction for the purpose of inducing Plaintiffs and Class Members to purchase timeshare properties and, once they owned timeshare properties, to purchase additional timeshare properties and services from Westgate. Had Westgate disclosed the truth, for example in its sales pitches, advertisements, or other

- 38 -

1344504.22

materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought timeshare properties (including by exercising their right to rescind their purchase contracts), or would have paid less for them.

**COUNT ONE**
**VIOLATIONS OF THE TENNESSEE TIME-SHARE ACT OF 1981/RESCISSION PURSUANT TO THE TENNESSEE TIME-SHARE ACT OF 1981**

**The Secret Pocket**
**(Against all Defendants)**

111. Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

112. Tenn Code. Ann. §66-32-101, *et seq*., entitled the Tennessee Time-share Act of 1981 (the "Tennessee Time-share Act"), regulates sellers of time-share interests, and this statute applies to and governs the conduct of the Defendants.

113. Tenn. Code Ann. §66-32-112 affirmatively requires Westgate to provide Plaintiffs with the Public Offering Statement for the Resort. Tenn. Code Ann. §66-32-112 provides that a public offering statement "must contain" or "fully and accurately disclose" fifteen different categories of factual information, including, but not limited to, the name and address of the developer, a description of the building units (including completion dates), the type and number of units, a budget and information regarding fees that will be charged, a list of liens and encumbrances, and specific rescission language.

114. Tenn. Code Ann. §66-32-112(9) requires a time-share developer to include the following language in its Public Offering Statement:

> A statement that within ten (10) days from the date of the signing of the contract made by the purchaser, where the purchaser shall

- 39 -

have made an on-site inspection of the time-share project prior to the signing of the contract of purchase, and where the purchaser has not made an on-site inspection of the time-share prior to the signing of the contract of purchase fifteen (15) days from the date of the signing of the contract, the purchaser may cancel the contract for the purchase of a time-share interval from the developer.

115.    Tenn. Code Ann. §66-32-114 provides that a time-share purchase contract is voidable until the purchaser has received the Public Offering Statement. Tenn. Code Ann §66-32-116 requires Westgate to amend its Public Offering Statements to report any material changes to the information required by Tenn. Code Ann. §66-32-112.

116.    Tenn. Code Ann. §66-32-118 provides the Plaintiffs with a claim for relief, including punitive damages and attorney's fees, for Westgate's failure to provide the Public Offering Statement. Tenn. Code Ann. §66-32-119 contemplates a private right of action for rescission and damages.

117.    Tenn. Code Ann. §66-32-121(a) provides that the Tennessee Real Estate Commission may adopt rules and regulations "in furtherance of the objectives" of the Tennessee Time-share Act. Pursuant to Tenn. Code Ann. §66-32-121(a), the Tennessee Real Estate Commission has adopted various rules which were in effect at the time of the transaction described in this Complaint. These rules include, inter alia, the following:

> **1260.06.02    RECEIPT OF PUBLIC OFFERING STATEMENT**. Before transfer of a time-share interval and no later than the date of any sales contract, the developer shall obtain from the purchaser a signed and dated receipt for the public offering statement (and any amendments and supplements thereto) provided in accordance with Tenn. Code Ann. §66-32-112. **The receipt shall specify the number of pages in the public offering statement as filed with the Commission**. The developer shall retain such receipt for a period of four (4) years from the date thereof.

- 40 -

1344504.22

...

## 1260.06.04     DISCLOSURE OF RESCISSION RIGHTS.

The following statement shall appear in boldface and conspicuous type in:

    (1)    Every public offering statement; and

    (2)    **Every contract for the sale of a time-share interval, immediately above the space reserved for the signature of the purchaser**:

"You May Cancel a Contract to Purchase a Time-Share Interval within Ten (10) Days from the Date of the Signing of the Contract, Where You Have Made an On-Site Inspection of the Time-Share Project Before Signing the Contract, and, if You Have Not Made Such an Inspection, within Fifteen (15) days from the Date of the Signing of the Contract. If You Elect to Cancel, You May Do So by Hand Delivering Notice to the Seller at [insert address] within the Designated Period, or by Mailing Notice to the Seller (or His Agent for Service of Process) by Prepaid United States Mail at [insert address] Postmarked Anytime within the Designated Period."

