| | | |
|---|---|---|
| MARILYN MOORE, et al., individually and<br>on behalf of all others similarly situated | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.: 3:18-cv-00410 |
| | ) | |
| WESTGATE RESORTS, LTD., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR PROTECTIVE ORDER FROM
PLAINTIFFS' NOTICE OF CORPORATE REPRESENTATIVE DEPOSITION**

Defendants Westgate Resorts, Ltd., Central Florida Investments, Inc., Westgate Resorts, Inc., Westgate Marketing, LLC, Westgate Vacation Villas, LLC, and CFI Resorts Management, Inc. (collectively, "Defendants"), pursuant to Rules 26 and 30, file this Motion for Protective Order, and respectfully show as follows.

**I.**
**INTRODUCTION**

Plaintiffs' own testimony establishes they cannot satisfy the requirements for class certification. Now, Plaintiffs are seeking discovery in search of a claim, a classic fishing expedition outside the bounds of permissible discovery and not proportional to the needs of the case. As set forth below, the Court should enter a protective order. As the Court is aware, Plaintiffs assert individual claims and attempt to assert class claims against six Westgate entities. Three of those entities—Westgate Resorts, Ltd., CFI Resorts Management, Inc., and Westgate Marketing, LLC (collectively, "Resort Defendants")—are involved with the Westgate Smoky Mountain Resort at Gatlinburg (the "Resort."). The other three Defendants (collectively, "Non-Resort Defendants") are not involved with the Resort and have filed a motion to dismiss for lack

of personal jurisdiction.[1]  Doc. Nos. 48-49.  Notwithstanding Plaintiffs conclusory allegations, the factual allegations are limited to alleged fraud and misrepresentations in the sales and/or closing process, alleged concealment of required documents in a so-called "secret pocket," and an alleged inability to make reservations to stay at the Resort.  Doc. No. 46.  All Defendants have filed a motion to dismiss on numerous grounds.  Doc Nos. 48-49.

Plaintiffs previously requested every document and every byte of data relating to every aspect of Westgate's business for an 11-year period, regardless of any relation to the facts.  In response, Resort Defendants did what Plaintiffs should have done, defined what might actually be relevant to this case and produced responsive documents.  Thus, Resort Defendants produced everything they had relating to the Named Plaintiffs, and discovery as to the Named Plaintiffs is not in dispute.  And as to Plaintiffs' class allegations, Resort Defendants produced electronic information relating to the putative class of over 73,000 timeshare owners, including the owners' information and details relating to their purchases, along with policy-level documents and emails relating to the sales, closing, and reservations processes, and training for the employees involved, among many other documents.  Although Resort Defendants dispute that any discovery is necessary to resolve Plaintiffs fraud-based class allegations, if it were theoretically possible for Plaintiffs to ever build a class based on their factual allegations—which is denied—such a class would have to be based on policy-level actions.  For that reason, the discovery Resort Defendants provided was appropriate, and Plaintiffs' request for individualized discovery for over 73,000 putative class members is illogical, improper, and disproportionate.

At issue now is Plaintiffs' unilateral deposition notice to all Defendants combined, seeking corporate representative deposition testimony covering—for the past 11 years—every document, email, byte of data, and decision made as to every aspect of Westgate's business.

---

[1]    Non-Resort Defendants file this motion subject to their motion to dismiss for lack of personal jurisdiction.

Exhibit 1.  Without conferring as to 25 of 27 topics and dozens of subtopics,[2] Plaintiffs noticed the deposition on November 26, 2019, to occur on December 17, 2019.  Exhibit 1.

Resort Defendants have proposed to present witnesses to testify on certain of Plaintiffs' proposed topics.  However, outstanding issues remain, including which Defendant entities will be deposed, limits on the scope of the topics—and the Court's Order Governing Depositions, Doc. No. 4—and the amount of time allotted for the deposition.  For the reasons set forth below, the Court should enter a protective order governing Plaintiffs' deposition of Defendants.

## II.
### JURISDICTIONAL DISCOVERY

As noted above, the Non-Resort Defendants have challenged the Court's lack of personal jurisdiction.  In response, Plaintiffs maintain that they are entitled to discovery from Non-Resort Defendants, to prove that Non-Resort Defendants are subject to personal jurisdiction in Tennessee.  However, Plaintiffs put the cart before the proverbial horse.  Plaintiffs have been deposed, and not a single one of them could testify to any good faith basis to believe any of the Non-Resort Defendants had anything to do with them or their timeshare.[3]  There is no basis to permit corporate representative depositions of three entities who have challenged jurisdiction with an affidavit defeating jurisdiction, in the complete absence of any articulable basis to believe they had anything to do with Plaintiffs or their timeshares, and the Court should enter a protective order.  *See, e.g., In re Porsche Cars N. Amer., Inc.*, No. 2:11-md-2233, 2012 WL 4361430 at *2 (S.D. Oh. Sept. 25, 2012).

---

[2]   Plaintiffs previously requested a deposition of IT-related personnel, and Resort Defendants requested clarification as to which electronic systems.  Plaintiffs never clarified, and never raised the issue again.

[3]   Exhibit 2 (R. Spado Depo) at 184:7 – 186:16; Exhibit 3 (L. Spado Depo) at 69:25 – 71:16; Exhibit 4 (Moore Depo) at 179:18 – 181:6; Exhibit 5 (Gallegos Depo) at 320:8 – 322:12; Exhibit 6 (B. Miller Depo) at 138:1 – 145:19; Exhibit 7 (D. Miller) at 107:20 – 110:20; Exhibit 8 (L. Gilliland Depo) at 153:6 – 154:19; Exhibit 9 (E. Gilliland) at 149:9 – 150:4.

