## ED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

| | |
|---|---|
| MARILYN MOORE, RYAN and LAURA SPADO, ELLEN and LARRY GILLILAND, and GEROLD GALLEGOS and DEBORAH CAMPBELL, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 3:18-cv-00410 |
| v. | Class Action |
| WESTGATE RESORTS, LTD., L.P. a/k/a WESTGATE RESORTS, LTD., CENTRAL FLORIDA INVESTMENTS, INC., WESTGATE RESORTS, INC., WESTGATE MARKETING, LLC, and CFI RESORTS MANAGEMENT, INC., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................................ 3

I.     Westgate's "Floating Use" Scheme ................................................................. 3

II.    Westgate's Uniform Sales Presentation ......................................................... 7

III.   Westgate's Closing Process .......................................................................... 11

IV.   Plaintiffs' Experiences ................................................................................. 12

LEGAL STANDARD .................................................................................................... 15

THE PROPOSED CLASS .............................................................................................. 16

ARGUMENT ............................................................................................................... 16

I.     The Proposed Class Satisfies the Four Rule 23(a) Factors ........................... 17

     A.    The Class is So Numerous that Joinder Would Be Impractical ........................ 17

     B.    There are Questions of Law and Fact Common to the Proposed Class and Plaintiffs' Claims are Typical of the Proposed Class ......................................... 18

     C.    Plaintiffs and Counsel Will Fairly and Adequately Represent the Interests of the Class ......................................................................................................... 20

II.    The Proposed Class Satisfies the Two Rule 23(b)(3) Factors ....................... 21

     A.    Common Questions Predominate Over Individual Questions. ........................... 21

     B.    A Class Action is Superior to Other Methods of Resolving These Claims ......... 24

III.   The Membership of the Class is Readily Obtainable by Objective Criteria ................... 25

IV.   Appointment of Class Counsel ..................................................................... 25

CONCLUSION ............................................................................................................. 26

CERTIFICATE OF SERVICE ........................................................................................ 28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Almendares v. Palmer,*
222 F.R.D. 324 (N.D. Ohio 2004) ......................................................................... 20

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ..................................................................................... 21, 25

*Amgen v. Conn. Ret. Plans & Trust Funds,*
568 U.S. 455 (2013) ....................................................................... 3, 16, 18, 22

*Butler v. Sears, Roebuck & Co.,*
727 F.3d 796 (7th Cir. 2013) ............................................................................. 3

*Cary v. Evans,*
1986 WL 6642 (Tenn. Ct. App. June 12, 1986) ...................................................... 23

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) ..................................................................................... 23, 24

*Compressor Eng'g Corp. v. Thomas,*
319 F.R.D. 511 (E.D. Mich. 2016) ...................................................................... 24

*Fallick v. Nationwide Mut. Ins. Co.,*
162 F.3d 410 (6th Cir. 1998) ............................................................................. 18

*Harris v. CoreLogic Flood Servs.,*
No. 3:11-CV-00412, 2019 WL 2869175 (M.D. Tenn. July 3, 2019) ........................... 23

*Hartigan v. Brush,*
No. E201900262COAR3CV, 2020 WL 563522 (Tenn. Ct. App. Feb. 4, 2020).............. 23

*In re First All. Mortg. Co.,*
471 F.3d 977 (9th Cir. 2006) .......................................................................... 2, 22

*In re Polyurethane Foam Antitrust Litig.,*
314 F.R.D. 226 (N.D. Ohio 2014) ...................................................................... 23

*In re Prudential Ins. Co. of America Sales Practices Litig.,*
962 F.Supp. 450 (D.N.J. 1997), *aff'd*, 962 F. 3d 283 (3d Cir. 1998) ..................... 2, 22

*In re Scrap Metal Antitrust Litig.,*
527 F.3d 517 (6th Cir. 2008) ............................................................................. 23

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.,*
722 F.3d 838 (6th Cir. 2013) ...................................................................... passim

*Moore v. PaineWebber, Inc.,*
306 F.3d 1247 (2d Cir. 2002) .................................................................. 2, 17, 21

*Powers v. Hamilton Cty. Pub. Def. Comm'n,*
    501 F.3d 592 (6th Cir. 2007) ................................................... 21

*Pund v. City of Bedford, Ohio,*
    No. 1:16CV1076, 2017 WL 3219710 (N.D. Ohio July 28, 2017) ........................... 17

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.,*
    863 F.3d 460 (6th Cir. 2017) ................................................... 25

*Sec. Land Co. v. Touliatos,*
    716 S.W.2d 918 (Tenn. 1986) ................................................... 23

*Senter v. General Motors,*
    523 F.2d 511 (6th Cir. 1976) ................................................... 20

*Sprague v. Gen. Motors Corp.,*
    133 F.3d 388 (6th Cir. 1998) ................................................... 19

*Tyson Foods, Inc. v. Bouaphakeo,*
    135 S. Ct. 1036, (2016) ................................................... 21, 22

*Walker v. Sunrise Pontiac-GMC Truck, Inc.,*
    249 S.W.3d 301 (Tenn. 2008) ................................................... 2, 22

*Wal-Mart Stores v. Dukes,*
    564 U.S. 338 (2011) ................................................... 18

*Williams v. Mohawk Indus., Inc.,*
    568 F.3d 1350 (11th Cir. 2009) ................................................... 24

*Young v. Nationwide Mut. Ins. Co.,*
    693 F.3d 532 (6th Cir. 2012) ................................................... passim

**Statutes**

Tennessee Time-Share Act of 1981 (Tenn. Code Ann. § 66-32-101, *et seq.*) ................ 1, 2, 16, 23

**Rules**

Fed. R. Civ. P. 23(a) ................................................... 15, 16

Fed. R. Civ. P. 23(a)(1) ................................................... 17

Fed. R. Civ. P. 23(a)(2) ................................................... 18

Fed. R. Civ. P. 23(a)(3) ................................................... 18

Fed. R. Civ. P. 23(a)(4) ................................................... 20

Fed. R. Civ. P. 23(b) ................................................... 15, 20

Fed. R. Civ. P. 23(b)(3) ................................................... 15, 16, 22, 23

Fed. R. Civ. P. 23(g)(1) ................................................... 25

As a result of an hours-long, "████████"[1] high-pressure sales presentation rife with uniform misrepresentations and material omissions, Westgate sold Plaintiffs timeshares at the Westgate Smoky Mountain Resort at Gatlinburg. Westgate uniformly pushes prospective purchasers to ████████ without time for deliberation or research.[2] But the timeshares are far from what Westgate promised and are worth far less than what Plaintiffs bargained for. According to Westgate's sales script and sworn testimony by Westgate's management, Westgate's sale representatives uniformly misrepresented timeshares to potential purchasers as having ████████ ████████████████████████████████████████████████[3]

Westgate's sales representatives also uniformly failed to disclose that, because of the design of Westgate's floating use scheme—where all owners fight for the same handful of highly-desirable weeks—timeshare owners will likely be unable to use their timeshare on their desired dates or to use the type of timeshare unit they purchased.[4] Westgate further limits the units available to owners by bogarting units for Westgate to use to lure in new prospective owners or to generate revenue for Westgate by renting them to non-owners.[5]

As a result of Westgate's uniform bad conduct, all purchasers, even those who were able to make some use of the Resort, paid far more for their timeshares than they would have in the absence of such misrepresentations and omissions—that is, if Westgate adequately disclosed *prior to the purchase decision* the true nature of the floating use scheme and their deceptive practices.

