UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

MARILYN MOORE *et al*.,                 )
                                        )
                                        )          3:18-CV-00410-DCLC
            Plaintiffs,                 )
                                        )
    vs.                                 )
                                        )
WESTGATE RESORTS LTD., L.P. *et al*.,   )
                                        )
                                        )
            Defendants.                 )

**MEMORANDUM OPINION AND ORDER**

In this action involving the purchase of timeshare units located in Gatlinburg, Tennessee,

Plaintiffs seek class certification on claims against Defendants for breach of contract, violation of

the Tennessee Time Share Act, fraudulent misrepresentation and fraud in the inducement, unjust

enrichment, and civil conspiracy. Plaintiffs claim that Defendants employ a "high-pressure

scheme" to convince prospective buyers to purchase timeshare units, while intentionally

concealing legally required documents from buyers at the time of purchase [Doc. 98, pgs. 1-3].

Specifically, Plaintiffs claim that Defendants conceal documents in "hidden pockets" of their sales

portfolios, cleverly hiding language that would inform buyers of their right to rescind these

timeshare contracts. Plaintiffs also claim that Defendants' mislead buyers into thinking that they

are purchasing specific time share units for specific times of use, when in fact this is not guaranteed

[Doc. 98, pgs. 1-3].

Plaintiffs filed the original Complaint in this matter on September 25, 2018 [Doc. 1]

followed by an Amended Complaint [Doc. 32], a Second Amended Complaint [Doc. 46], and a

Third Amended Complaint [Doc. 98 ("TAC")]. Defendants responded by filing a Motion to Dismiss and Motion to Strike Plaintiffs' Third Amended Complaint [Doc. 101].

After several subsequent motions[1] between the parties, the Court now considers Defendants' Motion to Dismiss and Motion to Strike Plaintiffs' Third Amended Complaint [Doc. 101]. For the reasons set forth herein, Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

Plaintiffs in this case are individuals Marilyn Moore, a resident of Tennessee, Ryan and Laura Spado, residents of South Carolina, Ellen and Larry Gilliland, residents of Florida, and Gerold Gallegos and Deborah Campbell, residents of Texas. Defendants are companies that sell time-share units in Gatlinburg, Tennessee: Westgate Resorts, Ltd., L.P., Central Florida Investments, Inc. ("CFI"), Westgate Resorts, Inc., Westgate Marketing, LLC, and CFI Resorts Management, Inc. ("CFI Management") (collectively referred to herein as "Defendants" or "Westgate"[2]).

### A. Ryan and Laura Spado

In July 2008, Plaintiffs Ryan and Laura Spado purchased a timeshare from Westgate for

---

[1] Plaintiffs responded in opposition to Defendants' Motion to Dismiss and Strike the TAC [Doc. 104], and Defendants replied [Doc. 106]. In addition, Plaintiffs filed a Supplemental Brief in opposition to Defendants' motion [Doc. 142], to which Defendants responded [Doc. 117] and Plaintiffs replied [Doc. 119]. Defendants also filed a Supplemental Brief [Doc. 175], and Plaintiffs have responded [Doc. 176]. Plaintiffs named in the original Complaint, Brian and Danyelle Miller, and Tonya Melfi, have since voluntarily dismissed all their claims against Defendants without prejudice. [Doc. 121].

[2] Defendant Westgate Vacation Villas, LLC was originally included as a Defendant, but has since been dismissed from this action without prejudice by stipulation of the parties [Doc. 108]. Defendant CFI is the parent company to Westgate Resorts, Ltd. and Westgate Resorts, Inc. is a general partner of Westgate Resorts, Ltd.

$10,000, plus a $450 maintenance for the right to use a "unit that included a balcony" once a week every other year. The Spados attempted to reserve their timeshare unit in 2010, but were told by Defendants it was unavailable, and that if they wanted a balcony they would need to upgrade [Doc. 98, ¶ 63]. The Spados twice purchased upgrades, first in August 2010 and again in July 2012 for $6,500 and $9,888 respectively, plus an increased annual maintenance fee [Doc. 98, ¶¶ 63, 64]. During the July 2012 purchase, the Spados asked Defendants' agent if they were buying specific units with specific floor plans and were assured by the agent that they were. *Id*. The Spados continued to have difficulty reserving a unit with the floor plan they had purchased [Doc. 98, ¶ 65]. In July 2016, Defendants allegedly pressured the Spados to sign "new closing papers" which authorized Defendants to place them in a different unit if an equivalent unit to their preferred floor plan was not available [Doc. 98, ¶ 66]. When the Spados refused, Defendants threatened them with eviction, and the Spados have not visited the resort since that time [Doc. 98, ¶¶ 66, 67].

The Spados claim that Defendants' sales representative did not inform them that they may encounter difficulty reserving the unit they had purchased, nor that an equivalent might not be available [Doc. 98, ¶ 61]. The Spados further claim that Defendants did not provide them with the Public Offering Statement, which is required under the Tennessee Time Share Act ("Time Share Act" or the "Act") [Doc. 98, ¶ 62]. Finally, the Spados allege that Defendants failed to inform them of their right to rescind the contract pursuant to the Act [Doc. 98, ¶ 62].

**B.    Marilyn Moore**

In August 2008, Plaintiff Marilyn Moore purchased from Defendants a "one-bedroom unit" that she could reserve for one week, every other year, for $5,200 and an annual $400 fee [Doc. 98, ¶ 68]. Defendants informed Moore that she could reserve the unit any time if she booked 24 hours in advance [Doc. 98, ¶ 60]. In 2010 and 2011, Moore was unable to reserve her unit, and in 2012

Defendants informed her that an upgrade would solve the availability problem [Doc. 98, ¶ 70, 71]. Moore purchased an upgrade on November 16, 2012 but was repeatedly unable to reserve this unit [Doc. 98, ¶ 72, 74]. Moore purchased another upgrade in 2013 for $28,900 when Defendants' agent told her that an upgrade would solve the availability problem [Doc. 98, ¶ 75].

Moore claims that Defendants' agents never informed her of her right to rescind the contract, nor did they adequately disclose that she was not purchasing the right to use a specific unit or type of unit.

## C. Ellen and Larry Gilliland

On December 14, 2015, Plaintiffs Ellen and Larry Gilliland purchased two timeshare units, as well as a life insurance policy, from Defendants for a total of $31,401.03 [Doc. 98, ¶ 80]. At Defendants' urging, the Gillilands financed their purchase on a "Westgate Mastercard" at an interest rate of 17.99% [Doc. 98, ¶ 80]. The Gillilands were unable to book these units, and instead had to reserve units of lesser value [Doc. 98, ¶ 85]. When they complained about this allegedly "bait and switch" maneuver, Defendants encouraged them to upgrade to new units to solve the problem, which they did for an extra $2,000 on May 24, 2016 [Doc. 98, ¶ 85, 86].

The Gillilands claim that the disclosure of their right to rescind these transactions was "hidden" within a "secret pocket on a disk" in the materials given them by Defendants [Doc. 98, ¶ 84]. They further claim that Defendants never informed them the legally required Public Offering Statement existed, nor were they informed of their right to rescind any of these transactions until "many months later." [Doc. 98, ¶ 84].

## D. Gerold Gallegos and Deborah Campbell

On September 30, 2017, Plaintiffs Gerold Gallegos and Deborah Campbell purchased a one-bedroom "deluxe" time share unit in one of Defendants' "yet-to-be constructed" resort

complexes [Doc. 98, ¶¶ 88-90].  Gallegos paid 10% of the $10,000 purchase price up front, later paying the balance through a credit card transaction.  *Id.*  Gallegos and Campbell purchased the unit after a "closing process" that stretched on for many hours, at which Defendants "refused to let them leave" and "insisted that, due to the late hour, they sign closing documents without reading them." [Doc. 98, ¶ 88, 89].

Gallegos and Campbell claim they were not given a reasonable opportunity to adequately review the closing documents prior to closing, nor were they informed about their right to rescind the contract [Doc. 98, ¶ 93].  They claim the disclosure of the right to rescind was "hidden on a disc containing the Public Offering Statement." [Doc. 98, ¶ 95].  Gerold Gallegos alleges that he attempted to rescind the timeshare contract the next day, on October 1, 2017 [Doc. 98, ¶ 96][3].  According to Gallegos, Defendants informed him that there would be "no way he could get his money back." [Doc. 98, ¶ 96].  Gallegos and Campbell have never been able to stay at any Westgate property, and the unit they purchased has not yet been built [Doc. 98, ¶ 97].

### E.    Defendants' Motion to Dismiss and Motion to Strike

Defendants have raised several issues in their Motion to Dismiss and Motion to Strike Plaintiffs' Third Amended Complaint.  First, Defendants contest this Court's personal jurisdiction over Westgate Resorts, Inc. and Central Florida Investments ("CFI") pursuant to Fed. R. Civ. P. 12(b)(2).  Second, Defendants assert that Plaintiffs' claims are barred by time limitations and the underlying contracts, pursuant to Fed. R. Civ. P. 12(b)(6).  Finally, Defendants move to strike Plaintiffs' class allegations and jury demand pursuant to Fed. R. Civ. P. 12(f).  The Court will analyze each of these in turn.

---

[3]The Third Amended Complaint reads "the day after the transaction—October 1, 2018," but this is in error.  The transaction occurred on September 30, 2017, therefore the attempt to rescind would have occurred on October 1, 2017.

## II.    ANALYSIS

## A.    Rule 12(b)(2):  Personal Jurisdiction

## 1.    Standard of Review

"A court deciding a motion to dismiss for lack of personal jurisdiction may rule on the motion on the basis of affidavits alone, permit discovery in aid of the motion, or conduct an evidentiary hearing on the merits of the motion." *Kerns v. Caterpillar, Inc.*, 583 F. Supp. 2d 885, 891 (M.D. Tenn. 2008) (citing *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998)).  "In all cases, the party asserting personal jurisdiction bears the burden of establishing that such jurisdiction exists." *Id.* (citing *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003)).  In deciding personal jurisdiction, the Court construes the facts in the light most favorable to the plaintiff.  *Sanders v. Allenbrooke Nursing and Rehabilitation Center, LLC*, No. 2:20-cv-02001, 2020 WL 5651675, at *2 (W.D. Tenn. September 22, 2020) (citing *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)).

In the present case, the Court permitted Plaintiffs to conduct limited jurisdictional discovery [Doc. 93, pg. 11; Doc. 100, pg. 9].  Without more extensive discovery, Plaintiff's burden remains "relatively slight." *Williams v. Firstplus Home Loan Owner Tr. 1998-4*, 310 F. Supp. 2d 981, 990 (W.D. Tenn. 2004) (citing *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002)).  Because there has been no evidentiary hearing, Plaintiffs need only make a prima facie showing of personal jurisdiction. *Id*. Any factual conflicts in the parties' affidavits must be resolved in the plaintiff's favor. *Dochnal v. Thomson Reuters Corp.*, No. 2:18-CV-00044, 2018 WL 5045205, at *2 (E.D. Tenn. Oct. 17, 2018) (In a jurisdictional inquiry, a court should not consider facts proffered by the defendant when they conflict with those of the plaintiff) (citing *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002)).

