UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MARILYN MOORE, *et al*.,                    )
                                            )
            Plaintiffs,                     )
                                            )
v.                                          )          No. 3:18-cv-410-DCLC-JEM
                                            )
WESTGATE RESORTS LTD., L.P.,                )
a/k/a Westgate Resorts, LTD., *et al*.,     )
                                            )
            Defendants.                     )

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court,

and the Order referring the matter by United States District Judge Clifton Corker [Doc. 205].

Now before the Court is Defendants' Motion to Exclude Opinions of Ken[neth] Free

[Doc. 147]. Plaintiffs have responded in opposition to the motion [Doc. 163], and Defendants have

replied [Doc. 166]. Given the passage of time since the briefing, the Court allowed the parties to

file supplemental briefs [Doc. 206]. On April 28, 2025, the parties filed supplemental briefs

[Docs. 208 & 209]. On June 11, 2025, the parties appeared before the Court for a motion hearing.

Attorneys Christopher Coleman, John Belcher, Kenneth Byrd, and Wayne Ritchie, II, appeared on

behalf of Plaintiffs. Attorneys Benjamin New and Robert Vance appeared on behalf of Defendants.

The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a).

For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART**

the motion [**Doc. 147**].

## I.      BACKGROUND.

On September 25, 2018, Plaintiffs filed their Complaint [Doc. 1], and later, on July 17,

2020, they filed the Third Amended Class Action Complaint ("Third Amended Complaint")

[Doc. 98]. Plaintiffs are purchasers of timeshares at Westgate Smoky Mountain Resort ("Resort") [*Id*. ¶¶ 61, 68, 79, 88, 99, 107]. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, they also seek to bring this action on behalf of others, defining their proposed class as:

> All residents of the United States and its territories who purchased from [Defendant] a "floating use plan" vacation timeshare property at the Westgate Smoky Mountain Resort at Gatlinburg from September 25, 2008[,] through the date of class certification.

[*Id*. ¶ 114].[1] On May 1, 2020, Plaintiffs moved to certify the class and to appoint class counsel [Doc. 124].

Plaintiffs allege that "Defendants [are] various entities associated with the . . . Resort" [Doc. 98 p. 1]. Plaintiffs generally claim that Defendants "use a high-pressure scheme that involves convincing prospective purchasers to buy into [their] vacation timeshare program while failing to adequately disclose material and legally required information to buyers" [*Id*.]. According to Plaintiffs, Defendants failed to disclose material facts to timeshare purchasers by: (1) "fail[ing] to adequately train or to supervise their sales agents, and, . . . encourag[ing] their sales agents to utilize high-pressure sales tactics[,]" (2) "provid[ing] their sales and closing agents with a folio to give to purchasers with the purchasers' documentation; however, the folios provided by the Defendants contain a 'secret pocket' which Defendants know their sales and closing agents often use to conceal the required disclosures[,]" (3) "fail[ing] to adequately disclose to purchasers that they are not purchasing a share in a specific unit but are instead buying into a 'floating use plan[,]'" and they do not explain how those plans work, (4) "fail[ing] to adequately disclose that the Defendants may delay delivery of a deed to the purchasers for a period of years[,]" and (5) "fail[ing] to disclose to purchasers that because [Defendants] oversell[] and artificially restrict[]

---

[1] Plaintiffs define the "floating use plan" as a plan that provides "owners the right to use a certain type of unit, subject to availability" [Doc. 98 ¶ 48].

2

the availability of Resort properties . . . they will not be able to use their timeshare purchase as advertised or as would be reasonably expected" [*Id.* ¶ 36(a)–(d); *see also* ¶¶ 39–60]. Plaintiffs add that "Defendants['] sales agents pressure purchasers to sign a series of complex and misleading legal documents without giving purchasers the opportunity to read—or in some cases, see—the documents they are signing" [*Id.* ¶ 37]. In addition, Plaintiffs assert that "[Defendants] specifically train [their] sales agents to make misrepresentations and omissions during the sales process" [*Id.* ¶ 38]. Plaintiffs outline their experiences with purchasing and owning a timeshare [*Id.* ¶¶ 61–113].

Plaintiffs bring claims against Defendants for violations of the Tennessee Time-Share Act of 1981, Tenn. Code Ann. § 66-32-101 *et seq.* (Counts I and II), unjust enrichment (Count III), fraudulent misrepresentation by omission (Count IV), fraud in the inducement (Count V), negligent misrepresentation by omission (Count VI), breach of the implied covenant of good faith and fair dealing (Count VII), breach of contract (Count VIII), and civil conspiracy (Count IX) [*Id.* ¶¶ 150–241].

On November 18, 2020, Judge Corker granted in part and denied in part Defendants' motion to dismiss [Doc. 185]. He dismissed Counts I and VIII [*Id.* at 50]. In addition, he found Plaintiff Moore's, Plaintiff Ryan Spado's, and Plaintiff Laura Spado's claims under Counts I, II, III, IV, V, VI, and IX were barred by the statute of limitations [*Id.*].

On March 12, 2020, Plaintiffs retained Kenneth C. Free ("Mr. Free") as an expert in this case [Doc. 147-1]. Plaintiffs engaged Mr. Free "to opine upon the issue of possible wrongful actions or consumer-abusive practices within [the Resort]" [*Id.* at 3]. Specifically, he "review[ed] [Defendants'] obvious or possible failures to adhere to proper business practices or failure to operate within industry standards of care" [*Id.*]. Mr. Free states that he "has been given license to

3

comment upon areas where [his] knowledge and experience supports credible opinion-making" [*Id*.].

Mr. Free describes himself as "a hospitality and timesharing operations, asset management, and real estate executive" [*Id*. at 4]. "[I]n [his] forty-six year career[,]" he has "held positions of responsibility in three major hotel companies" [*Id*.]. Mr. Free states that his last position at Hilton Worldwide was the Director of Real Estate Administration, and in that role, he was "responsibl[e] for the real estate sides of all corporate owned hotels, resorts, and resort timesharing" [*Id*.]. He asserts that he "was a key founder of Hilton Grand Vacations Company," which was "the company's entry into the timeshare arena and now one of the timeshare industry's most prominent players" [*Id*.].

Since 1993, Mr. Free has operated Straightline Hospitality, "focus[ing] on consulting for hotels, resorts, and timesharing" [*Id*.]. Because he has "been engaged by many of the major firms in the hospitality arena, by developers, law firms, and public accounting firms[,]" Mr. Free states that his "work requires [him] to maintain current knowledge of rules and regulations and standard practices for timesharing in the United States" [*Id*.]. "[He is] a Registered Resort Professional by the American Resort Development Association [("ARDA")], a Licensed Real Estate Broker [in California], and a member of the Urban Land Institute" [*Id*.]. He has also served on "multiple committees of the American Hotel & Lodging Association and the International Society of Hospital Accountants" [*Id*.]. Mr. Free states that he has also been an adjunct professor in the graduate school at the University of Phoenix [*Id*.].

Mr. Free sets forth four conclusions in his report:

(1)     During the period under review [Defendants] operated under a self-designed, sophisticated set of business practices that were in serious and sometimes egregious violation of Industry Standards of Care and ARDA Code of Ethics, as

4

well as their obligations under Tennessee law as I understand it.

(2)   In the litigation in this case there is substantial evidence from [Defendants'] violations of industry standards and of the law that support the specific claims of the lead [P]laintiffs.

(3)   When the lead [P]laintiff parties experienced difficulties with the financial burdens of Ownership and various problems concerning program usage no one within [the Defendant companies] stepped up to the plate to resolve these difficulties and problems. [Defendants] simply abandoned the Owners. This is a clear Breach of Industry Standards.

(4)   The true value of the timeshare intervals within the Resort sold to consumers, including to lead [P]laintiffs, by [Defendants] were significantly less than the marketed prices. Such over-pricing in a high-pressure same-day-close hot-box sales environment should be construed to be a serious Violation of the industry standards and their obligations under relevant law, including the Duty of Good Faith and Fair Dealing.

[*Id.* at 56].

Mr. Free organizes his critiques of Defendants into four areas: (1) weakness in unit availability, (2) pricing and valuation challenges, (3) obstacles to resales, and (4) additional sales and marketing practices of concern [*Id.* at 10]. Starting with weakness in unit availability, Mr. Free states that "[f]rom 2008 until the wildfire in 2016[,] annual occupancies at the Resort ranged from 68.9% to 74.7%" [*Id.*]. According to Mr. Free, such numbers "would seem to indicate the presence of plenty of unit inventory for demand by interval Owners" [*Id.* at 11].[2] But he states that "[t]he design of the usage program at [the Resort] calls for 'first come, first served' reservations within the season purchased by the Owner" [*Id.*]. There are two seasons: All Season Float and Value

---

[2]   Mr. Free defines "Owners" as "Lead Plaintiffs and other consumer purchasers" [Doc. 147-1 p. 3].

Season Float [*Id*.]. The former, Mr. Free describes, is a program where "Owners pay[] more for the ability to reserve the units throughout the year[,]" while the latter refers to a program where "Owners pay[] less for usage rights [but are] limited to eight seasonally unattractive weeks" [*Id*.]. He defines the term "float" as "mean[ing] that despite purchasing a fee simple interest in a specific unit[,] the Owner has consented to contributing his usage rights thereto into a pool from which all owners of that season and unit type can make reservations on a first come first served basis" [*Id*.].

Mr. Free states that "[o]ne of the problems with floating use plans occurs after a substantial portion of the seasonal inventory is sold" [*Id*. at 12]. This is because the "most desirable unit type and dates get reserved quickly" and other Owners must therefore "seek progressively less desirable unit-product and dates" [*Id*.]. "In other words," Mr. Free opines, "a substantial proportional of Owners will not get what they paid for" [*Id*.]. Mr. Free states that the Resort practices "'Breakage Rights,'" which occurs when Defendants remove intervals from the inventory to offer "to prospects as 'minivacs', i.e., short-term rentals on a discounted or complimentary basis" [*Id*. (citation omitted)]. Mr. Free states that Defendants also "withdr[e]w intervals for purposes of transient rentals on the open market [*Id*. at 12–13 (citation omitted)]. "In the case of transient rentals," Mr. Free contends, "Defendants also convert[] all rental income to itself" [*Id*. at 13]. According to Mr. Free, "The effect of this practice is to further substantially reduce inventory available for usage by Owners" [*Id*. (emphasis omitted)]. Given the practices, Mr. Free states that "it is probable . . . that most inventory comes from Owner failures or inability to reserve, Owner defaults, and Owner delinquencies" [*Id*.].

