UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MARILYN MOORE, *et al.*,                    )
                                            )
      Plaintiffs,                           )
                                            )
v.                                          )          No. 3:18-cv-410-DCLC-JEM
                                            )
WESTGATE RESORTS LTD., L.P.,                )
a/k/a Westgate Resorts, LTD., *et al.*,     )
                                            )
      Defendants.                           )

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order referring the matter by United States District Judge Clifton Corker [Doc. 205].

Now before the Court is Defendants' Motion to Exclude Opinions of Dan[iel] Werner [Doc. 150]. Plaintiffs have responded in opposition to the motion [Doc. 165], and Defendants have replied [Doc. 173]. Given the passage of time since the briefing, the Court allowed the parties to file supplemental briefs [Doc. 206]. On April 28, 2025, Plaintiffs filed a supplemental brief [Doc. 210]. On June 11, 2025, the parties appeared before the Court for a motion hearing. Attorneys Christopher Coleman, John Belcher, Kenneth Byrd, and Wayne Ritchie, II, appeared on behalf of Plaintiffs. Attorneys Benjamin New and Robert Vance appeared on behalf of Defendants. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a).

For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** the motion [**Doc. 150**].

## I.     BACKGROUND

On September 25, 2018, Plaintiffs filed their Complaint [Doc. 1], and later, on July 17, 2020, they filed the Third Amended Class Action Complaint ("Third Amended Complaint")

[Doc. 98]. Plaintiffs are purchasers of timeshares at Westgate Smoky Mountain Resort ("Resort") [*Id*. ¶¶ 61, 68, 79, 88, 99, 107]. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, they also seek to bring this action on behalf of others, defining their proposed class as:

> All residents of the United States and its territories who purchased from [Defendant] a "floating use plan" vacation timeshare property at the Westgate Smoky Mountain Resort at Gatlinburg from September 25, 2008[,] through the date of class certification.

[*Id*. ¶ 114].[1] On May 1, 2020, Plaintiffs moved to certify the class and to appoint class counsel [Doc. 124].

Plaintiffs allege that "Defendants [are] various entities associated with the . . . Resort" [Doc. 98 p. 1]. Plaintiffs generally claim that Defendants "use a high-pressure scheme that involves convincing prospective purchasers to buy into [their] vacation timeshare program while failing to adequately disclose material and legally required information to buyers" [*Id*.]. According to Plaintiffs, Defendants failed to disclose material facts to timeshare purchasers by: (1) "fail[ing] to adequately train or to supervise their sales agents, and, . . . encourag[ing] their sales agents to utilize high-pressure sales tactics[,]" (2) "provid[ing] their sales and closing agents with a folio to give to purchasers with the purchasers' documentation; however, the folios provided by the Defendants contain a 'secret pocket' which Defendants know their sales and closing agents often use to conceal the required disclosures[,]" (3) "fail[ing] to adequately disclose to purchasers that they are not purchasing a share in a specific unit but are instead buying into a 'floating use plan[,]'" and they do not explain how those plans work, (4) "fail[ing] to adequately disclose that the Defendants may delay delivery of a deed to the purchasers for a period of years[,]" and (5) "fail[ing] to disclose to purchasers that because [Defendants] oversell[] and artificially restrict[]

---

[1]    Plaintiffs define the "floating use plan" as a plan that provides "owners the right to use a certain type of unit, subject to availability" [Doc. 98 ¶ 48].

2

the availability of Resort properties . . . they will not be able to use their timeshare purchase as advertised or as would be reasonably expected" [*Id.* ¶ 36(a)–(d); *see also* ¶¶ 39–60]. Plaintiffs add that "Defendants['] sales agents pressure purchasers to sign a series of complex and misleading legal documents without giving purchasers the opportunity to read—or in some cases, see—the documents they are signing" [*Id.* ¶ 37]. In addition, Plaintiffs assert that "[Defendants] specifically train [their] sales agents to make misrepresentations and omissions during the sales process" [*Id.* ¶ 38]. Plaintiffs outline their experiences with purchasing and owning a timeshare [*Id.* ¶¶ 61–113].

Plaintiffs bring claims against Defendants for violations of the Tennessee Time-Share Act of 1981, Tenn. Code Ann. § 66-32-101 *et seq.* (Counts I and II), unjust enrichment (Count III), fraudulent misrepresentation by omission (Count IV), fraud in the inducement (Count V), negligent misrepresentation by omission (Count VI), breach of the implied covenant of good faith and fair dealing (Count VII), breach of contract (Count VIII), and civil conspiracy (Count IX) [*Id.* ¶¶ 150–241].

On November 18, 2020, Judge Corker granted in part and denied in part Defendants' motion to dismiss [Doc. 185]. He dismissed Counts I and VIII [*Id.* at 50]. In addition, he found Plaintiff Moore's, Plaintiff Ryan Spado's, and Plaintiff Laura Spado's claims under Counts I, II, III, IV, V, VI, and IX were barred by the statute of limitations [*Id.*].

Plaintiffs disclosed Daniel P. Werner ("Dr. Werner") to testify about damages models for their proposed class [Doc. 150-1]. Dr. Werner is a senior consultant at NERA Economic Consulting, Inc. ("NERA") [*Id.* ¶ 1]. He is a certified public accountant ("CPA") and has maintained an active license since 2010 [*Id.* ¶ 2]. Dr. Werner has "Ph.D. and M.S. degrees from [the] University of Maryland, College Park, where [he] performed academic research in the area

of applied microeconomics" [*Id*. ¶ 3]. He describes his work as "involv[ing] the analysis of economic damages, financial statements, valuations, and financial forecast" [*Id*. ¶ 1]. In addition, he has "litigation consulting experience" relating to "false advertising, deceptive pricing, business valuation, fraudulent inducement of investments, financial reporting, breach of contract, financial liquidity and solvency, lost wages, and anti-competitive behavior" [*Id*.]. With respect to his "consulting assignments[,]" Dr. Werner submits that they "have covered a variety of industries, including real estate, consumer products and retail, technology, and financial sectors" [*Id*.].

Dr. Werner details the economic background of the timeshare market [*Id*. ¶¶ 13–47]. He explains (1) Defendants' operations, financial condition, and the timeshare industry generally [*see id*. ¶¶ 13–24], (2) the Resort's location, in Gatlinburg, Tennessee, and the tourism that it attracts [*id*. ¶¶ 25–30], and (3) Defendants' property, revenue at the Resort, expenditures, and how they structure their timeshares [*id*. ¶¶ 31–41].

Dr. Werner describes the "three commonly accepted approaches to valuation: (i) Market Approach, which is based on a comparison with the price of an identical (or sufficiently similar) item, (ii) Income Approach, which is based on future cash flows (cost savings or income), and (iii) Cost Approach, which is based on the replacement or reproduction cost" [*Id*. ¶ 49]. For purposes of his damages models here, Dr. Werner relies on the Income and Market Approaches [*Id*.].

Dr. Werner opines, "To the extent that consumer demand was artificially inflated from the alleged deception in this case, economic theory suggests that each customer likely paid higher prices" [*Id*. ¶ 47]. He states "if sufficient data is made available[,]" in this case, he is able to calculate damages using three approaches: (1) dilution of value ("Dilution of Value Approach"), (2) "comparing the difference between the price paid by consumers for the timeshare and the

4

market value of a similar asset that is not subject to the alleged misconduct" ("Market Value Approach") and (3) "analyzing the use value of the timeshare not received by customers because of the alleged misconduct" ("Restricted Use Value Approach") [*Id.* ¶ 48]. "Each of these methods[,]" Dr. Werner asserts, "is consistent with commonly accepted approaches to valuation and may isolate the economic harm attributable to the Defendants' alleged misconduct" [*Id.*].