(Emphasis added.)

    118.    In short, The Tennessee Time-Share Act establishes very clear requirements regarding the delivery of proper public offering statements and purchase contracts to time-share purchasers. Westgate was required to provide the Plaintiffs with an up-to-date public offering statement that included, among other things, specific rescission language.

    119.    Westgate was also required to provide the Plaintiffs with a contract that included specific rescission language.

    120.    By using a folio containing a secret pocket, compensating closing agents on commission, and encouraging and/or allowing them to hide the public offering statement and the contract in a secret pocket, Westgate willfully circumvented these requirements.

- 41 -

1344504.22

121.     This conduct is part of a pattern and practice within Westgate that is designed to reduce the number of contracts that are rescinded.  Specifically:

A.      Westgate designs and/or buys folios that contain a secret or hidden pocket.

B.      Westgate utilizes a compensation system that penalizes its closing agents when customers rescind their contracts.

C.      Sales at Westgate often follow a predictable pattern in that there is typically a lengthy and high pressure sales pitch by the sales agent or agents assigned to a particular customer, followed by a closing with a different closing agent.  The sales agents do not typically attend the closing.

D.      By the time of the closing, the customers are necessarily tired and worn down from the sales pitch.

E.      During the closing, customers are presented with numerous documents to sign in short order, with minimal or incorrect explanation by the closing officer, and without the opportunity to fully review the documents.  Documents signed at closing might typically include a settlement statement, power of attorney, allonge, acknowledgement of representations, truth in lending disclosure, acknowledgment of recording, and other documents.

G.      Following the closing, the closing officer typically takes all of the closing documents that have been signed away to be copied.

H.      Later, the purchasers are presented with a black folio to conclude the sales process.  Typically the black folio contains numerous documents, including, but not limited to, sales brochures, maps, resort directories, information regarding

- 42 -

1344504.22

Interval International, and other booklets and brochures.

122.    Defendants incentivize the closing agent and/or sales staff to a) not mention or downplay that the purchasers have a statutory right of rescission; b) encourage the purchasers to sign the purchase contract and public offering statement receipt without fully examining the purchase contract and the public offering statement, and c) place the purchase contract and the public offering statement in the secret pocket so that the purchasers will not realize they are in possession of these documents, and will not recognize that they have a statutory right of rescission.

123.    Westgate's use of a secret or hidden pocket is well known among Defendants' sales staff, who sometimes refer to the pocket as the "secret pocket," and it is the subject of numerous consumer complaints and internet posts.  *See* Brinkmann, "Westgate Resorts denies hiding cancellation documents," Orlando Sentinel (Sept. 30, 2015), *available at* [https://www.orlandosentinel.com/business/brinkmann-on-business/os-westgate-resorts-cancellation-20150930-post.html](https://www.orlandosentinel.com/business/brinkmann-on-business/os-westgate-resorts-cancellation-20150930-post.html).

124.    This process was followed in Plaintiffs' experience at Westgate.  Plaintiffs were worn down by lengthy, high-pressure sales pitches, and were not provided adequate disclosures about their rights or their purchase.

125.    Plaintiffs, despite exercising reasonable diligence, did not know that certain disclosures were mandated by Tennessee law and they did not know that their contract and their public offering statement were often hidden in the secret pocket.  Plaintiffs did not realize that they were missing documents, and they were not told that they had a statutory right of rescission.

126.    By utilizing a system whereby closing agents use folios containing a secret

- 43 -

1344504.22

pocket, which incentivizes the closing agents to avoid giving the Plaintiffs the disclosures that they are required by law to give, Westgate willfully violated the Tennessee Time-share Act.

127.    All of Westgate's sales agents and closing agents' actions were in the course and scope of their employment with Westgate and for the benefit of Westgate as well as for themselves, and Westgate is liable for their actions under the doctrine of respondeat superior.

128.    Accordingly, for its various violations of the Tennessee Time-share Act and the Rules of the Tennessee Real Estate Commission, which implement the Tennessee Time-share Act, all as described herein, Defendants are liable to the Plaintiffs.  Specifically, pursuant to Tenn. Code Ann. §66-32-118(a), Plaintiffs respectfully request that they be granted rescission of the contracts, compensatory damages, punitive damages, attorney's fees, and other relief.