# III.
## APPLICABLE STANDARDS

There is a difference between discovery relevant to a claim, and discovery in search of a claim. Rule 26 defines the scope of permissible discovery to include "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).[4] The rules further provide, "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that the proposed discovery is outside the scope permitted by Rule 26(b)(1)." FED. R. CIV. P. 26(b)(2)(C)(iii). Finally, Rule 26 provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c).

By its definition, the scope of relevant discovery depends on the case. Here, Named Plaintiffs have made factual allegations against Defendants, and they seek to represent a class of all 73,000 individuals who purchased a timeshare at the Resort since 2008. The existence of Named Plaintiffs request for class treatment, even if it had any merit at all, and it does not, would not change the factual allegations at issue, that Resort Defendants made verbal misrepresentations and fraudulent statements in the sales and/or closing processes that contradicted the closing documents Plaintiffs signed, that Plaintiffs' closing documents were concealed from them, and that Plaintiffs had difficulty making a reservation to stay at the Resort.

---

[4]    Prior to 2015, the standard allowed for discovery of "any matter relevant to the subject matter involved in the action," but following the 2015 amendments, discovery is expressly limited to that which is relevant to a party's claim or defense, subject to the proportionality analysis. *See, e.g., Lifeguard Licensing Corp. v. Kozak*, No. 15-civ-8459, 2016 WL 3144049, *3 (S.D.N.Y. 2016)

Plaintiffs' conclusory statements relating to Westgate violating the Tennessee Timeshare Act ("TTA") in undisclosed ways, or without corresponding factual allegations are not claims and cannot support discovery broadly as to all matters touching on compliance with the TTA. *See, e.g., Lifeguard Licensing Corp. v. Kozak*, No. 15-civ-8459, 2016 WL 3144049, *3 (S.D.N.Y. 2016) (discovery as to unpled claims or defenses is outside the scope of permissible discovery). What Plaintiffs would have to prove to maintain a class highlights that Plaintiffs' request for class treatment does not justify any further discovery.

1. _Rule 23(a) – Commonality Prerequisite_

To certify a class under Rule 23(a), Plaintiffs must establish, *inter alia*, (1) there are questions of law or fact common to the class, and (2) the claims or defenses of the representative parties are typical of the claims or defenses of the class. FED. R. CIV. P. 23(a). In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court addressed whether Title VII gender discrimination claims could be tried as a class action based on an alleged culture that permitted individual managers to discriminate, even though each manager made subjective decisions. This case is similar, where Plaintiffs seek to impose class liability for tens of thousands of fraud claims, based on alleged verbal statements by individual sales or closing agents that contradicted the signed closing documents. The Supreme Court explained:

> The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members. Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.
>
> The crux of this case is commonality—the rule requiring a plaintiff to show that there are questions of law or fact common to the class. That language is easy to misread, since any competently crafted class complaint literally raises common

questions. . . . This does not mean merely that they have all suffered a violation of the same provision of law. . . . Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

What matters to class certification is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-50 (2011) (internal citations and quotations omitted). The Supreme Court further discussed the possible methods to establish commonality where the putative class members each had an individual experience, and each of those methods require a policy affecting all putative class members such that a determination of whether that policy was lawful or not would resolve the question for the entire class. *Id.* at 352-58 (discussing in depth, *Gen. Tele. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982)).

Although not an opinion on discovery, the Supreme Court has defined what evidence could be used to support a class of the nature alleged by Plaintiffs—there must be a policy applicable to the putative class. Because a policy is necessary, only discovery as to defendant's policies is relevant and proportional, and not individual discovery as to 73,000 putative class members. It is for that reason the Court should limit any class discovery to the policy level.

2.      *Rule 23(a) – Typicality Prerequisite*

To meet the typicality prerequisite, the claims of the representative party must be typical of the claims of the class.

Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*In re American Medical Systems, Inc.*, 75 F. 3d 1069, 1082 (6th Cir. 1996); *Sprague v. Gen. Motors Corp.*, 133 F. 3d 388, 399 (6th Cir. 1998). This standard highlights the continuity required between the Plaintiffs' factual allegations and the class claims. Plaintiffs cannot maintain a class simply because each of them were unhappy with some aspect of their timeshare ownership. As set forth below, Plaintiffs' own testimony establishes their experiences were not typical even of each other. To possibly argue that Plaintiffs' experiences were typical of all putative class members, Plaintiffs would have to establish Resort Defendants' alleged misdeeds were pursuant to a uniform policy, further underscoring why any class discovery should be limited to the policy-level.

3.    *Rule 23(b)(2) – Class Certification for Declaratory/Injunctive Relief*

Even if Plaintiffs were entitled to discovery that could bear on Rule 23(b)(2) class certification—which is denied—the Rule only applies where the defendant "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). Again, Plaintiffs would only be entitled to policy-level discovery.

4.    *Rule 23(b)(3) – Class Certification for Damages Based on Predominance*

"To demonstrate predominance, parties seeking class recognition must show that questions of law or fact common to class members predominate over any questions affecting

only individual members." *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011). As set forth below, Plaintiffs' own testimony demonstrates the variance in their own alleged fact patterns—different alleged misrepresentations, different experiences with the so-called "secret pocket," and different experiences making reservations. This alone demonstrates Plaintiffs' inability to establish predominance, as there are no predominate questions that could be answered on a class-wide basis. *See, e.g., id.* (striking class allegations without individualized discovery); *Schellenbach v. GoDaddy.com*, 321 F.R.D. 613 (D. Ariz. 2017) (in failure to disclose case where some purchasers received disclosure, individualized inquiries were required and there was no predominant question). However, even if further discovery were to be permitted, for there to be some predominant question, Plaintiffs would have to establish that Resort Defendants had some uniform policy, and Plaintiffs would only be entitled to policy-level discovery.