Plaintiffs here bring claims[6] to recover money damages, including under the Tennessee

---

[1] Coleman Decl., Ex. 2, Closing Officer Training Manual, WG-3196-037372 ("Other than a few legal terms and your Intent Statement, your closing will not be **fully scripted as required in Sales Training.**")(emphasis added).
[2] Coleman Decl., Ex. 1, Inhouse Training Manual, WG-3196-037487 ("In order to Sell it **today** and sell it **now**, you must create a sense of urgency which will motive your customers into buying.")(emphasis in original).
[3] Coleman Decl., Ex. 1, Inhouse Training Manual, WG-3196-037474.
[4] Coleman Decl., Ex. 3, Expert Report of Kenneth Free ("Free Rpt.") at pp. 11-12.
[5] Coleman Decl., Ex. 4, Rule 30(b)(6) Deposition of Westgate Corporate Representative Jared Saft ("Saft Dep.") 56:2-11; 62:1-19.
[6] Plaintiffs' claims are for (1) violations of the Tennessee Time-Share Act of 1981 (Tenn. Code Ann. § 66-32-101, *et seq*.) (specifically, § 66-32-132(11), which prohibits misleading or deceptive advertising in the sale of timeshares); (2) unjust enrichment; (3) fraudulent misrepresentation by omission; (4) fraud in the inducement; (5) negligent misrepresentation by omission; (6) breach of contract (implied covenant of good faith and fair dealing); (7) breach of contract; and (8) civil conspiracy.

Time-Share Act which specifically contemplates class actions under the Act. Tenn. Code Ann. § 66-32-118(a) ("If a developer . . . violates any provision thereof … any person *or class of persons* adversely affected has a claim for appropriate relief.") (emphasis added). Plaintiffs also seek an injunction enjoining Defendants from engaging in the deceptive conduct detailed herein.

The claims here are particularly well-suited to being adjudicated most efficiently on a class basis, where the common questions are resolved in one forum, at one time. The evidence overwhelmingly establishes that Westgate's misrepresentations and omissions were made in the course of a uniform pre-purchase sales presentation that Westgate itself describes as "fully scripted," which makes the class mechanism the most efficient procedure for resolution. *See* Section II below. It is well-settled that class certification is appropriate where alleged misrepresentations and omissions were made in the course of a "standardized sales pitch." *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) (Sotomayor, J) (Class treatment of fraud claims is proper where "the misrepresentations were made pursuant to a written, standardized sales script and . . . the sales agent participated in a common training program that emphasized uniformity in sales techniques."); *In re First All. Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) (Class treatment is permitted in fraud cases where "a standardized sales pitch is employed."); *In re Prudential Ins. Co. of America Sales Practices Litig.*, 962 F.Supp. 450 (D.N.J. 1997), *aff'd*, 962 F. 3d 283 (3d Cir. 1998) (holding that common issues predominated where evidence showed that oral misrepresentations by agents were "virtually identical" because agents were trained uniformly and required to use uniform sales materials); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 312 (Tenn. 2008) ("Whether a fraud claim is suitable for class-action treatment depends on the degree of similarity between the representations made to the class members.").

On this motion, Plaintiffs need not demonstrate, and the Court need not determine, that Plaintiffs will prevail on the merits. Rather, Plaintiffs must show that the elements of Rule 23 are satisfied, primarily by demonstrating that the trial of this matter will predominantly focus on

evidence common to the class that will provide common answers to common questions. [7] *See*

*Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013). Here, common questions

include:

- Whether the structure and operation of Westgate's floating use scheme provides owners with a reasonable opportunity to use their timeshare;

- Whether, in the course of its uniform sales presentation, Westgate adequately disclosed that its floating use scheme fails to provide owners with a reasonable opportunity to use their timeshare;

- Whether Westgate's uniform sales presentation violates the Tennessee Timeshare Act's prohibition on misleading or deceptive advertising;

- Whether the misrepresentations and omissions constitute common law fraudulent or negligent misrepresentations;

- Whether Westgate's uniform conduct breached its uniform contract and the implied warranty of good faith and fair dealing; and,

- Whether, as a result of Westgate's uniform conduct, Plaintiffs and class members have suffered damages (regardless of amount at this point).

These questions are common, because the answers to these questions—yes or no—will be the

same for every member of the class. And to the extent those questions are answered in Westgate's

favor, a final class judgment would "largely exonerate [Westgate]—a course it should welcome, as

all class members who did not opt out of the class action would be bound by the judgment." *Butler*

*v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013). Accordingly, Plaintiffs respectfully

ask the Court to grant their motion to certify the proposed class and appoint Ritchie, Dillard,

Davies & Johnson and Lieff, Cabraser, Heimann & Bernstein as class counsel.

## FACTUAL BACKGROUND

### I.     Westgate's "Floating Use" Scheme

The earliest timeshare resorts in the United States tended to be failed hotels or

apartment/condominium projects in resort locations where the developers needed a mechanism to

---

[7] Plaintiffs have attached a proposed Class Trial Plan to their Motion for Class Certification to aid the Court in a plan to proceed to a single trial for the entire class.

cash out of their investments.[8] Such developers devised the practice of carving hotel rooms or apartments into 52 weekly intervals for separate sale to vacationing consumers.[9] Most early timeshare projects were "fixed unit, fixed week," meaning that owners purchased a fee simple interest in a specific unit for a specific week of the year.[10] This "fixed unit, fixed week system," however, created a problem for developers: if a developer is limited to selling specific weeks, after the desirable and valuable weeks are sold, the remaining selection of weeks will be unattractive by prospective buyers and therefore difficult for the developer to sell without substantial price discounts, if at all.[11]

A "floating use" timeshare scheme, like Westgate's[12], allows the developer to maximize profits by selling timeshares on a "floating" basis as opposed to selling specific weeks.[13] Under a floating use scheme, owners do not have a right to use their unit on a specific pre-determined week, but instead can use a particular unit type any week of the year. By selling floating use rather than fixed week timeshares, a developer like Westgate can more easily sell up to 100% of the legally-crafted unit-weeks at optimum pricing, secretly shifting the value loss associated with the less desirable weeks to the timeshare owner.[14]

While this practice increases revenues for the developer, it also forces owners into a zero-sum fight with each other for reservations during the limited desirable weeks.[15] At the Resort, Westgate prohibits owners of All Season[16] floating use timeshares from submitting a reservation

---

[8] Coleman Decl., Ex. 3, Free Rpt. at p. 5.
[9] *Id.*
[10] *Id.*
[11] *Id.* at p. 12.
[12] Defendants in this case are alter egos of each other: through the same common management team and employees, they act as a single economic entity and jointly control the development, operations, sales & marketing, and management of the Westgate Smoky Mountain Resort, including controlling even its homeowners' association. *See* Coleman Decl., Ex. 5, Expert Report of Alec Fahey ("Fahey Rpt.") at p. 7. Thus, Plaintiffs refer to all Defendants collectively as "Westgate."
[13] Westgate sells "an immaterial number" of fixed week intervals at the Resort. Coleman Decl., Ex. 4, Saft Dep. 89:14-90:8.
[14] Coleman Decl., Ex. 3, Free Rpt. at p. 12.
[15] *Id.*
[16] Westgate offers two types of floating use timeshare products at the Resort: All Season and Value Season. All Season owners are allowed to book a reservation in their unit type—if one is available—for any time of the year, while Value Season owners are limited to eight seasonally unattractive weeks. Coleman Decl., Ex. 3, Free Rpt. at p. 11. Plaintiffs are only seeking certification of a class of All Season owners.

request until eleven months prior to the date of stay.[17] The most desirable dates and unit types get reserved quickly, after which owners who are "denied" are left with progressively less desirable— and substantially less valuable—options.[18] Through affirmative misrepresentations and material omissions, Westgate hides from prospective owners *prior to them making the purchase decision* that owners will likely not be able to use the units as promised.