When, as in this case, a court has subject matter jurisdiction over a matter pursuant to diversity of citizenship, 28 U.S.C. § 1332, the court "applies the law of the forum state in which it sits to determine whether personal jurisdiction is appropriate." *Williams*, 310 F. Supp. 2d at 990. "The court may maintain jurisdiction over a non-resident defendant only in accordance with the forum state's long-arm statute and the limitations of the Due Process Clause of the United States Constitution." *Id.* (citing *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994)). Tennessee's long-arm statute provides that personal jurisdiction over a nonresident defendant is proper so long as the exercise of such jurisdiction is not inconsistent with the Constitution of the State of Tennessee or of the United States. Tenn. Code Ann. § 20-2-214(a)(6). Therefore, this Court need only determine whether the exercise of personal jurisdiction over the nonresident Defendants would violate the Due Process Clause of the U.S. Constitution. *Williams*, 310 F. Supp. 2d at 990-91.

A court's exercise of specific personal jurisdiction over nonresident Defendants comports with Due Process when those Defendants "have 'certain minimum contacts such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

Here, Defendants do not argue that this Court lacks personal jurisdiction over Westgate Resorts, Ltd., L.P. ("Westgate Ltd."), Westgate Marketing, LLC, and CFI Resorts Management, Inc. ("CFI Management") [Doc. 102, pgs. 2-3]. However, Defendants contend that Plaintiffs have failed to establish personal jurisdiction over Westgate Resorts, Inc. and Central Florida Investments, Inc. ("CFI") [Doc. 102, pg. 3]. Defendants assert that these companies do not have "sufficient contacts" with Tennessee to be subject to personal jurisdiction in the state [Doc. 102,

pg. 9]. Plaintiffs respond that sufficient contacts do exist to support this Court's exercise of specific personal jurisdiction over them [Doc. 104, pg. 22]. Westgate Resorts, Inc. is a general partner of Westgate Resorts, Ltd., and Westgate Resorts, Ltd. is a subsidiary of parent company CFI [Doc. 98, ¶¶ 14, 15].

**2.      Westgate Resorts, Inc.**

Defendants state that Westgate Resorts, Inc. has no contacts with Tennessee other than in its role as general partner of Westgate Resorts, Ltd. [Doc. 102, pg. 3]. Defendants cite Tenn. Code Ann. § 61-2-902 to argue that Westgate Resorts, Inc.'s role as general partner cannot by itself subject Westgate Resorts, Inc. to personal jurisdiction in this Court [Doc. 102, pg. 10]. The statute provides: "A [general partnership] formed or organized under . . . the laws of any state other than [Tennessee] shall not be deemed to be doing business in Tennessee solely by reason of its being a partner in a domestic or registered foreign limited partnership." Tenn. Code Ann. § 61-2-902(b).

Plaintiffs state that Westgate Resorts, Inc. did business in Tennessee when it signed warranty deeds executed by Westgate Resorts, Ltd. [Doc. 104, pg. 26 (citing Docs. 101-7, 101-11, 101-19)]. Defendants clarify that Westgate Resorts, Inc., as the general partner of Westgate Resorts, Ltd., "has the authority and in some cases the obligation, to sign documents on behalf of Westgate Resorts, Ltd." [Doc. 106, pg. 5 (citing Tenn. Code Ann. §§ 61-3-402 and 61-2-902(b))]. Defendants argue that signing deeds on behalf of Westgate Resorts, Ltd. does not in itself show that Westgate Resorts, Inc. was involved in real estate transactions in Tennessee, nor does it prove sufficient contacts with Tennessee [Doc. 106, pg. 5]. Defendants further argue that Westgate Resorts, Inc.'s signing the deeds did not give rise to Plaintiffs' claims.

Plaintiffs respond that Westgate Resorts, Inc.'s signing of Plaintiffs' warranty deeds leaves "no doubt" that this Court has specific personal jurisdiction over them [Doc. 104, pg. 26]. To

support this claim, Plaintiffs cite *Masada Investment Corp. v. Allen*, in which the court held that an out of state attorney had purposely availed himself of Tennessee laws when he prepared property deeds to be filed in Tennessee. 697 S.W.2d 332, 335 (Tenn. 1985)[4].

The defendant in *Masada* was a Texas attorney who had no other contacts with Tennessee, nor had he physically entered the state. *Id*. at 333. He had merely prepared the "warranty deed and the agreement of sale and purchase" for parties to a real estate sale in Memphis, Tennessee. *Id*. Though the defendant had "never entered Tennessee and had no direct financial interest in the sale," the court found that not only did the defendant have "sufficient minimum contacts" with Tennessee, but that he had "purposely availed himself of the privilege of doing business in Tennessee." *Id*. at 335. This was enough to justify personal jurisdiction over the defendant. *Id*.

The *Masada* court reasoned that the defendant could be subjected to personal jurisdiction in Tennessee because 1) he knew that his legal work "would control the sale of several million dollars of Tennessee realty," 2) he knew that the documents "were to be recorded and given full legal effect in Tennessee" and  3) he "purposely directed his activities toward the citizens of this state." *Id*. The court concluded that "the nature and quality" of the defendant's contacts with Tennessee supported the assertion of jurisdiction. *Id*. ("Tennessee has substantial interest in the outcome of this litigation since the action involves a Tennessee defendant . . . Tennessee property, and is controlled by Tennessee law.").

Like the situation in *Masada*, Defendant Westgate Resorts, Inc. signed warranty deeds for

---

[4] The Tennessee Supreme Court has recently recognized that "the structure of the due process analysis in *Masada* . . . differs somewhat from more contemporary expressions such as *Gordon*" *Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC,* No. M201702540SCR11CV, 2020 WL 5902930, n. 8 (Tenn. Oct. 6, 2020) citing *Gordon v. Greenview Hosp., Inc.,* 300 S.W.3d 635 (Tenn. 2009)). However, the court stated: "We do not believe that the difference is qualitatively significant or that it reflects an erroneous statement of law . . . ." *Id.*

Plaintiffs' real property interests located in Tennessee. In *Masada*, the defendant attorney prepared a warranty deed and other contract-for-sale documents on behalf of his client, a Texas real estate broker, to complete the sale of real property located in Tennessee. *Id*. at 333. Here, the Defendant signed a warranty deed for each Plaintiff, representing a share of their ownership in the Smoky Mountain Resort in Gatlinburg, Tennessee [Doc. 104, pg. 26; Doc. 106, pg. 5].

Unlike the attorney defendant in *Masada*, the Defendant in this case is a business entity, but the principles of personal jurisdiction remain the same. See *Caboodles Cosmetics, Ltd. P'ship v. Caboodles*, *LLC*, 412 F. Supp. 2d 872, 876 (W.D. Tenn. 2006) (following *Masada* to find personal jurisdiction over defendant who signed a "purchasing agreement[,] warranties" and other documents in the state, even when the facts involved a different business relationship than that in *Masada*, because they "highlight the same principal").

The case for personal jurisdiction here is even stronger than that in *Masada*. Unlike the defendant in *Masada*, Westgate Resorts, Inc. is not a disinterested attorney preparing documents for third parties, but is a general partner to Westgate Resorts, Ltd., the company that manages the Tennessee property in question [Doc. 98, ¶¶ 12-14]. Thus, while the defendant in *Masada* had no financial interest in that property sale, Westgate Resorts, Inc., as a business partner to Westgate Resorts, Ltd., has a direct financial interest in the sale of these timeshare properties. And whereas the defendant in *Masada* signed one deed in one single event, Westgate Resorts, Inc. signed all the Plaintiffs' warranty deeds over the course of several years [Doc. 104, pg. 26 referring to Doc. 101-7, 101-11, 101-19, and 101- 26]. Like the defendant in *Masada*, Westgate Resorts, Inc. knew when it signed the warranty deeds that these documents would be recorded and given legal effect in Tennessee. Finally, Westgate Resorts, Inc. knew that these warranty deeds represented tens of thousands of dollars of real estate property interests. Through signing these deeds, Westgate

Resorts Inc. purposely availed itself of the laws of Tennessee and should be on notice that it might be haled into court in Tennessee.

The Court therefore concludes that it has specific personal jurisdiction over Defendant Westgate Resorts, Inc. and that the exercise of this jurisdiction will not offend traditional notions of fair play and substantial justice. It is not necessary to analyze Plaintiffs' assertions of general personal jurisdiction, personal jurisdiction by consent, or personal jurisdiction through conspiracy.

### 3. Central Florida Investments, Inc. ("CFI")

Defendants next argue that CFI, the parent company to Westgate Resorts, Ltd., is not subject to personal jurisdiction in Tennessee because CFI is incorporated in and has its principal place of business in Florida and lacks the requisite minimum contacts with Tennessee [Doc. 101, pg. 1; Doc. 102, pg. 3 (citing *Aff. of John Willman*, Doc. 101-1)]. According to Defendants, CFI is presumed to be a separate entity from Westgate Resorts, Ltd. absent a showing that Westgate Resorts, Ltd. is merely a sham corporation [Doc. 102, pg. 10 (citing *McConkey v. McGhan Med. Corp.*, 144 F. Supp. 2d 958, 962 (E.D. Tenn. 2000))].

Plaintiffs allege that because "all defendants are agents, alter egos of, and/or co-conspirators with one another liable for civil conspiracy" all Defendants are therefore subject to specific personal jurisdiction "based on their co-conspirators' minimum contacts." [Doc. 104, pg. 27 quoting *Chenault v. Walker*, 36 S.W.3d 45, 52-55 (Tenn. 2001)]. Defendants counter that these claims are not factual and are a mere "recitation of the elements." [Doc. 106, pg. 7].

As noted above, Plaintiffs sought and received the Court's permission [Doc. 93] to engage in limited jurisdictional discovery [Doc. 142, pg. 2]. Following this discovery, Plaintiffs filed a Supplemental Brief [Doc. 142] in which they further developed their argument that this Court has personal jurisdiction over Defendant CFI through an alter ego theory [Doc. 142].

Plaintiffs argue that personal jurisdiction exists over an out of state defendant when that defendant is "an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Estate of Thomson ex rel. estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008). Plaintiffs contend that "courts apply the alter ego theory of personal jurisdiction to a parent-subsidiary relationship when the parent company exerts so much control over the subsidiary that the two do not exist as separate entities." *Id.* (internal quotations omitted).

Defendants counter that the *Estate of Thomas* standard for "alter ego" personal jurisdiction is inapplicable to this case because the *Thomas* court applied Ohio law to alter ego inquiry, which is "materially different" from Tennessee law [Doc. 117, pg. 3]. Defendants argue that alter ego is only established in Tennessee if the parent company uses its control "to commit a fraud or wrong," to perpetuate "the violation of a statutory . . . legal duty" or to commit "a dishonest or unjust act [violating] third parties' rights." [Doc. 117, pg. 3 (quoting *Continental Bankers Life Ins. Co. of the South v. The Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979))].

Defendants mischaracterize the factors in *Continental Bankers*. *Continental Bankers* is not an inquiry into personal jurisdiction but is a discussion of the instrumentality rule. In fact, *Continental Bankers* does not address personal jurisdiction at all. *Id.* Moreover, Defendants rely heavily on only one of three elements used by the *Continental Bankers* court to determine alter ego in the context of corporate veil piercing. While the alter ego factors of the instrumentality rule bear some similarity to factors necessary to exert personal jurisdiction, the tests are not the same.

The Tennessee Supreme Court has set forth guidelines to determine whether companies are alter egos of one another for the purposes of personal jurisdiction. *Gordon v. Greenview Hospital,* 300 S.W.3d 635 (Tenn. 2009). "[T]he actions of a parent corporation may be attributable

to a subsidiary corporation (1) when one corporation is acting as an agent for the other or (2) when the two corporations are essentially alter egos of each other." *Gordon v. Greenview Hosp., Inc*., 300 S.W.3d 635, 652 (Tenn. 2009). For personal jurisdiction to be established, the alter ego relationship is "typified" by the "parent corporation's control of the subsidiary corporation's internal affairs or daily operations." *Id*.