Mr. Free asserts that "there is insufficient inventory to meet demand at certain items of the year" [*Id*.]. He explains that the best way to establish this assertion "would be to review statistics maintained by [Defendants'] telephone reservations center (and their online counterpart) regarding

'successful conversions'" [*Id*.]. Because Defendants do not maintain such records, Mr. Free states that he is forced "to impute stress points in unit availability and demand" [*Id*.]. After conducting a stress analysis, Mr. Free concludes "that in 86 of the 107 months during the 2008–2016 period of review[,] there was stress in meeting the demand expectations of Resort Owners[,] . . . represent[ing] 80.4% of the time" [*Id*. at 18]. He clarifies, "This does not mean Owners were Denied or Regretted 80% of the time" [*Id*. (emphasis omitted)]. Instead, he states that it means "that within approximately 80% of the months[,] there were greater demand than supply and that large numbers of Owners would have experienced considerable difficulty in obtaining reservations within those times" [*Id*.]. Mr. Free concludes, "The simple explanation is that [Defendants] oversold timeshare intervals at [the Resort] to the extent [they were] unwilling to make inventory available to Owners" [*Id*. (footnote omitted)].

Furthermore, Mr. Free states that Defendants failed to disclose to Owners: (1) "the float program by definition creates imbalances between supply and demand in high demand periods and that there was high probability that Owner reservations expectations would be frustrated, and" (2) "that [Defendants] had full control over the unit inventory[,] and [they were] carving out substantial parts for it for [their] own use in conflict with the rational expectations of, and to the detriment of, Owners" [*Id*. at 21]. He concludes:

> Because of the float design of the usage program, the sales levels relative to physical inventory, and [Defendants'] retainage of interval inventory for [their] own use, it is virtually certain that accommodation availability will be constrained to Owners, particularly during periods of high demand. Thus the perceived flexibility in using the float program to make reservations on the dates Owners desire is mischaracterized when this program is explained during the sales process. This applies to Owners who purchased in all periods, including after the 2016 fire. Such behavior could be seen to be Abusive Behavior Towards Consumers, an ethical deficiency, Concealment of Material Facts, a Violation of the ARDA Code of Ethics, and a violation of the Tennessee Time-Share

7

> Act. This certainly applies to [Defendants'] actions towards the named multiple [P]laintiffs in this case and the other owners at Westgate Smoky Mountain Resort.

[*Id*. at 20–21 (citation omitted)].

Next, Mr. Free opines on Defendants' prices and valuation. Mr. Free states that Defendants' pricing for timeshare intervals at the Resort is not impacted by "comparative values" because customers "are induced to buy in aggressive sales presentations where alternatives are not available for comparison" [*Id*. at 22]. In Defendants' case, Mr. Free states that "the basis for valuation of intervals is nowhere publicly reported, although values are clearly secured to the fee simple value of the land" [*Id*.]. Mr. Free describes Defendants' valuation as "highly problematic . . . because the equity value is encumbered not only by the time subdivision of the property, but by the usage program[,] which doesn't even guarantee rational usage rights" [*Id*.].

"[I]n late 2016, Mr. Free states, "the Resort included 980 condominium units with 50,960 weekly-equivalent timeshare intervals" [*Id*. at 23]. To test the property value, he compares the Resort's "units using hotel industry standard metrics" [*Id*.]. He calculates the value of the Resort by looking at its rating on Tripadvisor (3.38), comparing that with the typical rate for a night stay at a hotel ($144.50), making an adjustment to reflect that the timeshare is larger than a hotel (1.2), and considering the typical ratio of hotel guestroom property value per $1 per average daily rate [*Id*. at 23]. He therefore finds that "market value of a 100-room 3.4-Star timeshare resort, operated as a transient hotel, in 2016 would have approximated $17,340,000" [*Id*.]. Given that value and the 980 units at the Resort, Mr. Free determines that the Resort has a "total property portfolio value of $169,932,000" [*Id*. at 24]. He concludes that "each of the 50,960 timeshare interests should have been priced at about $3,335" and that "[t]he consumer in this instance is vastly overpaying for the equity it acquires in the Resort" [*Id*.]. Mr. Free adds that Defendants display "very little

price integrity" because they have a "wide variety of sales prices for the exact same timeshare product[,]" which "starts with the amount each consumer prospect admits to spending on vacation" [*Id*.].

Mr. Free compares the usage value of the Resort to that of hotels [*Id*. at 25]. He states that there is added costs in the form of maintenance fees and internal resort exchanges [*Id*.; *see also id*. at 27 (Table B.1)]. According to Mr. Free, "These costs are due in perpetuity in consonance with the permanent ownership regime" [*Id*.]. Assuming Owners retain their timeshare for 30 years, Mr. Free opines that Owners pay $30,234 more for [the Resort] accommodations than Owners would if they were free-traveling hotel guests using equivalent accommodations" [*Id*. (emphasis omitted)]. This figure, Mr. Free states, does not include "any financing charged on loans" [*Id*. at 25–26 (footnote omitted)]. He concludes:

> The total cost of timeshare interval accommodations over the assumed hold period in fixed 2016 dollars is calculated at about $86,000. This compares to about $36,000 for comparable hotel accommodations. This indicates that over time the Westgate Owner will overpay by about $50,000 relative to value. Such overpayments would have impacted [Plaintiff] Moore, the other lead Plaintiffs, and other owners at [the Resort] in the same proportion to the amount of their purchases.

[*Id*. at 29].

Next, Mr. Free compares the Resort's usage value with the nightly rental cost for the same unit at the Resort [*Id*.]. "[He] selected four sets of dates in each of the four calendar seasons for hypothetical vacation stays" [*Id*.]. Mr. Free then reviewed the "quoted rates on one-bedroom units from three online travel agencies ('OTAs'): Tripadvisor.com, Booking.com, and Priceline.com" [*Id*.]. He also reviewed the rates on Defendants' in-house transient rental site [*Id*.]. He found that rates on the OTAs on average were $117.08 per night, while Defendants' rental site listed the units at $225 per night [*Id*. at 29–30]. In reviewing these rates with what Owners pay (Table B.2),

9

Mr. Free states, "potential Owners could rent the exact same unit types in [the Resort that] they are considering owning and, by avoiding the purchase, save as much as 73%, without any of the obligations and restrictions of ownership, including perpetual ownership of a non-liquid and probably worthless 'asset'" [*Id*. at 30 (emphasis omitted); *see also id*. at 31 (Table D)]. Over the course of 30 years, Mr. Free opines that the Owner would be paying $63,710 more, on a present value basis, than if he simply rented the same physical units on the open market" [*Id*. at 32].

Mr. Free then details Defendants' employees' sales pitches [*Id*. at 32–34]. Based on his review, he states, "[Defendants] train[] [their] Developer Agents to falsely assert to prospects that by purchasing timeshare intervals they will be saving money compared to alternative vacation methodologies" [*Id*. at 35 (emphasis omitted)]. Mr. Free opines that "[Defendants] further train[] [their] Agents incorrectly that because [their] timeshare interval products are deeded that they will grow in value over time" [*Id*.]. He concludes that Defendants are "grossly overcharging for timeshare intervals in a sales environment where buyer prospects are unprepared to perform adequate due diligence" [*Id*.].

Next, Mr. Free discusses the obstacles to resales [*Id*. at 36]. He states, "When one shops the internet for timeshare interval resales[,] one discovers two groupings (nodes) of asking prices for each interval" [*Id*.]. "First, Mr. Free contends that many owners try to sell at or near their initial purchase price and therefore there is a node for one-bedroom units in the vicinity of $20,000.50" [*Id*. (citation omitted)]. The second node is $4,000–$6,000, which encompass "those sellers who recognize the necessity to price their owned interval product at a level that will ultimately sell" [*Id*.]. "In my experience," Mr. Free states "actual resale prices range from *zero to 50%* of the initial purchase price from the developer, with median values being perhaps *20%*, i.e., 80% less than initial purchase price" [*Id*. at 37 (emphasis omitted)]. He states that "this is consistent with the

reported resale prices averaging about $4,000" [*Id*. (citation omitted)]. He provides two reasons why the resale price is low:

> (a) Most timeshare intervals are initially sold in a "hot box" sales environment where prospects are induced to attend a sales presentation with a premium (incentive gift) and then after a multi-hour capture find themselves signing up for this unplanned purchase. Prospects get beat over the head for such an extended period by multiple sales personnel with stories of wonderful vacations to the point that resistance weakens and initial skepticism declines.

> (b) The purchase price is not emphasized. Rather, while the monthly or annual cost is acknowledged, it is compared to "savings on hotel rooms" to sell the concept that the purchase will actually save the Owner money.

[*Id*. at 37]. He also states that low resales may be contributed to: (1) "[l]ack of objective independent 'Blue Book' price sourcing[,]" (2) "[r]ecognition by potential buyers of the high recurring costs for maintenance and assessments[,]" (3) "[v]ery weak financing availability for resales[,]" (4) "[d]iscovery by potential buyers of shallow market demand for resales[,]" (5) "[c]onfusion by potential buyers about the most effective buying methodologies, and" (6) "[f]raud by nefarious resellers or purported timeshare brokers" [*Id*. at 38].

In addition, Mr. Free states that the Resort's general manager and his team read a script to potential owners that stated they "can sell or rent it at any time" [*Id*. at 40 (citation and emphasis omitted)]. He concludes, "Disclosure by [Defendants] to buyer prospects concerning the highly illiquid market for timeshare intervals is inadequate and fails to provide material information" [*Id*. at 41]. Specifically, Mr. Free opines, "[Defendants] did not disclose to buyers that there is no active, organized or liquid resale market for timeshare intervals" [*Id*. at 43].

Finally, Mr. Free discusses his concerns about additional sales and marketing practices [*Id*. at 44]. First, he states that "[Defendants] operate[] a sales and marketing enterprise that copies

many of the features employed by Predatory Developers[,]" especially their "aggressive sales practices" [*Id.*]. For example, Mr. Free states that Defendants acquire prospects for sales presentations ("Tours") through promotional incentives or cash [*Id.*]. The goal of Defendants' sales team is to close the sale by the end of the day because "[i]t is well-known in the industry that 'there is no such thing as a be-back'" [*Id.*]. Mr. Free states that this means prospects "are not given the opportunity to take home sales information and to shop competitive timeshare systems" [*Id.*]. While this practice is not against the law, Mr. Free states that "aggressive discouragement of comparison shopping is certainly customer unfriendly and feeds consumer distrust of the product and the [Defendants]" [*Id.*].[3]

Mr. Free states that the Resort has "substantial negative reviews" on TripAdvisor and that he has concerns about Defendants' sales pitch [*Id.* at 49, 51]. With respect to the latter, he submits that the salespersons and closing officers have written training material that "contain directives that are unethical and/or fraudulent" [*Id.* at 51]. For instance, he asserts that in the salespersons' training manual, *Dayline Training Manual*, it states that the "owners have a Deed to prime real estate that can build value" [*Id.*]. According to Mr. Free, "That . . . is a claim that should never be used in a timeshare sales presentation" [*Id.*]. The closers use the *Closing Officer Training Guide*, and Mr. Free states that it "directs the closing officers first to imply that there shouldn't be any problems making reservations and then to divert the attention of the Owner to the other topics" [*Id.*]. He summarizes his findings:

> a) [Defendants] engage[] in aggressive same-day-close practices, including discouragement of comparison shopping and promises of special price drops "just for you" because you are buying a previously owned timeshare, or something similar. Such practices are Highly Unfriendly to Consumers. This is a Violation of ARDA Code of Ethics and the Tennessee Time-Share Act. This applies to [Defendants'] actions towards

---

[3]   Mr. Free details Plaintiff Marilyn Moore's experience [Doc. 147-1 pp. 44–49].