## II. POSITIONS OF THE PARTIES

Defendants move to exclude Dr. Werner's opinions pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) [Doc. 150]. First, Defendants assert that Dr. Werner is not qualified to offer his opinions on dilution of value and market value [Doc. 151 pp. 9, 14]. Second, they argue that Dr. Werner spends thirty pages outlining background information that is not "related to the opinions he offers in this case[,]" and therefore, they should be excluded as irrelevant [*Id.* at 7–8 (citation omitted)]. Third, Defendants contend that the Dilution of Value and Market Value Approaches are unreliable and irrelevant [*Id.* at 9–18]. Fourth, with respect to Dr. Werner's Restricted Use Value Approach, Defendants do not challenge his methodology but argue that during his deposition he rendered opinions about using a representative sample that he did not previously disclose and for which he is not qualified to render [*Id.* at 19].

Plaintiffs respond that Dr. Werner is qualified to render his opinions [Doc. 165 pp. 9–11]. They claim that Dr. Werner's economic background analysis is admissible because it includes information that experts would normally rely on in this field [*Id.* at 11–13]. With respect to Defendants' challenge to Mr. Werner's methodologies, Plaintiffs claim that "[t]he foundation of [Defendants'] argument is the erroneous premise that timeshares are a wholly unique property interest" and their argument is contrary to "fundamental economic principle[s]" [*Id.* at 13–14].

They argue that Defendants mispresent Dr. Werner's Dilution of Value Approach, and they contend that he uses a reliable methodology for it and the Market Value Approach [*Id.* at 16–22]. With respect to Defendants' objection to Dr. Werner's deposition testimony, Plaintiffs state that he is qualified and that the remaining "criticisms essentially demand that Dr. Werner provide a comprehensive statistical methodology without having the necessary substantive data" [*Id.* at 23].

Defendants filed a reply, arguing that Dr. Werner is not qualified to render his opinions about dilution of value and the market value because he is not an appraiser [Doc. 173 pp. 3–5]. With respect to the background information, Defendants assert that they do not challenge this section in Dr. Werner's report because he relied on inadmissible evidence, but instead, because the information does not relate to his opinions [*Id.* at 17–18]. They maintain that Dr. Werner does not use a valid methodology for either of his Dilution of Value or Market Value Approaches, and therefore, his opinions are not unreliable [*Id.* at 5–14]. Stating that they do not challenge Dr. Werner's Restricted Use Value Approach, Defendants claim that it is otherwise inadmissible because it is not helpful, expert testimony is unnecessary, and "Plaintiffs have not established Dr. Werner has any special knowledge or skills to perform this task" [*Id.* at 16].

## III.  STANDARD OF REVIEW

"[Rule] 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

6

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[2] The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner

_____

[2]    Rule 702 was amended on December 1, 2023, after the parties completed briefing on the motion. The Court utilizes the current version of Rule 702 because it governs "insofar as just and practicable, all proceedings then pending." Prop. Ams. to the Fed. R. Evid., 344 F.R.D. 850, 851. *See also United States v. Candelaria*, No. 22-CR-767, 2023 WL 8185932, at *1 n.1 (D.N.M. Nov. 27, 2023) (applying amendment before the effective date of the amendment because the trial was scheduled to occur after the effective date); *Andrews v. Brethern Mut. Ins. Co.*, No. 4:19-cv-01107, 2023 WL 660710, at *6 (M.D. Pa. Oct. 12, 2023) (taking "heed of the forthcoming changes so as to avoid the misapplication of Rule 702 identified by the Advisory Committee"). But the result would be the same regardless of whether the Court applied the current or prior version of Rule 702. The changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (quoting *Daubert*, 509 U.S. at 593–94), *aff'd by* 89 F. App'x 927 (6th Cir. 2003). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

With respect to expert testimony at the class certification stage, recently, the United States Sixth Circuit Court of Appeals joined the majority view by finding, "If challenged expert testimony is material to a class certification motion, the district court must demonstrate the expert's credibility under *Daubert*." *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253 (6th Cir. 2024). The rationale is that "[c]lass certification requires the plaintiffs to provide 'evidentiary proof' that they meet the elements of Rule 23," and unreliable expert testimony "cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact' through acceptable evidentiary proof." *Id.* (citation omitted). In other words, to the extent the expert's opinions do not pass muster under *Daubert*, the plaintiffs cannot establish "the Rule 23(a) prerequisites." *Id.* (quoting *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015)).

8

## IV.   ANALYSIS

The Court finds that Dr. Werner is qualified to offer his opinions. The Court declines to exclude the entirety of Part IV of Dr. Werner's report but excludes certain paragraphs as irrelevant. While the Court finds his Dilution Value Approach unreliable, the Court declines to exclude the Market Value and the Restricted Use Value Approaches.

### A.   Qualifications

Defendants argue that Dr. Werner cannot issue opinions about the dilution of value or market value because he is not an appraiser [Doc. 151 pp. 2, 9, 10, 14].

Plaintiffs respond that "[Defendants do] not make a serious attempt to argue that Dr. Werner is not qualified to offer expert testimony in this case" [Doc. 165 p. 9]. Based on his professional background and education, Plaintiffs state that Dr. Werner meets the standard under Rule 702 [*Id.* at 9–10]. "[The] only substantive attack on Dr. Werner's qualifications[,]" Plaintiffs state, "is [Defendants'] refrain that he is 'not an appraiser'" [*Id.* at 10 (citation omitted)]. But Plaintiffs argue, "[Defendants do] not define 'appraiser' or explain how Dr. Werner's qualifications differ from that of an appraiser" [*Id.*]. And further, Plaintiffs contend, Dr. Werner is not required to "hav[e] a specific license or job title" [*Id.* (citation omitted)].

Defendants reply that "[i]n an effort to make his opinions appear to be generally accepted, Dr. Werner characterizes his first two proposals as being appraiser functions" [Doc. 173 p. 4]. According to Defendants, "It is disingenuous for Dr. Werner and Plaintiffs to feign confusion about what is an appraisal or an appraiser where Dr. Werner is the one opining that he could use appraiser's methods to value the putative class members' timeshares" [*Id.*]. Relying on the Tennessee Code Annotated, Defendants argue, "The fact that neither Dr. Werner nor Plaintiffs understand that being an appraiser is a profession that requires specialized training, a state license,

9

and adherence to professional standards and ethical rules further highlight the impropriety of the opinions Dr. Werner offers" [*Id.*]. They state that "whatever his credentials are, they do not satisfy Tennessee law, and Dr. Werner is not lawfully permitted to perform the appraisals he contemplates" [*Id.* at 5 (citations omitted)].

Rule 702 requires that experts have "knowledge, skill, experience, training, or education[.]" The United States Court of Appeals for the Sixth Circuit has explained that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). "[Courts] take a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient to satisfy the requirement." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 209 (6th Cir. 2015) (quoting *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000)).

Dr. Werner is a senior consultant at NERA providing "expert economic and financial analysis" [Doc. 150-1 ¶ 1]. He has been a CPA for over twenty years and consulted in various areas, including the real estate industry [*Id.* ¶ 2]. Defendants object because he is not a licensed appraiser, but "other district courts have clearly stated that a 'license is not a prerequisite to expert testimony under the Federal Rules.'" *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 112 (D.D.C. 2004) (quoting *Malbrough v. State Farm Fire and Cas. Co.*, No. Civ. A. No. 95-3340,1996 WL 565819, at *2 (E.D. La. Sept. 27, 1996)); *see also GeigTech E. Bay LLC v. Lutron Elecs. Co.*, No. 18 CIV. 05290, 2023 WL 6614486, at *22 (S.D.N.Y. Sept. 20, 2023) ("[I]t is well-settled that, to be an expert, a person need not hold a particular degree or license[.]" (quoting *Emig v. Electrolux Home Prods. Inc.*, No. 06-CV-4791, 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008))).