## COUNT TWO
## VIOLATIONS OF THE TENNESSEE TIME-SHARE ACT OF 1981/RESCISSION PURSUANT TO THE TENNESSEE TIME-SHARE ACT OF 1981

### (Against all Defendants)

129.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

130.    In addition to the provisions discussed in Count One, the Tennessee Time-share Act, Tenn. Code Ann. §66-32-102, defines "advertisement" to include "any...verbal... offer by an individual..."

131.    Tenn. Code Ann. §66-32-132(1) provides that no advertising for the sale of a time-share shall contain any representation regarding the availability of a resale or rental program.

132.    Tenn. Code Ann. §66-32-132(2) provides that no advertising for the sale of a

- 44 -

1344504.22

time-share shall C=contain an offer or inducement to purchase which purports to be limited as to quantity or restricted as to time unless the numerical quantity and/or time applicable to the offer or inducement is clearly and conspicuously disclosed.

133.     Tenn. Code Ann. §66-32-132(3) provides that no advertising for the sale of a time-share shall contain any statement regarding the investment merit or profit potential of a time-share interval unless it has been approved by the State.

134.     Tenn. Code Ann. §66-32-132(9) provides that no advertising for the sale of a time-share shall misrepresent the nature or extent of any services incident to the time-share project.

135.     Tenn. Code Ann. §66-32-132(11) provides that no advertising for the sale of a time-share shall make any misleading or deceptive representation with respect to the contents of the time-share program, the purchase contract, the purchaser's rights, privileges, benefits, or obligations under the purchase contract or the Time-share Act.

136.     Defendants violated these provisions of the Tennessee Time-share Act by omitting, failing to make, or hiding material facts and required disclosures, all as described in this Complaint. Specifically, Defendants utilize folders containing a secret pocket, compensate their sales and closing agents on a commission basis, encourage and/or allow them to conceal material facts from consumers regarding the lack of unit availability due to Defendants' practice of overselling the Resort, delay the frequent deliveries of deeds, fail to disclose consumers' statutory rights to rescind, and other material facts alleged in this Complaint.

137.     Westgate's sale and closing agents made these representations in the course and scope of their employment with Westgate, and for Westgate's benefit.  Accordingly, Westgate is

- 45 -

1344504.22

liable for their actions pursuant to the doctrine of respondeat superior.

138.    Upon information and belief, Defendants also violated Tenn. Code Ann. § 66-32-113 and its implementing regulations (Tenn. Comp. R. & Regs. 1260-06-.03) by failing to deposit into and maintain funds paid by timeshare purchasers in an escrow account in this state, for the duration of the cancellation period.

139.    Accordingly, for their various violations of the Tennessee Time-share Act and the Rules of the Tennessee Real Estate Commission, which implement the Tennessee Time-share Act, all as described herein, Defendants are liable to Plaintiffs.  Specifically, pursuant to Tenn. Code Ann. §66-32-118(a), Plaintiffs respectfully request that they be granted rescission of the contracts, compensatory damages, punitive damages, attorneys' fees, and other relief.

**COUNT THREE**
**UNJUST ENRICHMENT**

**(Against all Defendants)**

140.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

141.    Plaintiffs and Class Members conferred benefits upon Westgate in the form of down payments, monthly mortgage payments, recurring maintenance fee payments, and additional fee and membership payments for property at the Resort and membership in Westgate's timeshare and other programs.

142.    Those payments were made with the reasonable expectation that Westgate was selling timeshare properties that could be used and enjoyed by Plaintiffs as represented by Westgate agents, and that Westgate was complying with the Tennessee Time-Share Act and the Tennessee Consumer Protection Act.

- 46 -

1344504.22

143.     It would be unjust to permit Westgate to keep the payments made by Plaintiffs and Class Members because Westgate induced Plaintiffs and Class Members to make those payments by failing to disclose the facts material to the transactions.

144.     Plaintiffs, on behalf of themselves and the proposed Class, seek restitution.

## COUNT FOUR
## FRAUDULENT MISREPRESENTATION BY OMISSION

### (Against all Defendants)

145.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

146.     Defendants engaged in a high-pressure sales pitch designed to induce the Plaintiffs to make a significant financial decision in a short time span with inaccurate information.