## IV.
## FACTS AT ISSUE, FROM PLAINTIFFS' TESTIMONY[5]

### *Purchases*

1.     The Named Plaintiffs' initial purchases were in 2008 (Spado & Moore), 2015 (Gilliland), 2017 (Gallegos), and 2018 (Miller).[6] The Named Plaintiffs had upgraded purchases in 2010 (Spado), 2012 (Spado & Moore, and 2013 (Moore).[7]

2.     The Spados also had an upgrade purchase in 2013, although they rescinded that purchase, and Westgate refunded their purchase price.[8]

---

[5]     Westgate disputes many of Plaintiffs' factual allegations. But, for purposes of this motion only, Plaintiffs' testimony is taken as true.

[6]     Exhibit 2 (R. Spado) at 29:24 – 35:19; 38:13 – 39:7; 41:5 – 41:16; 41:22 – 42:17; 44:2 – 21; 45:2 – 46:1; 46:14-25; 61:23 – 62:8; Exhibit 4 (Moore) at 52:14-18; Exhibit 9 (E. Gilliland) at 22:14-20; Exhibit 5 (Gallegos) at 75:10 – 13; Exhibit 6 (B. Miller) at 31:12-18.

[7]     Exhibit 2 (R. Spado) at 97:15 – 25; 105:16 – 25; 133:8 – 138:25; Exhibit 4 (Moore) at 92:9 – 94:13; 115:3 – 118:22

[8]     Exhibit 2 (R. Spado) at 155:20 – 159:6; 160:1 – 21.

3.    At the time of the Gillilands' December 2015 transaction, Westgate did not have inventory available to sell the Gillilands the type of timeshare they wanted, and everyone understood there would have be new documentation to change the Gillilands' purchase when the inventory became available.[9]  The correction was made in May 2016.

4.    Named Plaintiffs all had different sales representatives, sales manager, and closing officers at each of their transactions.

5.    All of the Named Plaintiffs signed the transactional documents (or, even if they could not remember, did not dispute signing the documents), including acknowledgments and conspicuous notices regarding rescission rights immediately adjacent to their signatures; however, all the Named Plaintiffs claimed they did not read the documents, despite having an opportunity to have done so.[10]

6.    They all understood the floating use plan.[11]

*Alleged Secret Pocket*

7.    The Spados received black briefcases at the end of each closing in 2008, 2010, and 2012, but they never looked inside them until 2015, when they were moving houses; they found documents, which were not concealed.[12]

---

[9]    Exhibit 9 (E. Gilliland) at 26:5 – 27:16; 94:8 - 21.

[10]   Exhibit 2 (R. Spado) at 47:1 – 67:3; 74:10 – 25; 95:4-20; 106:1 – 114:20; Exhibit 4 (Moore) at 61:7 – 64:2; 66:5 – 73:5; 74:11 – 19; 74:20 – 76:6; 76:12 – 25; 94:23 – 98:22; 120:19 – 122:9; 123:19 – 124:21; 126:21 – 23; 127:4 – 128:16; 131:9 – 132:13; Exhibit 5 (Gallegos) at 196:10 – 200:18; 203:5 – 206:8; 216:18 – 228:2; 228:25 – 230:6; Exhibit 6 (B. Miller) at 54:4 – 63:10; 64:20 – 68:17; 71:4 – 77:11; 78:5 – 79:3; 88:2 – 21; 91:17 – 98:7; 104:25 – 106:3; Exhibit 7 (D. Miller) at 52:21 – 64:21; 65:12 – 71:16; 73:25 – 74:16; Exhibit 9 (E. Gilliland) at 62:1 – 63:24; 64:20 – 67:15; 76:1 – 88:24.
       **Gallegos claims he felt rushed, but he admitted the closing took 45-60 minutes, during which time he was laughing and telling jokes, and talking about a book he was writing.  Exhibit 5 (Gallegos) at 128:11 – 131:2.

[11]   Exhibit 2 (R. Spado) at 46:14-25; Exhibit 4 (Moore) at 73:6 – 74:10; 100:8 – 101:19; Exhibit 5 (Gallegos) at 212:3 – 213:7; Exhibit 6 (B. Miller) at 80:17 – 81:23; 90:3-11; Exhibit 7 (D. Miller) at 60:21 – 25; Exhibit 9 (E. Gilliland) at 57:25 – 59:11.

[12]   Exhibit 2 (R. Spado) at 68:20 – 22; 75:1-12; 115:19 – 24; 121:19 – 123:14; 137:4 – 144:1; 145:10 – 146:13; 149:8 – 23; Exhibit 3 (L. Spado Depo) at 26:1 – 27:14.

8.    Ms. Moore received a physical binder from Westgate after each transaction; she was aware her documents were inside, and she never had trouble locating the documents.[13] She nonetheless claims the documents from one of her three transactions were concealed from her because her lawyers found them in the binder after she sent the lawyers the binder without actually looking for the documents.[14]

9.    The Gillilands received a black folio after their December 2015 transaction.[15] They acknowledge receiving the public offering statement and CD at the time of the purchase.[16] The first time they looked for their documents, they found them.[17]

10.   The Gillilands then had a separate transaction conducted by mail in May 2016, where all the transactional documents and the public offering statement were mailed to them, they had an opportunity to review the documents and ask any questions, and they signed and returned the documents without reviewing them.[18]

11.   Mr. Gallegos received a black briefcase after his transaction.[19] Approximately one month after the transaction, he claimed he looked for the documents, but he did not find them; his lawyers later produced the documents from inside the briefcase, but he did not know where the documents were located within the briefcase.[20]

12.   The Millers received a black briefcase after their transaction.[21] They found their documents the first time they looked for them in October 2018.[22]

---

[13]   Exhibit 4 (Moore) at 18:15 – 19:8; 19:21 – 23:7; 23:21 – 28:1; 31:1 – 32:11; 87:4 – 17; 112:17 – 113:3; 114:16 – 24; 137:24 – 138:9
[14]   Exhibit 4 (Moore) at 184:5 – 24.
[15]   Exhibit 9 (E. Gilliland) at 29:18 – 25.
[16]   Exhibit 9 (E. Gilliland) at 22:14-20; 88:2 – 8.
[17]   Exhibit 9 (E. Gilliland) at 119:21 – 120:12.
[18]   Exhibit 9 (E. Gilliland) at 121:22 – 122:15; 136:6 – 143:3
[19]   Exhibit 5 (Gallegos) at 238:15 – 239:3
[20]   Exhibit 5 (Gallegos) at 245:2 – 248:14
[21]   Exhibit 6 (B. Miller) at 106:18 – 110:6.