Compounding the availability problem, Westgate also fails to disclose pre-purchase that it regularly reserves units for its own use from the inventory of units available for reservation by owners. First, Westgate reserves each unit for two weeks per year for maintenance.[19] Westgate also reserves unit weeks for use by an affiliated "Exchange Company."[20] Westgate also reserves units for transient rentals for non-owners or "for family and friends of the owner on a complimentary basis."[21] Westgate determines the unit weeks that it will reserve for its own usage on a rolling basis at least twelve months in advance "because people can make reservations 11 months out."[22] However, Westgate does not provide potential purchasers with any way to check the availability of units for reservation prior to purchasing.[23]

The number of these developer-withheld unit weeks,[24] along with the contention among owners to reserve desirable weeks, can and do reach levels that precipitate significant owner denials.[25] According to Plaintiffs' hospitality industry expert Ken Free, who founded Hilton's timeshare program and has had a forty-six year career in the hospitality and timesharing industry, there was greater demand by owners to use their units than there was supply of available units to

---

[17] Coleman Decl., Ex. 4, Saft Dep. 46:12-14.
[18] Coleman Decl., Ex. 3, Free Rpt. at p. 12.
[19] *Id.* at WG-3196-024791
[20] ███████████████████████████████████████████████████ *See* Coleman Decl., Ex. 1, Inhouse Training Manual, WG-3196-037480.
[21] Coleman Decl., Ex. 4, Saft Dep. 56:2-11; 62:1-19.
[22] Coleman Decl., Ex. 4, Saft Dep. 68:18-69:14.
[23] *Id.* at 40:21-41:4.
[24] Westgate also controls the Home Owners Association by placing its own officers as the sole members of the Board of Directors. Coleman Decl., Ex. 4, Saft Dep. 11:19-21; Coleman Decl., Ex. 5, Fahey Rpt. at pp. 11, 18-22. In a non-fraud based timeshare project, the HOA would provide oversight of the property usage and would provide some protection for the owners' interests.
[25] Coleman Decl., Ex. 3, Free Rpt. at 19.

use during approximately 80% of the months between 2008 and 2016.[26] Thus, large numbers of owners would have experienced considerable difficulty obtaining reservations during those times.[27]

Westgate knows that the reason people buy timeshares is to *use* them.[28] But the inability of owners to reserve units they "own" is so routine and commonplace that Westgate has trained their call center employs to mollify dissatisfied owners.[29] When an owner attempts to reserve a week at the Resort but, predictably, the owner's unit type is not available for the desired week, Westgate instructs its reservation call center employees to offer the owner three alternatives, all of which are less than what purchasers bargained for: a reservation in the same unit type but for a less valuable week; a reservation for the same week but in a different unit type ███████████████ ███████████████[30]); or a reservation in the same week at a different resort.[31] By design, Westgate's floating use plan ensures that a substantial portion of owners will be forced to accept less desirable weeks or unit types if they want to use their "property" at all. In other words, a substantial portion of owners will get something less than Westgate promised them, which makes their timeshare less valuable than bargained for.

Owner dissatisfaction[32] is reflected in the number of owners at the Resort who default on their purchase loans or whose timeshares are foreclosed upon by Westgate. Westgate's ownership data shows at least 4,191 foreclosures and at least 2,576 defaults during the class period.[33] That is, at least 12.5% of timeshare sales at the Resort result in foreclosure or default. Defaults are so common that Westgate admittedly delays recordation of deeds for up to three years to "season the paper," i.e., to ensure that the owner is making regularly scheduled mortgage payments and thus

---

[26] *Id.* at 18.
[27] *Id.*
[28] Coleman Decl., Ex. 4, Saft Dep. 39: 8-11.
[29] Westgate does not keep records of how many times owners were unable to book the desired weeks or units. Coleman Decl., Ex. 4, Saft Dep. at 46:1-11.
[30] Coleman Decl., Ex. 6, WG-3196-037956.
[31] Coleman Decl., Ex. 4, Saft Dep. 65:20-67:16.
[32] Plaintiffs sought Westgate's documents and data regarding owner complaints related to the inability to book the units they purchased during desired times, but Westgate refused to produce them. The Court denied Plaintiffs' Motion to Compel, ruling that this evidence goes to the merits of Plaintiffs' claims, rather than the Rule 23 requirements. [Doc. 93 at 23.]
[33] Coleman Decl. ¶ 9.

reduce Westgate's risk that an owner's deed, if defaulted upon, would need to be recovered through an expensive judicial foreclosure process.[34] This practice of delaying deed recording for up to three years is also a result of Westgate's overselling of units, including selling units not yet built, further compounding the availability problem.[35] In any event, when an owner defaults or is foreclosed on, Westgate resells that unit to a new, unsuspecting purchaser using the same fraudulent sales scheme.

## II.    <u>Westgate's Uniform Sales Presentation</u>

Westgate requires all sales representatives at the Resort[36] to undergo a two- to three- week sales training.[37] Westgate uses a written sales training manual to train all of its sales personnel,[38]



Glenn Brown is Westgate's General Manager for Dayline sales at the Resort.[43] He has been employed in Dayline sales at the Resort since 2007, working first as a sales representative, and then being promoted to Sales Manager in 2010 and General Manager in 2013.[44] As General Manager, Mr. Brown oversees all of the Resorts' frontline sales staff, consisting of twelve

---

[34] Coleman Decl., Ex. 8, Rule 30(b)(6) Deposition of Westgate Corporate Representative John Willman 16:20-18:3.
[35] *Id.* at 18:4-11.
[36] Westgate employs two types of sales representatives: "Dayline" and "In-house." Dayline sales representatives attempt to sell timeshare intervals to potential purchasers who do not already own a timeshare. Coleman Decl., Ex. 9, Deposition of Glenn Brown ("Brown Dep.") 26:17-22. In-house sales representatives, also called "concierges," attempt to sell upgrades—larger units, more weeks—to existing timeshare owners. Coleman Decl., Ex. 10, Deposition of Robert Morris ("Morris Dep.") 10:13-16.
[37] Coleman Decl., Ex. 9, Brown Dep. 220:4-9; Coleman Decl., Ex. 10, Morris Dep. 15:3-7.
[38] Coleman Decl., Ex. 9, Brown Dep. 215:6-11; 217:8-17; Coleman Decl., Ex. 10, Morris Dep. 33:15-22. The trainings manuals for Dayline sales and In-House sales have slight variations in sequence, but are substantially identical in content.
[39] Coleman Decl., Ex. 1, Inhouse Training Manual, WG-3196-037452.
[40] Coleman Decl., Ex. 2, Closing Officer Training Manual, WG-3196-037372.
[41] Coleman Decl., Ex. 1, Inhouse Training Manual, WG-3196-037453.
[42] Coleman Decl., Ex. 2, Closing Officer Training Manual, WG-3196-037381.
[43] Coleman Decl., Ex. 9, Brown Dep. 6:13-19; 26:15-16.
[44] *Id.* at 9:6-18; 13:14-21; 16:14-16.