When determining personal jurisdiction through an alter ego theory, parent and subsidiary corporations are "presumed to be separate and distinct legal entities." *Id.* However, this presumption may be overcome in one of three ways. *Id.* The first is to show that the subsidiary is a "sham or dummy." *Id.* (citing *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp*., 691 S.W.2d 522, 526 (Tenn.1985). The second is to show that the two corporations are, in fact, identical and indistinguishable. *Id.* (citing *Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d at 846, 866 (Tenn. Ct. App 2000)). The third is to show that the subsidiary corporation is "merely an instrumentality, agent, conduit, or adjunct of the parent corporation." *Id.* (citing *Stigall v. Wickes Mach*., 801 S.W.2d 507, 511 (Tenn. 1990)). Because Defendant subsidiaries are neither a "sham," nor are they "indistinguishable" from one another, Plaintiffs' alter ego argument hinges on their ability to prove this third avenue to personal jurisdiction.

Applying the *Gordon* court's analysis of personal jurisdiction, we begin with the presumption that CFI is a separate and distinct legal entity from Westgate Resorts, Ltd., and CFI Management. The question then becomes whether that presumption can be defeated [Doc. 142, pg. 2].

In their Supplemental Brief [Doc. 142], Plaintiffs list and analyze seven factors to determine "whether a subsidiary is merely an alter-ego of the parent company" in the context of a

personal jurisdiction challenge [Doc. 142, pg. 3 (citing *Dochnal v. Thomson Reuters Corp.*, 2018 WL 5045205, at *4 (E.D. Tenn. Oct. 17, 2018))]. These factors are:

> (1) sharing the same employees and corporate officers; (2) engaging in the same business enterprise; (3) having the same address and phone lines; (4) using the same assets; (5) completing the same jobs; (6) not maintaining separate books, tax returns and financial statements; and (7) exerting control over the daily affairs of another corporation.

*Id.* (citing *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 849 (6th Cir. 2017)).

Beginning with the first of the *Dochnal* factors, "sharing the same employees and corporate officers," Plaintiffs argue that several of the employees and directors of both CFI and Westgate, Ltd. are the same individuals [Doc. 142, pg. 5]. Limited discovery revealed that David Siegel is "president, sole director, and shareholder" of CFI, Westgate Resorts, Inc., and CFI Resorts Management, Inc. and has also "executed documents" as president of Westgate Resorts, Ltd." [Doc. 142, pg. 5 n. 5-8 (citing Doc. 116, Exhibits 3-8)]. Siegel is also the president, secretary and sole member of the Board of Directors of the Westgate Smoky Mountain Resort at Gatlinburg Owners Association, Inc. ("Owners Association"), which is associated with Defendant Westgate Resorts, Ltd. [*See* Doc. 98, ¶ 13]. Plaintiffs state that Tom Dugan and Mark Waltrip are officers of CFI, Westgate Resorts, Inc., and CFI Management, and that Mr. Dugan is also the treasurer of the Owner's Association headed by Mr. Siegel [Doc. 142, pg. 5 n.8, 9 (citing Doc. 116, Exhibits 8,9)]. Plaintiffs state that "all of the Defendants" use the same registered agent [Doc. 142, pg. 5, (citing Doc. 116, Exhibit 10)]. The companies also share various managing employees that overlap. *Id.*

Plaintiffs successfully show a significant overlap in key positions between parent CFI and subsidiaries CFI Management and Westgate Resorts, Ltd. Though "shared management personnel are not by themselves enough to render a parent company subject to personal jurisdiction," it is a

significant factor for consideration. *Dochnal*, 2018 WL 5045205, at *4. One individual, David Siegel, is president, sole director, and shareholder of three of Defendant companies, including CFI, and has executed legal documents as president on behalf of the fourth, Westgate Resorts, Ltd. Siegel is also president of the Board of Directors of the Owner's Association for the Gatlinburg timeshare resort which is the object of this lawsuit. This demonstrates a singular source of control and gives credence to the allegation that parent company, CFI, potentially exerts "so much control" over the subsidiaries that "the two do not exist as separate entities." *Dochnal*, 2018 WL 5045205 at *4.

Plaintiffs next combine the second and fifth *Dochnal* factors to allege that Defendants are engaged in the same business enterprise and complete the same jobs [Doc. 142, pg. 6]. Plaintiffs claim that all Defendants, including CFI and Westgate Resorts, Inc., have made collective, unified statements in legal proceedings [Doc. 142, pg. 7]. Plaintiffs also allege that Defendants, including CFI and Westgate Resorts, Inc., all operate under the brand name "Westgate Resorts." [Doc. 142, pg. 6]. Finally, Defendants have "one entity contract" with an insurance company and are covered by a "global policy." [Doc. 142, pg. 8].

The Sixth Circuit has not determined whether "use of the same logo and branding materials" by parent companies and their subsidiaries would result in an alter ego determination. *Dochnal* at *4. One district court has held that a common, global brand and name shared by companies was not sufficient to establish an alter ego relationship between them. *Tuttle v. Sky Bell Asset Mgmt.*, 2011 WL 4713233, at *7 (N.D. Cal. Oct. 7, 2011).

Here, Plaintiffs plead that Defendant parent company CFI is the "applicant and owner" of the trademark name "Westgate Resorts." [Doc. 142, pg. 6]. Employees of subsidiary companies CFI Management and Westgate Marketing, LLC describe their positions as employees for

"Westgate Resorts." [Doc. 142, pgs. 5, 6]. One employee, John Willman, describes himself as the "Treasurer and VP of Mortgage Services at Westgate Resorts" and explains that the Westgate "brand name" is "a company in which an organization does business." [Doc. 142, pgs. 5, 6]. Willman is "employed by CFI Resorts Management," but "reports to Tom Dugan," an officer of CFI and Westgate Resorts, Inc. [Doc. 142, pg. 5]. Another employee, Jared Saft, says that he works for "a timeshare company…Westgate Resorts." [Doc. 142, pg. 5]. He describes his position as working for "all of the Westgate properties." *Id.*

These relationships appear significantly closer and more intertwined than the "global" brand name rejected as a basis for finding alter ego jurisdiction in *Tuttle*. *Tuttle*, 2011 WL 4713233, at *8. In that case, plaintiffs showed "no record whatsoever as to the actual relationships between the [entities]." *Id.* Here, Plaintiffs have alleged not only that CFI shares a logo and brand name with its subsidiaries, but that employees of these subsidiaries self-identify as working for the brand.

Plaintiffs further allege that CFI has behaved, in both legal and insurance spheres, as if it is the same entity as its subsidiaries. First, Plaintiffs allege that CFI filed a lawsuit on behalf of the other Defendants against a "timeshare exit" law firm [Doc. 142, pg. 6]. Second, Plaintiffs state that CFI "processes Westgate timeshare owners' credit card charges for mortgage payments and other fees on behalf of other Westgate entities." [Doc. 142, pg. 8]. Finally, CFI is the "named insured" on insurance policies for "numerous Westgate properties" including Westgate Smoky Mountain Resort [Doc. 142, pg. 8]. These allegations, together with the common brand name, weigh in favor of a finding that an alter ego relationship exists between CFI and CFI Management and Westgate Resorts, Ltd.

As to *Dochnal* factor three, Plaintiffs allege, with documentation, that all the Defendants have the same address [Doc. 142, pg. 8 n.25, citing Doc. 116, Exhibit 10].

Plaintiffs conflate *Dochnal* factor four, "using the same assets" with six, "not maintaining separate books, tax returns and financial statements." [Doc. 142, pg. 9]. Plaintiffs allege "substantial interdependence" of finances between Defendant companies [Doc. 142, pg. 9]. While Plaintiffs sufficiently allege that Defendants use the "same assets," they do not sufficiently allege that Defendants fail to maintain separate books, tax returns, and financial statements.

According to its limited partnership agreement with Westgate Resorts, Ltd., CFI shares in the "income and losses, guaranteed payments, and distributions of cash" from its 99% ownership of Westgate Resorts, Ltd. [Doc. 142, pg. 9]. Though these show an interdependence and use of some of the same financial assets, Plaintiffs do not allege facts that support a claim that CFI keeps the same books and financial statements as CFI Management and Westgate Resorts, Ltd.

Finally, turning to *Dochnal* factor seven, Plaintiffs allege with sufficient particularity that CFI exerts control over the daily affairs of Westgate Resorts, Ltd. and CFI Management. In their Supplemental Brief, Plaintiffs state that CFI "owns 100% of CFI Management." [Doc. 142, pg. 10], CFI owns "99% of Westgate Resorts, Ltd." [Doc. 142, pg. 8] and CFI "owns the Westgate Resorts trademark," and "is the name insured" on the insurance policy for Westgate Smoky Mountain, the resort that is the central object and location for this lawsuit [Doc. 142, pg. 10]. A single person, David Siegel, holds the office of president and sole director and shareholder of CFI and CFI Management [Doc. 142, pg. 5]. Moreover, Siegel personally signed the warranty deeds for Marilyn Moore and the Spados on behalf of Westgate Resorts, Inc. as general partner for Westgate Resorts, Ltd. [Docs. 101-7, 101-11].

Considering the totality of the *Dochnal* factors, Plaintiffs have sufficiently alleged that Defendant subsidiaries Westgate Resorts, Ltd. and CFI Management acted as mere agents or conduits for parent company CFI in selling timeshare units to Plaintiffs. This satisfies the third avenue to finding personal jurisdiction through an alter ego theory as expressed in *Gordon*. Through its subsidiaries, CFI has purposely availed itself of this forum. Therefore, this Court properly exercises personal jurisdiction over Defendant CFI.

**B.      Rule 12(b)(6): Failure to State a Claim**

**1.      Standard of Review**

A complaint must contain a "short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) eliminates a pleading or portion thereof that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) requires the Court to construe the allegations in the complaint in the light most favorable to the plaintiff and accept all the complaint's factual allegations as true. *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990). The Court may not grant a motion to dismiss based upon a disbelief of a complaint's factual allegations. *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990). The Court must liberally construe the complaint in favor of the party opposing the motion. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

However, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To meet this standard, a Plaintiff must "state a claim to relief that is plausible on its face." *Id.* at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Moreover, the Court

need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S.

at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Ashcroft*, 556 U.S. at 678.

## 2.     Statute of Limitations

### a.   Proper Timing to Bring Statute of Limitations

If the allegations in a complaint "show that relief is barred by the applicable statute of

limitations, the complaint is subject to dismissal for failure to state a claim." *Jones v. Bock,* 549

U.S. 199, 215 (2007). A statute of limitations is an affirmative defense, Fed. R. Civ. P. 8(c), and

therefore the defendant bears the burden to show that the statute of limitations has run. *Campbell*

*v. Grand Trunk W.R.R. Co*., 238 F.3d772, 775 (6th Cir. 2001). If the defendant meets this

requirement, "the burden shifts to the plaintiff to establish an exception to this statute of

limitations." *Id*. "[A] a motion under Rule 12(b)(6), which considers only the allegations in the

complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of

limitations. But, sometimes the allegations in the complaint affirmatively show that the claim is

time-barred. When that is the case … dismissing the claim under Rule 12(b)(6) is appropriate."

*Cataldo v. U.S. Steel Corp*., 676 F.3d 542, 547 (6th Cir. 2012).

### b.   Statute of Limitations under the Tennessee Time Share Act (Counts I, II, IV, V, and VI of the Third Amended Complaint).