12

[Plaintiff] Moore and, by implication, other lead [P]laintiffs and other owners at Westgate Smoky Mountain Resort.

b) [Defendants] misrepresent[] to existing Owners that sales upgrade pitches are "Owner updates". At such presentations, these preexisting Owners, many of whom could be characterized as "lay-downs", are subject to aggressive sales practices to upgrade their owned timeshare intervals. In the case of the [Plaintiff] Moore experience, they were held for an extended period despite their multiple requests to be released. Such action by Westgate was a clear violation of Industry Standard of Care.

c) Defendants' training manuals for salespersons and closing officers documented coercive sales practices, insufficient time for reasonable disclosure, and clear deceptive statements concerning liquidity, costs over time, reservations availability, and other key facts. Such practices could be characterized as Consumer Abusive, Fraud, a Violation of ARDA Code of Ethics, and a Violation of the Tennessee Time-Share Act.

[*Id*. at 54–55 (citation and footnote omitted)].

## II.    POSITIONS OF THE PARTIES

Defendants move to exclude Mr. Free's opinions pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). First, they claim that Mr. Free is not qualified to testify about any of his opinions [Doc. 148 pp. 7–11]. In addition, they argue that his opinions on limited stress availability, Defendants' alleged misrepresentations and omissions, timeshare prices, resale, and that Defendants are "bad" are unreliable, do not contain an appropriate methodology, and are otherwise irrelevant [*Id*. at 11–24]. Defendants assert that Mr. Free's extrapolation to all purchasers is inadmissible [*Id*. at 24–25].

Plaintiffs respond that Mr. Free is qualified to render his opinions in this case based on his experience [Doc. 163 pp. 13–17]. Stating that the "Court should evaluate whether Mr. Free's opinions are relevant and reliable to determine whether Plaintiffs' proposed Class meets the requirements of Rule 23," Plaintiffs contend that "[t]he Court need not undertake an analysis of

13

Mr. Free's merits opinions until after the class certification stage" [*Id*. at 7 (citation and footnote omitted)]. According to Plaintiffs, "Mr. Free offers three primary opinions relevant to the class certification analysis: (1) whether Defendants' standard sales pitch violates generally accepted industry standards; (2) whether [Defendants] adequately disclosed material information to prospective buyers[;] and (3) whether [Defendants'] units were reasonably available for owners' use as promised" [*Id*. at 7–8]. They claim that his opinions on limited stress availability, standardized sales pitches, timeshare prices, and resale are relevant and reliable [*Id*. at 18–20, 22– 31]. With respect to Defendants' argument to exclude any opinions that they are "bad," Plaintiffs state that "this opinion does not exist" [*Id*. at 22 n.11]. And Plaintiffs assert that "experts regularly extrapolate data samples to a larger data set" [*Id*. at 22 (citation omitted)].

Defendants reply that Mr. Free does not have the requisite experience to testify on the matters in his report [Doc. 166 pp. 5–8, 15–16, 17–18]. They maintain his opinions on stress availability, Defendants' alleged omissions or misrepresentations, timeshare prices, and resale are irrelevant and unreliable [*Id*. at 8–19]. With respect to Mr. Free's opinions that Defendants are "bad," Defendants state that Plaintiffs do not fully respond to this argument, and therefore, have not shown such opinions are admissible [*Id*. at 20].

Both parties filed supplemental briefs [Docs. 208 & 209], alerting the Court's attention to *Diamond Resorts U.S. Collection Development, LLC v. Pandora Marketing, LLC*, No. CV205, 2023 WL 9659943, at *1 (C.D. Cal. July 26, 2023), *reconsideration denied*, No. CV205486, 2023 WL 9659945 (C.D. Cal. Sept. 14, 2023), wherein the court considered challenges to Mr. Free's opinions. In addition, Plaintiffs state, "The time for evaluating Mr. Free's merits

14

opinions would be after class certification is decided, and after full merits discovery is conducted, and all related opinions and bases therefore are disclosed" [Doc. 209 p. 2 (citation omitted)].[4]

## III.    STANDARD OF REVIEW

"[Rule] 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and

---

[4]    Defendants argue that Mr. Free's resale and timeshare valuation opinions are not referenced in the motion for class certification [Doc. 148 p. 21; Doc. 166 p. 15]. Plaintiffs claim in their supplemental brief that the Court should consider only "those portions of Mr. Free's opinions that will aid the Court in determining whether common proof can provide answers to common questions[,]" which includes (1) "whether [Defendants'] deceptively marketed floating use plan provides owners with availability that can meet reasonably expected demand, and" (2) "whether the price paid by owners reflects the actual value of a timeshare ownership interest tainted by [Defendants'] fraudulent scheme" [Doc. 209 p. 3].

Based upon representations made during the hearing and in the briefing, the Court inquired during the hearing whether all Mr. Free's opinions that Defendants challenged are material to class certification. To the extent Plaintiffs are not relying on specific opinions to support their motion for class certification, Defendants noted that a *Daubert* ruling would not be necessary at this time. Plaintiffs clarified that they are relying on the entirety of Mr. Free's expert report to show that there are common questions to the class. Given Plaintiffs' representation, Defendants stated that a *Daubert* ruling is necessary at this time. The Court therefore finds it appropriate to rule on Defendants' objections.

15

> (d)     the expert's opinion reflects a reliable application of
>         the principles and methods to the facts of the case.

Fed. R. Evid. 702.[5] The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (quoting *Daubert*, 509 U.S. at 593–94), *aff'd by* 89 F. App'x 927 (6th Cir. 2003). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

---

[5]     Rule 702 was amended on December 1, 2023, after the parties completed briefing on the motion. The Court utilizes the current version of Rule 702 because it governs "insofar as just and practicable, all proceedings then pending." Prop. Ams. to the Fed. R. Evid., 344 F.R.D. 850, 851. *See also United States v. Candelaria*, No. 22-CR-767, 2023 WL 8185932, at *1 n.1 (D.N.M. Nov. 27, 2023) (applying amendment before the effective date of the amendment because the trial was scheduled to occur after the effective date); *Andrews v. Brethren Mut. Ins. Co.*, No. 4:19-cv-01107, 2023 WL 660710, at *6 (M.D. Pa. Oct. 12, 2023) (taking "heed of the forthcoming changes so as to avoid the misapplication of Rule 702 identified by the Advisory Committee"). But the result would be the same regardless of whether the Court applied the current or prior version of Rule 702. The changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

With respect to expert testimony at the class certification stage, recently, the United States Sixth Circuit Court of Appeals joined the majority view by finding, "If challenged expert testimony is material to a class certification motion, the district court must demonstrate the expert's credibility under *Daubert*." *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253 (6th Cir. 2024). The rationale is that "[c]lass certification requires the plaintiffs to provide 'evidentiary proof' that they meet the elements of Rule 23," and unreliable expert testimony "cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact' through acceptable evidentiary proof." *Id.* (citation omitted). In other words, to the extent the expert's opinions do not pass muster under *Daubert*, the plaintiffs cannot establish "the Rule 23(a) prerequisites." *Id.* (quoting *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015)).[6]

## IV.    ANALYSIS

After considering the parties' arguments and evidence in this case, the Court finds Mr. Free is qualified to render his opinions. Even so, the Court finds Mr. Free's opinion on limited or stressed availability at the Resort not reliable, his opinion on Defendants' alleged

---

[6]     The Sixth Circuit's decision was issued after the parties filed their briefs. To the extent the parties argue otherwise [*see, e.g.*, Doc. 163 p. 21], the Sixth Circuit's decision is dispositive of this issue.

misrepresentations and omissions are not helpful to the jury, and his opinion on timeshare prices is not reliable. The Court excludes these opinions. The Court finds Mr. Free's opinion on reselling a timeshare relevant and reliable, and the Court declines to exclude this opinion. But Plaintiffs have not shown that Mr. Free's opinions about Defendants' sales practices are admissible, and therefore these opinions are excluded. Finally, to the extent the Court has not excluded Mr. Free's opinions, the Court declines to exclude his remaining extrapolation opinions.

### A.      Mr. Free's Qualifications

Defendants argue that "Mr. Free lacks any relevant knowledge, skill, experience, training or education" [Doc. 148 p. 7]. They state that he has "no meaningful involvement with a timeshare" [*Id*. (citations omitted)]. In addition, Defendants claim that "he has not authored any relevant publications, lectured on any relevant topics, or attended any relevant seminars" [*Id*. (citation omitted)]. While Mr. Free contends that "he was a 'key founder' of Hilton Grand Vacations," Defendants assert that "[t]his is a flagrant misrepresentation" [*Id*. (citation omitted)]. According to Defendants, "Mr. Free's actual experience is as a financial consultant, with a focus on real estate in the hospitality industry" [*Id*. at 8 (citation omitted)]. Since 2008, Defendants claim that "most of [Mr. Free's] experience has been as an expert witness" [*Id*. (citation omitted)]. They identify four of Mr. Free's opinions and argue why he is not qualified to discuss each one [*Id*. at 8–11].

Plaintiffs respond that Mr. Free meets the standard under Rule 702 [Doc. 163 p. 13]. According to Plaintiffs, "Mr. Free has the requisite knowledge, by way of his decades-long career in investigating and consulting on timeshare projects for some of the world's largest hotel chains" [*Id*. (citation omitted)]. "Mr. Free also possesses the requisite skill[,]" Plaintiffs assert, "[because] he understands how to evaluate reservation availability relative to demand, how to evaluate sales practices, and how to determine the cost of a timeshare interest" [*Id*. (citations omitted)]. They

contend that Defendants have offered no support for their "central argument . . . that Mr. Free must have a specific degree, have held a specific position, or have examined [Defendants'] timeshare previously, in order to offer any of his opinions in this case" [*Id*. at 14 (citation omitted)]. And although "Mr. Free did hold relevant positions that Defendants erroneously claim are necessary[,]" Plaintiffs assert that Mr. Free's expertise stems from his experience, which is acceptable under Rule 702 [*Id*. at 14–16]. With respect to the specific opinions for which Defendants argue that Mr. Free is unqualified to testify, Plaintiffs state that Defendants' arguments are "without merit and focus not on admissibility, but rather on [their] disagreement with Mr. Free's conclusions" [*Id*. at 16].