10

Defendants argue that it is clear "Dr. Werner is proposed to develop an opinion as to the value of identified real estate[,]" but given that he is not an appraiser, he cannot do so [Doc. 173 p. 5]. During his deposition, he clarified his experience with the real estate industry stating that his work "generally involves valuation methodologies and valuation of real estate assets" [Doc. 150-2 p. 11]. He further stated that he has "used the tools [to] evalua[te and] analyze real estate" [*Id*. at 12]. Defendants contend that he "has never attempted to value a timeshare or calculate damages in the timeshare industry" [Doc. 151 p. 8 (citation omitted)]. While Dr. Werner could not recall a time where he "analyzed a specific timeshare company[,]" he noted his experience with "rental real estate" and "general real estate" [Doc. 150-2 p. 12]. *See Iannone v. AutoZone, Inc.*, 344 F.R.D. 319, 340 (W.D. Tenn. 2023) ("An expert need not be a specialist in every subject to which their testimony might relate." (citation omitted)). Indeed, when defense counsel asked during his deposition if he was an appraiser, he testified, "I'm an economist with expertise in the tools of economics. And those tools include quantitative analysis of data, financial data, pricing data, [and] cash flow data. All of that is consistent with the valuation methodologies here. And so to the extent, I would say that I do have expertise in valuation, and I've used these methods widely over the last 10 years" [Doc. 150-2 pp. 38–39].

"Experts need not even have direct experience with the precise subject matter or product at issue." *Ashland Hosp. Corp. v. Affiliated FM Ins. Co.*, No. CIV.A. 11-16, 2013 WL 3213051, at *2 (E.D. Ky. June 24, 2013) (citing cases); *Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 387–88 (W.D. Ky. 2018) (holding that an expert with an engineering background was qualified to opine on regenerative braking and electronic controllers even though the expert did "not have specific experience with [those subject matters]"); *Galloway v. Big G. Exp., Inc.*, 590 F. Supp. 2d 989, 994 (E.D. Tenn. 2008) (finding an expert with experience in the

field of mechanical engineering and accident investigation qualified to opine on windshield integrity). Hence, that Dr. Werner may not have experience as an appraiser is not fatal to his ability to testify.

In sum, given Dr. Werner's professional background, the Court finds that Plaintiffs have shown that Dr. Werner is more likely than not qualified to render his opinions in this case. Fed. R. Evid. 702. *See United States v. 0.161 Acres of Land, more or less, situated in City of Birmingham, Jefferson Cnty.*, 837 F.2d 1036, 1039 (11th Cir. 1988) ("An economist is qualified to testify about the market value of property although his valuation methodology is somewhat unique and he relies upon statistics provided by a government agency." (citation omitted)); *Precision Seed Cleaners v. Country Mut. Ins. Co.*, No. 03:10-CV-01023, 2013 WL 943571, at *15 (D. Or. Mar. 11, 2013) (declining to exclude the expert on the value of personal property, even though he had no "training in equipment valuation, ha[d] taken no formal classes of appraisal, and ha[d] no appraisal licensing"); *Capitol Just. LLC v. Wachovia Bank, N.A.*, 706 F. Supp. 2d 34, 41 (D.D.C. 2009) ("The fact that he is not a licensed appraiser will properly go to the weight of his testimony, not its admissibility."); *Cayuga Indian Nation of New York v. Pataki*, 83 F. Supp. 2d 318, 321–22 (N.D.N.Y. 2000) ("[T]he court finds that although [the expert] is neither an economist nor a statistician, that does not mean that he is unqualified to rely upon those disciplines as part of his appraisal methodology in this case.").[3]

---

[3]     Defendants rely on three cases, but they do not support excluding Dr. Werner. In *In re Webb Mtn, LLC*, 420 B.R. 418, 425–26 (Bankr. E.D. Tenn. 2009), *aff'd*, No. 3:09-CV-559, 2010 WL 1544092 (E.D. Tenn. Apr. 19, 2010), the court denied a request to strike the testimony of a real estate appraiser, or give it no weight, because he did not appraise the property at issue but rather used "a mathematical formula to 'back into' the valuation." In *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998), the Court of Appeals for the Fifth Circuit found that the district court did not abuse its discretion in excluding an expert because he was not a licensed appraiser or a licensed real estate broker, had no formal schooling in the method of appraisal, and could not address standard appraisal theory. And in *United States v. 60.14 Acres*

12

### B. Background Opinions

Defendants state that "Dr. Werner devotes more than half (30) pages of his report to discussing the timeshare industry, his editorial view of how the . . . Resort operates, generalized information regarding real estate and demographics in the Gatlinburg area, and various assumptions he has made as to how consumers made purchasing decisions and [Defendants'] practices" [Doc. 151 p. 7 (citation omitted)]. According to Defendants, "[N]one of that is related to the opinions he offers in the case" [*Id*. (citation omitted)]. Because Dr. Werner assumes liability, Defendants argue that "the background information [he] offers from pages 7 to 37 of his report should be excluded because it is not relevant, and it would not assist the fact finder in resolving any issue in the case or understanding the evidence" [*Id*. at 7–8].

Plaintiffs respond that "the admissibility of the underlying facts or data on which an expert relies in forming an opinion is irrelevant to the admissibility of the expert's opinion" [Doc. 165 p. 11]. In addition, Plaintiffs state that "an expert may base his opinion on facts or data that would be inadmissible in evidence, including hearsay evidence" [*Id*. at 12 (citation omitted)]. "The information contained in Dr. Werner's economic background analysis[,]" Plaintiffs contend, "is the type reasonably relied upon by other experts in the field" [*Id*.]. According to Plaintiffs, the academic literature supports Dr. Werner providing his background information [*Id*.].

Defendants reply that they are not challenging the background information "because it was inadmissible evidence being relied upon by an expert under Rule 703, but because Dr. Werner was not relying on it" [Doc. 173 p. 17 (citations and emphasis omitted)]. And although "Dr. Werner

---

*of Land, More or Less, in Warren & McKean Counties*, 362 F.2d 660, 668 (3d Cir. 1966), the Court of Appeals for the Third Circuit noted that a real estate appraiser cannot be "an expert on the value of property which is unknown to him or is situated in an area which is unfamiliar to him." With respect to the latter two cases, Dr. Werner has experience with valuing real estate, and he includes his familiarity with the Resort in his report [*See* Doc. 150-1 ¶¶ 13–41].

has testified that he is not offering liability opinions," Defendants assert "he includes discussions in his report aimed at bolstering a liability conclusion" [*Id.* (citation omitted)]. They state that Dr. Werner's background information "does not relate to the 'competitive market' for timeshares or other information that [Plaintiffs'] cited publication indicates might be relevant to appraising a timeshare" [*Id.* at 19]. This background information should be excluded, Defendants claim, "because (1) it is not relevant, (2) it would not assist the fact finder in resolving any issue in this case or understanding the evidence, (3) Dr. Werner did not rely on it in forming the opinions he is offering, and (4) it does not qualify as and is not being offered independently as an opinion of Dr. Werner" [*Id.*].

Expert testimony is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017) (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196–97 (9th Cir. 2014)).