147.     Westgate represented to the Plaintiffs and Class Members that as timeshare owners, they would have no difficulty using their timeshare and would have ample access to reservations.

148.     Westgate represented that it was a timeshare seller in Tennessee, meaning it had an affirmative duty under the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, *et seq*., to make certain disclosures, as described in Counts One and Two, incorporated by reference herein.  Defendants were required to fully and accurately disclose factual information about the property and the purchaser's rights with respect thereto, including but not limited to: reasonable arrangements for management and operation of the time-share program, the type and number of units, a budget and information regarding fees that will be charged, specific language informing the purchaser of his, her, or their right to rescind the agreement, and a public offering statement,

- 47 -

1344504.22

which if not received by the purchaser renders the contract voidable.

149. Westgate represented that it was a Tennessee real estate licensee, meaning Defendants—specifically Westgate Marketing, LLC—were required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and timely and accurate information regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

150. Westgate utilized a scheme to confuse consumers regarding their rights and avoid making required disclosures of material fact while selling the timeshares to Plaintiffs and Class Members.

151. In carrying out the above-described scheme and failing to make the above-described disclosures and/or intentionally hiding them so that the Plaintiffs would not see them, the Defendants fraudulently omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs.

152. Westgate intended for the Plaintiffs and Class Members to rely on its representations of material fact when the Plaintiffs and Class Members purchased timeshare interests, and Plaintiffs and Class Members did indeed rely on its representations.

153. Specifically, Westgate agents Gayla Harvey, Ernie Davis, Trina Jones, Mike Lewis, and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiffs Ryan and Laura Spado in connection with their timeshare purchases in July 2008, August 2010, and July 2012. Among these facts, Westgate failed to adequately disclose that: the Spados were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the

- 48 -

Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Spados had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Spados, as more fully described above.

154.    Similarly, Westgate agents Lou Ann Scholler, Rob Morris, Carol Henderson, Preston Waller, and/or other agents whose names are not known to Plaintiffs failed to adequately disclose material facts to Plaintiff Marilyn Moore in connection with her timeshare purchases in August 2008, November 2012, and November 2013.  Among these facts, Westgate failed to disclose that: Moore was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee her ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; she had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Moore, as more fully described above.

155.    Similarly, Westgate agents Glenn Brown, Isabel Liz, Charles McCoy, Ramon Larracuente, Jr., and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiffs Ellen and Larry Gilliland in connection with their timeshare purchases in December 2015 and May 2016.  Among these facts, Westgate failed to disclose that: the Gillilands were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; and they had a right to rescind the contract, as described in the

1344504.22

legally required Public Offering Statement, which Westgate by its agents concealed from the Gillilands, as more fully described above.

156.     Similarly, Westgate agent Michael Larochelle and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiff Cynthia Loveless in connection with her timeshare purchase September 2015.  Among these facts, Westgate failed to disclose that: Loveless was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee her ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; she had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Loveless, as more fully described above.

157.     Defendants knew, or should have known, that they were omitting and failing to make certain required disclosures.  The omissions described herein were material in nature, and were made to induce the Plaintiffs to enter a contract and purchase a time-share interest. Plaintiffs reasonably and justifiably relied upon Defendants' representations that omitted material facts in deciding to purchase the time-share interests.  Defendants knew of the falsity of the representations, or had utter disregard for their truth, when they were made.  Defendants intended to induce reliance upon the representations.  Plaintiffs were entitled to rely upon the representations, since the representations concerned complex matters of Westgate programs and real estate law, and since Westgate sales agents are time-share sales agents licensed by the State of Tennessee.  Plaintiffs' reliance was reasonable under the circumstances.

158.     Plaintiffs were injured and damaged by virtue of their reasonable reliance on these

- 50 -

1344504.22

representations containing omissions.  Had Plaintiffs known the truth, they would not have purchased the timeshares.

159.    Defendants' omissions were intentionally made for the purpose of inducing the Plaintiffs to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights.  Westgate sales agent work on commission, and received commissions from the sale to the Plaintiffs.  In the alternative, if the Defendants' omissions were not intentional, they were grossly negligent, as the Defendants knew or should have known the truth regarding Westgate, its policies, and its procedures.