*Use of the Resort*

13.     The Spados stayed at the Resort in 2010, the week of July 4, 2012, the week after July 4, 2013, and the week of July 4, 2014.[23]  In 2015, they were unable to reserve a stay in July, but they made a reservation in August and rented it to the public.[24]  In 2016, they stayed at the Resort; they were assigned to a unit on the side of the mountain, which they did not want, and they were told there was a paperwork error, they were given new paperwork, but they refused to sign.[25]  They had a reservation to stay at the Resort the week of July 4, 2017, although that reservation had to be cancelled due to the fire.[26]

14.     Ms. Moore stayed at the Resort without issue or complaint in 2010,[27] and she apparently had no complaints in 2012.  In 2014, she rented part of it to a non-party,[28] and used the other part herself.[29]  In 2015, she banked half the timeshare for future use and rented the other half to a non-party.[30]  In 2016, she again rented half her timeshare to a non-party, but she also stayed at the Resort herself.[31]  After the fire in late 2016, she never attempted to reserve a stay at any other Resort; but she resumed staying at the Resort in 2018.[32]

15.     The Gillilands called Westgate in January 2016 to make a reservation to stay at the Resort in June 2016; they were advised there was no availability, but that there was a smaller unit available if they wanted, and the Gillilands agreed.[33]  Despite understanding

---

[22]     Exhibit 6 (B. Miller) at 132:19 – 135:22; Exhibit 7 (D. Miller) at 41:8 – 44:9
[23]     Exhibit 2 (R. Spado) at 125:19 – 126:1; 128:8 -11; 154:12 – 14; 154:4 – 8.
[24]     Exhibit 2 (R. Spado) at 155:13 – 19; 152:22 – 153:2.
[25]     Exhibit 2 (R. Spado) at 165:13 – 15; 170:1 – 21.
[26]     Exhibit 3 (L. Spado) at 62:17 - 23
[27]     Exhibit 4 (Moore) at 89:15 – 90:9.
[28]     Exhibit 4 (Moore) at 139:21 – 140:19.
[29]     Exhibit 4 (Moore) at 142:1-9.
[30]     Exhibit 4 (Moore) at 142:10-17.
[31]     Exhibit 4 (Moore) at 142:18-22; 142:23 – 143:6; 164:14 – 165:15.
[32]     Exhibit 4 (Moore) at 166:2 – 20; 167:24 – 168:18; 142:23 – 143:6
[33]     Exhibit 9 (E. Gilliland) at 96:7 – 97:2

that making a reservation was subject to availability, they complain that this was far enough in advance that there should not have been an issue with availability.[34]

16. When Mr. Gallegos purchased the timeshare in 2017, he understood he was not entitled to use the timeshare until 2020.[35]

17. The Millers have never stayed at the Resort.[36]

*Complaints*

18. The Spados' primary complaint is that their initial purchase did not include a balcony, unlike the model unit they toured.[37] When they stayed at the Resort, their assigned unit did not have a balcony (2010) and that it was higher on the mountain than what they wanted (2010 and 2012, and 2016).[38] They also claim they were told the timeshare would increase in value, they could rent it, and they could sell it.[39] As with all other purchasers, they signed an acknowledgement indicating Westgate made no such representations.[40] Further, there is no indication that the alleged representations were untrue; the Spados successfully rented their timeshare the one time they tried, and they never tried to sell it.

19. Ms. Moore's complaints relate to her claim that she was told she could rent her timeshare, which she claims was impeded by difficulty making a reservation. As noted above, she successfully rented out her timeshare on multiple occasions, and she stayed at the Resort herself numerous times. However, she complained about a lack of availability when (1) she called on February 5, 2016 to check availability in March 2016, (2) she

---

[34] Exhibit 9 (E. Gilliland) at 104:17 – 105:1.
[35] Exhibit 5 (Gallegos) at 199:11-16; 314:18 – 316:13.
[36] Exhibit 6 (B. Miller) at 112:18 – 21; Exhibit 7 (D. Miller) at 92:13 – 19.
[37] Exhibit 2 (R. Spado) at 83:19 – 84:21.
[38] Exhibit 2 (R. Spado) at 97:15 – 25; 128:25 – 131:11
[39] Exhibit 2 (R. Spado) at 55:8 – 15
[40] Exhibit 2 (R. Spado) at 54:20 – 56:4

called on February 12, 2016 to check availability in June 2016, (3) she called on March 8, 2016 to check availability for the week of July 4, 2016, (4) she called on April 16, 2016 to check availability for June 2016, and (5) she called on April 18, 2016 to check on availability for May 2016.[41] On another occasion, Ms. Moore secured a reservation for the week of July 4, but she cancelled the reservation because she was unable to rent it to the public for $2,000, as she claimed the Westgate representative told her she could do.[42]

20.     The Gillilands complained that Westgate representatives took their ID cards and would not return them during the sales presentation.[43] The Gillilands also complain that they were told they were purchasing a piece of property, and that they do not believe they have purchased a piece of property, notwithstanding the deed they received and the fact that they have never tried to sell it.[44] They also claim they were told they were making an investment and could resell the timeshare; they believed they could resell the timeshares that they paid $27,000 to purchase for $60,000 or $70,000 because the sales representative had told them that other purchasers had paid that much for similar purchase.[45] This is despite signing acknowledges directly contradicting their claims.