managers and 48 sales representatives.[45] According to Mr. Brown, Westgate instructs its sales representatives to follow the sales strategies outlined in the training manuals and not to deviate from them: "[w]e expect [sales representatives] to follow the guidelines of the training manual."[46] Westgate requires all sales representatives to pass written tests to demonstrate that they are familiar with the training manual.[47] Westgate uses role-playing exercises to train trainees on the sales strategies in the training manual.[48] Trainers observe the role-playing exercises to "make sure [the trainees] follow the guidelines."[49] Every time Westgate makes a change to the training manual, Westgate conducts a new training for its sales representatives.[50] Westgate instructs its sales representatives to keep a copy of the training manual on hand at all times and to rely on it and use it any time they need.[51] Importantly, Westgate instructs its sales representatives not to provide a potential purchaser with any information that is not in the training manual.[52]

The sales training manual instructs sales representatives



---

[45] *Id.* at 25:21-26:3.
[46] *Id.* at 227:12-24; 262:7-13; *see also* Coleman Decl., Ex. 10, Morris Dep. 16:17-19 ("Q. You're told to follow the manual to a T, right? A. Yes."); Coleman Decl., Ex. 11, Deposition of James Rushford ("Rushford Dep.") 82:12-15 ("Q. [I]n the manual they tell you substantively what you should be saying, right? A. As far as what our product does, yes.").
[47] Coleman Decl., Ex. 9, Brown Dep. 230:16-25.
[48] *Id.* at 232:2-25.
[49] *Id.* at 232:6-25.
[50] *Id.* at 228:15-17.
[51] *Id.* at 215:22-216:2.
[52] Coleman Decl., Ex. 10, Morris Dep. 21:2-17 ("Q. The information that you're trained to give is only the information that's in the manual -- A. Yes. Q. -- correct? A. Yes. Q. You don't give them any other information? A. No. Q. And that's true for all the sales reps, right? A. Sales reps, or -- Q. That's true for all the personnel that are trained with either the -- with the training manuals? A. Yes.").
[53] Coleman Decl., Ex. 1, Inhouse Training Manual, WG-3196-037460.
[54] *Id.* at WG-3196-037470-7476.
[55] *Id.* at WG-3196-037488.
[56] *Id.* at WG-3196-037499.



[57] *Id.* at WG-3196-037474.
[58] *Id.* at WG-3196-037476.
[59] *Id.*
[60] *Id.* at WG-3196-037499.
[61] *Id.* at WG-3196-037502.
[62] *Id.* (emphasis in original).

 The bottom line price is set by Westgate and is not negotiable.[64]

If the customer agrees to the purchase,  [65] As Glenn Brown describes it, the sales representative summons a sales manager to "go over quickly" with the customer: "this is what you purchased; you purchased a, hypothetically, a two bedroom; you got it in blank season; is this what you guys understand you bought?"[66] If the customer agrees, the sales representative is excused and "the paper process starts."[67] This is the same process for every purchase at Westgate.[68]

Westgate's floating use scheme is James Rushford, a manager of Dayline sales at the Resort, testified that if potential purchasers ask questions about making a reservation, he tells them "they'll get all that information . . . when they finish their paperwork."[70]

Once Westgate's sales representatives complete their sales training and begin making sales presentations to potential purchasers, sales managers monitor the sales representatives'

---

[63] *Id.* at WG-3196-037508

[64] Coleman Decl., Ex. 9, Brown Dep. 201:19-202:15.

[65] Coleman Decl., Ex. 1, Inhouse Training Manual, WG-3196-037510

[66] Coleman Decl., Ex. 9, Brown Dep. 166:23-167:4.

[67] *Id.* at 163:5-6, 23.

[68] *Id.* at 167:15-168:1.

[69] Coleman Decl., Ex. 1, Inhouse Training Manual, WG-3196-037570

[70] Coleman Decl., Ex. 11, Rushford Dep. 47:18-25.

presentations to ensure that they conform to Westgate's uniform sales strategies.[71] If Westgate's sales managers find that sales representatives are deviating from Westgate's uniform sales strategies and scripts, the sales managers may remind sales representatives of what they learned in training: "if they deviating from what they was learned in training we want to make sure we get them back going in the same direction we were."[72] Sales managers can also send sales representatives deviating from Westgate's sales training to "retraining."[73] Some sales representatives may continue to deviate from Westgate's uniform sales strategies: "there's some people that . . . they're know-it-alls. They don't want to adapt. They want to do things their way."[74] These sales representatives "no longer will work for" Westgate.[75]

## III.    Westgate's Closing Process

When the closing process begins, often many hours after the start of the sales presentation, the purchaser has already agreed to purchase a timeshare.[76] The sales representative has already told the customer "all the important things they need to know about what they're getting."[77] All that remains is "the paper process."[78] Westgate even ████████████████████████████████ ███████████████████[79] Indeed, if a purchaser still has doubts about purchasing a timeshare at the Resort when the closing process begins, "it is often a breakdown in the sales process."[80]

As with its sales representatives, Westgate requires its closing officers to undergo two-

---

[71] Coleman Decl., Ex. 9, Brown Dep. at 63:11-21 ("Q. But even before then, even before you were in that role somebody at Westgate was going around making sure, they're kind of listening in to make sure that all the sales reps are following the same rules; right? A. That's correct. Q. And they're making sure that the sales pitches -- I mean, if anybody gets outside the bounds, or doing something unique, they would be able to resolve that; right? A. Yes.").
[72] *Id.* at 127:9-13.
[73] *Id.* at 64:3-11. Westgate uses the same training manual for sales representatives' retraining as it does for their initial training. *Id.* at 214:22-215:11.
[74] *Id.* at 65:5-9.
[75] *Id.* at 65:9.
[76] Coleman Decl., Ex. 12, Rule 30(b)(6) Deposition of Westgate Corporate Representative John Palmer ("Palmer Dep.") 51:11-14 ("Q. By the time the owner gets to closing, they've already made the decision to purchase a timeshare, correct? A. Correct."); Coleman Decl., Ex. 11, Rushford Dep. at 103:7-10 ("Q. [W]hen you get done with the sale with somebody, before they go to closing they've agreed to purchase something from you. Right? A. Correct.").
[77] Coleman Decl., Ex. 9, Brown Dep. 162:10-13.
[78] *Id.* at 163:5-6, 23.
[79] Coleman Decl., Ex. 2, Closing Officer Training Manual, WG-3196-037384.
[80] *Id.*

week training[81] and uses a written training manual to train all of its closing officers.[82] The training manual

[85]

Westgate requires its closing officer to follow the scripts and guidelines in the closing officer training manual.[86] It ensures that different purchasers who ask "the same question" of a closing officer are "going to get the same basic answer."[87]

[88]

## IV. __Plaintiffs' Experiences__

All Plaintiffs purchased an All Season floating use timeshare at the Resort. Their initial timeshare purchases were in 2008 (Spados[89] & Moore), 2015 (Gillilands), and 2017 (Gallegos and Campbell).[90] Before each purchase, all of the Plaintiffs were subjected to the same "fully scripted" sales pitch by Westgate's sales representatives as is presented in Westgate's sales training manual.