Plaintiffs claim two counts of violations of the Tennessee Time Share Act of 1981. *See*

Tenn. Code Ann. § 66-32-101 *et seq*. The Time Share Act provides that where "the validity of

any contract of purchase is in issue and a rescission of the contract or damages is sought" the action

"must be commenced within four (4) years after the date of the contract of purchase,

notwithstanding that the purchaser's terms of payments may extend beyond the period of

limitation." Tenn. Code Ann. § 66-32-119.

Defendants argue that this provision of the Act is a statute of repose and should therefore run from the date of the contract of purchase without regard to discovery [Doc. 102, p. 16]. Under this interpretation, Defendants state that tolling theories of fraudulent concealment and equitable estoppel do not apply, because the Act does not expressly include these as exceptions to the limitation period [Doc. 102, pg. 15, 16]. Defendants also reject any notion that the "discovery rule" would toll this four-year period because "the discovery rule does not apply to contract actions." [Doc. 102, pg. 16 citing *Dean Witter Reynolds, Inc. v. McCoy*, 853 F. Supp. 1023, 1036 (E.D. Tenn. 1994)]. Plaintiffs, in turn, reject Defendants' characterization of the Act's limitations as a statute of repose, stating that the provision "only purports to limit the time period for filing suit after a [timeshare contract] *accrues* or *re-accrues*." [Doc. 104, p. 18]. In support of this argument, Plaintiffs point to the title of the provision: "Statute of Limitations," as proof that legislators intended the provision to serve as a statute of limitations rather than a statute of repose [Doc. 102 pg. 18]. Plaintiffs further argue that the provision lacks the "telltale signs" of a statute of repose, namely "two dates," and a clause containing the words "notwithstanding' or "in no event." [Doc. 102, pg. 18].

"In the ordinary course . . . a statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.'" *Stein v. Regions Morgan Keegan Select High Income Fund, Inc*., 821 F.3d 780, 786 (6th Cir. 2016) (quoting *CTS Corp. v. Waldburger*, 134 S.Ct. 2175, 2182 (2014) (internal citation omitted)). A statute of repose, on the other hand, "puts an outer limit on the right to bring a civil action," which is "measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." *Id*. Thus, a statute of repose "limits the time within which [an] action may be brought" and is "entirely unrelated to the accrual of a cause of action." § 12:76 Statutes of limitations—

Comparison to other concepts, 22 Tenn. Prac. Contract Law and Practice. Statutes of repose and statutes of limitations "sometimes exist in the same statute." *Id*. Indeed, courts have been known to characterize the same provision as both a statute of limitations and a statute of repose. *Id*.

The limitations period in the Tennessee Consumer Protection Act ("TCPA") is illustrative of the difference between a statute of limitations and a statute of repose, because it contains both. Tenn. Code Ann. § 47-18-110. The statute of limitations provision in the TCPA expressly states that any action shall be brought "within one (1) year from a person's *discovery* of the unlawful act or practice." Tenn. Code Ann. § 47-18-110 (emphasis added). In the same provision, the statute of repose states that "in no event shall an action . . . be brought more than five (5) years after the *date of the consumer transaction* giving rise to the claim for relief." *Id*. (emphasis added). Thus, the statute of limitations period runs from the plaintiff's discovery of the unlawful act, and the statute of repose runs from the point of contract or purchase.

The time limitation provision in the Time Share Act tracks most closely with a statute of repose. The four-year time limit begins on the date "of the contract of purchase," and has no relation to plaintiff's discovery of a purported unlawful act. Tenn. Code Ann. § 66-32-119. The legislative choice to name this provision "Statute of Limitations" does not change the nature of the provision as a statute of repose, as Plaintiffs claim [Doc. 104, pg. 17]. Thus, the limitations period in this cause of action, for claims brought under the Act, began to run at the point of purchase for each Plaintiff.

This Court has recently interpreted the Act's four-year limitations provision as a time bar to timeshare claims sounding in fraud and misrepresentation. See *Shiels v. Orange Lake Country Club, Inc.,* No. 3:19-CV-216, 2019 WL 3323505, at *2 (E.D. Tenn. July 24, 2019) (quoting the Act's limitations provision followed by "it is clear that Plaintiffs' claims for 'intentional

misrepresentation (fraud)/promissory fraud/fraudulent concealment/negligent misrepresentation" and violation of the Tennessee Timeshare Act of 1981 are barred by the statute of limitations"); *Noblitt v. Bluegreen Vacations Unlimited, Inc.,* No. 3:18-CV-117, 2019 WL 7290474, at *14 (E.D. Tenn. Mar. 20, 2019) (summarizing fraud and constructive fraud claims under the Tennessee Time Share Act and finding such claims timely when brought within four years of the purchase date).

The Court therefore applies the Time Share Act's four-year statute of repose to Plaintiffs' claims of fraudulent misrepresentation (Count IV), fraud in the inducement (Count V), and negligent misrepresentation (Count VI). The Court also agrees with Defendants that tolling theories of fraudulent concealment, equitable estoppel, and the discovery rule do not apply in this instance due to the Act's clear limitations language and the absence of any language granting exceptions under these doctrines. Since each Plaintiff's timeline is different, the Court now turns to each of these claims in turn to determine whether they survive the statute of limitations defense.

### i. Plaintiffs Marilyn Moore and Ryan and Laura Spado

Plaintiffs Marilyn Moore and Ryan and Laura Spado each initiated their action against Defendants on September 25, 2018 [Doc. 1]. Plaintiff Marilyn Moore purchased three time-share property interests from Defendants, including the initial purchase in August 2008, and two subsequent "upgrade" purchases in November 2012 and November 2013 [Doc. 98, ¶¶ 68, 72, 75]. Plaintiffs Ryan and Laura Spado purchased their initial time-share interest from Defendants in July 2008, with upgrades purchased in August 2010 and July 2012 [Doc. 98, ¶¶ 61, 63, 64]. Calculating the limitations period from the point of purchase, these claims of action, even for the most recent upgrade contracts (November 2013 for Ms. Moore and July 2012 for the Spados) were brought well after the Act's four-year limitations period had run.

Consequently, Ms. Moore's and the Spados' claims of violation of the Act (Counts I and II) as well as their claims of fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation (Counts IV, V, and VI) are **DISMISSED** as time barred, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Section 66-32-119 of the Tennessee Time Share Act of 1981.

> ### ii. **Plaintiffs Ellen and Larry Gilliland, Gerold Gallegos and Deborah Campbell**

Plaintiffs Gilliland also initiated their action against Defendants on September 25, 2018 [Doc. 1]. The Gillilands purchased two timeshare units from Defendants on December 14, 2015 [Doc. 98, ¶ 79]. They purchased an upgrade from Defendants on May 24, 2016 [Doc. 98, ¶ 86]. Both actions were commenced within the four-year limitations period outlined in the Act. Therefore, Plaintiffs Gillilands' complaints under the Time Share Act, as well as the claims for fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation (Counts I, II, IV, V, and VI) are not time barred.

Plaintiffs Gallegos and Campbell also initiated their action against the Defendants on September 25, 2018 [Doc. 1]. Gallegos and Campbell purchased a unit from Defendants on September 30, 2017 [Doc. 98, ¶ 88]. This action was commenced well within the four-year limitations period. Therefore, Plaintiffs Gallegos and Campbell's claims under the Time Share Act, as well as the claims for fraudulent misrepresentation, fraudulent inducement, and negligent misrepresentation (Counts I, II, IV, V, and VI) are not time barred.

### c. **Statute of Limitations for Unjust Enrichment – Count III**

Because there is "no specific statute of limitations in Tennessee for unjust enrichment," courts look to the gravamen, or real purpose, of the complaint to determine the appropriate limitations period. *Alsbrook v. Concorde Career Colleges, Inc.*, No. 2:19-CV-02583, 2020 WL

3475107, at *8 (W.D. Tenn. June 25, 2020) (citing *Middle Tenn. Occup. and Envtl. Med., Inc. v. First Health Grp. Corp.*, No. 3:05-CV-0218, 2005, WL 3216282, at *4 (M.D. Tenn. Nov. 28, 2005). Determining the gravamen of a complaint "presents a question of law." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363, S.W.3d 436, 457 (Tenn. 2012) (internal citations omitted). The gravamen inquiry involves a "fact-intensive" examination of the allegations of the complaint for the "types of injuries asserted and damages sought." *Benz-Elliott v. Barrett Enterprises*, *LP*, 456 S.W.3d 140, 151 (Tenn. 2015).

Here, Plaintiffs specifically claim that they conferred benefits upon the Defendants in the form of down payments, mortgage payments, and other fees [Doc. 98, ¶ 167]. Plaintiffs state that these payments amount to unjust enrichment because they were made with Plaintiffs' "reasonable expectation" that Defendants were "complying with the Tennessee Time Share Act" and that Plaintiffs could use and enjoy their time share units "as represented by" Defendants [Doc. 98, ¶ 168]. Plaintiffs also claim that Defendants "induced" them to make those payments by "failing to disclose the facts material to the transactions." [Doc. 98, ¶ 169].

Plaintiffs claim that payments they made to Defendants were "unjust" because they were based on Plaintiffs' reasonable expectations that Defendants were comporting with provisions of the Tennessee Time Share Act, and Defendants' acts of concealing facts material to the transactions to induce Plaintiffs to enter into the bargain. Plaintiffs' unjust enrichment claims are predicated by Defendants' purported violations of the Time Share Act and the underlying torts of fraudulent misrepresentation, fraud in the inducement, and negligent misrepresentation. Therefore, the four-year limitation provision in the Tennessee Time Share Act governs Plaintiffs' claim of unjust enrichment.

For this reason, the claims of unjust enrichment brought by Plaintiffs Marilyn Moore and Ryan and Laura Spado, are **DISMISSED** as time-barred because the action was brought more than four years from the date of any of points of sale. For Plaintiffs Gilliland, Gallegos and Campbell, the claim of Unjust Enrichment is not time-barred.

### d. Statute of Limitations for Civil-Conspiracy – Count IX

The Plaintiffs also claim that the Defendants engaged in civil conspiracy (Count IX of the Third Amended Complaint) "related to defrauding consumers in the purchase of timeshare properties." [Doc. 98, ¶ 235]. Plaintiffs correctly state that "the limitations period for a civil conspiracy is determined by the underlying tort." [Doc. 104, p. 18 citing *Swafford v. Memphis Individual Practice Ass'n*, No. 02A01-9612-CV-00311, 1998 WL 281935, at *11 (Tenn. Ct. App. June 2, 1998)] The parties do not dispute that the "gravamen" of Plaintiffs' complaint is "fraud and misrepresentations." [Doc. 104, pg. 19; Doc. 102, p. 15]

A claim for civil conspiracy is "not a tort or a cause of action itself." *Swafford*, 1998 WL 281935, at *11(internal citation omitted). Nor is a claim of conspiracy "a wrong capable of supporting a cause of action by its own weight." *Id*.

Thus, if the underlying tort claims are time barred under the Tennessee Time Share Act, as they are in this case for some of the Plaintiffs, any claim of conspiracy to commit those torts are also time barred for those Plaintiffs. Even if Plaintiffs were to successfully argue that the Act's provision does not apply to the civil conspiracy claim, the time limitation for the "underlying torts" e.g. fraudulent misrepresentation, fraud in the inducement, and negligent misrepresentation, are all subject to a three year limitations period, which is even shorter than that of the Act. See Tenn. Code Ann. § 28-3-105; *Precision Tracking Sol., Inc. v. Spireon, Inc.,* 2014 WL 3058396, at *4 (E.D. Tenn. 2014).