Defendants reply that "[Mr. Free] has no experience analyzing availability of a floating use timeshare" [Doc. 166 p. 5]. They acknowledge that Mr. Free is not required to "have had any particular job title, or even that he must have exhaustively analyzed [Defendants'] floating use program" [*Id*.]. "But," Defendants state, "as Mr. Free has admitted, fixed use timeshare programs do not have any availability concerns, so whatever experience Mr. Free supposedly had with fixed use programs is therefore irrelevant to an analysis of availability in a floating use program" [*Id*. (citation omitted)]. According to Defendants, "[B]y his own admission[,] he only worked on the business plans, and not on any timeshare plans or operations" [*Id*. at 6 (citation omitted)]. They state that his "actual sworn testimony differs from his affidavit" and that neither his degrees, publications, teaching experience, or experience as an accountant provide the necessary requisite experience for his opinions here" [*Id*. at 7].

Rule 702 requires that experts have "knowledge, skill, experience, training, or education[.]" The United States Sixth Circuit Court of Appeals has explained that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those

qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). "[Courts] take a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient to satisfy the requirement." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 209 (6th Cir. 2015) (quoting *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000)). "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012) (citations omitted). "[I]f an expert witness relies 'solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Antioch Co. Litig. Tr. v. Morgan*, 633 F. App'x 296, 300 (6th Cir. 2015) (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendments).

The Court finds Mr. Free qualified to render his opinions in this case. Mr. Free has acquired "forty-six years of experience in the hospitality industry, inclusive of hotels, resorts, and timesharing [Doc. 163-3 ¶ 2(a)]. Specifically, he has been employed "by major hotel companies" for 20 years "with experience in hospitality operations, finance, and real estate development" [*Id.*]. In addition, he has operated Straightline Hospitality for over twenty years, where he "focuse[s] on consulting for hotels, resorts, and timesharing" [Doc. 147-1 p. 4]. He is a member of the American Resort Development Association ("ARDA") and American Hotel & Lodging Association, and was previously a member of the International Association of Hospitality Accountants [*Id.* at 63]. He received his certification of competency from the ARDA [Doc. 147-2 p. 5]. Mr. Free also has his Bachelor of Science in Hotel Management and a Master of Business Administration in Finance [Doc. 147-1 p. 62].

Defendants claim that "he has no relevant formal education or training[,]" because his hotel administration degree did not involve studying timeshares [Doc. 148 p. 7]. During his deposition, Mr. Free explained that he received his degree before the timeshare industry was founded and admitted "that academically[, he] did not study timeshares" [Doc. 147-2 pp. 4, 5]. But this is not fatal to his qualifications in light of his experience. *See Sanford v. Russell*, 387 F. Supp. 3d 774, 785 (E.D. Mich. 2019) ("[The expert's] lack of a 'degree in forensic science' does not disqualify him from testifying on matters within his practical knowledge and experience accumulated through his work."); *Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003) ("Thus, although a degree might be helpful in determining qualifications, since valid assumptions safely may be drawn from the general training one receives on the way to a diploma, it is neither a necessary nor a sufficient condition for qualification as an expert because the expert's education must be relevant to the opinion, and qualification may be based on knowledge, skill, experience or training as well." (citations omitted)).

Defendants also claim that he "had no meaningful involvement with timeshare" when he was employed by three different hotel companies, and they accuse Mr. Free of misrepresenting his involvement with Hilton Grand Vacations Company while employed with Hilton Hotels Corporations [Doc. 148 p. 7 (citation omitted)]. They argue that his "involvement was limited to working on the business plan for the joint venture, not the timeshare plan" [*Id*. (citations omitted)]. During his deposition, Mr. Free stated that he "brought Hilton into the timeshare business" [Doc. 147-2 p. 11]. While employed with Hilton Hotels Corporation, Mr. Free testified that he worked within the corporate properties division and reported to the senior vice president [*Id*. at 12]. His duties involved managing the real estate, which was separate from the hotel operations [*Id*.]. At the time, there were six or seven departments relating to the hard assets of the

21

company, and Mr. Free was "a staff guy [who] report[ed] to the senior vice president of real estate [and] provid[ed] services or tracking down problems within each of those six or seven departments" [*Id*. at 13]. With respect to timeshares, Mr. Free testified that Hilton Hotels Corporation entered into a joint venture with two individuals who had skills and expertise in the timeshare industry [*Id*. at 14]. Mr. Free explained:

> He was aware of timesharing, and while the hotel men within Hilton did not have high opinions of timesharing because of sales and marketing deficiencies and issues and lack of a resale market and so, on, nevertheless we recognized that, and I had recognized that timesharing was a legitimate, potentially legitimate industry and one that could add additional profits what would make the large scale resorts that we were most interested in, would make them financially feasible.
>
> So I had been internally promoting that concept[.]

[*Id*. at 15]. Over five to sixth months of working with certain individuals, they developed business plans, "which ultimately became Hilton Grand Vacations Company" [*Id*. at 16]. Mr. Free described himself as "a strategy guy to work on important deals that didn't fit into any of the other six or seven departments within corporate properties" and that was he "involved in designing the . . . timeshare regimes for whatever properties were going to be . . . operated as timeshares pursuant to this joint venture [*Id*. at 16–17].

Further, in his declaration, Mr. Free explains his involvement with the development of Hilton Grand Vacations Company [Doc. 163-3 ¶ 2(b)–(c)]. He states that "he was responsible for strategic planning with the [Corporate Properties] Division, including structuring and negotiating selected high profile transactions" [*Id*. ¶ 2(b)]. "This latter responsibility," Mr. Free submits, "included identifying and pursuing the timeshare industry as a potential growth opportunity of the corporation" [*Id*.]. He further states that he "spent countless days and hours investigating all aspects of the timesharing business" and that "[t]he company relied on [him] in entering the

22

timeshare industry domestically" [*Id*.]. Defendants claim that "he was never employed by [Hilton Grand Vacations Company], and never had an ownership interest in [it]" [Doc. 148 pp. 7–9]. But Mr. Free never made these claims. Instead, during his time with Hilton Hotels Corporation, he states that he "played a pivotal role in promoting and investigating Hilton's entry into the timeshare industry[,]" and he explains how he was involved "in the foundational steps towards Hilton's entry into [that] industry" [Doc. 163-3 ¶ 5(a)].

Defendants assert that Mr. Free cannot testify that accommodations are contracted due to Defendants' float design [Doc. 148 p. 8]. They argue that "Mr. Free . . . could not identify any situation in which he was involved in evaluating float-use purchasers' demand to use at a timeshare resort" [*Id*. at 9 (citation omitted)]. Defendants further challenge Mr. Free's qualifications with respect to his opinions that Defendants are "grossly overcharging for timeshare intervals" and "there is no active, organized, or liquid, resale market for timeshare intervals[,]" and his criticisms of the timeshare industry [*Id*. at 10–11 (citations omitted)]. They claim that he has no relevant qualifications in these areas [*Id*.].[7]

"Experts need not even have direct experience with the precise subject matter or product at issue." *Ashland Hosp. Corp. v. Affiliated FM Ins. Co.*, No. CIV.A. 11-16, 2013 WL 3213051, at *2 (E.D. Ky. June 24, 2013) (citing cases); *Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 387–88 (W.D. Ky. 2018) (holding that an expert with an engineering background was qualified to opine on regenerative braking and electronic controllers even though the expert did "not have specific experience with [those subject matters]"); *Galloway v. Big G.*

---

[7]     Defendants also claim that pages 44–55 of Mr. Free expert report violates the Federal Rules of Evidence [Doc. 148 p. 11]. At this time, the Court declines to comb through these ten pages and determine how the information therein violates various Rules of Evidence. Defendants may file a motion in limine at the appropriate time.

*Exp., Inc.*, 590 F. Supp. 2d 989, 994 (E.D. Tenn. 2008) (finding an expert with experience in the field of mechanical engineering and accident investigation qualified to opine on windshield integrity). Upon review, the Court finds that Defendants' "attempt to describe [Mr.] Free's prior experience so narrowly is unavailing." *Diamond Resorts U.S. Collection Dev., LLC*, 2023 WL 9659943, at *16 (citation omitted). And the Court is satisfied that Mr. Free's experience in the hotel industry allows him to offer his opinions. Moreover, during his deposition, Mr. Free stated that he was never involved with drafting the legal documents associated with floating usage rights, but he did "look[] at what the issues were" with respect to those designs [Doc. 147-2 pp. 43–44]. And in his declaration, he elaborates, stating, "I have been engaged as a business planning consultant for several hotel companies investigating entry into timesharing" and that he is "deeply knowledgeable about reservations systems, both on a centralized and individual property level, due to [his] mid-career involvement with hotel technology" [Doc. 163-3 ¶ 3(a)].

Mr. Free also responds to Defendants' challenge by explaining, "While my position titles have been varied, I, in fact, do have experience in managing appraisals for all company-owned hotels and resorts during my time at Hilton; I have taken various appraisal courses and reviewed third-party appraisers as part of my consultant and expert witness engagements" [*Id*. ¶ 4(a)]. He adds that he has also "held accounting and financial planning positions during [his] career[,] including as Vice-President of Finance and Chief Financial Officer, Controller, Financial Analysis, and Chief Accountant[,]" and he also "been an Adjunct Professor in finance and strategic planning at the University of Phoenix" [*Id*.]. Further, he submits that he has "previously co-authored timeshare financial performance studies for the [ARDA]" [*Id*.].

Given his experience in the hotel and hospitality industry, his Bachelor of Science in Hotel Administration and a Master of Business Administration in Finance, and his extensive work in

hotel operations, including with his firm, Straightline Hospitality, the Court finds that Plaintiffs have demonstrated more likely than not that he has specialized knowledge that will assist the jury. Fed. R. Evid. 702. *See id.* at *16 ("The Court finds that [Mr.] Free is minimally qualified to opine on the topics related to the timeshare industry addressed in his report.").[8]

### B.      Mr. Free's Limited or Stressed Availability Opinion

Defendants challenge Mr. Free's analysis on "whether [Defendants'] weekly interval availability was unable to meet reasonably expected owner demand" [Doc. 148 p. 23]. First, Defendants argue that Mr. Free relied on assumptions and disregarded the evidence [*Id.* at 11–14]. Second, they contend that Mr. Free's stress availability analysis does not have a valid methodology [*Id.* at 14–15]. Third, Defendants contend that his ultimate conclusions are unreliable [*Id.* at 15–16]. Fourth, they state that Mr. Free's opinion does not relate to any of the issues in the motion for class certification [*Id.* at 16–17].

Plaintiffs respond that "Mr. Free's method is grounded in existing industry standards" and that he relied on Defendants' data to arrive at his conclusions [Doc. 163 p. 2 (citation omitted)]. They claim that his "stressed availability analysis is testable" and that they "involve methods that are generally accepted in the hospitality industry" [*Id.* at 24]. According to Plaintiffs, he also "acknowledged the error rate in his stressed availability analysis, and when supplied with the allegedly correct percentage of developer owned intervals, [he] ran his analysis again, and his overall conclusion remains unchanged" [*Id.* (citations omitted)]. While Defendants argue that Mr. Free's conclusions are wrong, Plaintiffs state that his conclusions are not pertinent to the *Daubert* inquiry [*Id.* at 25]. Because Mr. Free's opinions relate to his experience in the industry,

---

[8]      Defendants also object to Mr. Free's opinions that "the supposed limited availability at the Resort was either verbally misrepresented or inadequately disclosed to purchasers because written disclosures are meaningless" [Doc. 148 p. 9]. They characterize Mr. Free's opinions as "legal conclusions" [*Id.*]. The Court will address this opinion below [*See infra* Part IV, section C].

he is not required to perform laboratory testing [*Id*.]. They deny that his opinions are based on invalid assumptions [*Id*.].