In the contested section, Dr. Werner details the economic background of the timeshare market, which spans about thirty pages [Doc. 150-1 ¶¶ 13–47]. He explains (1) Defendants' operations, financial condition, and the timeshare industry generally [*see id.* ¶¶ 13–24], (2) the Resort's location, in Gatlinburg, Tennessee, and the tourism that it attracts [*see id.* ¶¶ 25–30], and (3) Defendants' property, revenue at the Resort, expenditures, and how they structure their timeshares [*see id.* ¶¶ 31–41]. Upon review, the Court cannot find that this entire span is replete with irrelevant information. Indeed, Dr. Werner's section regarding the Resort's background [*see id.* ¶¶ 31–32] is the type of information with which the academic literature requires Dr. Werner to

be familiar. As Plaintiffs point out, a 2019 article from *Timeshares, Market Value, and Real Estate Appraisal Process* states:

> Central to every appraisal assignment to determine timeshare market value or fair market value are the following requirements: • identification of the "competitive market" or marketplace in which the real property interest would typically be marketed and sold; • determination of the "most probable price" that would be obtained in that particular competitive marketplace; • use of transaction prices between only "well informed or well advised" buyers and sellers who have "reasonable knowledge of relevant facts"; • use of transaction prices in which neither party is "under undue duress" or "compulsion to buy or sell"; and • utilization of prices that are not affected by special financing or sales concessions.

[Doc. 165 p. 12 (emphasis and citation omitted); *see also id*. at 13 (explaining that "academic literature on timeshare valuation regularly provides a description and analysis of the timeshare industry" (citations omitted))].

Yet, Plaintiffs have not shown that all of this section is admissible. Certain portions are irrelevant as Dr. Werner did not rely on them in rendering his opinions [*See* Doc. 173 p. 18 (citing Doc. 150-1 ¶ 14 (statistics about Defendants' workforce, sales, and profitability); ¶ 17 (industry revenues); ¶ 18 (industry sales trends); ¶¶ 20–21 (national industry sales prices and maintenance fees); ¶ 22 (median household income, education, and martial/family status of timeshare purchasers nationally); ¶ 25 (visitation statistics for national parks); ¶¶ 27–28 (population and median income trends in Gatlinburg, Tennessee, and nationally); ¶¶ 29–30 (non-timeshare rental property and single-family home values in Gatlinburg); and ¶¶ 33–34 (revenues and expenses of the Resort's owner's association)].

Defendants also assert that Dr. Werner testified that he is not offering liability opinions, but he discusses liability in this section [Doc. 151 p. 7 (citations omitted); Doc. 173 p. 18 (citation omitted)]. Specifically, Defendants point to Dr. Werner explaining how Defendants' training

manuals "include[] practices that are aimed at uniformly influencing the purchase behavior of potential buyers" and allude to timeshares as investments, which he states is contrary to the "academic literature analyzing the economics of timeshare ownership" [Doc. 150-1 ¶ 46]. Dr. Werner, however, relies on these statements to support his opinion, that, "[t]o the extent that consumer demand was artificially inflated from the alleged deception in this case, economic theory suggests that each customer likely paid higher prices" [*Id*. ¶ 47].

Accordingly, the Court declines to exclude all the information included in the background section, Part IV, of Dr. Werner's report. But the Court excludes the testimony provided in paragraphs 14, 17, 18, 20–22, 25, 27–30, and 33–34.[4]

### C. Dr. Werner's Dilution and Market Value Approaches

Defendants challenge the reliability of Dr. Werner's dilution value and market value opinions [Docs. 151 pp. 8–18]. "[A]n opinion is 'reliable' from an evidentiary standpoint if it is 'valid' according to the discipline upon which it is based." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 697 (E.D. Mich. 2019) (citation omitted). And in determining whether an opinion is valid, "the Court's focus is on the principles and methodology, not results." *Id*. An expert's testimony that is reliable "must be 'supported by appropriate validation—i.e., "good grounds," based on what is known.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Daubert*, 509 U.S. at 590).

---

[4]      Defendants also state that "Dr. Werner is not qualified as an expert to offer any such background information, and the background information is not reliable" [Doc. 151 p. 8]. But they do not explain why he is not qualified to testify about the background, nor do they explain why it is not reliable. The Court therefore need not address these issues. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)) (alteration in original)).

16

"Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based on 'sufficient facts or data,' whether the testimony is the 'product of reliable principals and methods,' and whether the expert 'has applied the principles and methods reliable to the facts of the case.'" *Id*. (quoting Fed. R. Evid. 702). In assessing reliability, the court may consider "(1) the testable nature of the hypotheses; (2) whether the methodology has been subject to peer review; (3) rate of error associated with the methodology; and (4) whether the methodology is generally accepted in the field." *Reynolds v. Freightliner LLC*, No. CIV. 05-70, 2006 WL 5249744, at *8 (E.D. Ky. June 21, 2006) (footnote omitted) (citing *Daubert*, 509 U.S. at 593–94). These factors are not "a definitive checklist." *Kumho Tire Co.*, 526 U.S. at 138 (citation omitted). "The reliability step focuses on the 'methodology and principles' that form the basis for the testimony." *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752, 757 (W.D. Tenn. 2006) (citation omitted).

### 1.    Dilution of Value Approach

Defendants argue that "this theory of dilution of value has never been applied in any context that Dr. Werner could identify, other than he claims that it is used when financial earnings per share are reported, either on a diluted or undiluted basis" [Doc. 151 p. 9]. According to Defendants, "[T]his concept has no application here" [*Id*.]. They contend that "[d]iluted and undiluted earnings per share do not attempt to measure damages caused by a decreased utility of the product purchased relative to purchasers' subjective expectations, and it does not seek to distribute the alleged harm to one member of a group to other members of that group" [*Id*. at 9–10]. Defendants state that Dr. Werner "is not applying the [I]ncome [A]pproach" because "he did not aggregate the future value of the vacations that could be taken, and then discount that to the present to assign a monetary value to the timeshare interest" [*Id*. at 10 (emphasis omitted)]. "The

17

question[,]" Defendants assert, "is whether the dilution of value theory is an accepted methodology to measure alleged damages to limited availability in this case" [*Id*.]. Defendants contend that it is not and state that "Dr. Werner's dilution of value theory was . . . made-up solely for use in this litigation and was not the product of independent work" [*Id*.]. Further, they claim that this theory has no known rate of error, Dr. Werner did not test it, and that it is based on Kenneth Free's limited availability analysis [*Id*. at 10–11]. Defendants also submit that the bases for Dr. Werner's opinions are unreliable and that they are not helpful because they "contradict[] black-letter law on damages" [*Id*. at 12–13 (citation omitted)].

Plaintiffs respond that "[Defendants] fundamentally misrepresent[] Dr. Werner's dilution of value approach" [Doc. 165 p. 16]. They deny that the dilution theory "seeks 'to distribute the alleged harm to one member of a group to the other members of the group'" [*Id*. at 17 (citation omitted)]. "Rather," Plaintiffs state, "if a jury finds [Defendants] liable for uniformly misrepresenting or omitting material facts about [their] floating use scheme and the availability of units at the Resort, the [D]ilution of [V]alue [A]pproach shows that all class members were harmed at the point of purchase by paying a premium price, even if some class members were (by chance) able to use their timeshare" [*Id*. (emphasis omitted)]. Other courts, Plaintiffs claim, have approved this methodology [*Id*. (citation omitted)]. They argue that "[t]he [D]ilution of [V]alue [A]pproach is an application of the generally accepted '[I]ncome [A]pproach' to the valuation of real property interests" [*Id*. (citation omitted)]. "Dr. Werner's [D]ilution of [V]alue [A]pproach," Plaintiffs assert, "is simply a way of calculating the change in value within the [I]ncome [A]pproach" [*Id*. at 18 (emphasis omitted)]. Plaintiffs state that "it has widespread acceptance in the field of economic valuation, including specifically the valuation of timeshares" [*Id*.]. And Plaintiffs claim that Dr. Werner explained the data he would rely upon to make this calculation and that his

approach "shows that damages are 'susceptible of measurement across the entire class'" [*Id*. at 19].