160.    At all times relevant, the sales agents and other individuals described herein were acting as agents of Westgate, and their actions, which were performed in the scope of their employment with Westgate, are attributable to Westgate pursuant to the doctrine of respondeat superior.

161.    For all of the reasons set forth herein, the Plaintiffs were induced to purchase a time-share interest from Westgate by fraud.  The omissions of material fact, combined with the high-pressure sales pitch, and the confusing nature of the written documents between the parties were all part of a scheme devised to induce the Plaintiffs to buy a time-share from Westgate at substantial cost to the Plaintiffs without complying with Tennessee law.

162.    The sale, and any contract between the parties, should be rescinded, with all sums paid returned to the Plaintiffs and with the time-share interest returned to Westgate.  In addition, the Plaintiffs should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent conduct of the Defendants.

- 51 -

1344504.22

## COUNT FIVE
## FRAUD IN THE INDUCEMENT

### (Against all Defendants)

163.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

164.    Defendants engaged in a high-pressure sales pitch designed to induce the Plaintiffs to make a significant financial decision in a short time span with inaccurate information.

165.    Defendants had an affirmative duty under the Tennessee Time-Share Act, Tenn. Code Ann. § 66-32-101, *et seq*., to make certain disclosures, as described in Counts One and Two, incorporated by reference herein.  Defendants were required to fully and accurately disclose factual information about the property and the purchaser's rights with respect thereto, including but not limited to: the type and number of units, a budget and information regarding fees that will be charged, specific language informing the purchaser of his, her, or their right to rescind the agreement, and a public offering statement, which if not received by the purchaser renders the contract voidable.

166.    As Tennessee real estate licensees, Defendants—specifically Westgate Marketing, LLC—were required to disclose to each party to the transaction any adverse facts of which they had actual notice or knowledge, and timely and accurate information regarding market conditions that might affect the transaction; and they were required to provide services to each party to the transaction with honesty and good faith.

167.    By utilizing a scheme to avoid making the above-described disclosures and/or intentionally hiding them so that the Plaintiffs would not see them, the Defendants fraudulently

- 52 -

1344504.22

omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs.

168.     Specifically, Westgate agents Gayla Harvey, Ernie Davis, Trina Jones, Mike Lewis, and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiffs Ryan and Laura Spado in connection with their timeshare purchases in July 2008, August 2010, and July 2012.  Among these facts, Westgate failed to adequately disclose that: the Spados were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into a "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; the Spados had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Spados, as more fully described above.

169.     Similarly, Westgate agents Lou Ann Scholler, Rob Morris, Carol Henderson, Preston Waller, and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiff Marilyn Moore in connection with her timeshare purchases in August 2008, November 2012, and November 2013.  Among these facts, Westgate failed to adequately disclose that: Moore was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee her ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; she had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Moore, as more fully described above.

1344504.22

170.    Similarly, Westgate agents Glenn Brown, Isabel Liz, Charles McCoy, Ramon Larracuente, Jr., and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiffs Ellen and Larry Gilliland in connection with their timeshare purchases in December 2015 and May 2016.  Among these facts, Westgate failed to adequately disclose that: the Gillilands were not purchasing the right to use a specific unit or even type of unit, but were instead purchasing into an inadequate "floating use plan" that would not guarantee their ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing them from utilizing their timeshare property; and they had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from the Gillilands, as more fully described above.

171.    Similarly, Westgate agent Michael Larochelle and/or other agents whose names are not known to Plaintiffs failed to disclose material facts to Plaintiff Cynthia Loveless in connection with her timeshare purchase September 2015.  Among these facts, Westgate failed to adequately disclose that: Loveless was not purchasing the right to use a specific unit or even type of unit, but was instead purchasing into a "floating use plan" that would not guarantee her ability to stay at the Resort; Westgate regularly and systematically oversold the Resort, preventing her from utilizing her timeshare property; she had a right to rescind the contract, as described in the legally required Public Offering Statement, which Westgate by its agents concealed from Loveless, as more fully described above.

172.    Defendants knew, or should have known, that they were omitting and failing to make certain required disclosures.  The omissions described herein were material in nature, and were made to induce the Plaintiffs to enter a contract and purchase a time-share interest.