21.     The Gillilands biggest complaint is that they did not receive an interval in the type of unit they thought they were purchasing. They acknowledge signing a set of floorplans, indicating what floor plans they were purchasing, and that they purchased a timeshare matching those floor plans, but they claim that was never the correct set of floorplans.[46] Then, when the second set of paperwork was done, the same issue arose again; it was

---

[41]   Exhibit 4 (Moore) at 150:18 – 153:22
[42]   Exhibit 4 (Moore) at 195:2 – 11; 196:6-15.
[43]   Exhibit 9 (E. Gilliland) at 47:1 – 48:7
[44]   Exhibit 9 (E. Gilliland) at 57:13 – 59:11
[45]   Exhibit 9 (E. Gilliland) at 59:12 – 61:20.
[46]   Exhibit 9 (E. Gilliland) at 76:1 – 15.

discovered that Westgate does not even sell what the Gillilands claim they were buying, which is why the Gillilands signed the floorplans, so there would not be a dispute.[47]

22.     Mr. Gallegos testified he was held against his will, had his dogs held hostage by Westgate representatives, was denied his medications, and that his girlfriend was exposed to risk of permanent injuries from the stress inflicted on them during the sales presentation.[48]  Of course, he was never touched, never threatened, went to check on the dogs on multiple occasions while they waited in the car, and simply chose to stay through an allegedly 9.5 hour presentation because he was told he would miss out on a great investment if he left.[49]  The great investment, according to Mr. Gallegos, was an opportunity to resell his $10,000 timeshare for $20,000,[50] even though Mr. Gallegos testified he is a frequent investor in everything except real estate, because real estate is not a good investment.[51]

23.     Mr. Gallegos also claims that he tried to verbally rescind his purchase the following day by going to the Resort, but that no one would help him.[52]  Despite this, he exchanged otherwise pleasant text messages for months with the sales representative who supposedly abused him, without ever making any complaint.[53]

24.     Mr. Miller complained that he was told the timeshare was an investment that he could rent during bike week to make enough to pay the maintenance fees.[54]  Mrs. Miller made

---

[47]   Exhibit 9 (E. Gilliland) at 132:1 – 138:19.
[48]   Exhibit 5 (Gallegos) at 171:8 – 173:9; 178:19 – 179:12; 181:12 – 185:9; 188:10 – 196:7; 298:16 – 301:23; 305:24 – 306:13; 307:6-21.
[49]   *Id.*
[50]   Exhibit 5 (Gallegos) at 300:1-12.
[51]   Exhibit 5 (Gallegos) at 183:13 – 24.
[52]   Exhibit 5 (Gallegos) at 254:22– 259:15.
[53]   Exhibit 5 (Gallegos) at 261:10 – 286:16
[54]   Exhibit 6 (B. Miller) at 42:21 – 44:22.

the same complaint, but she also claims she was told she could use the Resort any time.[55] Mrs. Miller also claims she was never told they were purchasing a value season timeshare only available during certain weeks of the year.[56]  Of course, the Millers both signed acknowledgements directly contradicting their claims.[57]

25.     The Millers most significant complaint is that they were unable to make a reservations when they wanted.  First, they looked online in mid-June 2018 to stay at one of Westgate's beach-front resorts in Florida for dates in July or August (dates not in the value season they had purchased), and there was nothing available for them.[58]  Then, in February or March 2019, they tried to reserve a stay at the Resort during Thanksgiving (again, dates not in the value season they had purchased), and there was nothing available for them.[59] On one other occasion in April or May 2019, she called to reserve a stay on Labor Day weekend at a non-Westgate resort in Michigan, where she was hoping to exchange her Westgate timeshare, but she was told there was nothing available.[60]

26.     The Named Plaintiffs do not have issues with branding, marketing, promotion, deeds, escrow of funds, or foreclosures.  None of the Named Plaintiffs ever attempted to resell their timeshares.  Although Named Plaintiffs complain that timeshares were available for rent on the internet, Named Plaintiffs have no knowledge of any timeshare being made available for rent when it should have been made available for owner use.  To the contrary, Resort Defendants own intervals that they are free to rent to the public—just like Plaintiffs Spado and Moore have rented to the public.  There are no issues relating to

---

[55]   Exhibit 7 (D. Miller) at 86:22 – 88:2.
[56]   Exhibit 7 (D. Miller) at 88:3 – 88:9.
[57]   *See* discussion *supra*.
[58]   Exhibit 7 (D. Miller) at 95:1 – 96:10.
[59]   Exhibit 7 (D. Miller) at 96:11 – 97:22
[60]   Exhibit 7 (D. Miller) at 98:24 -100:12

any underlying financing of the Resort, management of the Resort, the financial condition of Resort Defendants or Non-Resort Defendants, or any of the regime documents, which are publicly filed, approve by the state, and given to each timeshare owner.

## V.
### DISCOVERY AT ISSUE

These factual allegations are what control discovery, not some vague notion of Resort Defendants might have violated the Tennessee Timeshare Act, so Plaintiffs get discovery as to every document, byte of data, and decision that was ever made. These factual allegations also get plugged into the class action framework, and there is no commonality or typicality. To the extent any discovery is warranted, it should be limited to Westgate actions at the policy-level.