---

[81] Coleman Decl., Ex. 12, Palmer Dep. 83:17-19.

[82] *Id.* at 50:20-51:10.

[83] Coleman Decl., Ex. 2, Closing Officer Training Manual, WG-3196-037372 (emphasis added).

[84] *Id.* at WG-3196-037311, -037313, -037315, -037345

[85] *Id.* at WG-3196-037263.

[86] Coleman Decl., Ex. 12, Palmer Dep. 55:13-15 ("Q. So if it's in the manual, you trust that it's followed, right? A. Yes. Yes.").

[87] *Id.* at 42:11-15 ("If [a customer] asks the same question, they're going to get the same basic answer.").

[88] Coleman Decl., Ex. 13, WG-3196-037131.

[89] The Spados purchased an upgraded timeshare in 2010 and 2012. Coleman Decl., Ex. 14, R. Spado Dep. at 97:15-25; 105:16-25; 133:8-138:25

[90] Coleman Decl., Ex. 14, R. Spado Dep. 29:24-35:19; Coleman Decl., Ex. 15, Moore Dep. 52:14-18; Coleman Decl., Ex. 16, E. Gilliland Dep. 22:14-20; Coleman Decl., Ex. 17, Gallegos Dep. 75:10-13. Marilyn Moore initially purchased a Value Season timeshare in 2008, but she "upgraded" her purchase in 2010 to an All Season timeshare. Coleman Decl., Ex. 15, Moore Dep. 94:14-24. Ms. Moore also purchased an upgrade to a two-bedroom in 2013. *Id.* at 92:9-94:13; 115:3-118:22. The Gillilands wanted to purchase an All Season timeshare in 2015, but Westgate did not have any All Season timeshare units available to sell. So Westgate agreed to sell them a Value Season timeshare with the understanding that they would be allowed to use it as an All Season timeshare until Westgate had inventory available to convert it to an All Season timeshare at no extra cost.[90] In other words, Westgate sold more timeshare usage rights than it had available to sell. In May 2016, Westgate sent the Gillilands new closing documents and completed the sale of All Season timeshare they had been promised. Coleman Decl., Ex. 16, E. Gilliland Dep. 24:20-27:10.

-12-

For example, in 2013, Marilyn Moore purchased an upgrade to her timeshare from a "one-bedroom deluxe" unit to a two-bedroom unit.[91] She had complained to Westgate's sales representative that "[w]e were having booking issues at the time, really nothing was ever available."[92] The sales representative told her that upgrading to a two-bedroom would "solve my problem."[93] Among the documents from Ms. Moore's 2013 purchase is a copy of ████████████████ delivered by the sales representative to Ms. Moore:[94]



This document is clearly based on ███████████████████████████████████████████████ ██████. *See* Section II above. ████████████████████████████████████████ ████████████.[95] Ellen Gilliland describes the sales presentation she was given in similar terms to the script for the Pencil Pitch presented in Westgate's sales training manual: "So you're telling me we're buying something. We're buying this. We can use it. We can sell it. We can rent it."[96]

Both Marilyn Moore and the Spados had upgrade purchases, so they were subjected to Westgate's sales presentation on more than one occasion. They describe being subjected to the

[91] Coleman Decl., Ex. 15, Moore Dep. 116:18-118:22.
[92] *Id.* at 116:23-117:3.
[93] *Id.* at 117:25-118:3.
[94] Coleman Decl., Ex. 18, WG-3196-024033.
[95] Coleman Decl., Ex. 19, WG-3196-020058 (Gallegos and Campbell); Ex. 20, WG-3196-026207 (Spado); Ex. 21, WG-3196-021695 (Gilliland).
[96] Coleman Decl., Ex. 16, E. Gilliland Dep. 51:7-9. For comparison, the script to the Pencil Pitch in the sales training manual reads: "*You can use it, loan it out to friends and family, rent it out to not such good friends and family, sell it or will it to your children.*" Coleman Decl., Ex. 1 , Inhouse Training Manual, WG-3196-037474.

same sales presentation before each purchase.[97]

During these sales presentations, the only information disclosed to any of the Plaintiffs about Westgate's All Season floating use plan was that, instead of being limited to using their unit during a fixed week of the year, they could reserve a unit of the type they owned any time of the year they wanted. As the Plaintiffs testified:

- Marilyn Moore: "The guy told me that I could vacation when, where, and how I wanted to with this timeshare."[98]

- Laura Spado: "The way she explained it, and I understood it, was that we had a week for every other year, for any time of the year, for the floor plan that we purchased."[99]

- Ryan Spado: "He described – for what I know as floating week was you could just use any week throughout the year."[100]

- Gerard Gallegos: "He said, You can get it anytime you want."[101]

- Ellen Gilliland: "We were also told that we can rent it when we want to or have it available to us when we wanted it."[102]

Contrary to what Westgate had led them to believe, all of the Plaintiffs had difficulty securing a reservation in the unit types they purchased when they wanted, and they often settled for different unit types or less desirable weeks if they were able to secure a reservation at all.[103] For example, according to Westgate's records, Ms. Moore (1) called on February 5, 2016 to check availability in March 2016; (2) called on February 12, 2016 to check availability in June 2016; (3)

---

[97] Coleman Decl., Ex. 22, L. Spado Dep. 67:1-13 (". . . I noticed over the time periods of visiting that was very similar, like they use the same strategies, you know, the piece of paper with what we call 'the big math problem' on it. Every single time you go, it was the same – you know, take the tour of the place, let's sit down and talk, here's this big math problem. I mean, it was just very generic. So it would lead me to believe that it was kind of, like, a game plan."); Coleman Decl., Ex. 15, Moore Dep. 181:7-17 ("I don't know how they train them, no, but they all do the same thing. . . . All the same step by step . . . .").
[98] Coleman Decl., Ex. 15, Moore Dep. 67:17-18.
[99] Coleman Decl., Ex. 22, L. Spado Dep. 19:23-20:10.
[100] Coleman Decl., Ex. 14, R. Spado Dep. 198:20-199:1.
[101] Coleman Decl., Ex. 17, Gallegos Dep. 216:8-13.
[102] Coleman Decl., Ex. 16, E. Gilliland Dep. 112:5-6.