Therefore, as to Plaintiffs Marilyn Moore and the Spados, the civil conspiracy claims (Count IX of the TAC) are time barred. The civil conspiracy claims for Plaintiffs Gilliland, Gallegos and Campbell are not time-barred, because they were brought within the four-year limitations period of the Time Share Act.

Defendants claim Plaintiffs' Gilliland, Gallegos and Campbell's civil conspiracy claims should also be time-barred, because these Plaintiffs "knew or should have known of their claims" in 2016 and October 1, 2017, respectively, but "did not file suit until September 25, 2018." [Doc. 102, pg. 19]. But, as discussed above, the limitations period for civil conspiracy, as with the underlying tort claims, are tied to the Tennessee Time Share Act, which is a statute of repose. Thus, the limitations period began to run from the date of purchase, not from the discovery of the wrong. Plaintiffs Gilliland, Gallegos and Campbell raised their civil conspiracy action within four years of their time share purchases. Therefore, as to these Plaintiffs, the civil conspiracy claim is not time barred.

### e. Statute of Limitations for Breach of Contract Claims (Counts VII and VIII)

Plaintiffs claim that the Defendants breached their contracts with each Plaintiff by (1) breaching the covenant of good faith and fair dealing [Doc. 98, ¶ 222]; and (2) failing to provide Plaintiffs with the opportunity to use and enjoy their time share purchases [Doc. 98, ¶ 230]. "Actions on contracts not otherwise expressly provided for" must be "commenced within six (6) years after the cause of action accrued." Tenn. Code Ann. § 28-3-109 (a)(3). There is no dispute between the Parties that Plaintiffs' breach of contract claims are governed by this six-year limitations period [Doc. 102, p. 15; Doc. 104, p. 19 n.7].

All Plaintiffs but the Spados have alleged claims that survive the six-year breach of contract limitations period even without tolling by the discovery rule. The Spados' claim was brought more

than six years after any of their three timeshare purchases were complete. Thus, the Spados' breach of contract claim is time barred unless the discovery rule applies.

The discovery rule, first announced in Tennessee in *Teeters v. Currey*, 518 S.W.2d 512, 515 (Tenn. 1974), provides that the applicable statute of limitations is tolled until a plaintiff's "injury is discovered, or, in the exercise of reasonable care and diligence, the injury *should have been discovered*." *Quality Auto Parts Co. Inc. v. Bluff City Buick Co.*, Inc., 876 S.W.2d 818, 820 (Tenn. 1994) (emphasis added). The Tennessee Supreme Court has applied the discovery rule to breach of contract claims. *Goot v. Metro. Gov't of Nashville & Davidson Cty.,* No. M200302013COAR3CV, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005) (stating that "a cause of action for breach of contract begins to run when a party either discovers the breach or could have or should have discovered the breach through the exercise of reasonable judgement.") (citing 31 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS, § 79:14, at 304 (Richard A. Lord ed., 4th ed. 2004)).

Courts are more likely to invoke the discovery rule in contract disputes when contractual injuries are "inherently undiscoverable." *Id*. A contractual injury is inherently undiscoverable in cases where "(1) the breach of contract was difficult for the plaintiff to detect, (2) the defendant was in a far superior position to comprehend the breach and the resulting damage, or (3) the defendant had reason to believe that the plaintiff remained ignorant that it had been wronged." *Id*. (citing *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir.2003)).

There are, however, circumstances in which "invocation of the discovery rule would be improper even when the breach of contract is inherently undiscoverable." *Id*. For example, the discovery rule cannot be invoked when it is "inconsistent with the terms of the applicable statute

of limitations," and second, the discovery rule "cannot supersede a contractually agreed upon limitations period" as long as that time is reasonable. *Id.*

In July 2008, the Spados purchased from Westgate "what the sales representative told them was a unit that included a balcony, and the right to use it for one week every year." [Doc. 98, ¶ 61]. Two years later, in 2010, the Spados were unable to reserve a unit with a balcony and were told that "if they wanted a balcony, they would have to upgrade." [Doc. 98, ¶ 63]. The Spados assert in the Third Amended Complaint that this offer to upgrade was "contrary to what the sales representative had told them in 2008." [Doc. 98, ¶ 63]. The Spados purchased an upgrade in August 2010 [Doc. 98, ¶ 63]. They then purchased another upgrade in July 2012 [Doc. 98, ¶ 64], and during this purchase event, questioned the sales agent about specific use of these new units because they had "previously been unable to reserve time in their units or an equivalent unit." [Doc. 98, ¶ 64]. The Spados allege that the Defendants did not inform them of the Public Offering Statement nor their right to rescind, nor did Defendants reveal to them that they would have difficulty reserving a unit even after their specific questioning of the sales agents [Doc. 98, ¶¶ 62-64].

Based on the pleadings alone, the Court is unable to conclude whether the discovery rule should be applied to the Spados' claims because it remains to be determined whether the breach was inherently undiscoverable. Therefore, the Spados claims in Count VII of the TAC are not dismissed as time barred.

### 3. Rule 12(b)(6) - Failure to State a Claim

#### a. Count 1: Violations of the Tennessee Time-Share Act of 1981

The failure to state a claim analysis for Count I of the Third Amended Complaint applies only to Plaintiffs Gilliland, Gallegos and Campbell, because the Count I claims of Plaintiffs Marilyn Moore and Ryan and Laura Spado have been dismissed as time barred.

Count I alleges violations of several provisions of the Tennessee Time-share Act of 1981 [Doc. 98, ¶¶ 137-54 citing Tenn. Code Ann. §§ 66-32-112, 114, 116, 118-19, and 121].

Plaintiffs contend that "[b]y using a folio containing a secret pocket, compensating closing agents on commission, and encouraging and/or allowing them to hide the public offering statement and the contract in a secret pocket, Westgate willfully circumvented these requirements." [Doc. 98, ¶ 146]. Specifically, Plaintiffs allege that after they signed the closing documents, the closing officer took them away to be copied and then concealed them in a hidden pocket inside a black folio before returning them to Plaintiffs [Doc. 98, ¶ 147]. Plaintiffs assert that pursuant to Tenn. Code Ann. §§ 66-32-118 and 119, they are entitled to punitive damages, attorneys' fees, rescission, and further damages for these violations [Doc. 98, ¶ 142]. The Court finds that the transaction documents rebut all of Plaintiffs' allegations in Count I.

Plaintiffs cites language from the Act, alleging that Westgate was "required" to provide Plaintiffs with an up to date "public offering statement" that included "specific rescission language" but that "by using a folio containing a secret pocket . . . Westgate willfully circumvented these requirements." [Doc. 98, ¶¶ 144-46]. Defendants point to the following disclosure, written in bold, capital letters and placed directly above the signature line the following disclosure:

> YOU MAY CANCEL A CONTRACT TO PURCHASE A TIME-SHARE
> INTERVAL WITHIN TEN (10) DAYS FROM THE DATE OF THE
> CONTRACT, WHERE YOU HAVE MADE AN ON-SITE INSPECTION OF
> THE TIME-SHARE PROJECT BEFORE SIGNING THE CONTRACT, AND, IF
> YOU HAVE NOT MADE SUCH AN INSPECTION, WITHIN FIFTEEN (15)
> DAYS FROM THE DATE OF THE CONTRACT. IF YOU ELECT TO
> CANCEL, YOU MAY DO SO BY HAND DELIVERING NOTICE TO THE
> SELLER WITHIN THE DESIGNATED PERIOD, OR BY MAILING NOTICE

> TO THE SELLER (OR HIS AGENT FOR SERVICE OF PROCESS) BY
> PREPAID UNITED STATES MAIL POSTMARKED ANY TIME WITHIN THE
> DESIGNATED PERIOD. NOTICES FROM PURCHASER TO SELLER SHALL
> BE SENT TO WESTGATE RESORTS, LTD. 2801 OLD WINTER GARDEN
> ROAD, OCOEE, FLORIDA 34761. THE RECISSION SET FORTH HEREIN
> MAY NOT BE WAIVED BY EITHER THE PURCHASER OR THE
> DEVELOPER.

[Docs. 101-3, 101-8, 101-12, 101-16, 101-20].

Plaintiffs then cite Section 66-32-114(a) of the Act, which provides:

> Before transfer of a time-share interval and no later than the date of any sales
> contract, the developer shall provide the intended transferee with a copy of the
> public offering statement and any amendments and supplements thereto. The
> contract is voidable by the purchaser until the purchaser has received the public
> offering statement.

[Doc. 98, ¶ 141]. Defendants counter that each Plaintiff signed a document entitled "Receipt for

Timeshare Documents" or "Receipt for Public Offering Statement," acknowledging their receipt

of the public offering statement [Docs. 101-5, 101-9, 101-13, 101-17, 101-21].

The clear language in the aforementioned documents, all signed or initialed by each

Plaintiff, are persuasive to defeat Plaintiffs' claims in Count I pursuant to the Tennessee Time

Share Act. Therefore, all Plaintiffs have failed to state a claim as to Count I, and it is

**DISMISSED**.

### b. Count II: Violations of the Tennessee Time-Share Act of 1981

The failure to state a claim analysis for Count II of the TAC applies only to Plaintiffs

Gilliland, Gallegos and Campbell, because, the Count II claims of Plaintiffs Marilyn Moore and

Ryan and Laura Spado have been dismissed as time barred.

Count II alleges further violations of the Act, particularly Sections 66-32-113 and 132

[Doc. 98, ¶¶ 155-65]. Plaintiffs state that pursuant to T.C.A. § 66-32-118(a), they are entitled to

"rescission of the contracts, compensatory damages, punitive damages, attorneys' fees, and other relief." [Doc. 98, ¶ 165].

T.C.A. § 66-32-113 provides:

> A developer of a time-share program shall deposit into an escrow account established and held in this state, in an account designated solely for the purpose, by an independent bonded escrow company, or in an institution whose accounts are insured, a governmental agency or instrumentality, one hundred percent (100%) of all funds which are received during the purchaser's cancellation period provided for in this part.

Tenn. Code Ann. § 66-32-113(a)(1). The implementing regulations instruct who may serve as the escrow agent, how the developer may use payments it is permitted to withdraw, and what the accounting records should contain. *See* Tenn. Comp. R. & Regs. 1260-06-.03. Plaintiffs allege Defendants violated these provisions "by failing to deposit into and maintain funds paid by timeshare purchasers in an escrow account in this state, for the duration of the cancellation period." [Doc. 98, ¶ 164]. Even if Plaintiffs had alleged facts to support this claim, they have failed to state how they were "adversely affected" by this alleged violation of the Act. *See* Tenn. Code Ann. § 66-32-118(a). Only two Plaintiffs (Gallegos and Campbell) allege an attempt to rescind their contracts during the cancellation period [Doc. 98, ¶ 96]. Consequently, only Gallegos and Campbell successfully state a claim that they were adversely affected by Defendants' failure to maintain an escrow account for purchasers' funds.

Count II next alleges false advertisement [Doc. 98, ¶¶ 156-61]. Section 66-32-102(2) of the Act defines "advertisement" as "any written, printed, verbal or visual offer by an individual or general solicitation." Section 66-32-132 establishes the following limits on advertisements for time-share intervals:

> No advertising for the offer of sale of time-share intervals shall:
> (1) Contain any representation as to the availability of a resale program or rental program offered by or on behalf of the developer or its affiliate unless the resale

program and/or rental program has been made a part of the offering and submitted to the commission;

(2) Contain an offer or inducement to purchase which purports to be limited as to quantity or restricted as to time unless the numerical quantity and/or time applicable to the offer or inducement is clearly and conspicuously disclosed;

(3) Contain any statement concerning the investment merit or profit potential of the time-share interval unless the commission has determined from evidence submitted on behalf of the developer that the representation is neither false nor misleading;

(9) Misrepresent the nature or extent of any services incident to the time-share project;

(11) Make any misleading or deceptive representation with respect to the contents of the time-share program, the purchase contract, the purchaser's rights, privileges, benefits or obligations under the purchase contract or this part[.]