Defendants reply that "Plaintiffs completely ignore the fact that Mr. Free's home-made 'stressed availability' analysis has never been used before—not by Mr. Free and not by anyone else—is not accepted in any industry, and was made up for this litigation" [Doc. 166 p. 8]. According to Defendants, "[T]he only question is whether the developer maintained at least a one-to-one ratio of available intervals to sold intervals" [*Id*.]. They state that Plaintiffs provided no citation or discussion for their argument that stressed availability is a generally accepted methodology [*Id*. at 9]. Defendants characterize "Plaintiffs' claim that Mr. Free substituted in the correct percentage of developer-owned inventory into his analysis and reached the same result" as "false" [*Id*.]. "But even if true," Defendants assert, "this would highlight the fact that the methodology is invalid and subjective" [*Id*.]. They maintain that "Mr. Free's assumptions were baseless and egregious" [*Id*. at 10 (citation omitted)]. Defendants state that Mr. Free's ultimate conclusion is not relevant to any of Plaintiffs' causes of action [*Id*. at 12].[9]

During the hearing, Plaintiffs acknowledged that the court in *Diamond Resorts U.S. Collection Development, LLC*, 2023 WL 9659943, at *19, excluded Mr. Free's stress availability analysis. But they argued that the court excluded his opinion because he did not rely on the opposing party's data to perform his analysis. Plaintiffs argued that here, Mr. Free reviewed declarations, covenants, conditions, and restrictions; the Resort's Public Offering Statement, Owner Reservation Guide, Amendment 27 to the Declaration of Covenants, Conditions, and

---

[9]      To support their arguments, Defendants state that "in an earlier paid engagement, Mr. Free declared under oath, in federal court in 2012, that float use plans were consumer-friendly and offered flexibility that consumers wanted" [Doc. 166 p. 6 (citations omitted)]. But during his deposition, Mr. Free stated, "When the system works, it can work well" [Doc. 147-2 p. 67]. Regardless, this challenge is for cross examination and not a basis to exclude.

Restrictions; Defendants' interrogatory responses, Defendants' chief business officer's deposition, Plaintiffs' deposition, the Resort's owner data from 2008 to 2019; and the Resort's occupancy statistics from 2008 to 2018 [Ex. 1]. They argued that Mr. Free's methodology was pure math.

Defendants responded that his methodology was not pure math because it involved many incorrect assumptions that ignored the available data. According to Defendants, Mr. Free's methodology ignores the legal restrictions placed on timeshares. For instance, they assert that because Defendants' timeshares are deeded and recorded, they cannot sell them more than once. But further, Defendants argued that Mr. Free relied on incorrect assumptions that renders his entire stress test availability unreliable.

Plaintiffs replied that Defendants' objections are for cross examination.

"[A]n opinion is 'reliable' from an evidentiary standpoint if it is 'valid' according to the discipline upon which it is based." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 697 (E.D. Mich. 2019) (citation omitted). And in determining whether an opinion is valid, "the Court's focus is on the principles and methodology, not the results." *Id.* An expert's testimony that is reliable "must be 'supported by appropriate validation—i.e., "good grounds," based on what is known.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Daubert,* 509 U.S. at 590).

"Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based on 'sufficient facts or data,' whether the testimony is the 'product of reliable principals and methods,' and whether the expert 'has applied the principles and methods reliable to the facts of the case.'" *Id.* (quoting Fed. R. Evid. 702). In assessing reliability, the court may consider "(1) the testable nature of the hypotheses; (2) whether the methodology has been subject to peer review; (3) rate of error associated with the methodology; and (4) whether the methodology

is generally accepted in the field." *Reynolds v. Freightliner LLC*, No. CIV. 05-70, 2006 WL 5249744, at *8 (E.D. Ky. June 21, 2006) (footnote omitted) (citing *Daubert*, 509 U.S. at 593–94). These factors are not "a definitive checklist." *Kumho Tire Co.*, 526 U.S. at 138 (citation omitted). "The reliability step focuses on the 'methodology and principles' that form the basis for the testimony." *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752, 757 (W.D. Tenn. 2006) (citation omitted).

The Court finds that Plaintiffs have not shown that it is more likely than not that Mr. Free's stress available analysis is reliable under Rule 702. Mr. Free opines, "[T]here is insufficient inventory to meet demand at certain times of the year" [Doc. 147-1 p. 13]. The best method to determine this, Mr. Free states, is to review Defendants' telephone reservation records, which would presumably show whether Owners were able to make their "reservation based upon first request, second request, and so on" [*Id*. (citation omitted)]. Because Defendants do not maintain such records, Mr. Free created his stress availability formula [*Id*.]. In order to conduct this analysis, he relied on "[Defendants'] entire dataset of occupancy statistics from 2008 to 2018" [Doc. 163 p. 22 (citation and emphasis omitted)].

Mr. Free first reviewed the relevant time period and the number of units available [Doc. 147-1 p. 14]. He then considered several factors: (a) the available nights of the units; (b) the number of units that Defendants withheld from the total inventory; (c) the number of units that Owners successfully reserved; (d) the percentage of the number of units that Owners successfully reserved relative to the full year of Owners' successful reservations; (e) the number of units that theoretically should be available to the Owners; (f) the number of units that theoretically should be available to the Owners converted to weeks; (g) the breakage that he calculates at 7.5%; (h) Owner demand at a 94% sellout; (i) Owners' successful reservations by week; and (j) unmet

Owners' demand [*Id*. at 14–15; *see also* Table A.2]. These factors led to Mr. Free's stress availability calculation [*Id*.]. He concludes that his analysis shows that "in 86 of the 107 months during 2008–2016 period of review[,] there was stress in meeting the demand expectations of Resort Owners" [*Id*. at 18; *see also* Doc. 147-2 p. 76 ("[T]here is stress on the availability system and that stress effectively means that a substantial portion or a major portion of a [sic] guest will be frustrated during those times.").

Defendants argue that Mr. Free assumes without any factual basis that Defendants only owned 6% of the intervals and that Owners owned 94% of the intervals" [Doc. 148 p. 12]. Defendants claim that they "always owned at least 20% of the intervals" [*Id*. (citation omitted)]. In addition, Defendants state that "Mr. Free assumes without any factual basis that none of the purchasers with a use right would be in default" [*Id*. at 13 (citation omitted)]. They point out that Plaintiffs earlier presented to the Court that the rate was actually 12%, even though it is approximately 10% [*Id*. (citations omitted)]. Mr. Free disputes Defendants' data, calling it "unreliable" [Doc. 163-3 ¶ 7(f)].

Although attacks on an expert's data are generally for cross examination, *see Victorino v. FCA US LLC*, No. 16CV1617, 2018 WL 2767300, at *3 (S.D. Cal. June 7, 2018) (finding that the "[d]efendant's challenge to the data or input underlying [the expert's] formula calculations is subject to cross-examination at trial, and not exclusion" (citation omitted)), this does not necessarily mean "that a significant error in application will never go to the admissibility, as opposed to the weight, of the evidence," *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)) (emphasis omitted and alteration in original).

29

And in Plaintiffs' motion for class certification, they represent that "at least 12.5% of timeshares at the Resort result in foreclosure or default" [Doc. 124-1 p. 10]. This is different than the 0% that Mr. Free assumed. *See Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 809 (6th Cir. 2005) ("We find that the estimates and assumptions used by [the expert] undermine the likelihood that [he] used data sufficiently tied to the facts of the case here . . . ."). And Plaintiffs do not sufficiently explain how Mr. Free arrived at his opinion that Defendants owned 6% of the intervals, nor does he explain how he arrived at the net available for incremental owner demand, which is column (e) in his chart [*See* Doc. 147-1 pp. 14, 16].

Mr. Free states that he "us[ed] [Defendants'] figures of 20% developer-owned inventory[] and 12% owner forfeit usage" and that using these figures did not affect his analysis [Doc. 163-3 ¶ 7(g)]. But there are two issues with Mr. Free's statement. First, he did not include in his affidavit any updated analysis. The Court is not required to accept Mr. Free's conclusion without any basis to do so. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) ("[C]onclusions and methodology are not entirely distinct from one another." (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Second, this is inconsistent with his deposition testimony [Doc. 147-2 pp. 97–98]. Defense counsel asked whether his "chart [was] based on the assumption that this resort was 94 percent sold out and that the developer was using approximately 25% of those . . . ?" [*Id.*]. Mr. Free testified, "Those are key components in the calculation. Obviously, the last column, Column K is, you know, the key numbers, so those numbers would certainly be impacted if any of the assumptions were different. Absolutely" [*Id.* at 98].

Moreover, Mr. Free testified he did not determine the rate of error of his projections [Doc. 147-2 p. 101]. While he "backtrack[ed]" and stated that he tested his method "using different assumptions for sellout and breakage" [*id.*], he did not test his methodology against Plaintiffs to

determine "if they experienced supposed limited availability in the months where his . . . analysis indicates availability would be stressed" [Doc. 166 p. 9 (citing Doc. 147-2 p. 106)]. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 602 F. Supp. 3d 767, 786 (D. Md. 2022) (finding the expert's "untested *ipse dixit*" opinion not reliable, noting that he had access to the named plaintiffs' data and could have used that to test his theory); *see Daubert*, 509 U.S. at 594 (considering error rates and whether the theory has been tested). Further, when defense counsel asked how much stress is acceptable, Mr. Free did not sufficiently explain, instead testifying, "I haven't looked at it and it kind of depends on what . . . magnitude, too" [Doc. 147-2 p. 103]. He has not heard of any "standard as to how many months can be under [his] definition of stress availability" [*Id*. at 104]. Plaintiffs cite to Mr. Free's report as "discussing stress availability analysis using industry standard assumptions" [Doc. 163 p. 24 (citation omitted)], but they do not explain those industry standard assumptions.[10] Indeed, at the hearing, the Court questioned Plaintiffs' claim that the stress availability analysis is "grounded in existing industry standards" [Doc. 163 p. 23]. Plaintiffs discussed Mr. Free's experience and the ARDA Code of Ethics. But as Defendants noted, Mr. Free has conducted the stress availability analysis only one other time, *see Diamond Resorts U.S. Collection Dev., LLC*, 2023 WL 9659943, at *19, and the ARDA Code of Ethics does not mention the stress availability analysis.

---

[10]     For example, Mr. Free accounted a full week of breakage at 7.5% [Doc. 147-1 pp. 14–15]. Plaintiffs state that "Mr. Free testified that breakage is a concept-well-known in the timeshare industry" [Doc. 163 p. 23]. While this point does not appear to be in dispute, it is not clear how Mr. Free arrived at that exact percentage. During his deposition, he stated that the percentage was an "estimate on [his] part" [Doc. 147-2 p. 86]. He noted it was based on his knowledge of the industry, testifying, "I have never seen a study on that issue . . . . I would say it is clearly a Ken Free estimate made on his reasonable expectations" [*Id*. at 86–87].