Defendants filed a reply, stating that "the dilution of value methodology has never been used—either as part of the appraiser's [I]ncome [A]pproach or otherwise—in any analogous situation" [Doc. 173 p. 5]. According to Defendants, during his deposition, "Dr. Werner could only say that the appraiser's approach and not the dilution of value theory was generally accepted" [*Id*. at 6 (citation omitted)]. Defendants maintain that he is not utilizing the Income Approach because "he is not contemplating performing any valuation of future vacations that timeshare purchasers could take" [*Id*.]. "Instead," Defendants contend that "Dr. Werner is proposing to reduce the purchase price that each purchaser paid by some percentage that he attributes to dilution of value, to determine what he claims should have been the purchase price" [*Id*.]. Defendants add, "The percentage reduction he would apply to the purchase price would have to be concocted at some point in the future by Mr. Free, or more likely, by Plaintiffs' counsel in a claims administration process" [*Id*. at 6–7 (footnote omitted)]. They state that this is not the Income Approach [*Id*. at 7]. And Defendants assert that Dr. Werner's "theory is not viable, as it takes the alleged harm to one member of a group and spreads it out amongst all unharmed members of a group" [*Id*. at 8 (footnote omitted)].

In addition, Defendants argue that "this method is invalid because it does not determine alleged damages caused by Plaintiffs' theory of liability" [*Id*. at 9]. According to Defendants, "Dr. Werner is either relying on Mr. Free to determine how many intervals should have been available, or he is relying on the jury to determine that number, however that works" [*Id*.]. "But," Defendants state, "nowhere does Dr. Werner articulate how it is that Defendants' alleged failure to disclose supposedly limited availability actually caused the supposed limited availability and

19

the resulting dilution" [*Id.* (emphasis omitted)]. Moreover, Defendants claim that Dr. Werner has no reliable basis for his opinions because "Plaintiffs acknowledge that Dr. Werner is not going to determine [the number of intervals/units that should have existed]" [*Id.* at 13].

Plaintiffs filed a supplemental brief, claiming that "'dilution of value' is common to all class members, even those who by chance have been able to use the Resort" [Doc. 210 p. 1 (citations omitted)]. Plaintiffs state that "these damages are provable by a class wide damages model" [*Id.* (citations omitted)]. "Since [their] initial briefing," Plaintiffs claim that "multiple courts have specifically approved a 'price premium' damages model like the one proposed by Dr. Werner" [*Id.* (citations omitted)].

During the hearing, Plaintiffs argued that Dr. Werner relied on the Income Approach, which they stated has been applied in the timeshare industry. They asserted that the dilution effect merely measures the delta and that it is part of the Income Approach. Plaintiffs added that Dr. Werner's opinions have been found reliable in other cases.

Defendants acknowledged that the Income Approach is an acceptable method to appraise real estate. But Defendants stated that Dr. Werner does not explain the data that he intends to rely on. Defendants noted that recent cases have recognized the price premium as a harm, but they argued that those cases involved tangible products and not a right to use a timeshare. Stating that Dr. Werner has not explained his methodology, Defendants argued that it appears he intends to rely on the stress availability analysis utilized by Plaintiffs' other expert, Kenneth Free ("Mr. Free").

Plaintiffs replied that Dr. Werner's methodology is not dependent on Mr. Free's stress availability analysis and that the jury will have to determine the available use.

20

Dr. Werner explained that according to the International Valuation Standards Council ("IVSC"), there are three approaches to valuation, one of which is the Income Approach [Doc. 150-1 ¶ 49 (citation omitted)]. "[The] Income Approach . . . is based on future cash flows (cost savings or income)" [*Id*. (citation omitted)]. And Dr. Werner testified that the Income Approach has been used to value real property interests [Doc. 150-2 p. 38].

Dr. Werner explains that "a timeshare is essentially a right to occupy or use a facility for a given amount of time" [Doc. 150-1 ¶ 50 (footnote omitted)]. According to Dr. Werner, "When access to a timeshare is restricted by the developer . . . , this alleged misconduct dilutes the probability that a class member can use their timeshare unit as reasonably expected" [*Id*. ¶ 51]. "[E]ven if some members were (by chance) able to use their timeshares as reasonably expected[,]" Dr. Werner states that the "dilution effect is common to all class members, meaning that all class members were harmed by the alleged misconduct" [*Id*. ¶ 52]. In other words, "If class members had known of this dilution (i.e., that if class members knew they could not frequently use their timeshare unit as reasonably expected)," the "market demand for the timeshare would be reduced and all class members would have paid a lower market price" [*Id*. (footnote omitted)].

According to Dr. Werner, there are two elements to determining dilution of value: "(i) quantifying the fair market use value of the property, and (ii) quantifying the dilution effect caused by Defendants' misconduct" [*Id*. ¶ 53].

Starting with the fair market use value, Dr. Werner states that there are "a variety of ways" to calculate it [*Id*. ¶ 54]. One way, Dr. Werner submits, is to use the "nightly rental rate" for a unit given that "Defendant[s] restrict[] timeshares owners' ability to use their units by renting them out to non-owner vacationers" [*Id*.]. Dr. Werner refers to this approach as an "opportunity cost[,]"

which he states "is consistent with the commonly accepted Income Approach to valuation" [*Id*. (footnotes omitted)].

Turning to quantifying the dilution effect, Dr. Werner offers two ways to calculate it [*Id*. ¶ 55]. First, he states that "the dilution percentage could be calculated using the number of units (or keys) that actually exist relative to the number of units (or keys) that should have existed within the property (i.e., additional units that would have balanced supply and demand to allow class members to use their property as reasonably expected)" [*Id*. (emphasis omitted)]. Or, Dr. Werner claims, "the dilution percentage could be calculated using the number of timeshares actually sold relative to the number of timeshares that should have been sold (i.e., the reduction in sold units (keys) that would have balanced supply and demand to allow class members to use their property as reasonably expected)" [*Id*.]. During his deposition, he stated that he could review the "extent the property is oversold," "unmet demand," "units that are available or keys that are available versus – and in addition to looking at the units that are actually booked, the timeshare that are actually sold[,]" and "units that are used by the developers" [Doc. 150-2 p. 45].

Dr. Werner opines, "Applying the dilution effect to the fair market use value of the property results in an estimate of the 'diluted' use value that class members actually received" [Doc. 150-1 ¶ 55]. He concludes:

> Under this approach, economic damages are then calculated by comparing the "undiluted" fair market use value of the property (*i.e.*, what class members paid for) and the "diluted" fair market use value of the property (*i.e.*, what class members received). Analyzing value on a diluted and undiluted value is akin to common financial metrics used in stock ownership, such as "earnings per share" (*i.e.,* net income divided by outstanding shares of stock) verses "diluted earnings per share" (*i.e.*, net income divided by outstanding shares of stock plus convertible preferred shares, stock options, etc.).

[*Id*. ¶ 56].