- 54 -

1344504.22

Plaintiffs reasonably and justifiably relied upon Defendants' representations that omitted material facts in deciding to purchase the time-share interests. Defendants knew of the falsity of the representations, or had utter disregard for their truth, when they were made. Defendants intended to induce reliance upon the representations. Plaintiffs were entitled to rely upon the representations, since the representations concerned complex matters of Westgate programs and real estate law, and since Westgate sales agents are time-share sales agents licensed by the State of Tennessee. Plaintiffs' reliance was reasonable under the circumstances.

173. Plaintiffs were injured and damaged by virtue of their reliance on these representations containing omissions. Had Plaintiffs known the truth, they would not have purchased the time-shares.

174. Defendants' omissions were intentionally made for the purpose of inducing the Plaintiffs to enter a contract, close the sale, and remain in the contract without knowing about their rescission rights. Westgate sales agent work on commission, and received commissions from the sale to the Plaintiffs. In the alternative, if the Defendants' omissions were not intentional, they were grossly negligent, as the Defendants knew or should have known the truth regarding Westgate, its policies, and its procedures.

175. At all times relevant, the sales agents and other individuals described herein were acting as agents of Westgate, and their actions, which were performed in the scope of their employment with Westgate, are attributable to Westgate pursuant to the doctrine of respondeat superior.

176. For all of the reasons set forth herein, the Plaintiffs were induced to purchase a time-share interest from Westgate by fraud. The omissions of material fact, combined with the

1344504.22

high-pressure sales pitch, and the confusing nature of the written documents between the parties were all part of a scheme devised to induce the Plaintiffs to buy a time-share from Westgate at substantial cost to the Plaintiffs without complying with Tennessee law.

177.     The sale, and any contract between the parties, should be rescinded, with all sums paid returned to the Plaintiffs and with the time-share interest returned to Westgate.  In addition, the Plaintiffs should recover all damages and other relief to which they are entitled, including punitive damages, which are warranted for the intentional deceptive, unfair, and fraudulent conduct of the Defendants.

## COUNT SIX
## NEGLIGENT MISREPRESENTATION BY OMISSION

### (Against All Defendants)

178.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

179.     Westgate sales agents are licensed as time-share salesmen by the State of Tennessee.  In addition, Westgate (through related entity Westgate Marketing, LLC) serves as a broker for these licensees.  Defendants are agents, servants, partners, aiders and abettors, co-conspirators and/or joint venturers, and subject to a unity of interest, ownership, and control, and are alter egos of one another, as more fully alleged above.

180.     Defendants and Westgate sales agents are governed by the Tennessee Real Estate Commission.

181.     Tenn. Code Ann. §62-13-403 provides, in relevant part, that real estate licensees in Tennessee owe "all parties" to a real estate transaction the following duties:

### §62-13-403.  Duties owed to all parties

- 56 -

1344504.22

A licensee who provides real estate services in a real estate transaction shall owe all parties to the transaction the following duties, except as provided otherwise by §62-13-405, in addition to all other duties specifically set forth in this chapter or the rules of the commission:

(1)     Diligently exercise reasonable skill and care in providing services to all parties to the transaction;

(2)     Disclose to each party to the transaction any adverse facts of which the licensee has actual notice of knowledge;

(3)     Maintain for each party to a transaction the confidentiality...;

(4)     Provide services to each party to the transaction with honesty and good faith;

(5)     Disclose to each party to the transaction timely and accurate information regarding market conditions that might affect the transaction only when information is available through public records and when the information is requested by a party;

(6)     Timely account for trust fund deposits...; and

(7)     ...

182.     Defendants and their sales agents also had a duty to disclose material facts that affected the timeshare property's value and were not known or reasonably discoverable by Plaintiffs and the proposed class through the exercise of ordinary diligence.

183.     As described in this Complaint, Defendants and their sales agents breached these duties, and, in fact, intentionally defrauded the Plaintiffs rather than provide them with accurate information honestly and in good faith.  Defendants, in the course of their business and in the course of a transaction in which they had a pecuniary interest, supplied false information for the guidance of Plaintiffs and proposed class members, omitted material facts about the transaction

- 57 -

1344504.22

affecting the property's value, and failed to exercise reasonable care or competence in obtaining or communicating that information.