Topics 1 and 2 seek deposition testimony as to the location, manner of storage, and other information as to every byte of data Defendants have had since 2008, but not the meaning of it. This information is irrelevant and misses the point; Resort Defendants are not claiming they do not have data, or that it has been destroyed. Plaintiffs objected to producing the data because it is outside the scope of permissible discovery, and it is not proportional to the needs of the case. Deposition testimony is outside the scope of permissible discovery because it is not relevant, it certainly is not proportional because it would take at least a day of deposition testimony to explain all computing systems Westgate uses, and it is unduly burdensome and harassing.

Topic 3 seeks discovery as to how Westgate determines what specific timeshare unit a timeshare purchaser will be deeded. This is irrelevant; it would be like asking a car dealership how they decide what vehicle is sold. The purchaser picks out what they want, the parties negotiate a price, and available inventory is sold. Only one of the Plaintiffs has complained about the timeshare interval they were deeded—the Gillilands—and the complaint is that they knowingly purchased a particular floorplan, despite believing they were purchasing a different

floorplan that does not exist. This has nothing to do with how Westgate determines what unit to deed to a purchaser. Westgate identified available inventory, and the Gillilands purchased it, despite having concerns that it was not what they thought. Deposition testimony is outside the scope of permissible discovery because it is not relevant, it certainly is not proportional because it would require a separate witness to testify, and it is unduly burdensome and harassing.

Topic 4 seeks discovery as to how Westgate prices timeshares for sale. This is irrelevant; the Plaintiffs and all putative class members negotiate a price and the transaction is consummated. As in virtually every transaction on earth, not all purchasers pay exactly the same amount for identical products. Deposition testimony on pricing is outside the scope of permissible discovery because it is not relevant, it certainly is not proportional because it would require a separate witness to testify, and it is unduly burdensome and harassing.

Topics 7 and 8 seek discovery as to the secondary market for timeshares and any limitations on a purchaser's ability to resell. This is irrelevant. There are no allegations relating to resale, and none of the Named Plaintiffs have attempted to resell their timeshares. Moreover, Westgate does not directly participate in the secondary market for timeshares. There are some restrictions on resales, which are set forth in the regime documents and disclosed to purchasers. However, it is not at issue in the case. Thus, deposition testimony is outside the scope of permissible discovery because it is not relevant, and it is not proportional because it would require a separate witness to testify.

Topic No. 10 seeks discovery as to escrow accounts—classic discovery in search of a claim. Although Plaintiffs make a one-sentence allegation that Westgate violates the Tennessee Timeshare Act through its use of escrow accounts, there are no factual allegations relating to escrow in a 69-page complaint. Notably, the TTA only provides a cause of action for any person

adversely affected by any supposed violation of the TTA (Tenn. Code Ann. § 66-32-118(a)), and none of the Plaintiffs could identify any issues or harm relating to escrow. Thus, deposition testimony is outside the scope of permissible discovery because it is not relevant, and it is not proportional because it would require a separate witness to testify.

Topics 11 and 12 seek discovery as to Westgate's foreclosures, yet this case has absolutely nothing to do with foreclosures. None of the Named Plaintiffs were ever subject to foreclosure or were foreclosed upon, or otherwise had any contact with Westgate's foreclosure procedures or process. Deposition testimony concerning foreclosures is outside the scope of permissible discovery because it is not relevant, and it is not proportional because it would require a separate witness to testify.

Topics 14 and 15 seek discovery as to Westgate's rentals of timeshare intervals to the public. The reality is that Resort Defendants own and have rights to use intervals, and what they do with those intervals is not relevant to any issue in the case any more than what putative class members do with their intervals is relevant. Another reality is that individual owners also rent their intervals to the public—Plaintiffs Spado and Moore have done it. Deposition testimony as to what Resort Defendants do with intervals that they own or have the right to use is outside the scope of permissible discovery because it is not relevant, and it is not proportional because it would require a separate witness to testify.

Topic 16 seeks communications with owners after the November 2016 fire. First, Plaintiffs do not mention the fire in their complaint or raise any complaints relating to the fire in their depositions. Nothing about such communications are relevant. Going further, and as to macro-level communications with all owners, same are not relevant and are already in Plaintiffs' possession because they are owners who received those communications. As to all

communications with all owners regarding reservations after the fire, it would be an impossible task to present a corporate representative to testify to all such communications, which amounts to individualized discovery as to all accounts in existence at the time (tens of thousands of accounts). The deposition testimony would be irrelevant, outside the scope of discovery, and not proportional to the needs of the case. But, the deposition testimony would also be impossible and would be unduly burdensome.

Topic 17 seeks deposition testimony relating to insurance proceeds from the fire. After the fire—as Plaintiffs know because documents have been produced—insurance proceeds were held in trust by the non-party owners association and were used to rebuild the Resort. The Resort is being rebuilt, and much of it has already been rebuilt, with insurance proceeds disbursed accordingly. Plaintiffs do not mention the fire or insurance proceeds in their complaint, and none of them mention it in their depositions. The deposition testimony would be irrelevant, outside the scope of discovery, and not proportional to the needs of the case.

Topic No. 19 relates to training materials broadly, but it is overbroad in light of Topic No. 22 and its numerous subparts, which seek deposition testimony on narrowed issues. Resort Defendants have agreed to present deposition testimony on Topic 22, other than subpart (b), and with respect to certain sub-subparts of subpart (e). As to subpart (b), Plaintiffs appear to seek deposition testimony on training provided to various employees on the issue of how Resort Defendants monitor compliance with their policies or procedures. First, the request is vague. Second, responding would presumably require Resort Defendants to present a witness to testify about every occasion on which any employee has been trained or counseled on any matter that might relate to compliance. However, there are no factual allegations relating to most of the compliance issues about which training may be provided. This is, yet again, a fishing

expedition as to the entire group of 73,000 putative class members to see what complaints might be out there. Yet, as detailed above, class treatment here could only be based on policy-level action. As to subpart (e), Resort Defendants have agreed to provide deposition testimony as to training on reservations, interval ownership, the floating use plan, and all season/value season. However, Resort Defendants oppose deposition testimony as to "fixed weeks," which are not part of the complaint, are not mentioned in any factual allegations, and are not mentioned in Plaintiffs' depositions. Similarly, Plaintiffs have not complained—in their pleadings or in deposition—about banking weeks, bonus weeks, supplemental weeks, interval gold program, getaway program, ice platinum rewards programs, or exchange programs. Thus, the deposition testimony would be irrelevant, outside the scope of discovery, and not proportional.