[103] *See*, *e.g.*, Coleman Decl., Ex. 16, E. Gilliland Dep. 96:7-22; Ex. 14, R. Spado Dep. 152:22-10; 155:13-19. Indeed, Mr. Gallegos and Ms. Campbell were not even able to reserve their unit type on the dates they desired in January, 2020, a month in which Westgate states that there is a "very, very small chance of all of the units being used." Declaration of Gerard Gallegos; Coleman Decl., Ex. 4, Saft Dep. at 97:4-5.

called on March 8, 2016 to check availability for the week of July 4, 2016; (4) called on April 16, 2016 to check availability for June 2016, and (5) called on April 18, 2016 to check on availability for May 2016.[104] "There was nothing available," Ms. Moore testified about these attempts to secure a reservation. "[A]t one point they told me there was nothing available until the New Year. Like from June to December, there was nothing." [105] Her experience was typical of all of the Plaintiffs' experiences:

- Ryan Spado: "We were having booking issues at the time, really nothing was ever available."[106]

- Laura Spado: "[W]hen I called, the dates that we were available they – they couldn't – there was nothing they had."[107]

- Ellen Gilliland, after being informed that the only available unit was smaller than the unit type she owned: "When I called to book, my intent and what I asked for was what we had purchased. And it – they said it's not available. Again, we were told when you buy it and you want to use it, you can use it. Oh no, it's not available."[108]

- Larry Gilliland: "[W]hen you call up there, you never have a unit available, three months out. And you won't get the unit that you purchased."[109]

## LEGAL STANDARD

Plaintiffs seeking to certify a class action must show that each proposed class meets the requirements of Rule 23. All classes must satisfy the four prerequisites of Rule 23(a): Numerosity, Commonality, Typicality, and Adequacy. Each class must also fit into one of the categories of class actions in Rule 23(b). In this case Plaintiffs seek certification under Rule 23(b)(3), which has two additional requirements: Predominance and Superiority. Finally, Rule 23 implicitly requires that the court be able to ascertain by objective criteria whether an individual is a class member.

---

[104] Coleman Decl., Ex. 15, Moore Dep. 150:18 – 153:22.
[105] *Id.* at 154:2, 156:13-15.
[106] Coleman Decl., Ex. 14, R. Spado Dep. 116: 24-25.
[107] Coleman Decl., Ex. 22, L. Spado Dep. 40:18-20.
[108] Coleman Decl., Ex. 16, E. Gilliland Dep. 96:7-17.
[109] Coleman Decl., Ex. 23, L. Gilliland Dep. 151:24-152:1.

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012).

In determining whether the Rule 23 requirements are met—i.e., whether the claims of the classes may be grouped for trial—courts do not decide whether either party has the better case on the merits. "'Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) (quoting *Amgen*, 568 U.S. at 466).

## THE PROPOSED CLASS

Plaintiffs move to certify a class of similarly situated timeshare owners to resolve common questions of liability and damages. Specifically, Plaintiffs seek class certification of Plaintiffs' claims for: (1) violation of the Tennessee Time-Share Act (Tenn. Code. Ann. § 66-32-101, *et seq*.); (2) unjust enrichment; (3) fraudulent misrepresentation by omission; (4) fraud in the inducement; (5) negligent misrepresentation by omission; (6) breach of contract (implied covenant of good faith and fair dealing); (7) breach of contract; and (8) civil conspiracy. For each of these claims, Plaintiffs move to certify the following class:

> All residents of the United States and its territories who purchased from Westgate an All Season "floating use plan" vacation timeshare property at the Westgate Smoky Mountain Resort at Gatlinburg from September 25, 2008 through the date of class certification.

Excluded from the proposed class are: (a) the Defendants, any entity in which any Defendant has a controlling interest, and Defendants' legal representatives, officers, directors, management, employees, subsidiaries, affiliates, assigns, and successors; and (b) Judges assigned to this case and any members of their immediate families or staffs. The proposed class meets the requirements of Rule 23(a) and Rule 23(b)(3).

## ARGUMENT

Plaintiffs have met Rule 23's requirements for the proposed class. **First, numerosity:** the proposed class is so numerous that joinder of all members is impractical. Plaintiffs propose a class with well over 50,000 members. **Second and third, commonality and typicality** (which "tend to

merge"): there are questions of law and fact that are common to the class, and Plaintiffs' claims are typical of those of the class. These questions include whether the nature and operation of Westgate's floating use scheme is a material fact about the timeshare that Westgate is legally required to disclose to timeshare purchasers at the Resort and, if so, whether Westgate adequately disclosed that fact. **Fourth, adequacy:** the Plaintiffs are adequate class representatives because "Plaintiffs' prosecution of the litigation to date support[s] a finding that they will continue to vigorously prosecute the claims of the class as a whole." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543-44 (6th Cir. 2012).

**Fifth, predominance:** common questions of law and fact predominate over questions affecting individual class members, because Plaintiffs and proposed class members all bought timeshares at the Resort subject to Westgate's floating use scheme, and the alleged misrepresentations and omissions made by Westgate to sell them those timeshares "were made pursuant to a written, standardized sales script and . . . the sales agent participated in a common training program that emphasized uniformity in sales techniques." *Moore*, 306 F.3d at 1247. **Sixth, superiority**: all members of the proposed class were subjected to the same "fully scripted" sales presentation and all bought a timeshare subject to Westgate's uniform floating use plan. The alternative to adjudicating this case as a class action is for the Court to handle thousands, perhaps tens of thousands, of cases raising the exact same issues. **Finally,** the proposed class is easily **ascertainable**. It is defined by objective criteria—purchase of an All Season floating use timeshare at the Resort. This case is well-suited for class certification.

## I.      The Proposed Class Satisfies the Four Rule 23(a) Factors

### A.      The Class is So Numerous that Joinder Would Be Impractical

Plaintiffs must first demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While no strict numerical test exists, 'substantial' numbers of affected consumers are sufficient to satisfy this requirement." *Young*, 693 F.3d at 541 (affirming class certification with an estimated minimum of 69 members). "[A] class of 40 or more

members raises a presumption of impracticability of joinder based on numbers alone." *Pund v. City of Bedford, Ohio*, No. 1:16CV1076, 2017 WL 3219710, at *3 (N.D. Ohio July 28, 2017).

The proposed class easily satisfies the numerosity requirement. Westgate's ownership spreadsheet shows at least 54,126 closings on All Season timeshares at the Resort between September 25, 2008 and March 2020.[110] Joinder of all class members would be impractical.

**B.      There are Questions of Law and Fact Common to the Proposed Class and Plaintiffs' Claims are Typical of the Proposed Class**

Plaintiffs must demonstrate that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). In particular, Plaintiffs must show that there are one or more common questions such that "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). Commonality requires merely "one issue whose resolution will affect all or a significant number of the putative class members." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998); *accord Dukes*, 564 U.S. at 359 ("[E]ven a single common question will do."); *Whirlpool*, 722 F.3d at 853 ("[T]here need only be one common question to certify a class."). For class certification, whether common questions will be answered at trial in Plaintiff's favor does not yet matter; rather, commonality is satisfied when even one common question will be answered one way or the other for the class in its entirety. *Fallick*, 162 F.3d at 424; *Whirlpool*, 722 F.3d at 853. Rule 23 "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469.