Tenn. Code Ann. § 66-32-132.  Plaintiffs allege that "Defendants violated these provisions," by hiding required disclosures in a secret pocket [Doc. 98, ¶ 162].  Plaintiffs further allege that Defendants "encourage and/or allow" their sales agents to "conceal material facts" regarding the "lack of unit availability due to Defendant's practice of overselling the Resort."  [Doc. 98, ¶ 162].

In other sections of the Third Amended Complaint, as well as the supplemental documents, Plaintiffs have supplied sufficient facts to support the allegations of false advertisement, particularly regarding Section 66-32-132(11) of the Act ("no advertising . . . shall make any misleading or deceptive representation with respect to the contents of the time-share program . . . ."). Therefore, for Plaintiffs Gilliland, Gallegos and Campbell, the false advertising claims survive Defendants' Motion to Dismiss for failure to state a claim and are not dismissed.

**c. Count III: Unjust Enrichment**

The failure to state a claim analysis for Count III of the TAC applies only to Plaintiffs Gilliland, Gallegos and Campbell, because the Count III claims of Plaintiffs Marilyn Moore and Ryan and Laura Spado have been dismissed as time barred.

Count III of the TAC alleges unjust enrichment [Doc. 98, ¶¶ 166-70].  Plaintiffs allege they conferred benefits upon Westgate in the form of various payments "made with the reasonable

expectation that Westgate was selling timeshare properties that could be used and enjoyed by Plaintiffs [Doc. 98, ¶¶ 167-68] Plaintiffs also allege that the Defendants misrepresented unit availability in violation of the Time Share Act [Doc. 98, ¶¶ 167-68]. Plaintiffs further allege it would be unjust for Westgate to keep those payments because Westgate induced Plaintiffs to make those payments by failing to disclose facts material to the transactions [Doc. 98, ¶ 169].

Under the theory of unjust enrichment, a contract is implied in law where no contract exists. *Coffey v. Coffey*, 578 S.W.3d 10, 24 (Tenn. Ct. App. 2018), *appeal denied* (Feb. 20, 2019). To state a claim for unjust enrichment under Tennessee law, Plaintiffs must allege facts to support the following elements: (1) Plaintiffs conferred a benefit upon Defendants; (2) Defendants appreciated that benefit; (3) Defendants accepted that benefit under such circumstances that it would be inequitable for them to retain the benefit without payment of the value thereof. *Coffey*, 578 S.W.3d at 25 (quoting *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005)).

Defendants argue Plaintiffs' unjust enrichment claim fails "because there are express contracts governing Plaintiffs' relationships with Defendants." [Doc. 102, pg. 11]. Plaintiffs respond that because they were induced to sign the contracts by fraud, the contracts were invalid [Doc. 104, pg. 15]. Federal Rule of Civil Procedure 8(a)(3) permits pleading in the alternative; therefore, the fact that Plaintiffs have also alleged two counts of breach of contract does not itself defeat their unjust enrichment claim.

The Court finds that Plaintiffs have successfully pled unjust enrichment. First, Plaintiffs allege that they conferred a benefit upon Defendants, namely purchase price for the property interest, fees and in some cases mortgage payments. Second, Defendants appreciated that benefit in that they received those payments from Plaintiffs and have not held them as separate or escrow funds. Finally, it would be unfair for Defendants to retain the benefit of payments conferred by Plaintiffs

because, Plaintiffs allege, they have not been able to use their timeshare units. Therefore, the unjust enrichment claims of Plaintiffs Gilliland, Gallegos and Campbell survive Defendants' Motion to Dismiss for failure to state a claim and are not dismissed.

### d. Counts IV and V Fraudulent Misrepresentation and Fraud in the Inducement

The failure to state a claim analysis for Counts IV and V of the TAC applies only to Plaintiffs Gilliland, Gallegos and Campbell, because the claims in Count IV and V brought by Plaintiffs Marilyn Moore and Ryan and Laura Spado have been dismissed as time barred.

### i. Rule 9(b) Heightened Standard for Fraud Claims

According to Rule 9 of the Federal Rules of Civil Procedure, a party must state with "particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The goal of this "heightened pleading standard" is to "provide a defendant fair notice of the substance of a plaintiff's claim." *Noblitt v. Bluegreen Vacations Unlimited, Inc.,* No. 3:18-CV-117, 2019 WL 7290474, at *3 (E.D. Tenn. Mar. 20, 2019) (quoting *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc*., 683 F.3d 239, 257 (6th Cir. 2012) and *Michaels Bldg. Co. v. Ameritrust Co.,* N.A., 848 F.2d 674, 679 (6th Cir. 1988)). Rule 9(b) requires "at a minimum . . . that plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co*., 447 F.3d 873, 877 (6th Cir. 2006). Thus, the Court considers Counts IV and V of Plaintiffs' Third Amended Complaint, fraudulent misrepresentation by omission, and fraud in the inducement, on the backdrop of this heightened standard.

The Court finds that Plaintiffs have met this heightened standard in their pleadings. *See* discussion *infra* (discussing Count VII: Plaintiffs' claims of breach of the implied covenant of good faith and fair dealing). Each Plaintiff alleges a specific encounter or encounters with Westgate sales agents, in many instances referring to the agents by name [Doc. 98, ¶¶ 64, 68, 72,

79, 85, 88].  Each Plaintiff alleges the location of their timeshare unit as well as the location and nature of their meetings with Westgate agents [Doc.98, ¶¶ 61, 68, 9, 88].  Each Plaintiff alleges specific dates for purchase of sale and "upgrades."  [Doc. 98, ¶¶ 61, 63, 64, 66, 68, 72, 75, 79, 86, 88].  Finally, each Plaintiff alleges specific sales tactics and conversations between themselves and Westgate agents that induced them to purchase their timeshare units. *See* discussion *infra* (discussing Count VII).

The Court finds that these detailed allegations provide Defendants with ample notice of the substance of Plaintiffs' claims.  Therefore, the Court finds Plaintiffs have successfully met the heightened requirements for fraud claims required by Fed. R. Civ. P. 9(b).  The Court now considers the substantive fraud claims in Counts IV and V.

### ii.    Count IV - Fraudulent Misrepresentation

To state a claim for fraudulent misrepresentation, Plaintiffs must allege sufficient facts to support that (1) Defendants intentionally misrepresented a material fact; (2) Defendants made the representation "knowingly or recklessly or without belief or regard for its truth"; (3) Plaintiffs reasonably relied on the representation and suffered damages as a result; and (4) "the misrepresentation relate[d] to an existing or past fact." *Innerimages, Inc. v. Newman*, 579 S.W.3d 29, 42 (Tenn. Ct. App. 2019) (quoting *Dog House Investments, LLC v. Teal Properties, Inc.*, 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014)).

Plaintiffs allege that Westgate not only represented that Plaintiffs would not have difficulty using their timeshares, but that Defendants "fraudulently omitted material information, fraudulently induced the Plaintiffs to remain in the contract through the rescission period, and generally defrauded the Plaintiffs." [Doc. 98, ¶¶ 173, 177].  Plaintiffs name individual "Westgate agents" who failed to disclose material facts in connection with each Plaintiff's timeshare contract

[Doc. 98, ¶¶ 179-82]. Specifically, Plaintiffs allege these agents failed to disclose that (1) Plaintiffs were purchasing a floating use plan rather than the right to use a specific unit; (2) "Westgate regularly and systematically oversold the Resort," which would prevent Plaintiffs from using their timeshare properties; and (3) Plaintiffs had the right to rescind their contracts [Doc. 98, ¶¶ 179-82].

Defendants counter that all of Plaintiffs' claims, including those for fraudulent misrepresentation and fraudulent inducement, are defeated by "underlying documents" in the form of "contracts," "receipts," and "acknowledgements," which were all signed and/or initialed by Plaintiffs [Doc. 102, pgs. 12-13]. Defendants first point to the contracts signed by Plaintiffs, [Exhibits to Doc. 101],[5] and state that these contain language providing that Plaintiffs were purchasing a "floating use plan" and that the contracts "may be rescinded." *Id*. Defendants next state that the "acknowledgement" form initialed multiple times by each Plaintiff provides "specifically that they are releasing their right to reserve a specific unit in exchange for the ability to make a reservation in the floating use plan, subject to availability." *Id*. This is not entirely accurate. Though the acknowledgement form does contain a statement concerning the "floating use plan,"[6] the language "subject to availability" appears in a different section which addresses "trading of time" within the resort. Plaintiffs do not allege that they were unable to trade time at the resort but allege instead that they were unable to reserve time at the resort. Therefore, the

_____

[5][*See* Docs. 101-3 (Moore), 101-8 (Spado), 101-12 (Gilliland), 101-16 (Gilliland), 101-20 (Campbell & Gallegos)].

[6][*See* Docs. 101-6 (Moore), 101-10 (Spado), 101-14 (Gilliland), 101-22 (Campbell & Gallegos)] Under the title "Applicable Resorts Only" is a line "12" that each Plaintiff initialed, which states: "I (We) understand that by participating in the Floating Use Plan I (We) are not entitled to the use of the specific Unit for the specific Unit Week owned, but rather that the possession and use rights are released in consideration for receiving the right to make a reservation under the Floating Use Plan."

"subject to availability" language is part of a section in the acknowledgement that is not at issue here.[7]

Further, these documents, standing alone, do not sufficiently explain the "floating use plan." Instead, the "acknowledgement" documents signed by Plaintiffs merely states that buyers are receiving a "right to make a reservation under the floating use plan" in exchange for forfeiting their entitlement to a "specific unit" on a "specific unit week." [*See, e.g.* Doc. 101-6, ¶ 12].

Defendants next argue that the conspicuous rescission language on both the "receipt" and the "contract" documents bars Plaintiffs claims in their entirety. The Court does not deny that this rescission language is conspicuous, as it appears in bold, all capital letters above the signature line on both documents. However, this rescission language gives purchasers only ten to fifteen days to rescind their purchase contracts. None of the Plaintiffs could have possibly known the true nature of the "floating use plan" within that time frame, since none of them had yet tried to use their timeshare units within that time. Plaintiffs claim that agents misrepresented how and when they could use their timeshare units, and misrepresented what Plaintiffs were actually purchasing. The truth or falsity of these claims would not have become apparent until well after the ten- or fifteen-day rescission window.

Plaintiffs further argue that Defendants cannot invoke fraudulent documents as a defense to claims sounding in fraud [Doc. 104, pg. 12]. Plaintiffs cite *Overton v. Westgate* for the proposition that Plaintiffs who allege fraudulent inducement to a contract are not bound by the terms of that underlying contract. No. E2014-00303-COAR#CV, 2015 WL 399218, at *12 (Tenn. Ct. App. Jan. 30, 2015). Plaintiffs clarify that a claim for fraudulent misrepresentation seeks to rescind the contract on the ground that "one party fraudulently induced the other to enter the

---

[7] *Id.* section "8".

contract." [Doc. 104, pg. 13 citing *Butler v. Butler*, No. W2007-01257-COA-R3-CV, 2008 WL 5396019, at *6-7 (Tenn. Ct. App. Dec. 23, 2008)].