Plaintiffs argue that "an expert may rely on a model, even if that specific model is novel" [Doc. 163 p. 26].[11] Even so, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. 146. The Court concludes so here and excludes Mr. Free from offering his opinions on limited or stress availability at the Resort.[12]

### C. Mr. Free's Opinions on Defendants' Alleged Misrepresentations or Omissions

Defendants move to exclude Mr. Free's opinion that the alleged "limited availability . . . was misrepresented to or inadequately disclosed to purchasers" [Doc. 148 p. 17 (citing Doc. 147-1 pp. 20–22)]. They state that he lacks qualifications, the opinion is a legal conclusion, and is otherwise not appropriate for expert testimony [*Id.*]. With respect to the latter, Defendants state, "It is well within the experience of common men to determine whether availability was accurately and adequately disclosed" [*Id.* (citations omitted)]. "Mr. Free's opinions are also inadmissible[,]" Defendants contend, "because they are nothing more than a statement of Plaintiffs' preferred outcome" [*Id.* (citations omitted)]. They add that "Mr. Free did not apply any methodology or standard" and that he "does not know what any purchaser was verbally told or not during a sales closing" [*Id.* at 18].

Plaintiffs respond that Defendants "ignore[] that Mr. Free does not make simple comparisons, nor are his opinions about binary facts" [Doc. 163 p. 28]. According to Plaintiffs,

---

[11]  Plaintiffs rely on *Galloway v. Big G Express, Inc.*, 590 F. Supp. 2d 989 (E.D. Tenn. 2008), in support of their argument. In *Galloway*, the court found the plaintiff's expert used a method that had not been "developed in the past." *Id.* at 996. But the court also found the plaintiff's expert used the general methodology "as that employed by [the d]efendants' experts, use of the scientific method, coupled with engineering principles[.]" Such is not the case here.

[12]  Given this finding, the Court need not consider Defendants' remaining arguments.

"Mr. Free is clarifying a key question based on his extensive experience, which is how a sales pitch or representation made during a sale can impact customer expectations and perceptions of product value" [*Id.*]. They contend that "Mr. Free's opinions aid the trier of fact to connect the 'logical dots' between [Defendants'] sales pitches, the representations made, and how they are likely to be perceived" [*Id.* (citation omitted)]. Further, Plaintiffs state that because these opinions "are qualitive[,] . . . the error rate and accepted method factors for reliability are inapposite" [*Id.* at 27]. Instead, Plaintiffs state that "Mr. Free's assessment is grounded in his extensive experience and knowledge of the industry standard of care, as well as the industry standards outlined by the ARDA Code of Ethics" [*Id.* (citation omitted)]. Plaintiffs deny Mr. Free offers any legal conclusions, stating that "Mr. Free's opinions as to [Defendants'] representations during sales pitches speak to the duty of care and ethical standards in the industry" [*Id.* at 16 (citations omitted)].

Defendants reply that "[t]o the extent Mr. Free claims to know what purchasers know and understand, he is not a consumer behavior expert, he conducted no consumer behavior surveys/studies, and he is not holding himself out as a clairvoyant" [Doc. 166 p. 14]. They maintain that "Mr. Free did not apply any methodology or standard as to the accuracy or effect of the disclosures" [*Id.*]. "But, even so," Defendants assert that "there is no standard that could be applied to determine whether there was an actional misrepresentation or that a failure to disclose occurred because this is the fact finder's question to answer" [*Id.*].

The Court finds that Plaintiffs have not shown that it is more likely than not that Mr. Free's opinion that Defendants misrepresented or inadequately disclosed the alleged limited availability to purchasers will help the trier of fact understand an issue. Rule 702 requires the expert's "specialized knowledge . . . help the trier of fact to understand the evidence or to determine a fact

33

in issue[.]" Fed. R. Evid. 702(a); *see also United States v. Bell*, No. CR 17-20183, 2022 WL 1014497, at *4 (E.D. Mich. Apr. 5, 2022) ("Expert testimony must assist the jury in understanding 'an area which is not within the experience of the average juror.'" (quoting *United States v. Meadows*, 822 F. App'x 434, 437 (6th Cir. 2020))). The Court must "examine[] whether the 'untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'" *Bell*, 2022 WL 1014497, at *4 (quoting *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016)); *see also Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (explaining that an expert's opinion is not helpful if it is within "common understanding" (citation omitted)).

Here, Mr. Free states:

> From my review of the claims in this case, inclusive of Plaintiffs' assertions, it appears that when reservations availability was questioned by prospects, [Defendants'] Resort sales reps responses generally were framed using the argument that reservations availability shouldn't be a problem because Owners can reserve up to a year in advance and there is plenty of supply is [sic] this very large Resort.

[Doc. 147-1 p. 20]. He therefore opines that "[Defendants'] sales rep[resentatives] failed to convey material information about availability" [*Id.*]. He bases this opinion on Defendants' *FAQs During Closing*, which is contained in Defendants' *Closing Officer Training Guide* [*Id.* at 21]. He opines that "[r]eferences to exchanges imply that they will be relatively easy to effect and can be successfully consummated, neither of which are necessarily true" [*Id.*]. According to Mr. Free, "The technique used here is to divert the Owner from the actual problem (which the Developer has not anywhere disclosed) of weak reservation conversion rates at [the Resort]" [*Id.*]. He concludes:

> Thus the perceived flexibility in using the float program to make reservations on the dates Owners desire is mischaracterized when

this program is explained during the sales process. This applies to Owners who purchased in all periods, including after the 2016 fire. Such behavior could be seen to be Abusive Behavior Towards Consumers, an ethical deficiency, Concealment of Material Facts, a Violation of the ARDA Code of Ethics, and a violation of the Tennessee Time-Share Act. This certainly applies to [Defendants'] actions towards the named multiple [P]laintiffs in this case and the other owners at Westgate Smoky Mountain Resort.

[*Id*. at 21–22 (citation omitted)].

During his deposition, he testified, "[T]he training material very clearly includes direct or inferred misrepresentations regarding certain issues such as availability, availability issue" [Doc. 147-2 p. 109]. Later, when asked about the closing documents and what they disclosed about availability, Mr. Free testified, "Well, I reviewed the closing documents, which included within them disclosures, which included certain general waivers of responsibility for availability or lack of availability. You know, certain lines to initial and say I read everything. So I did read through all those for all of the [P]laintiffs" [*Id*. at 111–12]. He saw the line that the Owner was required to initial about accommodations being subject to availability, noting that it was "legally required and necessary in its own right" but "inadequate" [*Id*. at 112]. He stated:

Okay. It's inadequate because the consumer really doesn't understand what that means. It's not emphasized. It's a general statement that is presented during closing process. Generally after the prospect has been through arduous hours of being sold on this product, and they tend to be hungry or exhausted or just want to get out of there. They've made their decision. Yes, we'll buy, but at that point in time, they have to fill out all of this closing paperwork, which is extensive, and if they're told to initial something, they'll initial it. No one, I can tell you no one reads all the paperwork. No one.

[*Id*.].

Merely summarizing Defendants' training manuals and opining that they do not adequately disclose certain facts is not helpful to the trier of fact. Indeed, the jury is capable of reviewing

35

Defendants' training manuals and the closing documents and determining whether they made adequate disclosures. *See Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 365 (W.D. Ky. 2020) ("What is or is not written . . . is a matter of fact and not an issue of expert testimony."); *see also Diamond Resorts U.S. Collection Dev., LLC v. Newton Grp. Transfers, LLC*, No. 9:18-CV-80311, 2022 WL 1642865, at *8 (S.D. Fla. Mar. 31, 2022) ("Neither does [the expert's] testimony offer 'special technical assistance' necessary to assist the jury in determining whether the Mailer is false or misleading. Once the Court instructs the jury on the parameters of Florida law, the jury can determine the accuracy of the Mailer.").[13] Plaintiffs argue that Defendants' reliance on *Cunningham* is not helpful because Mr. Free's testimony relates to "how a sales pitch or representation made during a sale can impact customer expectations of product value" [Doc. 163 p. 28]. But Mr. Free's expertise is in the hospitality industry, which does not translate to expertise about customer expectations. *Cf. Diamond Resorts U.S. Collection Dev., LLC*, 2022 WL 1642865, at *17 ("Logically, understanding what the consumers thought, felt, and

---

[13]     Plaintiffs rely on *United States v. Frazier*, 442 F. Supp. 3d 1012 (M.D. Tenn. 2020). In *Fraizer*, the court allowed the expert to testify that "drug traffickers often carry guns and are fronted with drugs by suppliers, reasoning that "drug dealing [ is not] within the experience of the average juror[.]"442 F. Supp. 3d at 1030. The testimony here is of a different nature.

Plaintiffs also rely on *Wilson v. Greyhound Lines, Inc*., No. 13-CV-3013, 2015 WL 12564159 (W.D. Tenn. Sept. 8, 2015). In that case, the court excluded the expert from "testify[ing] about the mental health issues of passengers[,]" but allowed the expert, who had "years of experience dealing with bus passengers," to testify "about general behavioral issues bus drivers typically encounter from passengers and how bus drivers should be trained to deal with how different passengers may react to commands from authority figures." *Id*. at *3. Here, Mr. Free is not offering testimony about general behavior issues he generally encounters, but instead, he is offering testimony on customer expectations. This case is therefore inapposite.

The Court further finds that Plaintiffs' reliance on *In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006), misplaced. In that case, the court noted that class treatment may be appropriate when "a standardized sales pitch is employed." *Id*. at 991. The court did not address a *Daubert* challenge on this subject matter.

36

believed about the advertisement would help the jury decide whether an advertisement is misleading. That fact can be demonstrated through relevant evidence like a consumer survey that tests consumers thoughts, feelings, and beliefs after viewing the advertisement at issue.").