22

Defendants argue that Dr. Werner's theory "starts with alleged harm to one person in a group and distributes that harm to uninjured members of the group[, which] is inconsistent with legal standards relating to damages" [Doc. 151 p. 10]. They state "it impermissibly concludes that every single purchaser has been harmed without regard to that purchaser's use of the Resort, that [Defendants] caused the harm, and that the harm was equal, when all three are necessarily untrue" [*Id*. at 2]. But Defendants mischaracterize the alleged harm that Dr. Werner's opinions measure. Dr. Werner's approach measures "[t]he price that was paid and the value of the asset that was received" [Doc. 150-2 p. 50]. In other words, "If class members had known of this dilution (i.e., if class members knew that they could not frequently use their timeshare unit as reasonably expected), then market demand for the timeshare would be reduced and all class members would have paid a lower market price" [Doc. 150-1 ¶ 52]. The harm is the price paid, and other courts have recognized such harm. *See Heredia v. Sunrise Senior Living, LLC*, No. 22-55332, 2023 WL 4930840, at *2 (9th Cir. Aug. 2, 2023) ("Dr. Kennedy opined that facility-wide staffing shortfall percentages can be used to estimate the value of the services that class members received and the discounted service level fees they would have paid had they known of the actual staffing policies."); *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 37 (1st Cir. 2022) ("The complaint here alleges analogous economic injuries that manifested at the moment of purchase because each purchase was allegedly the product of misrepresentations, regardless of whether any physical injury ultimately resulted." (footnote omitted); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) ("Because *all* Duet owners were injured at the point of sale upon paying a premium price for the Duets as designed, even those owners who have not experienced a mold problem are properly included within the certified class."); *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 580

23

(6th Cir. 2013) ("The district court erred by ignoring the allegation that plaintiffs would have purchased a lower-priced cold remedy (thus saving money) were it not for [the defendant's] alleged misrepresentations."); *Wixon v. Wyndham Resort Dev. Corp.*, No. C 07-02361, 2009 WL 3353445, at *7 (N.D. Cal. Oct. 19, 2009) ("[The plaintiffs] theorize that [the defendant] has taken a number of actions in violation of the Governing Documents that, whether considered individually or collectively, proximately caused each putative class member harm by diminishing the overall value of their Vacation Credits. That is, under [the plaintiffs'] theory, the putative class members' Vacation Credits are worth less than they were before [they] engaged in the alleged misconduct.").[5]

Even so, Plaintiffs have not met their burden to show that Dr. Werner's method is reliable. *See* Fed. R. Evid 702. There is no dispute that the Income Approach is an acceptable methodology to measure the value of a timeshare. Indeed, Plaintiffs cited literature applying the Income Approach to timeshares [Ex. 2 p. 6 & Doc. 165-3 pp. 3–4 ("Ragas applies a discounting case flow model for timeshare valuation which estimates the net present value of expected after-tax cash flows" and "Zebrowski and Zebrowski present an implied discounting cash flow model for timeshare valuation based on readily available variables" (footnotes omitted))]. But Plaintiffs have not pointed to any evidence showing that the Dilution of Value Approach has been applied in a similar context. Instead, Dr. Werner stated that it is commonly applied "to calculate earnings per share for a particular company on a diluted or undiluted basis" [Doc. 150-2 p. 55]. And further,

---

[5] Defendants distinguish *In re Whirlpool* and *Wixon* in their reply brief [Docs. 173 pp. 10–11]. They state, "These two cases do not support a conclusion that Dr. Werner's novel dilution of value is generally accepted, and certainly not in any analogous scenario" [*Id*. at 12]. But these cases support Plaintiffs' argument about their alleged harm that relate to Dr. Werner's damages models—that is, "all class members were [allegedly] harmed at the point of purchase by paying a premium price, even if some class members were . . . able to use their timeshare" [Doc. 165 p. 17 (emphasis omitted)]. Defendants' remaining arguments about these cases are more appropriately suited for whether this lawsuit should be certified as a class action [*See* Doc. 173 pp. 10–11].

Dr. Werner did not test this dilution theory, nor is there any known rate of error. *See Daubert*, 509 U.S. at 594 (factors to consider when determining reliability include error rates and whether the theory has been tested).

Although the failure to test is not always fatal, Plaintiffs have not shown that there are alternative indicia of reliability. *See Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 833 (N.D. Ohio 2011) ("[A] hypothesis may satisfy *Daubert* even if it is untested so long as the expert provides sufficient alternative indicia of reliability."). With respect to his Dilution of Value Approach, he states that it could be calculated (1) using the number of units (or keys) that exist relative to the number of units that should have existed, or (2) the number of timeshares sold relative to the number that should have been sold [Doc. 150-1 ¶ 55]. While the data on the number of units and the number of timeshares sold exists, Plaintiffs cannot explain the data Dr. Werner would use to calculate the number of units that should have existed, or the number that should have been sold. Without knowing where Dr. Werner would obtain this information, the Court finds that his method is unreliable.

At the hearing, Plaintiffs suggested that the jury would provide the data. "Neither Defendants nor the Court is obligated to accept the untested *ipse dixit* pronouncement of an expert that he is satisfied that his method is reliable and will produce accurate results, without the inconvenience of having to test it to show that it is." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 602 F. Supp. 3d 767, 786 (D. Md. 2022). "This is precisely the type of opinion that Rule 702 (b)–(d) guards against, by requiring as a condition precedent to admissibility that the expert's conclusions be supported by 'sufficient facts or data' and be 'the product of reliable principles and methods,' and that the expert 'has reliably applied the principles and methods *to the facts of the case.*'" *Id.* "[A]t the class certification stage, it is sufficient for

[Dr. Werner] to show that he has a model that may be reliably applied to whatever class members are ultimately certified, [but] this does not relieve him of the requirement to show that it can in fact produce reliable results by actually testing it." *Id*.[6]

Accordingly, the Court excludes Dr. Werner's Dilution of Value Approach.[7]

### 2. Market Value Approach

In their motion, Defendants acknowledge that that Market Value Approach is a "recognized methodology" [Doc. 151 p. 14]. According to Defendants, in order to apply the Market Value Approach in this case, "Dr. Werner would compare a population who did not experience the alleged misrepresentation or omission, to a population that did, and look at the differences in the prices paid" [*Id*.]. They contend that "there are numerous disqualifying defects applied in this case" [*Id*.].

For instance, Defendants argue that "Dr. Werner wants to appraise tens of thousands of timeshare interests—where the primary benefit is a use right—based on an alleged limitation in the use right that he is assuming may have been verbally misrepresented or verbally not disclosed"

---

[6] Plaintiffs argue that other courts have declined to exclude Dr. Werner's opinions [Doc. 204 pp. 2–3 (citing *In re Folgers Coffee, Mktg. Litig.*, No. 21-00828, 2024 WL 4068851, at *4–8 (W.D. Mo. July 31, 2024), and *GeigTech E. Bay LLC*, 2023 WL 6614486, at *41–42)]. In *In re Folgers Coffee, Marketing Litigation*, Dr. Werner concluded that "damages can be calculated as the difference between the price paid by consumers and the value of the product received by consumers (i.e., the 'overcharge' or 'price premium' paid by consumers)." 2024 WL 4068851, at *2. In determining damages, Dr. Werner presented four different damages models—all of which incorporated specific data, including results from a survey expert, actual sales data, and historical sales data. *Id*. at *2–4. And the court found that the models he relied on were valid. *Id*. at *4–8. Such is not the case here. In *GeigTech East Bay LLC*, Dr. Werner provided opinions about damages in a trade dress infringement case, specifically "opinions about (1) the portion of the Palladiom Shading System profits attributable to the alleged trade dress and (2) the expenses that should be deducted from Lutron's Palladiom Shading System revenue and his opinions." 2023 WL 6614486, at *41. This case does not support Plaintiffs' arguments.