184.    Defendants and their sales agents knew, among other facts described herein, that Plaintiffs and proposed class members were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiffs and proposed class members would not be able to use a Resort property when desired due to Westgate's artificial restriction of availability; and that Plaintiffs and proposed class members had a right to rescind their timeshare purchase under Tennessee law.  They failed to disclose these material facts to Plaintiffs, as more fully described herein.

185.    Defendants and their sales agents did this for their own pecuniary benefit, in the form of commissions and increased payments to Westgate.

186.    Defendants' omissions of material fact described herein constituted material inducements to Plaintiffs and proposed class members to purchase timeshare property at Westgate Smoky Mountain Resort, to pay other charges and fees at the time of purchase, to upgrade to purportedly superior properties, and to pay charges and fees during the period of ownership.

187.    Plaintiffs were entitled to rely upon the representations of the Defendants and their sales agents, given the respective position of the parties and the duties owed by real estate licensees and sellers of real property.  Ordinary diligence by Plaintiffs would not have revealed the undisclosed facts.  Plaintiffs and proposed class members were induced to act by the representations of Defendants and their sales agents, and did act, in ignorance of the falsity of the representations and with a reasonable belief that the representations were true. Plaintiffs' reliance

- 58 -

1344504.22

was reasonable and justifiable, and caused them to be damaged.

188.   At the time the statements omitting material facts were made, Defendants and their sales agents knew that they were false.  In short, Defendants and their sales agents deceived the Plaintiffs intentionally and for the purpose of closing the sale, for the benefit of themselves (via their commissions) and for the benefit of Westgate, breaching duties owed to Plaintiffs and proposed class members.

189.   For all of these reasons, the Contract should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs, and for punitive damages.

## COUNT SEVEN
## BREACH OF CONTRACT (IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

### (Against all Defendants)

190.   Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

191.   Plaintiffs and members of the proposed class contracted with Defendants to purchase timeshare properties at Westgate Smoky Mountain Resort.

192.   Good faith is an element of every contract pertaining to the purchase of timeshare property.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute

- 59 -

1344504.22

examples of bad faith in the performance of contracts.

193.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

194.    Defendants breached their timeshare purchase contracts with Plaintiffs and proposed class members, and specifically the covenant of good faith and fair dealing, through Defendants' omissions, misrepresentations, and practices as alleged herein.

195.    Plaintiffs and proposed class members have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

196.    Plaintiffs and proposed class members have sustained damages as a result of Defendants' breach of the contract.

197.    As a result of these breaches, the contracts should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs and proposed class members, and for punitive damages.

## COUNT EIGHT
## BREACH OF CONTRACT

### (Against all Defendants)

198.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

199.    Plaintiffs and members of the proposed class contracted with Defendants to purchase timeshare properties at Westgate Smoky Mountain Resort.

- 60 -

200.     Defendants breached their timeshare purchase contracts with Plaintiffs and proposed class members through Defendants' omissions, misrepresentations, and practices as alleged herein, specifically including (but not limited to) Defendants' failure to adequately disclose to Plaintiffs and proposed class members that Westgate artificially restricted the availability of timeshare units, Defendants' scheme to avoid providing required disclosures, and Defendants' failure to provide the Plaintiffs and proposed class members the opportunity to use and enjoy their purchases.

201.     Plaintiffs and proposed class members have performed all, or substantially all, of the obligations imposed on them under the subject contracts.

202.     Plaintiffs and proposed class members have sustained damages as a result of Defendants' breach of the contract, including but not limited to the funds lost as described herein, and the lack of use and enjoyment of the timeshare properties purchased by Plaintiffs.

203.     As a result of these breaches, the contracts should be rescinded, and Defendants should be liable for the damages they have caused Plaintiffs and proposed class members, and for punitive damages.

## COUNT NINE
## CIVIL CONSPIRACY

### (Against all Defendants)

204.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

205.     Defendants agreed to join a conspiracy related to defrauding consumers in the purchase of timeshare properties seemingly, but not actually, in compliance with the law of Tennessee.

- 61 -

1344504.22

206. The conspiracy had a common design, jointly and knowingly established by Defendants acting through their agents and employees.