As to the remainder of Topic 22 where Resort Defendants have agreed to present witnesses to testify—all relating to training—Resort Defendants have only agreed to present witnesses to testify at a macro level. Resort Defendants object to providing deposition testimony as to all training that any particular employee—out of more than 1,000 employees—might have received, consistent with the principle that only a policy-level action could ever support a class. Moreover, it would be impossible and unduly burdensome for a human to testify to all training— i.e., on the job, verbal comments, verbal counseling, or even documented instances—for over 1,000 employees. Thus, Resort Defendants are requesting that the topics be limited to training provided generally to the types of employees at issue, and not to specific employees.

Similarly, Topic 21 seeks deposition testimony as to the determination of whether employees should undergo retraining, the training materials used, and the methods of evaluating any such retraining. As with Topic 22(b), this request is vague. Second, responding would presumably require Resort Defendants to present a witness to testify about how Resort

Defendants monitor employees for compliance, every occasion on which any employee has been retrained, and all follow-up monitoring. This is necessarily an individualized inquiry as to each employee. Further, there are no factual allegations relating to most of the compliance issues about which retraining could potentially be provided. This is, yet again, a fishing expedition as to the entire group of 73,000 putative class members to see what issues might be out there. Yet, as detailed above, class treatment could only ever be based on policy-level action.

As to Topic 23, Plaintiffs seek deposition testimony as to every complaint, grievance, or allegation made by owners since 2008. There have been over 73,000 owners at the Resort. Responding would require Resort Defendants to identify every document that alludes to any communication of unhappiness that any owner may have made, review those documents and determine if they relate to any issue in this lawsuit, identify all other documents that relate to the subject matter of the complaint, and present a human being to testify to each such topic. This is a monumental task. Such complaints and related testimony would not relate to Named Plaintiffs and the requested types of complaints would not relate to Plaintiffs' claims or the factual allegations in the case. Thus, the testimony would be irrelevant and outside the permissible scope. Given its inability to support a class, it would also be disproportionate. Further, as described above, any class could only be built on policy-level action, and this testimony would not demonstrate a policy. The deposition testimony sought should be prohibited because it is not relevant, it is not proportional, and it is unduly burdensome. *See, e.g., Steinbach v. Credigy Receivables, Inc.*, No. Civ.A. 05-114-JBC, 2006 WL 1007272, *3-4 (E.D.Ken. Apr. 14, 2006); *see also Brent v. Wayne County Dep't of Human Servs.*, No. 11-10724, 2011 WL 4507323 (E.D.Mich. Sep. 29, 2011).

Topic 24 requests deposition testimony from each of the named Defendants relating to its business and financial relationship to any other Defendant, along with the manner in which decisions have been made and continue to be made with respect to every topic affecting the Resort. Plaintiffs cannot—without a single factual allegation and after confirming they have no good faith basis to believe Non-Resort Defendants were involved—continue to pursue discovery relating to Non-Resort Defendants. Further, there are no factual allegations relating to most of these topics, and Plaintiffs did not testify to any issues involving these topics. Resort Defendants have agreed to present witnesses relating to its policy-level actions on the matters about which Plaintiffs have made factual assertions. However, the deposition testimony sought covers every decision every Defendant has made since 2008, which is out of bounds by any standard. It is outside the scope of permissible discovery, it is not proportional to the needs of the case and would require numerous witnesses and weeks of depositions. It is unduly burdensome, and Resort Defendants should not be forced to consider every decision made in the past 11 years to determine if that is a proper subject of deposition testimony and, if so, prepare for a deposition.

Topics 25 and 26 request deposition testimony as to all communications between any Defendant and any Named Plaintiff, and a witness to explain codes, acronyms, conventions, or other information contained with the electronic comments Resort Defendants have produced. On Topic 25, Plaintiffs have taken, and may continue to pursue, depositions of the individuals who have had communications with Named Plaintiffs. Short of one of those individuals having a specific recollection—to date, none of them have—all that Resort Defendants can do is point to training materials (already produced and the subject of a separate deposition topic) and read the comments in the computer system (already produced). On Topic 26, Resort Defendants have provided code sheets for all codes used in the documents produced. A cursory review indicates

they are almost always easy to ascertain. These deposition topics are a complete waste of time; and even if it is relevant, not proportional to the needs of the case to have witnesses read typed words from conversations to which they were not a party. There are also numerous audio recordings of telephone calls and of the closing sessions, likely including almost a week's worth of audio recordings, which Resort Defendants would presumably have to review to prepare to discuss, and then listen to in a deposition. There is no possibility Plaintiffs could take the deposition topics already requested within a reasonable amount of time, and extending the amount of time for additional depositions on Topics 25 and 26 is not proportional, where it will add no evidentiary value.

Finally, Topic 27. Plaintiffs seek deposition testimony relating to the developer control period. First, there is nothing in the pleadings and nothing in Plaintiffs' depositions that even remotely touches on the developer control period. Second, there is no reason to believe any contracts for goods or services at the Resort has any bearing on any issue in the case. The requested deposition testimony is irrelevant, outside the scope of permissible discovery, and not proportional to the needs of the case.