Plaintiffs must also show that their claims "are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims,'" ensuring "that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Whirlpool*, 722 F.3d at 852-53 (quotation omitted). In practice, commonality and typicality "tend to merge," and the Sixth Circuit

---
[110] Coleman Decl. ¶ 9.

has analyzed them together. *Id.* at 853.

Here, the proposed class is comprised of individuals who purchased an All Season "floating use plan" vacation timeshare property at the Resort. The evidence clearly establishes that Westgate requires its sales representatives to deliver a uniform, ███████████ [111] sales presentation when attempting to sell timeshares to all potential purchasers. Thus, common questions include:

- Whether the structure and operation of Westgate's floating use scheme provides owners with a reasonable opportunity to use their timeshare;

- Whether, in the course of its uniform sales presentation, Westgate adequately disclosed that its floating use scheme fails to provide owners with a reasonable opportunity to use their timeshare;

- Whether Westgate's uniform sales presentation violates the Tennessee Timeshare Act's prohibition on misleading or deceptive advertising;

- Whether the misrepresentations and omissions constitute common law fraudulent or negligent misrepresentations;

- Whether Westgate's uniform conduct breached its uniform contract and the implied warranty of good faith and fair dealing; and,

- Whether, as a result of Westgate's uniform conduct, Plaintiffs and class members have suffered damages (regardless of amount at this point).

These questions are common, because the answers to these questions—yes or no—will be the same for every member of the class.[112] *Whirlpool*, 722 F.3d at 855 ("Common proof will advance the litigation by resolving [common issues] 'in one stroke' for all class members."). Any one of these common issues is sufficient to satisfy the commonality requirement. For the same reason, Plaintiffs' claims are typical of the class. Their claims are not unique or idiosyncratic; they will rise or fall together with all class

---

[111] Coleman Decl., Ex. 2, Closing Officer Training Manual, WG-3196-037372.

[112] To the extent that Westgate may have "some individualized defenses" against certain members of the proposed class, such defenses do "not defeat the commonality requirement . . . "when liability arose from a single course of conduct," as here. *Young*, 693 F.3d at 543.

members. *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.").

### C.   Plaintiffs and Counsel Will Fairly and Adequately Represent the Interests of the Class

Plaintiffs must show that they will fairly and adequately protect the class's interests. Fed. R. Civ. P. 23(a)(4). The Sixth Circuit has outlined two criteria to consider in determining whether the representation of the class would be adequate: "1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. General Motors*, 523 F.2d 511, 524-25 (6th Cir. 1976). "Arguments challenging the adequacy of class representatives should be viewed skeptically." *Almendares v. Palmer*, 222 F.R.D. 324, 332 (N.D. Ohio 2004).

Plaintiffs satisfy both criteria here. As to the first requirement, Plaintiffs have common interests with class members because they purchased an All Season "floating use plan" vacation timeshare property at the Resort, each Plaintiff and class members has been injured in the same manner by Westgate, and Plaintiffs seek identical relief to that which would be sought by all class members. Moreover, Plaintiffs are committed to vigorously prosecuting this action. All Plaintiffs have provided Plaintiffs' counsel with the information and documentation requested of them, and all have sat for depositions conducted by Westgate's counsel.[113] Plaintiffs' "prosecution of the litigation to date support[s] a finding that they will continue to vigorously prosecute the claims of the class as a whole." *Young*, 693 F.3d at 543-44. Second, plaintiffs' counsel have extensive experience in prosecuting consumer class actions such as this one.[114] Counsel's experience qualifies them to vigorously prosecute the action on behalf of the class.

---

[113] Coleman Decl. ¶ 28.
[114] Declaration of Mark P. Chalos; Declaration of Wayne A. Ritchie.

## II.     The Proposed Class Satisfies the Two Rule 23(b)(3) Factors

### A.     Common Questions Predominate Over Individual Questions.

Plaintiffs must show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, . . . ." Fed. R. Civ. P. 23(b)). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594 (1997). It "asks whether the common, aggregating-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 135 S. Ct. 1036, 1045 (2016). While the commonality inquiry asks whether "there is a single factual or legal question common to the entire class," the "predominance requirement is met if this common question is at the heart of the litigation." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007).

Here, two common questions are "at the heart of the litigation": (1) whether Westgate's floating use scheme provides owners with the reasonable opportunity to use their timeshare as promised and reasonably expected; and (2) whether Westgate adequately disclosed to potential purchasers in the course of its uniform, fully scripted sales presentation that they would not be able to use the timeshare as promised and reasonably expected. Answers to these questions will resolve issues that cut across all of Plaintiffs' claims. The answer to the first question will establish whether Westgate breached it contracts—which are identical in all material terms—and their implied covenants of good faith and fair dealing with class members. It will also establish whether the structure and operation of Westgate's floating use scheme is a material fact that Westgate was under a duty to disclose to potential purchasers, an essential element in Plaintiffs' fraud and misrepresentation claims. The answer to the second question will establish whether Westgate misrepresented or omitted material facts about timeshare ownership at the Resort, an essential element in Plaintiffs' fraud claims, as well as whether Westgate violated the Tennessee Time-Share Act.

Crucially, Westgate adequately disclosed the structure and operation of its floating use

scheme to class members can be determined on a class-wide basis, because the evidence establishes that the alleged misrepresentations and omissions were made pursuant to a "standardized sales script" and that Westgate's sales representatives participated in a "common training that emphasized uniformity in sales techniques." *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) (Sotomayor, J) (Class treatment of fraud claims is proper where "the misrepresentations were made pursuant to a written, standardized sales script and . . . the sales agent participated in a common training program that emphasized uniformity in sales techniques."); *In re First All. Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) (Class treatment is permitted in fraud cases where "a standardized sales pitch is employed."); *In re Prudential Ins. Co. of America Sales Practices Litig.*, 962 F.Supp. 450 (D.N.J. 1997), *aff'd*, 962 F. 3d 283 (3d Cir. 1998) (holding that common issues predominated where evidence showed that oral misrepresentations made by agents throughout the country were "virtually identical" because agents were trained uniformly and required to use uniform sales materials); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 312 (Tenn. 2008) ("Whether a fraud claim is suitable for class-action treatment depends on the degree of similarity between the representations made to the class members.").

Moreover, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469; *Whirlpool*, 722 F.3d at 858 ("A plaintiff class need not prove that each claim can be established by classwide proof …."). So long as "one or more of the central issues in the action are common to the class," certification can still be appropriate "even though other important matters will have to be tried separately…." *Tyson Foods*, 136 S. Ct. at 1045. Plaintiffs have established that common issues predominate over individual issues, making one class action a more appropriate method of resolution than many individual suits.

To the extent that any individual issues may arise at trial, they might potentially do so in the context of the amount of damages. It is well-settled that "individual damages calculations do not preclude class certification under Rule 23(b)(3)." *Whirlpool*, 722 F.3d at 860-61. In other words, to merit class certification, Plaintiffs must show predominance on liability, not necessarily

on the precise amount of damages.[115] They have done so.