The Court finds *Overton* instructive in this matter. In *Overton*, plaintiffs brought an action similar to this one against Westgate, alleging "fraud" and "misrepresentation" and various contractual violations. *Overton*, 2015 WL 399218, at *1. The court below had found Westgate guilty of common law fraud and misrepresentation because Westgate had engaged in deceptive practices including training salespersons to make promises to buyers, knowing that these promises were not reflected in the written purchase documents. *Id*. at *3. The trial court had awarded punitive damages as well as attorneys' fees to plaintiffs. *Id*. Westgate appealed on several issues, including whether the trial court erred in failing to enforce a forum selection clause provision contained in the underlying contract. *Id*. The Tennessee Court of Appeals held that the trial court had properly refused to enforce the forum selection clause because the plaintiffs had alleged, and the court ultimately found, fraudulent inducement and misrepresentation. *Id*. at *12. The Court of Appeals stated that "fraud in the underlying transaction renders a contract clause . . . unenforceable." *Id*. (quoting *Lamb v. MegaFlight, Inc.,* 26 S.W.3d 627, 631 (Tenn. Ct. App. 2000)).

Here, Plaintiffs allege facts like those in *Overton* in their claims of fraudulent misrepresentation by omission and fraudulent inducement. Plaintiffs allege that Westgate sales agents made misleading statements to Plaintiffs which directly conflict with the written statements found in the purchase documents that they signed and initialed. Plaintiffs further claim that these misleading verbal representations induced them to purchase their timeshare units, and that the true nature of the "floating use plan" was not adequately explained to them. These verbal

representations and omissions, considered in the context of alleged "high-pressure" sales tactics, state a sufficient claim for fraudulent misrepresentation by omission.

The *Overton* court refused to enforce a contract provision when the underlying contract was alleged to have been induced by fraud. Similarly, the Court in this case declines to find that the documents, signed by Plaintiffs, are sufficient to block Plaintiffs' fraud claims regarding those very same purchase agreements. Neither does the rescission language on the contract documents bar Plaintiffs' claims for fraudulent misrepresentation. Therefore, the fraudulent misrepresentation claims of Plaintiffs Gilliland, Gallegos and Campbell survive Defendants' Motion to Dismiss for failure to state a claim and are not dismissed.

### iii. **Count V - Fraud in the Inducement**

The elements of fraudulent inducement to a contract are "(1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance." *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627 (Tenn. Ct. App. February 9, 2000).

In Count V, Plaintiffs allege details of their encounters with Westgate salespeople [Doc. 98, ¶¶ 179-182]. Plaintiffs allege that Westgate agents told them they were purchasing specific units that they could use, when in truth Westgate "regularly and systematically oversold the Resort," making it difficult to impossible to book these units [Doc. 98, ¶¶ 179, 180, 181, 182]. Together with specific quotations from the various agents to Plaintiffs, discussed *infra* (*see* discussion in Count VII), these allegations sufficiently state a claim that Westgate agents made false statements to Plaintiffs and had "utter disregard" for the truth of these statements. Plaintiffs further allege that Defendants "engaged in a high-pressure sales pitch designed to induce the

Plaintiffs to make a significant financial decision in a short time span with inaccurate information" and that they "intended to induce reliance upon the representations." [Doc. 98, ¶¶ 192, 202].

Taking the pleadings as true, Plaintiffs reasonably relied on alleged statements and omissions made by Westgate agents in purchasing their timeshare units and suffered economic loss in the form of mortgage payments and fees for property shares they were not able to use.

For these reasons, the Count V fraud in the inducement claims of Plaintiffs Gilliland, Gallegos and Campbell survive Defendants' Motion to Dismiss for failure to state a claim and are not dismissed.

### e. Count VI: Negligent Misrepresentation

The failure to state a claim analysis for Count VI of the TAC applies only to Plaintiffs Gilliland, Gallegos and Campbell, because the Count VI claims of Plaintiffs Marilyn Moore and Ryan and Laura Spado have been dismissed as time barred.

A plausible claim for negligent misrepresentation requires sufficient facts showing that "a defendant has provided (1) false information, (2) for the guidance of others, (3) in a business transaction." *City of Morristown v. AT&T Corp.*, 206 F.Supp.3d 1321, 1339 (E.D. Tenn. August 29, 2016) (quoting *Ritter v. Custom Chemicides*, Inc., 912 S.W.2d 128, 131 (Tenn.1995)). In determining negligent misrepresentation, a "business transaction" includes "the making of a contract." *Id.* A claim for negligent misrepresentation carries the same particularity requirements under Fed. R. Civ. P. 9(b) as the claims for fraudulent misrepresentation and fraud in the inducement. *Id.* at 1340. The Court need not address these requirements here because it has already addressed Plaintiffs' intentional fraud claims and found those pleadings sufficiently particular. *See* discussion *supra*. It follows that, because Plaintiffs have plausibly pled fraudulent misrepresentation and inducement, they have also plausibly pled the less stringent elements of

negligent misrepresentation. Therefore, the claims of negligent misrepresentation (Count VI) brought by Plaintiffs Gilliland, Gallegos and Campbell survive Defendants' Motion to Dismiss for failure to state a claim and are not dismissed.

### f. Counts VII and VIII: Breach of Contract

Count VII alleges that Defendants have breached the implied covenant of good faith and fair dealing in their contractual agreements with Plaintiffs. In Count VII, Plaintiffs define this implied covenant and allege generally that Defendants have breached these contracts through "omissions, misrepresentations, and practices." [Doc. 98, ¶¶ 220-227]. The allegations in Count VIII are very similar to those in Count VII, adding only one paragraph to the otherwise identical pleadings [Doc. 98, ¶ 230]. The added paragraph states that Defendants breached their timeshare contracts with Plaintiffs through "omissions, misrepresentations, and practices [such as] Defendants' failure to adequately disclose to [Plaintiffs] that Westgate artificially restricted availability of time share units [as well as] Defendants' scheme to avoid providing required disclosures and Defendants' failure to provide [Plaintiffs] the opportunity to use and enjoy their purchase." [Doc. 98, ¶ 230]. Because the pleadings in Counts VII and VIII are similar enough that they do not sufficiently state two separate claims for breach of contract, the Court considers them together as a single claim for breach of the implied covenant of good faith and fair dealing.

"In Tennessee, a duty of good faith and fair dealing is imposed in the performance and enforcement of every contract." *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009); see also *Universal Properties, Inc. v. Regions Bank*, No. 3:11-CV-538, 2012 WL 4360770, at *8 (E.D. Tenn. Sept. 21, 2012) ("Parties to a contract owe each other a duty of good faith and fair dealing as it pertains to the performance of the contract."). The covenant of

good faith and fair dealing also applies to contracts involving certain property interests. *See Dick Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM*, Inc. 395 S.W.3d 653, 656 (Tenn. 2013).

Tennessee courts have determined that the purpose of the implied duty of good faith and fair dealing is "(1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered." *Cadence Bank, N.A. v. The Alpha Trust*, 473 S.W.3d 756, 769 (Tenn. Ct. App. 2015) (internal citations omitted). Parties to a contract are presumed to know the law and that every contract contains this implied duty. *Id*.

In the TAC, Plaintiffs state that "bad faith may be overt or may consist of inaction, and fair dealing requires more than honesty." [Doc. 98, ¶ 223 (quoting 21 Tenn. Prac. Contract Law and Practice § 8:33 (2014)]. The implied covenant of good faith and fair dealing is "not limited to the specific contract terms" but is a "method of effectuating the parties' intent . . . ." *Cadence Bank*, 473 S.W.3d at 770 (internal citation omitted). However, "the implied covenant of good faith and fair dealing is not a stand-alone claim." *Universal Properties, Inc.*, 2012 WL 4360770, at *8 (citing *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000)). Rather, a claim for breach of good faith and fair dealing must be part of an "overall breach of contract claim." *Id*. A breach occurs when "a party to the contract exercises discretion authorized in a contract in an unreasonable way." *Id*. (citing *Jones Express, Inc. v. Watson*, 2012 WL 1717312 (M.D. Tenn. May 15, 2012)). Plaintiffs claim that Defendants violated the covenant of good faith and fair dealing by (1) failing to disclose documents and the nature of the "floating use plan;" and (2) failing to disclose their right to rescind the timeshare contracts.

### i. Failure to Disclose Documents and the Nature of the "Floating Use Plan."

Throughout the Third Amended Complaint, Plaintiffs allege that Defendants used "secret pockets" in their closing materials to conceal legally required materials in a deceptive manner [*See* Doc. 98, ¶¶ 2, 36(b), 52, 54, 55, 56, 62, 73, 76, 83, 103, 104, 132(b), 146, 147, 148, 149, 151, 152]. Plaintiffs allege that these pockets are commonly used by Defendants' employees to avoid calling Plaintiffs' attention to rescission provisions and the true nature of the "floating use plan." In essence, Plaintiffs allege that Defendants used these pockets to comport with the letter of the law while violating the spirit of the law.

Defendants argue that Plaintiffs each signed a contract that contains the required disclosure materials under the Tennessee Time Share Act. *See* discussion of Count IV, *supra*; [Doc. 101, pg. 1; Doc. 102, pg. 2]. Specifically, Defendants point to three pages of contract documents, each signed and initialed by the Plaintiffs, that contain the required rescission clause and indication of the "floating use plan." [Doc. 102, pgs. 12-13]. Defendants rest their motion to dismiss largely on the existence of these signed documents [Doc. 101, Doc. 102 pgs. 4,6,7, and 8]. Defendants contend that Plaintiffs' complaint should be dismissed because each Plaintiff signed these documents, and because each document, on its face, comports with the Tennessee Time Share Act and properly discloses the true nature of the timeshare contracts.

As discussed *infra*, Plaintiffs plead more than a simple failure to disclose information. Plaintiffs allege not only careful omissions by Defendants' agents, but also affirmative verbal misrepresentations to Plaintiffs that they were purchasing specific timeshare units that could be reserved without difficulty. Plaintiffs allege these statements with sufficient particularity, detailing specific instances in which Defendants' sales agents told Plaintiffs, directly or by implication, that they would ample opportunity to book a specific or comparable unit to the one purchased [Doc. 98, ¶¶ 63, 64, 69, 71, 75, 79, 90].

Plaintiffs Ryan and Laura Spado allege they paid $10,000 "for what the sales representative told them was a unit that included a balcony, and the right to use it for one week every other year." [Doc. 98, ¶ 61].  In August 2010, Defendants told the Spados they would need to "upgrade to a different unit" to book a unit with a balcony [Doc. 98, ¶ 63]. Again, in July 2012, the Spados "specifically asked" Defendants' agent "to confirm that they were buying specific units with specific floor plans." [Doc. 98, ¶ 64].  According to the complaint, the agent did confirm this, notarizing a copy of two "specific floor plans." [Doc. 98, ¶ 64].  Despite this, the Spados were repeatedly denied reservation requests for their timeshare [Doc. 98, ¶ 65].

Plaintiff Moore was informed by Defendants' sales agents that the "one-bedroom unit" she had purchased "would be available anytime she wanted to use it" with a 24-hour advanced booking [Doc. 98, ¶ 69].   Defendants told Ms. Moore that she would have "first priority" in booking her unit.  *Id*.  When Ms. Moore had trouble booking, Defendants' agents told her that purchasing a second unit would "solve the availability problem." [Doc. 98, ¶ 72].  On November 16, 2012, Ms. Moore upgraded to a "nicer '1-bedroom deluxe'" unit [Doc. 98, ¶ 72].   In November 2013, Defendant agents again told Ms. Moore that the "availability problem" would be solved if she upgraded to another unit [Doc. 98, ¶ 75].