While Plaintiffs' response largely focuses on Mr. Free's attempt to testify about customer expectations [*see* Doc. 163 p. 28], they generally claim elsewhere in their brief that Mr. Free is allowed to opine on whether Defendants' representations during sales pitches violate industry standards [*Id*. at 16; *see also id*. at 19]. "[T]rial courts routinely allow experts to testify on industry standards, ordinances, and policies." *Schlueter v. Ingram Barge Co.*, No. 3:16-CV-02079, 2019 WL 5683371, at \*8 (M.D. Tenn. Nov. 1, 2019) (quoting *Garrity v. Wal-Mart Stores E., Ltd. P'ship*, 288 F.R.D. 395, 402 (W.D. Ky. 2012)). After Mr. Free summarizes Defendants' training manuals, he opines that Defendants' actions are "Abusive Behavior towards Consumers, an ethical violation, a Violation of the ARDA Code of Ethics, The Tennessee-Time-Share Act, and perhaps a Violation of Duty of Fair Disclosure" [Doc. 147-1 p. 220]. Mr. Free cannot testify about violations of the law, *see Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) ("[T]estimony offering nothing more than a legal conclusion—i.e., testimony that does little more than tell the jury what result to reach—is properly excludable under the Rules."), or that Defendants' conduct violates Mr. Free's ethical standards, *see In re Flint Water Cases*, No. 17-10164, 2021 WL 6102744, at \*10 (E.D. Mich. Dec. 24, 2021) ("Only testimony regarding [the expert's] personal opinions about the morality of [the d]efendants' conduct is prohibited."). Moreover, Mr. Free does not explain the industry standards. During his deposition, he testified that the industry standards constitute what a reasonable hotel, resort, or timeshare operator would do in response to a particular situation [Doc. 147-2 pp. 29–30]. *See Dunlap v. Choice Hotels Int'l, Inc.*, No. 5:20-CV-00159, 2021 WL 6126154, at \*5 (W.D. Ky. Dec. 28, 2021) ("Although [the expert]

states that Sleep Inn's procedures 'were not consistent with those that would have been employed by a reasonable . . . lodging operator," [the expert] never states what those reasonable procedures would be. Claiming that an industry standard exists is not the same as discussing that standard." (citation omitted and alteration in original)). While courts allow an expert to discuss "the contents of ethical and professional guidelines[,]"*In re Flint Water Cases*, 2021 WL 6102744, at *10, Mr. Free does not explain how Defendants' conduct violated the ARDA Code of Ethics, rendering it not helpful, *see Diamond Resorts U.S. Collection Dev., LLC*, 2023 WL 9659943, at *17 (noting that Mr. Free "fail[ed] to identify what provisions of the [ARDA] Code [the plaintiffs] violated or to provide any explanation for how he reached his conclusions").

The Court therefore finds Mr. Free's opinions on Defendants' alleged misrepresentations and omissions about the Resort's availability unhelpful, and therefore, they are excluded.

### D. Mr. Free's Opinions on Timeshare Prices

Defendants argue that Mr. Free opines that "[Defendants] made misrepresentations to every purchaser by stating or suggesting that timeshare ownership is less expensive than a hotel, that [Defendants] sell[] timeshares as investments, and that [Defendants do] not disclose prices of comparable products" [Doc. 148 p. 19]. Defendants state, "It is also with the juror's common knowledge to look at two prices and tell which one is higher, to determine whether [Defendants are] selling timeshares as investments . . . , or whether [Defendants have] disclosed comparator prices" [*Id*.]. Defendants assert that Mr. Free does not use an appropriate methodology and that his opinions are not reliable [*Id*. at 19–22].

Plaintiffs respond that Mr. Free's opinions are relevant because they "speak to the true value of a timeshare ownership interest[] and allow for a meaningful comparison to the statements made during the sales pitches" [Doc. 163 p. 20 (citation omitted)]. Plaintiffs claim that his opinions

are "relevant to the classwide question of whether [Defendants'] sales pitch claims regarding the value of timeshare violate ethical standards" [*Id*. at 19]. They state that his "opinion[s] can readily be tested—since his calculations use actual financing and closing cost data" [*Id*. at 29–30]. In addition, Plaintiffs claim, the Owners can verify the interest, closing costs, and maintenance fees" [*Id*. at 30]. "Mr. Free's analysis[,]" Plaintiffs assert, "rests on longstanding industry standards" [*Id*.].

Defendants reply that Mr. Free's opinions are not relevant, arguing that "[a] seller i[s] free to set its price" [Doc. 166 p. 15]. According to Defendants, Plaintiffs have not claimed that the cost of the timeshare referenced in Defendants' sales pitches violate ethical standards [*Id*. at 16]. "[I]t is within the juror's common knowledge[,]" Defendants claim, "to look at two prices and tell which one is higher" [*Id*.]. They assert, "Mr. Free's methodology is inappropriate as it is one that has never been tested before in the relevant community, is completely subjective, has yet to be tested in the marketplace, and has an unknown rate of error" [*Id*. (citation omitted)]. They accuse Mr. Free of making up the data that he relied on [*Id*. at 16–17].

Again, "Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based on 'sufficient facts or data,' whether the testimony is the 'product of reliable principals and methods,' and whether the expert 'has applied the principles and methods reliable to the facts of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting Fed. R. Evid. 702). In assessing reliability, the court may consider "(1) the testable nature of the hypotheses; (2) whether the methodology has been subject to peer review; (3) rate of error associated with the methodology; and (4) whether the methodology is generally accepted in the field." *Reynolds v*, 2006 WL 5249744, at *8 (footnote omitted) (citing *Daubert*, 509 U.S. at 593–94). These factors are not "a definitive checklist." *Kumho Tire Co.*, 526 U.S. at 138 (citation

omitted). "The reliability step focuses on the 'methodology and principles' that form the basis for the testimony." *Ellipsis*, 428 F. Supp. 2d at 757 (citation omitted).

The Court finds that Plaintiffs have not shown that it is more likely than not that Mr. Free's opinions are reliable under Rule 702. Mr. Free opines that Defendants "grossly overcharge[] for timeshare intervals" and that they fail to disclose costs for similar accommodations [Doc. 147-1 pp. 35–36]. In order to arrive at this opinion, Mr. Free reviewed TripAdvisor.com to determine Defendants' property quality, which received a 3.38 rating [*Id*. at 23]. Using a 3.4 rating, he relied on Smith Travel Research to determine the average cost of a hotel in Gatlinburg, Tennessee, which is $144.50, per night [*Id*.]. Next, he adjusted that rate by 1.2 to account for the size of timeshare compared to a hotel, which equates to $173.40 [*Id*.]. Finally, he multiplied $173.40 by 1,000 to account for the typical ratio of hotel guestroom property, which results in a $173,400 property valuation per unit [*Id*.]. Given that the Resort had 980 units, he calculates a total property portfolio value of $169,932.00, which means that "each of the 50,960 timeshare interest should have been priced at about $3,335" [*Id*. at 24]. He acknowledges that "this test of value and actual value would need to have been tested in the marketplace" and that "[t]he actual value, of course, could vary considerably from this estimate" [*Id*. at 23–24]. He then compares his calculation with what Plaintiff Marilyn Moore paid [*Id*. at 33–34].[14]

---

[14]    Defendants point out, "Mr. Free concludes that [Plaintiff] Moore paid $34,026 for one timeshare, when she very clearly paid $29,434 for two timeshares" [Doc. 148 (citation and emphasis omitted)]. Mr. Free responds, "The $34,026 cost per single timeshare was the average of [Plaintiff] Moore's three purchases calculated directly from the closing documents" [Doc. 163-3 ¶ 8(a)]. He contends that Defendants' "assertion that the cost was $29,434 for two timeshares is simply inaccurate" [*Id*. (emphasis omitted)]. But the parties' factual disputes are not appropriate under a *Daubert* analysis. *See Jackson v. Parker-Hannifin Corp.*, 645 F. Supp. 3d 577, 599 (S.D. Miss. 2022) (explaining that "factual disputes . . . are better suited for jury determination than a *Daubert* motion" (citations omitted)).

40

During his deposition, Mr. Free testified that he was "trying to compare the closest product type, which is a hotel, to timesharing" [Doc. 163-2 p. 16]. He stated that Defendants' "fundamental sales pitch" is to present to prospects that owning a timeshare makes economic sense [*Id.* at 16–17]. When asked how he arrived at the 1.2 adjustment, he explained that "there are appraisals standards" and that hotels and timeshares are different [*Id.* at 17]. He stated that the Resort does not have amenities, "hotels typically have more amenities, but hotel rooms are smaller than the units at [the Resort,]" and the Resort has kitchens [*Id.*]. He testified that his 1.2 adjustment "was meant to account the additional value that the timeshare unit would have" [*Id.*]. When asked if an appraiser told him to use the 1.2 multiplier, Mr. Free testified, "No[,] this is something I came up with myself" [*Id.* at 17]. But he submitted that the appraisals "define the features which allow[] them to develop a value based on a comparative methodology" and that he "went through those factors that would be comparative" [*Id.*]. He explained:

> For example, the presence of a kitchen in a timeshare unit, the difference in square footage, and some other features. Some features were negative for value of the timeshares, but I balanced them all out. In other words, if you looked at an appraiser report, it will say an extra 10 percent for this, or, you know, whatever, and then they'll come up with the difference in price again. That's what I did here.

[*Id.*].

But Mr. Free acknowledges that hotels and timeshares have "different guests; different settings; different resort products" [Doc. 147-2 p. 123]. He further states that his analysis needs to be "tested in the marketplace" and that the "actual value, of course, could vary considerably from this estimate" [Doc. 147-1 pp. 23–24]. And he does not sufficiently explain how he arrived at a 1.2 adjustment rate. Instead, he vaguely refers to "appraisal standards" and acknowledges that he did not "show [his] work" for that rate [Doc. 163-2 p. 17]. *See Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563, 575 (6th Cir. 2019) (affirming the district court's decision to exclude the

41

experts' testimony because they "never explained why they used that formula, and they failed to explain why that formula was reliable or recognized as reliable"). Plaintiffs assert that "[e]ven assuming Mr. Free's factual basis was incomplete, this goes to the weight of an opinion, not admissibility, and not to the class certification analysis" [Doc. 163 p. 30 n.13 (citations omitted)]. Plaintiffs' argument misses the mark—the issue with Mr. Free's opinion is not the facts that he relied on, but the formula that he cannot adequately explain. *See Joiner*, 522 U.S. at 146 (explaining that courts are not required to rely on "the *ipse dixit* of the expert").[15]

For these reasons, the Court excludes Mr. Free's opinions regarding timeshare prices.[16]

### E.     Mr. Free's Opinions on Resale

According to Defendants, Mr. Free's "opinions relate to an alleged lack of resale market and representations regarding the same" [Doc. 148 p. 21 (citation omitted)]. They claim that such opinions are not relevant to the issues in this case [*Id*.]. In addition, Defendants assert that Mr. Free does not have a methodology for his opinions, and they are unreliable [*Id*. at 21–22].

Plaintiffs respond that Mr. Free's opinion "speak[s] to the true value of a timeshare ownership interest[] and allow[s] for a meaningful comparison to the statements made during the sales pitches" [Doc. 163 p. 20]. Plaintiffs assert that he "makes reasonable assumptions about the market value of [Defendants'] timeshare interests by reference to how they fair in resale markets, and his analysis is directed towards representations [Defendants] make[] during [their] standardized sales pitches about the increasing value of a timeshare purchase" [*Id*. at 28–29].

---

[15]     Plaintiffs state, "This Circuit regularly finds reliable expert testimony based in part on other expert conclusions" [Doc. 163 p. 30 (citing *United States v. Roberts*, 830 F. Supp. 2d 372, 383 (M.D. Tenn. 2011))]. But they do not explain what other expert conclusions Mr. Free relied on [*See* Doc. 163 p. 30]. During Mr. Free's deposition, he testified that his 1.2 rate was "consistent with the numbers that came up in other expert witness and consultant assignments" [Doc. 163-2 p. 28]. He does not explain the expert witness and consultant assignments to which he is referring.