[7] Given this finding, the Court need not address Defendants' remaining arguments.

26

[*Id*.]. In addition, "Dr. Werner contemplates the possibility that he might be able to look at [Defendants'] pricing records . . . [to] identify a period of time when [Defendants were] not allegedly misrepresenting or failing to disclose the supposed limited availability" [*Id*. at 14–15 (citation omitted)]. "[But because] Plaintiffs want to certify a class of every purchaser from 2008 to the present[,]" Defendants assert that there are "no potentially comparable sales" [*Id*. at 15].

Defendants state that Dr. Werner also proposed "look[ing] at comparable properties" [*Id*. (citation omitted)]. But they submit, "Dr. Werner has not identified any sufficiently similar and comparable properties," nor has he "identified any identical or sufficiently similar comparable timeshare interests, with any comparable timeshare resort" [*Id*. (citation omitted)]. And Defendants contend that "Dr. Werner needs to find a comparable timeshare resort and comparable timeshare interests that were not subject to alleged misrepresentation or omission of alleged limited availability" and that "[w]ithout this step, there is no way to isolate the cause of alleged damages in this case" [*Id*. (emphasis omitted)]. Defendants claim that he will not be able to perform this analysis [*Id*.].

Defendants state that, in the alternative, "Dr. Werner contemplates a statistical analysis" [*Id*. at 16 (citations omitted)].[8] Defendants argue that "Dr. Werner is not a statistician, he has not performed any statistical analysis, he has not told [them] what methodology he would use, and there is no way to analyze such a proposal" [*Id*.].[9]

---

[8]    Defendants cite to Dr. Werner's deposition [Doc. 151 p. 16 (citing Ex. B at 160:13–162:9)]. But they only filed page 160. Regardless, Plaintiffs do not appear to rely on this given that they did not respond to this point in their brief [*See* Doc. 165 pp. 20–21].

[9]    Defendants also argue that "[a]s applied, this theory likely directly contradicts black-letter law on damages[,]" it runs afoul of "the Supreme Court's requirement that the damages model only identify damages attributable to the Plaintiffs' theory[,]" and it "cannot determine alleged damages mechanically or formulaically" [Doc. 151 pp. 17–18 (citing *In re Nexium Antitrust Litigation*, 777 F.3d 9, 19 (1st Cir. 2015), *Comcast Corp v. Behrend*, 569 U.S. 27, 35 (2013), and

27

Plaintiffs respond that "without any support in the economic literature or testimony in this case, [Defendants] argue[] that timeshares are economic unicorns—property interests that are so unique that it is impossible to find comparable properties to which they can be compared for purposes of valuation" [Doc. 165 p. 20]. They claim, "Dr. Werner's market approach is a generally accepted method of calculating the value of timeshares" [*Id.*]. "[F]or class certification purposes," Plaintiffs state that "Dr. Werner need not identify specific timeshare resorts or intervals for comparison" [*Id.*]. Instead, Plaintiffs assert that "he must only identify a reliable methodology for calculating damages" [*Id.*]. They acknowledge that Dr. Werner will need to find a comparable timeshare resort that was not subject to the alleged misrepresentations or omissions about availability [*Id.* at 21]. While Defendants insist that there are none, Plaintiffs counter that although "[Defendants] may be right, . . . [they] could have proffered an expert to support that opinion" [*Id.*]. This, Plaintiffs claim, "has nothing to do with whether Dr. Werner's market approach is a reliable method for calculating class-wide damages in this case" [*Id.*].[10]

Defendants reply that "Dr. Werner is going to need to get from a comparator timeshare resort most of the same discovery Defendants have provided in this action, from 2008 to the present[,]" but "neither Plaintiffs nor Dr. Werner have articulated how they plan to obtain the

---

*Beattie v. CenturyTel., Inc.*, 511 F.3d 554, 566 (6th Cir. 2007))]. While the Court has explained that Dr. Werner's opinion relates to the putative class members' alleged harm in overpaying, the Court notes that Defendants have raised these arguments in their response to the motion for class certification [Doc. 146 pp. 23–24]. These specific arguments are better suited for adjudication in that context. *See Schechner v. Whirlpool Corp.*, No. 2:16-CV-12409, 2019 WL 978934, at *5 (E.D. Mich. Feb. 28, 2019) ("Defendant's argument concerning *Comcast* therefore does not go to admissibility—it goes to class certification. . . . . The *Comcast* standard therefore does not govern admissibility.").

[10] Plaintiffs contend that the Market Value Approach is consistent with the Supreme Court's requirements [Doc. 165 pp. 21–22]. As noted above, this is better addressed in the context of the motion for class certification.

information from a non-party" [Doc. 173 pp. 14–15]. "The reality is that, if this were feasible," Defendants state, "Dr. Werner would have just done it, or at least told us how he planned to do it" [*Id*. at 15 (footnote omitted)]. They claim that "[w]ithout any explanation from Dr. Werner, Plaintiffs cannot meet their burden to establish that this is a valid methodology that can be reliably applied here" [*Id*.].

The Court finds Plaintiffs have shown that Dr. Werner's Market Value Approach is more likely than not reliable under Rule 702. *See* Fed. R. Evid. 702. According to Dr. Werner, the market value "may be estimated using the market price of a similar asset that is not subject to the alleged misconduct in this case" [Doc. 150-1 ¶ 57]. Dr. Werner relies on the International Valuation Standards Council ("IVSC"), which states that "the market approach is commonly applied for the valuation of real property interests" [*Id*. ¶ 58 (citation omitted)]. "[E]conomic damages[,]" Dr. Werner states, "are simply calculated as the difference between the price that class members paid for the timeshare and the estimated market value of the timeshare received" [*Id*. ¶ 59]. He contends that this value "is analogous to a 'price premium' approach to damages and isolates the economic harm occurring through class members' overpayment caused by Defendant[s'] misconduct" [*Id*.].

Unlike Dr. Werner's Dilution of Value Approach, there does not appear to be a dispute that the Market Value Approach is a reliable method. Dr. Werner's Market Value Approach is supported by the academic literature, he relies on the IVSC in rendering his opinion [*see* Doc. 170-1 ¶ 58], and Plaintiffs cite to another article explaining that relying on comparable sales is an "appropriate method for valuation of timeshare interests" [Doc. 165 p. 20 (citation omitted)]. *See Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 493 (S.D. Ohio 2020) ("These various published pieces of academic literature fit *Daubert*'s vision of reliable 'facts and data.'").

29

Defendants do not object to Dr. Werner's reliance on the IVSC. And here, Dr. Werner identified the data he would rely on: (1) Defendants' financial records and (2) similar timeshares [Doc. 150-1 ¶ 57].

Defendants argue that "this method is . . . unworkable" [Doc. 173 p. 13], and they object that Dr. Werner will not be able to find comparable sales or comparable properties. But they provide no authority for excluding an expert on this basis at this stage. Indeed, "[t]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30; *see also Victorino v. FCA US LLC*, No. 16CV1617, 2018 WL 2767300, at *3 (S.D. Cal. June 7, 2018) (finding that the "[d]efendant's challenge to the data or input underlying [the expert's] formula calculations is subject to cross-examination at trial, and not exclusion" (citation omitted)). Further, the Court has deferred merits discovery until after class certification [Docs. 93 & 100].

For these reasons,[11] the Court declines to exclude Dr. Werner's Market Value Approach.[12]

---

[11]    Defendants argue that Dr. Werner's opinion is not helpful because it "appears likely that he would attribute damages to every putative class member, regardless of whether they used the Resort exactly as they wanted" [Doc. 151 p. 17 (citation omitted)]. The Court has addressed this issue above [*See supra* part IV, section C, subsection 1].