207. Defendants knew that the object of this conspiracy was to market and sell timeshare properties to Plaintiffs and proposed class members, without disclosing, among other material facts described herein, that Plaintiffs and proposed class members were not buying a share in a specific unit but were instead buying into a "floating use plan"; that Plaintiffs and proposed class members would not be able to use a Resort property when desired due to Westgate's artificial restriction of availability; and that Plaintiffs and proposed class members had a right to rescind their timeshare purchase under Tennessee law. The objects of the conspiracy were fraud, breach of contract, unjust enrichment, negligent misrepresentation, and/or violations of the Tennessee Time-Share Act, as described more fully herein. Defendants knew that these objects were unlawful and would be accomplished by unlawful means such as fraud, misrepresentations, and omissions.

208. Defendants had a meeting of the minds on the object of or course of action for this conspiracy. Defendants knew and agreed upon the unlawful object or course of action for this conspiracy. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs.

209. As described above, Defendants committed multiple unlawful and overt acts to further the object or course of action for this conspiracy as described above.

210. These unlawful acts proximately caused the damages suffered by Plaintiffs. Accordingly, Plaintiffs are entitled to recover their actual damages, plus costs, attorneys' fees, and pre-judgment interest and post-judgment interest.

- 62 -

1344504.22

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiffs respectfully request:

211.    This action to be certified pursuant to Fed. R. Civ. P. 23 (b)(2), (b)(3), and (c)(4) as a class action on behalf of the proposed Class and subclasses, as warranted; that the named Plaintiffs be appointed as Class Representatives; and that counsel below be designated Class Counsel;

212.    That an injunction be issued declaring that Plaintiffs' and proposed class members' have a right to rescind the timeshare purchase contracts and that Defendants must disgorge profits received from them; and enjoining Defendants from using folders containing secret pockets, utilizing a "delayed closing" deed delivery system that invites fraud, violating the Tennessee Time-Share Act, continuing to breach the contracts described herein, and specifically from selling timeshare properties while restricting purchasers' ability to use them, failing to disclose that their availability is limited, and failing to disclose that purchasers have a right to rescind their purchase.

213.    Judgment to be entered against all Defendants on all causes of action and damages suffered;

214.    Plaintiffs and the Class be awarded the full, fair, and complete recovery for all causes of action and damages suffered;

215.    Plaintiffs and the Class be awarded rescission, damages, punitive damages, restitution, attorneys' fees, and costs.

216.    Plaintiffs and the Class be awarded all appropriate costs, fees, expenses, and pre-judgment and post-judgment interest, as authorized by law; and

- 63 -

1344504.22

217.    Such other relief that the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

Dated: September 25, 2018  Respectfully submitted,

          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


          By: /s/ Mark P. Chalos

          Mark P. Chalos (BPR #19328)
          John T. Spragens (BPR #031445)
          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
          222 2nd Avenue South, Suite 1640
          Nashville, TN 37201
          Telephone: 615.313.9000
          Facsimile: 615.313.9965
          mchalos@lchb.com
          jspragens@lchb.com

          *Attorneys for Plaintiffs and the Proposed Class*

Dated: September 25, 2018  Respectfully submitted,

          FARMER PURCELL WHITE & LASSITER, PLLC


          By: /s/ John O. Belcher

          John O. Belcher, Esq. (BPR #018335)
          150 Fourth Avenue North, Suite 1820
          Nashville, TN 37219
          Telephone: 615.810.8777
          Facsimile: 615.810.8770
          jbelcher@fpwlegal.com

          *Co-Counsel for the Plaintiffs*

- 64 -

1344504.22

Dated: September 25, 2018                  RITCHIE, DILLARD, DAVIES & JOHNSON, P.C.

By: /s/ Wayne A. Ritchie II

Wayne A. Ritchie II (BPR #013936)
606 W. Main Street, Suite 300
P.O. Box 1126
Knoxville, TN 37901-1126
Phone: 865.524.8444
war@rddjlaw.com

*Co-Counsel for the Plaintiffs*


Dated: September 25, 2018                  WALLACE & ASSOCIATES

By: /s/ Richard T. Wallace

Richard T. Wallace, Esq. (BPR #010151)
Parkway Professional Plaza
109 Parkway - Suite 2
Sevierville, TN  37862
Telephone:  865.453.1143
Facsimile:  865.453.5448
wallace@rwallacelaw.net

*Co-Counsel for the Plaintiffs*

- 65 -

1344504.22