## VI.
### OTHER LIMITATIONS

In prior depositions of current and former Westgate employees, Plaintiffs have abused the Court's Order Governing Depositions. Plaintiffs have asked questions about policies and training at resorts other than the Resort, extending as far back as 2000, when Plaintiffs define the relevant time period—as obscene as it is—from 2008 to the present. Exhibit 10 (Lacera) at 8:15 – 18:19 (sales training at different resorts from 2000 to 2004; where Westgate banked; her supervisors at other resorts 15 years ago); 18:21 – 35:13 (customer service and reservations training in Florida in 2004); 35:14 – 41:12 (how owners ate breakfast at a Florida resort in 2009).

However, policies and practices at other Westgate resorts could not possibly be relevant to the claims in this action, which are limited to the Westgate Smoky Mountain Resort. Plaintiffs have also tried to investigate claims under the Telephone Consumer Protection Act, when there are no factual allegations or other connections to any TCPA claims, Exhibit 10 (Lacera) 176:2 – 177:17, and Plaintiffs have tried to investigate claims under the Fair Labor Standards Act, when there are no factual allegations or other connections to any FLSA claims, Exhibit 10 (Lacera Depo) at 63:5 – 64:24. Just like Plaintiffs' are currently conducting discovery in search of a claim, they have done so in the past. In addition to issuing a protective order to prohibit the deposition topics discussed above, the Court should further limit Plaintiffs to deposition questions (1) relating to the approved topics, (2) relating to the Westgate Smoky Mountain Resort, (3) relating to the time from 2008 to the present, and (4) related to factual allegations in Plaintiffs Second Amended Complaint, ¶¶ 61-113.[61]

## VII.
### LENGTH & LOCATION OF DEPOSITIONS

Rule 30 provides that, unless otherwise stipulated or ordered, a deposition is limited to one day of 7 hours. FED. R. CIV. P. 30(d)(1). The party seeking a longer deposition must show good cause. *Burket v. Hyman Lippitt, P.C.*, No. 05-72110, 05-72171, 05-72221, 2007 WL 2421514, *3 (E.D. Mich. Aug. 23, 2007). Plaintiffs sent one deposition notice to six entities. Three Non-Resort Defendants should not be subject to deposition, *supra*. As to the remaining three Resort Defendants, they will coordinate to present an appropriate witness on the agreed topics, or if the Court orders otherwise. However, the agreed-upon topics—if pursued like

---

[61] Plaintiffs should not be permitted to refer to complaints on the internet, or other lawsuits, without making the factual allegations themselves, and then be given free reign to question Resort Defendants about those "facts" that they have not experienced and have not put at issue. Similarly, Plaintiffs should not be permitted to make conclusory statements that Resort Defendants violated the Tennessee Timeshare Act, without making corresponding factual allegations, and then be allowed to question Resort Defendants about any aspect of their business that might relate to the Tennessee Timeshare Act, even when Plaintiffs have not put those facts at issue.

Plaintiffs have pursued depositions of front-line employees, would almost certainly require multiple days of witness testimony. And, merely because Plaintiffs would spend that amount of time questioning witnesses does not establish good cause, render it proportional to the needs of the case, or render the deposition something other than unduly burdensome. Thus, Resort Defendants respectfully request that the deposition be limited to one day of 7 hours.

Finally, the witnesses who would testify—agreed and not agreed topics—live and work in Orlando, Florida. Either Plaintiffs' lawyers will have to travel to Florida, or the witnesses and their counsel will have to travel to Tennessee. Given the disparate topics, Resort Defendants will have to present multiple witnesses in response to the deposition topics, compared to only one Plaintiffs' lawyer. Resort Defendants have agreed to make multiple witnesses available in successive order, to prevent multiple trips, and Plaintiffs' lawyers have agreed to travel to Orlando, Florida for the deposition. Orlando has convenient commercial transportation. Resort Defendants will also have the ability to keep witnesses ready and to access information, if needed. Resort Defendants respectfully request that the Court's Order specify Orlando as the location of the deposition. *See Scooter Store, Inc. v. Spinlife.com, LLC*, No. 2:10-cv-18, 2011 WL 2118765, *1 (S.D. Ohio May 25, 2011).

## VIII.
### CONCLUSION

For the foregoing reasons, Defendants respectfully request entry of a protective order.

## CERTIFICATE OF CONFERENCE

I hereby certify that the parties have conferred in good faith by telephone in an attempt to resolve the issues raised by the motion.  Except where noted, the parties have been unable to resolve these issues.

By:  /s/ B. Eliot New
B. Eliot New, *Pro Hac Vice*

DATED:  December 17, 2019

**GREENSPOON MARDER, LLP**

By:  /s/ B. Eliot New
Richard W. Epstein (FL Bar #229091)
Jeffrey A. Backman (FL Bar #662501)
B. Eliot New (FL Bar #1008211)
*Admitted Pro Hac Vice*
200 E. Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
(954) 491-1120
Richard.Epstein@gmlaw.com
Jeffrey.Backman@gmlaw.com
Eliot.New@gmlaw.com

**WOOLF, MCCLANE, BRIGHT, ALLEN & CARPENTER PLLC**
Gregory C. Logue (BPR #012157)
Robert L. Vance (BPR #021733)
900 Riverview Tower, 900 S. Gay Street
Knoxville, TN 37902-1810
Telephone: (865) 215-1000
Facsimile: (865) 215-1001
glogue@wmbac.com
bvance@wmbac.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 17, 2019, a copy of the foregoing filing was filed electronically such that notice of this filing will be sent by the Court's electronic filing system. Any party who does not receive this filing through the Court's electronic filing system will be served by U.S. Mail.

By: /s/ B. Eliot New
B. Eliot New, *Pro Hac Vice*