Although class certification does not depend on Plaintiffs' ability to prove class-wide damages, Plaintiffs can so prove here. To certify a class for damages as well as liability, a plaintiff need show only the *ability* to calculate aggregate damages on a class-wide basis, but need not prove the specific *amount* of damages per class member until trial. *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 267 (N.D. Ohio 2014) (plaintiffs "must show damages are 'susceptible of measurement across the entire class for purposes of Rule 23(b)(3), though damages need not be 'exact'" (quoting *Comcast*, 569 U.S. at 35)); *accord In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[W]e have never required a precise mathematical calculation of damages before deeming a class worthy of certification.").

In *Comcast*, the Supreme Court held that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to" the theory of liability accepted for class-action treatment. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiffs have met this requirement here. For Plaintiffs' common law fraud and misrepresentation claims, Plaintiffs seek benefit of the bargain damages. This is measured by "the actual value of the property received at the time of the making of the contract as compared to the value if the representations had been true." *Harris v. CoreLogic Flood Servs.,* No. 3:11-CV-00412, 2019 WL 2869175, at *3 (M.D. Tenn. July 3, 2019) (citing *Cary v. Evans*, 1986 WL 6642 (Tenn. Ct. App. June 12, 1986). Similarly, for their breach of contract claims, Plaintiffs seek damages in the amount of the difference between the price they paid for their timeshare and the actual value of the timeshare "at the time set for closing."[116] *Hartigan v. Brush*, No. E201900262COAR3CV, 2020 WL 563522, at *3 (Tenn. Ct. App. Feb. 4, 2020) (quoting *Sec. Land Co. v. Touliatos*, 716 S.W.2d 918, 921 (Tenn. 1986)). Each measure of damages requires two data points: the purchase price and

---

[115] Indeed, the Court has already held that discovery into damages is "not relevant at this time." [Doc. 100 at 17.] Plaintiffs have filed a Motion for Review of this Magistrate Judge's ruling on this issue. [Doc. 103.]

[116] The Tennessee Time-Share Act provides for "appropriate relief" to "any person or class of persons" adversely affected by violations of the Act. Tenn. Code Ann. § 66-32-118. Plaintiffs seek "appropriate relief" for violations of the TTSA in the form of benefit of the bargain damages, just as they do for their common law claims.

the actual value of the timeshare at the time it was purchased.

Plaintiffs' damages expert, Daniel Werner, a Ph.D. in economics, provides multiple methodologies to determine the difference between the purchase price and the actual value of the timeshares on a classwide basis, if sufficient data is made available.[117] These methodologies satisfy *Comcast*'s mandate that a damages model measure only those damages attributable to the theory of liability accepted for class treatment. Here, liability is premised on Westgate's misrepresentations and omissions regarding its floating use scheme and the availability of units, which resulted in Plaintiffs and class members paying an inflated price for their timeshare. Moreover, consistent with Tennessee law's requirement that damages for fraud and breach of contract must be calculated based on the value of the property "at the time of making the contract," Dr. Werner proposes two methodologies that do not require any inquiry into how often a class member was actually able to use her timeshare. As Dr. Werner explains, if the jury finds Westgate liable, all class members were harmed because they paid an inflated price, even if some members were (by chance) able to use their timeshares as reasonably expected.[118] The Sixth Circuit approved a similar "price premium" damages model for class treatment in *Whirlpool*, 722 F.3d at 857 ("Because *all* Duet owners were injured at the point of sale upon paying a premium price for the Duets as designed, even those owners who have not experienced a mold problem are properly included within the certified class."). Thus, class wide damages issues predominate over individual issues.

### B. A Class Action is Superior to Other Methods of Resolving These Claims

A class action is the superior method of adjudicating the claims here. First, the same reasons justifying predominance here establish superiority. *See Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009) ("If a district court determines that issues common to all class members predominate over individual issues, then a class action will likely be more manageable than and superior to individual actions."). Second, a class action will be far more efficient by avoiding multiple individual actions, conserving judicial resources and promoting

---

[117] Coleman Decl., Ex. 24, Expert Report of Daniel P. Werner, pp. 37-46.
[118] *Id.* at p. 42.

consistency. According to Westgate's data, the class here contains over 50,000 members. Having 50,000 individual lawsuits is not more efficient or a better use of judicial resources than a class action. *See Compressor Eng'g Corp. v. Thomas*, 319 F.R.D. 511, 530 (E.D. Mich. 2016) ("It is not logical to believe that having 6,000 individual lawsuits (whether in state court or federal court) would be more efficient or a better use of judicial resources."). Finally, the possibility that individual recoveries could be substantial for some class members does not defeat superiority. *See Amchem Prods.*, 521 U.S. at 617 ("[T]he text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high.").

## III.    The Membership of the Class is Readily Obtainable by Objective Criteria

"Rule 23(b)(3) classes must also meet an implied ascertainability requirement." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017). To determine whether a proposed class's membership is ascertainable, the Sixth Circuit requires only that "objective criteria" exist for identifying class members. *Young*, 693 F.3d at 539. In this case, class members—all of whom purchased a timeshare from Westgate—are readily ascertainable from Westgate's records.

## IV.    Appointment of Class Counsel

Plaintiffs move the Court to appoint Ritchie, Dillard, Davies & Johnson and Lieff, Cabraser, Heimann & Bernstein as class counsel pursuant to Fed. R. Civ. P. 23(g)(1). The factors the court should consider include the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions and other complex litigation; counsel's knowledge of the applicable law; the resources counsel will commit to representing the class; and whether class counsel will fairly and adequately represent the class. *Id.* Proposed class counsel has led the work on this case and has substantial experience prosecuting consumer class actions; they have the resources to continue vigorously pursuing this case; and they have fairly represented the putative class so far.[119]

---

[119] Declaration of Mark P. Chalos; Declaration of Wayne A. Ritchie.

<u>**CONCLUSION**</u>

For the reasons above, Plaintiffs respectfully request this Court to certify the proposed class, appoint the named Plaintiffs as class representatives, appoint their counsel as class counsel, and direct the parties to submit a plan for class notice.

Dated:  May 1, 2020                Respectfully submitted,

**RITCHIE, DILLARD, DAVIES & JOHNSON, P.C.**

By: /s/ Wayne A. Ritchie

Wayne A. Ritchie II (BPR #013936)
606 W. Main Street, Suite 300
P.O. Box 1126
Knoxville, TN 37901-1126
Phone: 865.524.8444
war@rddjlaw.com

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

Mark P. Chalos (BPR #023541)
Kenneth S. Byrd
Christopher Coleman (BPR #024950)
Kartik S. Madiraju (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN  37201
Telephone:  615.313.9000
mchalos@lchb.com
kbyrd@lchb.com
ccoleman@lchb.com
kmadiraju@lchb.com

**FARMER PURCELL WHITE & LASSITER, PLLC**

John O. Belcher, Esq. (BPR #018335)
150 Fourth Avenue North, Suite 1820
Nashville, TN  37219
Telephone:  615.810.8777
Facsimile:  615.810.8770
jbelcher@fpwlegal.com

**WALLACE & ASSOCIATES**

Richard T. Wallace, Esq. (BPR #010151)
Parkway Professional Plaza
109 Parkway - Suite 2
Sevierville, TN  37862
Telephone:  865.453.1143
Facsimile:  865.453.5448
wallace@rwallacelaw.net

*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 1, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By:   s/Wayne A. Ritchie, II
      Wayne A. Ritchie, II