Plaintiffs Ellen and Larry Gilliland bought a "one-bedroom king site with a balcony and fireplace" and a "two-bedroom unit with balcony and fireplace" on December 14, 2015 [Doc. 98, ¶ 80].  Based on these unit descriptions, the Gillilands believed they were purchasing "the right to use a specific unit or . . . type of unit."  [Doc. 98, ¶ 82]. When they were unable to reserve their timeshares, they instead had to book units that "did not match the units they specifically purchased." [Doc. 98, ¶ 85].   On May 24, 2016, the Gillilands upgraded to new units that "purportedly conformed with the representations" previously made by Defendants [Doc. 98, ¶ 86].

On September 30, 2017, Plaintiffs Gerold Gallegos and Deborah Campbell purchased from Defendants a "1 Bedroom Deluxe unit, in the 'New H' section" of a "yet-to-be constructed cabin." [Doc. 98, ¶ 90]. Defendants' agents told them this resort would be "available in 2020." *Id*. Plaintiffs allege that Defendant agents "insisted" that they "sign closing documents without reading them." [Doc. 98, ¶ 89] and that Plaintiffs "were not given a reasonable opportunity to adequately review the closing documents." [Doc. 98, ¶ 92]. Defendants have since told Plaintiffs Gallegos and Campbell that the unit they purchased had "not been built" and "will not be built in 2020." [Doc. 98, ¶ 97]. At the time the Complaint was filed Plaintiffs Gilliland had not been able to stay at any of Defendants' properties [Doc. 98, ¶ 97].

Taking these details as true, each Plaintiff successfully pleads that the Defendants, through affirmative statements as well as omissions, led Plaintiffs to believe that they were purchasing specific time share units, or specific types of units. Thus, each Plaintiff reasonably believed that they had purchased a specific unit or type of unit. Each Plaintiff also successfully pleads that they reasonably believed they would be able to reserve their timeshare units at particular times. This reasonable belief was based on representations made by Defendant sales agents. Each Plaintiff pleads that, despite this reasonable belief, they were not able to book their time share units at the anticipated times. Thus, Plaintiffs did not receive the expected benefit of the contracts they signed, though they each paid for that benefit, sometimes twice and three times over [Doc. 98, ¶¶ 61, 63, 64, 68, 75, 77, 80, 86, 91].

Generally, Plaintiffs allege (1) that they were subject to Defendants' "high-pressure" sales tactics, (2) that they purchased what they thought were specific units and floorplans, (3) that they made specific attempts to use those units or floor plans, often after a second or third sizeable

payment to Defendants, and (4) that they were continually unable to benefit from their performance on those purchases.

As to the claim that Defendants concealed the true nature of the "floating use plan," the Court finds that all Plaintiffs have plausibly pled a claim for a breach of the covenant of good faith and fair dealing. Therefore, Plaintiffs' breach of contract claim survives Defendants' Motion to Dismiss and is not dismissed. Plaintiffs do not sufficiently plead that Defendants failed to disclose the right to rescind, because the rescission language is conspicuous on the contract documents. However, treatment of this is unnecessary here because the other claims in Count VII survive the Motion to Dismiss.[8]

### g. Count IX - Civil Conspiracy

The failure to state a claim analysis for Count IX of the TAC applies only to Plaintiffs Gilliland, Gallegos and Campbell, because the Count IX claims of Plaintiffs Marilyn Moore and Ryan and Laura Spado have been dismissed as time barred.

Count IX of the TAC alleges a civil conspiracy among all Defendants [Doc. 98, ¶¶ 234-41]. Defendants contend that Plaintiffs' civil conspiracy allegations fail to state a claim because civil conspiracy is not actionable by itself; it must be accompanied by an underlying tort [Doc. 102, pgs. 13-14 (citing *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 179-80 (Tenn. Ct. App. 2007))]. Defendants argue that, since Plaintiffs' allegations fail to state a claim for the alleged underlying causes of action, they therefore fail to state a claim for civil conspiracy [Doc. 102, pg. 14]. Defendants further assert that "Plaintiffs generically allege all

---

[8] *See* discussion *infra* regarding this rescission language and Plaintiffs' claims of fraudulent misrepresentation by omission and fraud in the inducement. While the Court agrees that the right to rescind was conspicuous on the documents, these provisions do not bar Plaintiffs' claims sounding in fraud.

Defendants had an agreement to commit unlawful acts, but Plaintiffs do not allege any facts forming the basis of their allegation that an agreement existed [Doc. 102, pg. 14].

Plaintiffs argue that the TAC sets forth ample factual allegations detailing "Westgate's scheme to defraud timeshare purchasers." [Doc. 104, pg. 16]. They point to paragraph thirty-eight (38) of the TAC, which alleges that "Westgate specifically trains its sales agents to make misrepresentations and omissions during the sales process" and includes quotes made by "Westgate Resorts Vice President Richard Siegel" regarding this training [Doc. 98, ¶ 38]. Plaintiffs further allege that "Westgate provides black folios to facilitate the concealment, and fosters a commission-based compensation system designed . . . to conceal information from its customers on a widespread basis." [Doc. 104, pg. 16 (citing Doc. 98, ¶¶ 36-60)]. In reply, Defendants state they are not challenging the fact that Plaintiffs have alleged an overall scheme to defraud; rather, Plaintiffs make no factual allegations regarding any common design or concerted action among Defendants—i.e., no factual allegations that could support an inference of conspiracy [Doc. 106, pg. 12].

To state a claim for civil conspiracy, Plaintiffs must allege facts to support: "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Diamond Resorts Int'l, Inc. v. Phillips*, No. 3:17-CV-1124, 2018 WL 3326443, at *3 (M.D. Tenn. Jan. 24, 2018) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)).[9]

---

[9] Plaintiffs do not indicate in the TAC whether they are pursuing a cause of action for civil conspiracy pursuant to state or federal law [*see* Doc. 98, ¶¶ 234-41]. However, Plaintiffs cite *Diamond Resorts Int'l* in their response [Doc. 104, pg. 15]. Because *Diamond Resorts Int'l* applies Tennessee law, the Court will construe the TAC as asserting a state-law claim for civil conspiracy for purposes of Defendants' motion.

A party seeking to establish civil conspiracy must do so by a preponderance of the evidence. *Kincaid*, 221 S.W.3d at 38. Because civil conspiracy requires "the performance of some underlying tortious act," a conspiracy claim is not "independently actionable." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. January 18, 2007). A claim of civil conspiracy must create "more than a suspicion or conjecture that a conspiracy exists." *Stanfill v. Hardney*, No. M200402768COAR3CV, 2007 WL 2827498, at *8 (Tenn. Ct. App. Sept. 27, 2007). It must enable "reasonable persons to infer" that the elements have been met. *Id.*

As Plaintiffs point out, "civil conspiracies are rarely proven directly. They are most often established using circumstantial evidence and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of the person in similar circumstances. Thus, factfinders may consider the nature of the acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances." [Doc. 104, pg. 16, quoting *Childs v. United Cmty. Bank*, No. 3:08-CV-271, 2009 WL 2244634, at *3 (E.D. Tenn. July 24, 2009)]. Conspiracies are "by their very nature [formed] in secret." *Stanfill*, 2007 WL 2827498, at *8. As a result, conspiracy is difficult to plead, because "in the absence of testimony of one of the conspirators, it is unlikely that direct evidence of a conspiratorial agreement will exist." *Id.*

The Court finds that Plaintiffs sufficiently state a claim for all prongs of civil conspiracy outlined in *Diamond Resorts*. First, it is apparent from the pleadings that the Defendant companies work together toward the common purpose of selling time share units. The Plaintiffs have pled that Defendants have a close relationship with one another, through common management, parent/subsidiary and partnership relationships, and concerted, centralized sales efforts for the purposes of selling time share units to Plaintiffs. Second, Plaintiffs have successfully alleged

fraudulent misrepresentation, fraud in the inducement, and negligent misrepresentation, all underlying tortious acts to a civil conspiracy claim. Third, Plaintiffs sufficiently allege that Defendants have done "overt acts" to make timeshare sales, including Westgate's use of high-pressure sales tactics and their placement of the required documents in difficult to find pockets in sales portfolios. Finally, Plaintiffs have alleged injury in the form of mortgage payments and fees paid for the use and enjoyment of timeshare units that, in most cases, was never delivered.

For these reasons, the civil conspiracy claims of Plaintiffs Gilliland, Gallegos and Campbell survive Defendants Motion to Dismiss for failure to state a claim and are not dismissed.

**C.      Rule 12(f): Motion to Strike**

Defendants have moved to strike Plaintiffs' class allegations and jury demand pursuant to Federal Rule of Civil Procedure 12(f) [Doc. 102, pgs. 19-25]. Rule 12(f) allows the Court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are viewed with disfavor and are not frequently granted." *Operating Engineers Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)). Such motions should be granted only if "it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense and are inferable from the pleadings." *Id.* (citing *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991)).

Plaintiffs have filed a Motion to Certify Class [Doc. 124] which is still pending. The Court will address the Motion to Certify Class in a separate ruling and believes that granting a Motion to Strike would therefore be premature. Consequently, Defendants' Motion to Strike class allegations is **DENIED**.

Defendants next argue that Plaintiffs' jury demand should be stricken because each Plaintiff signed a contract which included a jury waiver provision [Doc. 102 pg. 24]. Here, the Court finds *Overton* again instructive for the proposition that Plaintiffs who successfully allege fraudulent misrepresentation or fraudulent inducement to a contract are not bound by the terms of that underlying contract. No. E2014-00303-COAR#CV, 2015 WL 399218, at *12 (Tenn. Ct. App. Jan. 30, 2015). Plaintiffs have successfully alleged that they were induced to sign timeshare contracts through Defendants' misrepresentations and omissions. Therefore, Plaintiffs should not be bound by the jury waiver provisions contained within those contracts. Defendants' motion to strike Plaintiffs' jury demand is **DENIED**.

## III.    CONCLUSION

For the reasons stated herein, the Court finds that Defendants' Motion to Dismiss and Motion to Strike Plaintiffs' Third Amended Complaint is **GRANTED** in part and **DENIED** in part.

This Court has specific personal jurisdiction over all Defendants because the Defendants all have minimum contacts with the state of Tennessee and have purposely availed themselves of the benefit of doing business in the state. Therefore, Defendants' motion pursuant to Rule 12(b)(2) is **DENIED**.

Defendants have successfully argued that Plaintiffs have failed to state a claim in Counts I and VIII of the Third Amended Complaint. Therefore, pursuant to Rule 12(b)(6), Counts I and VIII of the Third Amended Complaint are **DISMISSED** with prejudice as to all Plaintiffs.

Defendants have successfully raised time limitations that bar certain of the Plaintiffs' claims. As to Plaintiff Marilyn Moore and Plaintiffs Ryan and Laura Spado Counts I, II, III, IV, V, VI, and IX are time barred, and are **DISMISSED** with prejudice. Count VII breach of contract

claims of Plaintiffs Moore and Spado survive defendant's Motion to Dismiss. Plaintiffs Ellen and Larry Gilliland, Gerold Gallegos and Deborah Campbell timely raised all claims presented in the Third Amended Complaint. Therefore, for Plaintiffs Gilliland, Gallegos, and Campbell, only Counts I and VIII of the Third Amended Complaint are **DISMISSED**.

       SO ORDERED:

<br>

s/ Clifton L. Corker
United States District Judge