[16]     Given this finding, the Court does not need to address Defendants' remaining arguments.

Plaintiffs state that "Mr. Free examined many data points to arrive at his opinions, and his analysis speaks more to the representations as to value made by [Defendants] during their standardized sales pitches" [*Id.* at 29].

Defendants maintain that Mr. Free's opinion on resale is not relevant the issues in the case [Doc. 166 p. 18]. They claim that Mr. Free performed an internet search, which is not a proper methodology [*Id.*].

Rule 702 requires an expert's testimony to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Daubert*, 509 U.S. at 591 (quoting 3 Weinstein & Berger ¶ 702[02], pp. 702–18). Some courts describe this inquiry as whether the opinion fits the facts of the case. *Id*; *see also Ellipsis, Inc.*, 428 F. Supp. 2d at 757 ("The relevance step of the inquiry is designed to ensure that 'there is a "fit" between the testimony and the issue to be resolved by the trial.'" (quoting *Greenwell v. Boatwright,* 184 F.3d 492, 496 (6th Cir. 1999)).

The Court finds that Plaintiffs have shown that it is more likely than not that Mr. Free's opinions are relevant and reliable under Rule 702. Plaintiffs' Third Amended Complaint alleges that Defendants "rel[y] on owners' inability to resell their timeshare properties, despite telling prospective buyers that they are purchasing an asset that will only appreciate in value" [Doc. 98 ¶ 31]. Plaintiffs' motion for class certification alleges that Defendants' sales representatives made uniform misrepresentations about an Owner's ability to resell a timeshare [Doc. 124-1 p. 5]. Mr. Free's opinion relates to whether Defendants misrepresented to Owners that ability to resale their timeshare.

43

But Defendants argue his opinion is irrelevant because he states that "the global average resale price is $4,000" [Doc. 148 p. 21]. Mr. Free states that the resale value of a timeshare is "determined by a number of factors, including most importantly the quality of the resorts, the preserved integrity of the sponsoring system developer, and the perceived reseller or reseller's agent" [Doc. 147-1 p. 36]. He further explains two types of groups, or what Mr. Free calls, "nodes": (1) sellers who try to sell at their initial purchase price, which is about $20,000 for a one-bedroom unit, and (2) sellers who recognize that they need a certain price in order to sell, which is generally between $4,000 to $6,000 [*Id*.]. Mr. Free explains that the listing price, however, is not necessarily the market price [*Id*. at 36–37]. In his experience, the resale value is about 80% less than the purchase price, which he explains is consistent with "reported resale prices" [*Id*. at 37 (citation omitted)].

Defendants argue that Mr. Free does not employ any methodology [Doc. 148 p. 22]. Mr. Free relies on his experience and different publications about the average resale of a timeshare [Doc. 147-1 pp. 36–37 & nn.50–51]. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (explaining that expert could rely on experience about police behavior); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("Indeed, in certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." (citations omitted)).

They also argue that he relied on an "arbitrary internet search to support his conclusion" that did not consider the unit type or the benefits from buying directly from Defendants [Doc. 148 p. 22]. Mr. Free used his internet searches to show "examples" that the resell value is below the purchase price [*See* Doc. 163 p. 29 ("Mr. Free examined many data points to arrive at his opinions, and his analysis speaks more to the representations as to value made by [Defendants] during their

44

standardized sales pitches")]. And he opines that there are no economic benefits by purchasing directly from Defendants [Doc. 163-3 ¶ 9(b)]. To the extent Defendants believe Mr. Free should have considered other factors, this goes to the weight of the opinion and not its admissibility. *See Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224 (6th Cir. 2025) ("[M]ere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." (quoting *In re Scrap Metal*, 527 F.3d at 530) (second alternation in original).[17]

Accordingly, the Court declines to exclude Mr. Free's opinions about resale.

## F. Mr. Free's Alleged Opinion that "Westgate is Bad"

According to Defendants, Mr. Free's opinions "relate to supposedly improper sales practices" [Doc. 148 p. 22]. Specifically, Defendants object to Mr. Free's opinions "(1) using incentives to induce attendance at sales presentations, having a one day-close, and discouraging comparison shopping are somehow improper; (2) [Plaintiff] Moore was mistreated; (3) internet reviews indicate [Defendants are] bad; and (4) statements in sales and closing processes are improper" [*Id.* at 23]. "First," Defendants argue, "Mr. Free admits these sales practices are not unlawful, they just offend subjective expectations" [*Id.* (citations omitted)]. Second, Defendants contend, the testimony is not helpful to the jury because Plaintiffs can testify about their experiences, "[a]nd the jury does not need Mr. Free to tell them whether something was true, or adequately disclosed, which are legal conclusions" [*Id.*]. Defendants claim that Mr. Free did not use any methods and that his opinions are not based on reliable facts [*Id.* at 24].

Plaintiffs respond that Defendants mischaracterize Mr. Free's opinions and that he has not claimed that Defendants are "bad" [Doc. 163 p. 17 (citation omitted)]. Instead, Plaintiffs assert

---

[17]     Defendants state that Mr. Free opined that there was "no active, organized, or liquid market[,]" but he later "acknowledge[d] that there is a resale market" [Doc. 148 p. 22]. Defendants argue that these "two statements are utterly incompatible" [*Id.*]. Mr. Free does not opine that there is no market, but instead it is "highly illiquid" [Doc. 141-1 p. 41; *see also* Doc. 163 p. 29 n.12].

that Mr. Free's testimony relates "to the standard of care and a problem in the hospitality industry of misrepresenting the value of timeshare assets" [*Id.* (citation omitted)]. Mr. Free's declaration states, "My opinions as to concerning the sales practices by [Defendants'] representatives do not assert that [Defendants are] 'bad' but rather my evaluation and investigation of sales practices at the Resort lead me to conclude that [Defendants'] practices do not conform to the standard industry recommendations, and are in violation of industry ethics, such as those set forth by the ARDA Code of Ethics" [Doc. 163-3 ¶ 10(a)].

Defendants reply that "Plaintiffs[] only responded as to Mr. Free's opinion of Defendants' purportedly improper statements in their sales and closing process" [Doc. 166 p. 20]. With respect to sales and closing processes, Defendants argue that "Mr. Free has no credentials[,] and he uses no methodology" [*Id.*]. They further claim that Mr. Free's opinions are not helpful to the jury and are unreliable [*Id.* at 20–24].

Mr. Free opines, "While not by definition a Predatory Developer, [Defendants] operate[] a sales and marketing enterprise that copies many of the features employed by Predatory Developers" [Doc. 147-1 p. 44]. For instance, he states that Defendants' sales representatives acquire prospective customers by inducing them through promotional incentives and Defendants do not give buyers "the opportunity to take home sales information and to stop competitive timeshare systems" [*Id.*]. He then describes Plaintiff Moore's experience with buying a timeshare from Defendants [*Id.* at 44–49]. Mr. Free also reviewed TripAdvisor, which showed that Defendants' sales process received "substantial negative reviews" [*Id.* at 49; *see also id.* at 50]. Mr. Free next describes Defendants' sales process [*Id.* at 51–54]. He discusses Defendants' *Dayline Training Manual* and *Closing Officer Training Guide*, which according to Mr. Free, contain statements about Owners having "a Deed to prime real estate that can build value[,]" and

46

directives that "imply that there shouldn't be any problems making reservations[,]" respectively [*Id*. at 51]. He further states that the *Dayline Training Manual* "provides to sales rep[resentatives] that if followed could sound convincing to buyer prospects[,]" such as price drops that are not true, and promises of personal concierge, which is really "a marketing representative whose primary job is to capture current Owners for upgrade sales presentations" [*Id*. at 51–52 (citation and emphasis omitted); *see also id*. at 52–54 (describing additional sales tactics that Mr. Free believes are untrue or fraudulent)].

With respect to Defendants' challenge to Mr. Free's opinions about the sales presentations, Plaintiff Moore's experience, and the internet reviews, Plaintiffs have not responded to their arguments. The Court therefore finds that Plaintiffs have not met their burden in demonstrating that Mr. Free's opinions about sales presentations, Plaintiff Moore's experience, and internet reviews are admissible under Rule 702. *See AK v. Behav. Health Sys., Inc.*, 382 F. Supp. 3d 772, 775 (M.D. Tenn. 2019) ("[W]hen a party fails to respond to an argument, that argument is generally deemed to be unopposed and the proposition conceded." (citations omitted)). With respect to Defendants' challenge to Mr. Free's opinions about the statements during the sale and closing process, the Court adopts the analysis set for in Part IV, section C.

### E.     Mr. Free's Extrapolation to All Purchasers

According to Defendants, "Mr. Free broadly proclaims that all putative class members . . . had the same alleged experiences as Plaintiffs" [Doc. 148 p. 24 (citing Doc. 147-1 pp. 21–22, 35–36, 43, 54–55]. They claim that "Mr. Free walked back parts of this in his deposition, acknowledging, for example, that the only way to know if someone experienced limited availability would be to depose them" [*Id*. at 25 (citation omitted)]. Defendants assert that

"extrapolation to all purchasers is inadmissible" and that he is not qualified to render this opinion [*Id.*].

Plaintiffs respond that "[e]ven assuming Mr. Free's opinions entailed any extrapolation, experts regularly extrapolate data samples to a larger dataset" [Doc. 163 p. 22 (citations omitted)].

In summarizing his critiques of Defendants' practices, Mr. Free concludes, "This certainly applies to [Defendants'] actions towards the named multiple [P]laintiffs in this case and the other [O]wners at [the Resort]" [Doc. 147-1 pp. 21–22, 43; *see also id.* at 35–36, 54–55 ("This applies to [Defendants'] actions toward [Plaintiff] Moore, the other lead [P]laintiffs, and other [O]wners at [the Resort]).

To the extent the Court has already excluded Mr. Free's underlying opinions, the Court need not address Defendants' challenges. And the Court declines to exclude Mr. Free's remaining extrapolation opinions. While Defendants argue that Mr. Free's opinions constitute "unreliable assumptions[,]" in making this conclusion, Mr. Free generally relies on Defendants' training materials and other documents. *See Davis*, 126 F.4th at 1224 (explaining that factual weaknesses are for cross examination). And Defendants provide no support for their argument that Mr. Free must be a statistician.[18]

In sum, to the extent the Court has not already excluded Mr. Free's underlying opinion, the Court declines to exclude Mr. Free's remaining extrapolation opinions.

---

[18]    Defendants rely on *Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974 (6th Cir. 2017), to support their argument. In that case, the court excluded an expert who improperly extrapolated toxic exposure causation findings across all class members without relying on any examination or testing. *Id.* at 981.

48

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART**

Defendants' Motion to Exclude Opinions of Ken Free [**Doc. 147**].

**IT IS SO ORDERED.**

ENTER:

Jill E. McCook
United States Magistrate Judge