[12]    "To the extent that Dr. Werner could be considered to be offering opinions relating to a claims administration process," Defendants seek to exclude those opinions [Doc. 173 p. 19]. They state that "throughout his deposition, and in particular as to his first two proposed damage models, Dr. Werner's solution for the obvious individualized issues that defeat class certification is an amorphous and expansive claims administration process" [Doc. 151 p. 20 (citation omitted)]. Defendants argue that the Court should not consider "any claims administration process advanced by Dr. Werner" because he does not have any expertise in this area, "he has not offered a methodology, and he has not indicated how this would be a reliable process" [*Id.*]. Because Plaintiffs did not respond to this point, *see AK v. Behav. Health Sys., Inc.*, 382 F. Supp. 3d 772, 774–75 (M.D. Tenn. 2019) ("[W]hen a party fails to respond to an argument, that argument is generally deemed to be unopposed and the proposition conceded." (citations omitted)), Dr. Werner cannot opine about a claims administration process.

## D. Dr. Werner's Restricted Use Value Approach

Defendants do "not challenge Dr. Werner's third model" with respect to "the overall methodology" [Doc. 151 p. 19]. Rather, Defendants submit that during his deposition, "Dr. Werner . . . casually mentions that this method could alternatively be used in combination with a statistical analysis of a representative sample of accounts to determine alleged damages for all putative class members" [*Id*. (citation omitted)]. But they assert he did not adequately disclose this opinion in his report[13] and he "is not qualified as a statistician, he has not articulated any statistical methodology, he has not identified what will serve as the basis for such opinions, or how [the] same would be reliable" [*Id*.]. Defendants note that "[t]his method is not referenced in Plaintiffs' Motion for Class Certification, and it highlights some of the many problems with class certification, at least with respect to alleged damages" [*Id*.].

Plaintiffs respond that "Defendants cite no elements of Rule 702 or *Daubert* that that this approach does not satisfy" [Doc. 165 p. 22]. "Instead," Plaintiffs claim, "[Defendants] challenge[] the admissibility of Dr. Werner's deposition testimony that damages could be determined under the use value approach using a representative sample of accounts" [*Id*. at 23 (citation omitted)]. Although Defendants argue that Dr. Werner is not qualified, Plaintiffs state that they "fail[] to define 'statistician' or explain how Dr. Werner's qualification[s] differ from that of a statistician" [*Id*.]. Regardless, Plaintiffs state that neither Rule 702 nor *Daubert* require an expert to have "a specific job title" [*Id*. (citation omitted)]. And Plaintiffs claim that he is qualified [*Id*.]. "The remainder of [Defendants'] criticisms essentially demand that Dr. Werner provide a comprehensive statistical methodology without having the necessary substantive data" [*Id*.].

---

[13]    Defendants do not develop this point. The Court therefore need not address it at this time. *See McPherson*, 125 F.3d at 995 (explaining that arguments are waived if not fully developed).

Defendants filed a reply, stating that they "do not challenge the overall methodology of looking at each purchaser's usage history to answer individualized questions necessary to evaluating alleged damages" [Doc. 173 p. 16]. "But," Defendants argue, "this methodology cannot be applied on a class-wide basis" [*Id.*].[14] They challenge this opinion on three grounds: "(1) identifying this as a possible method to determine the alleged damages is not relevant or helpful in the abstract, and it certainly does not support class certification; (2) Plaintiffs have not articulated any basis why expert testimony would be appropriate or necessary to complete this task; and (3) Plaintiffs have not established Dr. Werner has any special knowledge or skills to perform the task" [*Id.*]. Defendants contend that "Plaintiffs completely ignore that Dr. Werner's opinion is not mentioned [in their motion for class certification]" [*Id.* at 17].[15]

Dr. Werner states that this model "directly analyz[es] the use value of the timeshare purchased (and requested) but not received by customers" [Doc. 150-1 ¶ 60]. For instance, Dr. Werner submits that "[i]f Defendants have information on reservation requests by class members and the actual use of the property by class members, in combination with data on the contract terms (e.g., the property usage the class members purchased for a specific price), these data could be used to estimate the value of the usage not received by class members" [*Id.*]. He asserts that this figure could then "be monetized into a cash flow equivalent and converted into a lump using a discounted cash flow analysis, which is a common approach taken by the academic

---

[14]     This issue is not before the undersigned.

[15]     During the hearing, the Court asked whether Plaintiffs intend to rely on this damages model in support of their motion for class certification. To the extent Plaintiffs are not relying on this opinion to support their motion for class certification, Defendants noted that a *Daubert* ruling would not be necessary at this time. Plaintiffs clarified that they do rely on this opinion. Given Plaintiffs' representation, Defendants stated that a *Daubert* ruling was necessary. The Court therefore finds it appropriate to rule on Defendants' objections.

literature on timeshare valuation" [*Id.* ¶ 61 (citation omitted)]. Dr. Werner notes that the IVSC also contains "various forms of discounted cash flow models" [*Id.* (citation omitted)]. While the models in the IVSC vary, Dr. Werner submits that they "share the basic characteristics that the cash flow for a defined future period is adjusted to a present value using a discount rate" [*Id.* (citation omitted)]. He opines that this "approach is consistent with the widely accepted Income Approach to valuation" [*Id.* ¶ 62 (citation omitted)]. Given that Defendants do not dispute this methodology, for similar reasons as above [*see supra* part IV, section C, subsection 2], the Court declines to exclude it.

Defendants do object, however, to the approach Dr. Werner testified about in his deposition [Doc. 151 p. 19]. During his deposition, Defendants asked whether Dr. Werner would need to "look at each individual account to see what they requested and see what they received" [Doc. 150-2 pp. 26–27]. Dr. Werner responded that "a representative sample of data can be used for [a] larger population" [*Id.* at 28]. For example, he testified, "To know the unemployment rate in the United States, you don't need to speak to every single individual. Instead, you take a representative sample and then use that sample to make conclusions about the employment rate" [*Id.*].

Defendants assert that Dr. Werner is not qualified as a statistician [Doc. 151 p. 20]. But Dr. Werner "specializes in economic, financial, and statistical analysis" [Doc. 150-1 p. 51]. He has also provided expert testimony and consultations using statistical analysis [*see id.* at 52–53], and according to Plaintiffs, he "has published articles and/or presented on topics involving statistical methods" [Doc. 165 p. 23 (citation omitted)]. *See Bradley*, 800 F.3d at 208–09 (explaining the "liberal view of what knowledge, skill experience, training, or education is sufficient to satisfy Rule 702").

33

Defendants also state Dr. Werner has not offered "any statistical methodology, he has not identified what will serve as the basis for such opinions, or how [the] same would be reliable" [Doc. 151 p. 19]. Plaintiffs counter that this Court denied their motion to compel seeking Defendants' booking and reservation information because it related to the merits of the case instead of class certification [Doc. 165 p. 23]. While Plaintiffs may not have had access to this data, Plaintiffs have offered no argument to support the reliability of this approach, which is discussed only in Dr. Werner's deposition and not his report.

The Court therefore declines to exclude Dr. Werner's Restricted Use Value Approach as set forth in his report, but excludes the approach set forth in his deposition testimony.

## V.    CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES** Defendants' Motion to Exclude Opinions of Dan Werner [**Doc. 150**].

**IT IS SO ORDERED.**

ENTER:

Jill E. McCook
United States Magistrate Judge

34