UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MARILYN MOORE et al., individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:18-CV-00410-DCLC-JEM |
| WESTGATE RESORTS, LTD., et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Renewed Motion for Class Certification and Appointment of Class Counsel [Doc. 228], Plaintiffs' Memorandum of Law [Doc. 237], and Defendants' Response in Opposition [Doc. 234]. For the reasons below, the Court will deny Plaintiffs' motion.

## I. BACKGROUND

Defendants sell timeshare units to vacationers at Westgate Smoky Mountain Resort ("the resort")—a 1,004 unit resort in Gatlinburg, Tennessee—and Plaintiffs Marilyn Moore, Ryan and Laura Spado, Ellen Gilliland,[1] Gerold Gallegos, Deborah Campbell, Brian and Danyelle Miller, and Tonya Melfi purchased timeshare units at the resort between 2012 and 2018. [Third Am. Compl., Doc. 98, ¶¶ 46, 61, 64, 68, 72, 79, 88, 90, 99, 107]. Defendant Westgate Resorts, Ltd., operates the resort, and Defendants Central Florida Investments, Inc., Westgate Resorts, Inc., Westgate Marketing, LLC, Westgate Vacation Villas, LLC, and CFI Resorts Management, Inc.,

---

[1] Plaintiffs have notified the Court of the death of Ms. Gilliland's husband, Plaintiff Larry Gilliland. [Pls.' Notice, Doc. 197].

are general partners, subsidiaries, managers, and real-estate brokers of Westgate Resorts, Ltd., respectively. [*Id.* ¶¶ 13–18].[2]

Plaintiffs allege that Westgate used "high-pressure sales tactics" to induce them into buying their timeshare units. [*Id.* ¶¶ 36, 39–43; *see* Inhouse Training Manual, Doc. 221, at pg. 57 (instructing sales agents that, "[i]n order to sell [a timeshare unit] today and sell it now, you must create a sense of urgency which will motivate your customer into buying.") Specifically, they claim that Westgate invites vacationers like themselves to tour the resort—sometimes off the street, *see* [Gallegos Dep., Doc. 228-16, at 75:14–25]—but the tours turn into lengthy sales pitches "designed to ensure that they do not leave without purchasing a timeshare," [Third Am. Compl., Doc. 98, ¶ 40; *see* Inhouse Training Manual, Doc. 221, at pg. 57]. During one of these sales pitches, for example, Westgate's sales agents allegedly refused to allow Plaintiff Gerold Gallegos and his girlfriend, Plaintiff Deborah Campbell, to leave to take their prescription medications, and they "eventually succumbed to the[ir] high-pressure tactics" as the "closing process stretched beyond 10:00 p.m." [Third Am. Compl., Doc. 98, ¶¶ 88–89].

All of Westgate's sales agents undergo training before they interact with prospective purchasers of timeshare units. The training takes place over a multi-week period,[3] and Westgate devotes this training period to its internal sales manual, the inhouse manual. [Morris Dep., Doc. 228-10, at 16:9-13]. According to Glenn Brown, Westgate's general manager of sales, Westgate trains all its sales agents—forty-eight of them, in total, [Brown Dep., Doc. 228-9, at 63:22–25,

---

[2] For brevity, the Court will collectively refer to Defendants simply as Westgate, as the parties do in their briefs.

[3] The record on the length of training is inconsistent. Mr. Brown testified that it lasts two weeks, [Brown Dep., Doc. 228-9, at 220:4–9], while Mr. Morris testified that it is "a three-week training," [Morris Dep., Doc. 228-10, at 15:7]. The discrepancy is immaterial to the analysis that follows, which turns not on the duration of the training but on what the manual does and does not direct sales agents to say.

2

64:1–2]—to follow the sales manual "to a T," [*id.* at 227:16–18; *see* Morris Dep., Doc. 228-10, at 16:17–19]. The sales manual operates as sales agents' "Bible," [Brown Dep., Doc. 228-9, at 227:12– 15], informing them of "substantively what [they] should be saying" to prospective purchasers, [Rushford Dep., Doc. 228-11, at 82:12–15]. Any sales agent who does not adhere to the sales manual "no longer will work for" Westgate. [Brown Dep., Doc. 228-9, at 65:8–9].

Roughly 150-pages in length, the sales manual contains segments that are heavily if not fully scripted, including the "Intent Statement," "Pencil Pitch," "Urgency Statement," and "Trial Close."[4] [Inhouse Training Manual at pgs. 30, 40, 58, 69]. Indeed, all sales agents' presentations are "the same," apart from "minor differences" to adapt to "personalities and what people are interested in." [Brown Dep., Doc. 234-5, at 116:12–13]. According to John Palmer, a corporate representative of Westgate, if customers ask a question during the sales process, "they're going to get the same basic answer." [Pls.' Mem, Doc. 237, at pg. 17 n.66 (quoting Palmer Dep. at 42:11–15)].

Plaintiffs allege that Westgate "trains its sales agents to make misrepresentations and omissions during the sales process." [Third Am. Compl., Doc. 98, ¶ 38]. They claim that sales agents tell prospective purchasers that if they buy a timeshare unit they can use it "whenever they want." [*Id.* ¶ 44]. Indeed, the sales manual instructs sales agents, during the "Pencil Pitch," to tell prospective purchasers that, "like a home, you enjoy the same rights of ownership" with

---

[4] Once a sales agent completes the Trial Close, "the customer should be sold on [the timeshare unit]," the sales manual says. [Inhouse Training Manual, Doc. 221, at pg. 69]. After agreeing to purchase a timeshare unit, the purchaser enters into the closing process. *See* [Closing Officer Training Guide, Doc. 128]. Westgate has a separate manual, a closing manual, that governs the closing process. In the closing manual, Westgate refers to the sales process—i.e. the process that the sales agents follow in the sales manual—as "fully scripted": "Other than for a few legal terms and your Intent Statement, your closing will not be *fully scripted as required in Sales Training*." [*Id.* at pg. 133 (emphasis added)].

a timeshare unit and, "just like a home, each unit represents a deed to the real estate." [Inhouse Training Manual, Doc. 221, at pg. 43].

Plaintiffs, however, claim that purchasers of Westgate's timeshare units do not actually enjoy the same rights as homeowners because they are unable to reserve the type of unit that they bought even when they give Westgate as much as twelve months' advance notice. [Third Am. Compl., Doc. 98, ¶ 45]. Plaintiffs allege that the units are actually unavailable for use as advertised—and that Westgate knows they are unavailable but does not say so upfront—because Westgate sells them to multiple purchasers at a time, rents them to non-owners, showcases them as model units, and closes them for maintenance. [*Id.* ¶ 36(d)]. "Westgate specifically fails to disclose to purchasers that tens of thousands of people own timeshare properties at the 1,004-unit Resort," Plaintiffs allege. [*Id.* ¶ 46]. In short, purchasers are allegedly not "able to use their timeshare purchase as advertised or as would be reasonably expected—or sometimes at all," [*id.* ¶ 36(d)]; instead, purchasers are at the mercy of what is known as the "floating use plan," which Westgate does "not adequately describe to timeshare purchasers," [*id.* ¶ 51].

The floating-use model is a departure from the "fixed unit, fixed week" model that the nascent timeshare industry conceived in the 1960s. [Free Report, Doc. 228-5, at pg. 5]. Under the fixed-unit, fixed-week model, timeshare resorts sell their units in fifty-two-week intervals, i.e., for use on a specific week of the year. [*Id.* at pgs. 5–6]. But some seasons and some weeks are more desirable than others, and timeshare resorts do not always succeed in selling the less desirable weeks, and when they do succeed, they have to sell them at significant discounts. [*Id.* at pg. 12]. To maximize profits, the industry turned to the floating-use model, and under the floating-use model, purchasers do not receive a right of use on a certain week of the year. [*Id.*]. Rather, they receive a right to become part of a pool with other purchasers of their specific unit

type and season,[5] and their reservations are on a first come, first-reserved basis. [*Id.* at pg. 11]. So those who do not swiftly reserve that unit type during a particular week of a desirable season are left with fewer desirable units during less desirable weeks. [*Id.* at pg. 12].

Plaintiffs complain that they had to choose from these less desirable options after they purchased their units from Westgate. Plaintiff Marilyn Moore, who bought a one-bedroom unit in 2008, upgraded to a one-bedroom deluxe in 2012, and upgraded again to a two-bedroom unit in 2013,[6] [Moore Purchase Agreements, Docs. 31, 34, 37], attests that a sales agent "told [her] that [she] could vacation when, where, and how [she] wanted to with this timeshare," [Moore Dep., Doc. 228-14, at 67:17–18]. Plaintiff Gerold Gallegos, who purchased a unit in 2017 with Plaintiff Deborah Campbell, [Gallegos Decl., Doc. 228-27, at 1], asserts that a sales agent told them that "[they] can [use] it any time [they] want," [Gallegos Dep., Doc. 228-16, at 216:11–12], and "guarantee[d]" that they would "get any days [they] want," [Gallegos Dep., Doc. 234-50, at 82:23–24]. Plaintiff Ellen Gilliland, who purchased a unit in 2015, maintains that a sales agent assured her and her husband that they "can rent when [they] want to or have [the unit] available to [them] when [they] want it." [Gilliland Dep., Doc. 228-15, at 25:16–17, 112:5–6; *see id.* at 96:15–16 ("[W]e were told when you buy and you want to use it, you can use it.")]. Plaintiffs Ryan and Laura Spado purchased a unit 2008, upgraded to a bigger unit in 2010, and upgraded to a newer unit in 2012, [Ryan Spado Dep., Doc. 228-13, at 134:12–14, 134:22–25, 135:1–8], but unlike Ms. Moore, Ms. Gilliland, and Mr. Gallegos and Ms. Campbell, no sales agent expressly told Mrs. Spado when she and her husband could or could not use their unit,

---

[5] In requesting class certification, Plaintiffs seek to limit the class to purchasers of all-season timeshare units, [Pls.' Mem., Doc. 237, at pg. 19], and they assert that "[a]ll Plaintiffs purchased an All Season floating use timeshare at the Resort," [*id.* at pg. 17].

[6] For each purchase and upgrade, Ms. Moore participated in Westgate's sales presentations, which she believed to be "mandatory." [Moore Dep., Doc. 228-14, at 115:16–25, 116:1–5].

[Laura Spado Dep., Doc. 234-17, at 20:4–6]. Even so, her understanding was that they would be able to use it "any time of that year," and no sales agent told her that a reservation would be "subject to availability." [*Id.* at 20:1–3, 20:7–10].[7]

Plaintiffs, however, claim that they were all unable to reserve their units on dates when they requested them, and sometimes they were unable to reserve them at all. According to Ms. Moore, "[w]e were having booking issues," and "[r]eally nothing was ever available." [Moore Dep., Doc. 228-14, at 116:24–25]. She upgraded her unit in 2013 because Westgate said "that would solve [her] problem." [*Id.* at 117:4–8]. According to Mr. Gallegos, the unit type that he and Ms. Campbell purchased "was not available during the time [they] wanted to book it" and, after multiple tries, they were "eventually able to book a unit for use at a time that was not the time [they] preferred" and was "inconvenien[t]" for them. [Gallegos Decl. Doc. 228-27, ¶ 3]. According to Ms. Gilliland, "[w]hen [she] called to book," she "asked for . . . what [she] had purchased," but "they said it's not available," and they offered "some smaller unit" instead. [Gilliland Dep., Doc. 228-15, at 96:13–22]. And according to Mr. Spado, the unit type that he and Mrs. Spado purchased "was almost constantly booked" and, in 2015, they "were entirely unable to use [it]." [Ryan Spado Dep., Doc. 228-13, at 152:11–25].

Although Westgate's sales manual neither mentions the floating-use plan[8] nor instructs their sales agents to mention it, Ms. Moore, Ms. Gilliland, Mr. Gallegos and Ms. Campbell, and Mr. and Mrs. Spado, during Westgate's closing process, all signed an "Acknowledgment of

---

[7] Plaintiffs do not seek Mr. and Mrs. Spado's appointment as class representatives.

[8] The term "Floating Time" appears only in the sales manual's glossary, which defines "Floating Time" as follows: "Floating Time: (Only applies at home resort) An ownership that allows a request for a reservation in the season in which they own, in the size unit they own and resort they own. Owners either request a time to use it or it is randomly assigned by their resort." [Inhouse Training Manual, Doc. 221, at pg. 140]. The term does not appear in any of the manual's scripted segments.

Representations," in which each of them expressed their understanding that they had purchased a floating-use plan:

> Prior to consummation of your Purchase Agreement . . . the Developer desires to eliminate any possibility of misunderstanding as to what might have been represented to you which may have influenced your decision to purchase. Therefore, we ask that you kindly answer the following questions:
>
> . . . .
>
> I (We) understand that by participating in the Floating Use Plan I (We) are not entitled to the use of the specific Unit for the specific Unit Week owned, but rather that the possession and use rights are released in consideration for receiving the right to make a reservation *under the Floating Use Plan.*

[Moore 2012 Acknowledgment of Representations, Doc. 234-35, at pg. 2 (emphasis added); *see* Spado 2008 Acknowledgment of Representations, Doc. 234-19, at pg. 2 (acknowledging the same); Gilliland Acknowledgment of Representations, Doc. 234-45, at pg. 2 (acknowledging the same); Gallegos & Campbell Acknowledgment of Representations, Doc. 234-52, at pg. 2 (acknowledging the same)].

Further, Ms. Moore, Ms. Gilliland, Mr. Gallegos and Ms. Campbell, and Mr. and Mrs. Spado received a copy of Westgate's "Timesharing Plan" and Westgate's "Public Offering Statement" when they executed their respective purchase agreements. *See, e.g.,* [Moore 2012 Purchase Agreement, Doc. 234-34, at pg. 1 (stating that the purchase is "pursuant to the terms and conditions of this Contract for Purchase and Sale and *the Timesharing Plan, a copy of which is included with the Public Offering Statement*" (emphasis added)). In fact, each of them signed separate documents in which they confirmed their receipt of the Timesharing Plan as well as the Public Offering Statement. [Gallegos & Campbell Receipts for Public Offering Statement, Docs. 234-12, 234-53; Spado Receipts for Timeshare Docs., Docs. 234-20, 234-23, 234-26; Moore Receipts for Timeshare Docs., Docs. 234-33, 234-36, 234-39; Gilliland Receipts

7

for Public Offering Statement, Docs. 234-46, 234-49]. In the Timesharing Plan, Westgate describes and explains the floating-use plan, and it states that reservations are available on a "'first-come, first-served'" basis. [Timesharing Plan, Doc. 234-15, at Art. II, Section B(2)(A)]. Similarly, in the Public Offering Statement, Westgate states that "[p]ursuant to the Floating Use Plan all Floating Unit Weeks shall be available for use by all Owners at all times on a 'first come, first-served' reservation basis." [Public Offering Statement, Doc. 234-14, at pg. 5].[9]

Plaintiffs have now filed a proposed class-action suit against Westgate in this Court, seeking to bring suit on behalf of themselves and all others similarly situated to them. They allege violations of the Tennessee Time-Share Act ("TTSA"), Tennessee Code Annotated § 66-32-101 *et seq.* (Counts One and Two), as well as claims for unjust enrichment (Count Three), fraudulent misrepresentation by omission (Count Four), fraudulent inducement (Count Five), negligent misrepresentation by omission (Count Six), breach of the implied covenant of good faith and fair dealing (Count Seven), breach of contract (Count Eight), and civil conspiracy (Count Nine). Westgate has already moved to dismiss these claims, and the Court granted dismissal of some of them: Counts One and Eight in their entireties and Counts Two, Three, Four, Five, Six, and Nine but only as to Ms. Moore, Mr. Spado, and Mrs. Spado. [Mem. Op. & Order, Doc. 185, at 50–51].

As to only Counts Two, Seven, and Nine, Plaintiffs move for class certification under Federal Rule of Civil Procedure 23, and they propose the following class—consisting of more than 35,000 individuals whom they maintain are similarly situated—for certification: "All residents of the United States and its territories who purchased from Westgate an All Season

---

[9] Ms. Moore, Ms. Gilliland, and Mr. and Mrs. Spado stated that they did not read all these documents. [Moore Dep., Doc. 234-30, at 114:19–21, 139:7–11; Laura Spado Dep., Doc. 234-17, at 20:11–25, 21:1–5; Gilliland Dep., Doc. 234-43, 83:9–10].

8

Case 3:18-cv-00410-DCLC-JEM    Document 240    Filed 06/09/26    Page 8 of 35
PageID #: 10085

'floating use plan' vacation timeshare property at the Westgate Smoky Mountain Resort at Gatlinburg from September 25, 2012 through January 31, 2018." [*Id.* at 19]. They seek the appointment of Ms. Campbell, Mr. Gallegos, Ms. Gilliland, and Ms. Moore as representatives of the class.[10] The parties have fully briefed Plaintiffs' motion for class certification. Having carefully reviewed and considered Plaintiffs' motion and the parties' arguments, the Court will now rule on them.

## II. LEGAL STANDARD

Rule 23 governs class-action suits. A class-action suit under Rule 23 is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979), and it "'economiz[es] on the expense of litigation' by resolving key issues in one stroke," *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 321 (6th Cir. 2025) (quotation omitted). Under Rule 23, Plaintiffs, first, must demonstrate:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These requirements effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (quotation omitted).

---

[10] Plaintiffs seek the appointment of Ms. Moore as a class representative only for the claim for breach of contract. [Pls.' Mem., Doc. 237, at pg. 11 n.8].

9

Second, Plaintiffs must meet one of Rule 23(b)'s three requirements. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Plaintiffs seek certification under Rule 23(b)(3), which requires "the court [to] find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3), which is "more demanding" than Rule 23(a), *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), promotes "uniformity of decision as to persons similarly situated," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citation omitted).

Rule 23(a)'s and (b)'s requirements are "stringent," *In re Nissan N. Am., Inc., Litig.*, 122 F.4th 239, 245 (6th Cir. 2024), and command "precision across the board," *In re Ford Motor Co.*, 86 F.4th 723, 726 (6th Cir. 2023). In attempting to satisfy them, Plaintiffs have "a burden of *proof*, not a burden of pleading." *Id.* (quoting *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016)). In other words, Plaintiffs must "affirmatively demonstrate" their compliance with Rule 23's requirements by "actually *prov*[*ing*]—not simply plead[ing]— that their proposed class satisfies each requirement." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (quotation omitted); *Falcon*, 457 U.S. at 160 (recognizing that "actual . . . conformance with Rule 23(a)" is "indispensable").

On a motion for class certification under Rule 23, the Court may accept the pleading's allegations as true to the extent they are undisputed, *Doster v. Kendall*, 54 F.4th 398, 432 (6th Cir. 2022), *vacated as moot*, 144 S. Ct. 481 (2023); *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012), and "[s]ometimes the issues are plain enough from the pleadings" to enable the Court to determine whether a plaintiff has proven Rule 23's requirements, *Falcon*, 457 U.S. at 160. But sometimes the Court may need to "probe behind" the pleadings because

10

Rule 23's requirements can be "enmeshed" in the legal and factual issues that make up the underlying claims' merits. *Id.* (internal quotation mark omitted) (quotation omitted). "If there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class." *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (cleaned up) (quotation omitted); *see Ford*, 86 F.4th at 729 ("[I]f a question of fact or law *is* relevant to [the class-certification] determination, then the district court has a duty to actually decide it and not accept it as true or construe it in anyone's favor." (alterations and emphasis in original) (quotation omitted))); *see also In re Whirlpool Corp. Front-Loading Washer Prods. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) (stating that, "[o]rdinarily," the "class determination should be predicated on evidence presented by the parties concerning the maintainability of the class action" (citation omitted)).

The need for the Court to perform an inquiry that overlaps with the merits "cannot be helped" when addressing commonality under Rule 23(a) and predominance under Rule 23(b). *Speerly*, 143 F.4th at 317 (quoting *Wal-Mart*, 564 U.S. at 351). The Court, "as a result, *must not* defer merits questions bearing on commonality and predominance until summary judgment." *Id.* (emphasis added). Even so, the Court does not have license to perform "free-ranging merits inquires." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Instead, it may only "peek" at the evidence on the merits when relevant to its determination of whether a movant has met Rule 23's requirements. *Doster*, 54 F.4th at 433; *see Amgen*, 568 U.S. at 465–66. That evidence includes expert opinions. *Nissan*, 122 F.4th at 253–54.

### III. ANALYSIS

In asserting that class certification will permit a factfinder to resolve key issues in one stroke, Plaintiffs argue that Westgate engaged in "uniform illegal conduct," [Pls.' Mem., Doc.

11

237, at pg. 7]—conduct that, they maintain, "did not change meaningfully during the relevant time period," [*id.*]. They emphasize, multiples times over, Westgate's "'fully-scripted' sales presentation," and they contend that it resulted in "the same misrepresentations and material omissions" to prospective purchasers, [*id.* at pg. 22], yielded "materially identical purchase contracts," [*id.*], and culminated in "the same core harm" to prospective purchasers, namely a "'floating use' timeshare product that did not have the qualities or benefits represented during the sale," [*id.* at pg. 8].

Westgate, on the other hand, insists that class certification "would create an absolute mess" because "[t]here is no uniform evidence of what the proposed class was told" apart from what was in the documents they received. [Defs.' Resp., Doc. 234, at pg. 1]. Confronted with the possibility of class certification, Westgate envisions not only "a discovery quagmire" but also "mini-trials for 35,000 proposed class members to figure out what they knew, what they were told, whether it was material, whether something more was required, and whether they got their requested reservations." [*Id.* at pg. 2]. In short, Westgate believes that "individualized disputes" abound. [*Id.*].

"[B]ecause even one individualized issue risks dramatically increasing the costs of class litigation," *Speerly*, 143 F.4th at 322, the Court must conduct a "rigorous analysis" to determine if Plaintiffs satisfy Rule 23's prerequisites, *Falcon*, 457 U.S. at 161. Of those prerequisites, "[c]ommonality drives the initial Rule 23 inquiry" because "[i]t either establishes the first building block of a proposed class action or exposes an inadequate foundation." *Speerly*, 143 F.4th at 322 (citing *Wal-Mart*, 564 U.S. at 351). Commonality is the "more complicated" of Rule 23's requirements. *Id.* at 316. Before addressing commonality, however, the Court must address Defendants' threshold argument that the proposed class lacks standing.

12

## A. Standing

A constitutional requirement under Article III, standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). In class actions, however, "a court need not worry about . . . standing until it certifies the class" because "class members are not parties before class certification." *Fox v. Saginaw Cnty.*, 67 F.4th 284, 296 (6th Cir. 2023) (citing *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011); *Amchem*, 521 U.S. at 612–13)); *see* [Defs.' Mem., Doc. 234, at pg. 10 (acknowledging that "class member standing only becomes relevant once certified")]. Class certification of Plaintiffs' claims is not proper, for the reasons that the Court will now go on to articulate, and the question of standing is therefore moot.

## B. Commonality

Commonality requires Plaintiffs to identify at least one question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). To be common, the question must "clear two hurdles." *Clippinger v. State Farm Auto. Ins. Co.*, 173 F.4th 817, 827 (6th Cir. 2026). First, "it must yield a *cohesive* yes-or-no answer for all class members." *Id.* (citing *Wal-Mart*, 564 U.S. at 350). "If a reasonable decisionmaker left with the evidence may answer 'yes' to a question for some class members and 'no' for others," then it lacks cohesion and "the class has not shown that it is common." *Speerly*, 143 F.4th at 319 (citations omitted); *see id.* at 318 ("A question is not common if the answer requires 'evidence that varies from member to member.'" (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 443, 453 (2016))).

Second, the question must "resolve an issue that is *central* to the validity of each one of the claims." *Wal-Mart*, 564 U.S. at 350 (emphasis added). An issue is central if it "affect[s]

at least one element" of the claims.[11] *Nissan*, 122 F.4th at 246 (quotation omitted). Plaintiffs, therefore, must "trace the question to a legally salient element in each cause of action," *Speerly*, 143 F.4th at 319 (quotation omitted),[12] and show that the question "drive[s] the resolution" of each cause of action, *Clippinger*, 173 F.4th at 829 (quoting *Wal-Mart*, 564 U.S. at 350).

Plaintiffs "cannot ignore the individualized inquires that might occur with respect to the allegedly 'common' question." *Speerly*, 143 F.4th at 319 (citations omitted). And neither can the Court. As part of its obligatory "rigorous analysis" under Rule 23, it must decide whether Plaintiffs have actually proven commonality,[13] *Falcon*, 457 U.S. at 161, and to do so, it must "assess potential '[d]issimilarities within the proposed class'" and explain why they do or do not defeat class certification, *Nissan*, 122 F.4th at 247 (alteration in original) (quoting *Wal-Mart*, 564 U.S. at 350)). In the end, it "must actually decide" whether a proposed question is common. *Speerly*, 143 F.4th at 316 (citation omitted).

Plaintiffs fail to prove commonality for their claims, and the Court will therefore begin and end its analysis with it. *See Wal-Mart*, 564 U.S. at 349 n.5 ("In light of our disposition of the commonality question . . . it is unnecessary to resolve whether respondents have satisfied"

---

[11] The Sixth Circuit has "yet to decide whether the question must conclusively resolve (rather than just 'affect') an element. But there is no doubt that a question on a peripheral issue . . . will not suffice." *Clippinger*, 173 F.4th at 827 (citations omitted).

[12] Rule 23 "does not require a plaintiff seeking class certification to prove that *each* element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469 (cleaned up) (emphasis added). Rather, the common question must be capable of generating answers that "affect at least one element" of the class members' claims. *In re Nissan*, 122 F.4th at 246. Plaintiffs contend this analysis, i.e., an "element-by-element commonality analysis," *Speerly*, 143 F.4th at 319, is not new and does not "heighten" Rule 23's standards, [Pls.' Mem., Doc. 237, at pgs. 8–9]. Whether *Speerly* merely clarifies or instead meaningfully expands the commonality question is subject to disagreement. *Compare Speerly*, 143 F.4th at 315–335 (majority opinion), *with id.* at 366, 369 (Moore, J., dissenting) (arguing that the majority's opinion creates a "heightened standard" that requires a "labored, mechanized analysis" and permits "only plaintiffs with unassailable claims [to] proceed past class certification in [this] circuit")).

[13] By examining "the material elements of each claim" and determining "which ones, if any, yield a common answer," the Court conducts the requisite rigorous analysis of commonality. *Id.*; *see Nissan*, 122 F.4th at 246 ("In asking whether the trial court conducted a 'rigorous analysis' of commonality, the answer does not turn on whether the district court wrote a long opinion or held multiple hearings. It turns on whether the court examined the material elements of each claim and determined which ones, if any, yield a common answer." (quotation omitted)).

Rule 23's other requirements.); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (stating that "[n]o class that fails to satisfy all four of the prerequisites of Rule 23(a) may be certified" (citation omitted)).

### 1. *The Tennessee Time-Share Act (Count Two)*

In Count Two, Plaintiffs allege Westgate violated the TTSA by engaging in false advertising. [Third Am. Compl., Doc. 98, ¶¶ 156–65]. The TTSA defines an advertisement as "any written, printed, verbal or visual offer," Tenn. Code Ann. § 66-32-132(1), and it prohibits certain types of wrongful "advertising for the offer or sale of time-share intervals," *id.* § 66-32-132. Under § 66-32-132(11), the provision under which Plaintiffs request certification, the TTSA states: "No advertising for the offer or sale of time-share intervals shall . . . . [m]ake any misleading or deceptive representation with respect to the contents of the time-share program, the purchase contract, the purchaser's rights, privileges, benefits or obligations under the purchase contract or this part." *Id.* § 66-32-132(11). And further, the TTSA creates a cause of action for "any person or class of persons adversely affected" by any misleading or deceptive representation. *Id.* § 66- 32-118(a). So under § 66-32-132(11), the elements of a claim for false advertising are: (1) a written, printed, verbal, or visual offer for a time-share interval, (2) a misleading or deceptive representation with respect to that offer, and (3) an adverse effect that is caused by the misleading or deceptive representation.

The TTSA does not define "misleading or deceptive," so Plaintiffs ask the Court to adopt the common-law definition of "deceptive" that applies to the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq.*, which prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," Tenn. Code Ann. § 47-18-109(a)(1). Under the TCPA, a "'deceptive act or practice' is a material representation,

practice or omission likely to mislead a reasonable consumer." *Davis v. McGuigan*, 325 S.W.3d 149, 162 (Tenn. 2010) (quotation omitted).[14] Because the TTSA is silent as to what constitutes deception, "the standards to be used in" defining it "are legal matters to be decided by the [C]ourt[]." *State ex rel. Slatery v. HRC Med. Ctrs., Inc.*, 603 S.W.3d 1, 24 (Tenn. Ct. App. 2019) (citation omitted).

The Tennessee Supreme Court has not yet addressed whether courts can, or should, construe the TTSA consistently with the TCPA. When the Tennessee Supreme Court has not addressed an issue, this Court, to resolve the issue, "must predict how" the Tennessee Supreme Court "would rule by looking to all the available data," which "include[s] the decisional law of the state's lower courts." *Faber v. Ciox Health, LLC*, 944 F.3d 593, 601 (6th Cir. 2019) (alteration in original) (quotations omitted). In this vein, the Tennessee Court of Appeals has noted that the TTSA "applies to the primary sale of time share estates between the developers and the first purchaser" and that the TCPA "may apply to this type of transaction." *Williams v. Starace*, No. 85-162-II, 1985 WL 4074, at *5 n.3 (Tenn. Ct. App. Oct. 29, 1985) (citing *Klotz v. Underwood*, 563 F. Supp. 335, 337 (E.D. Tenn. 1982)). The Tennessee Court of Appeals has also affirmed that, in an action to rescind a contract for a purchase of a timeshare, liability can simultaneously arise under both TTSA and the TCPA. *Overton v. Westgate Resorts, Ltd.*, No. E2014–00303–COA–R3–CV, 2015 WL 399218, at *4–7 (Tenn. Ct. App. Jan. 30, 2015).

The Court's assessment of how the Tennessee Supreme Court would address this issue does not rest on the lower courts' decisions alone. It is also based on the two statutes' purposes. The TTSA prohibits a "misleading or deceptive representation," Tenn. Code Ann. § 66-32-

---

[14] "[A] plaintiff under the TCPA is not required to show reliance upon a misrepresentation by the defendant in order to maintain a cause of action." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 469 (Tenn. Ct. App. 2003) (citation omitted).

16

132(11), and the TCPA forbids "deceptive acts[s] or practice[s]," Tenn. Code Ann. 47-18-104. Both statutes focus on the same thing—addressing the deception of consumers in commercial transactions. The TCPA "shall be liberally construed" to protect the public form deceptive practices, Tenn. Code Ann. § 47-18-102, and the Tennessee Supreme Court has confirmed that the TCPA "is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices," *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn. 1992) (citing *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 305 (Tenn. Ct. App. 1984)). To construe the TTSA's "deception" language more narrowly than that provided for in the TCPA would not serve the shared remedial purposes of both statutes. For these reasons, this Court predicts the Tennessee Supreme Court would rule that a deceptive representation under the TCPA is analogous to, and interchangeable with, a deceptive representation under the TTSA.

### a. Centrality

Having identified the material elements of Plaintiffs' claim under § 66-32-132(11) of the TTSA, and the definitions of those elements' key terms, the Court must now determine whether Plaintiffs have come forward with a question that they can trace to at least one of those elements. *Speerly*, 143 F.4th at 319. They must "identify only *one*" such question, *id.* (citing *Wal-Mart*, 564 U.S. at 359), but they offer two:

- "Whether, in the course of its uniform sales presentation, Westgate made material misrepresentations or omissions about its 'floating use' timeshare product; and,

- If so,[15] whether the proposed class members were adversely affected by those material misrepresentations or omissions."

---

[15] Because Plaintiffs premise their second question on the outcome of the first question, the Court will treat a failure to prove centrality and cohesion for the first question as dispositive for the second question.

17

[Pls.' Mem., Doc. 237, at pg. 23].

The first question resolves, and at a minimum affects, the second element of Plaintiffs' TTSA claim—the element requiring a misleading or deceptive representation with respect to an advertisement—because, if a jury answers yes, it will establish that Westgate misrepresents or omits material information about "unit availability" to prospective purchasers, as Plaintiffs allege. [Third Am. Compl. ¶ 162]. And if a jury instead answers no, the question will likewise resolve whether Westgate has made these misrepresentations or omissions, thereby driving the resolution of the claim. *See Clippinger*, 173 F.4th at 829–30 (addressing the issue of centrality by considering the "answers that the jury might give to this [proposed] question at trial" and deciding whether those answers would "'drive the resolution'" of the claim (quoting *Wal-Mart*, 564 U.S. at 350)). Plaintiffs have therefore shown that this question is *central* to the validity of their claim under the TTSA.

### b. Cohesion

Next, the Court must decide whether a reasonable decisionmaker can give a *cohesive* yes-or-no answer to this question for all the class members. *Id.* at 827. Plaintiffs argue that the answer to this question—an answer of yes—will be the same for all the class members because the evidence "overwhelmingly establishes" that Westgate's sales agents made "uniform" oral misrepresentations and uniform omissions to prospective purchasers about the availability of timeshare units during their "uniform," "fully-scripted" pre-purchase sales presentations. [Pls.' Mem., Doc. 237, at pg. 10]. Plaintiffs identify three alleged misrepresentations or omissions— all of which, they claim, occurred "pre-sale" or "*prior to them making the purchase decision*," rather than during the closing process. [*Id.* at pgs. 7, 13 (emphasis in original)]. Those alleged misrepresentations or omissions are:

- "Westgate uniformly trained its salespersons to create false urgency and push prospective purchasers to buy 'TODAY' while falsely representing the nature of the product,"

- "Westgate's sale representatives uniformly misrepresented timeshares to potential purchasers as having 'the same rights of ownership as a home. You can use it, loan it out . . . rent it out . . . sell it,'" and

- "Westgate's sales representatives also uniformly failed to disclose that, because of the design of Westgate's floating use scheme—where all owners fight for the same handful of highly-desirable weeks—timeshare owners will likely be unable to use (or loan or rent) their timeshare on their desired dates or to use the type of timeshare unit they purchased."

[*Id.* at pgs. 7–8].[16] Westgate, however, argues "there is no evidence of any uniformity," [Defs.' Resp., Doc. 234, at pg. 13], insisting "there is no evidence that purchasers were uniformly told" that they could use their timeshare units whenever they wanted to use them. [*Id.* at pg. 12]. Westgate, therefore, contends that "there is no common answer to what purchasers were told." [*Id.*].

Whether Westgate's sales manual, and by extension the alleged misrepresentations and omissions that originated from the sales manual, operates as a uniform script is highly relevant to the Court's determination of class certification—and to its determination of commonality in particular. Indeed, when oral statements factor into a material element of a claim, as they do here under the TTSA, the Sixth Circuit has held that commonality is lacking if those oral statements are "not uniform." *Sprague*, 133 F.3d at 398. The Court must therefore resolve the parties' dispute regarding whether Westgate's alleged oral misrepresentations and omissions relating to the floating-use plan are uniform. *See Speerly*, 143 F.4th at 317 (stating that "[t]he district court . . . must not defer merits questions bearing on commonality and predominance

---

[16] The first and second misrepresentations—i.e., whether Westgate's sales agents "falsely represent[] the nature of the product" and whether they falsely represent that Westgate's product confers the same ownership rights as a home—overlap with each other, and the Court will consider them interchangeably in its analysis.

19

until summary judgment"); *Ford*, 86 F.4th at 729 ("[I]f a question of fact or law *is* relevant to [the class-certification] determination, then the district court has a duty *to actually decide it*[.]" (alterations and first emphasis in original) (second emphasis added) (quotation omitted))).

Class certification "is usually inappropriate where oral representations are relied upon to support" claims of deceptive acts "due to the highly individualized nature of the statements." *Bobbitt v. Acad. of Ct. Reporting, Inc.*, 252 F.R.D. 327, 340 (E.D. Mich. 2008) (citing *Yadlosky v. Grant Thornton, LLP*, 197 F.R.D. 292, 299 (E.D. Mich. 2000)); *see Lichoff v. CSX Transp., Inc.*, 2004 WL 2280354, at *6 (N.D. Ohio Oct. 6, 2004) (observing that "claims based on oral misrepresentations" are usually "not proper for class treatment because they are presumptively individualized" (citing *Simon v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 484 F.2d 880, 882 (5th Cir. 1973)); *see also Sprague*, 133 F.3d at 398 (determining that "the plaintiff's claims clearly lacked commonality" because the defendant's "statements to [the proposed class] were not uniform").

But, "there is no immutable rule prohibiting class certification in . . . cases premised on oral misrepresentations," *Bobbitt*, 252 F.R.D. at 340, and certification may be proper with proof that "[1] the oral misrepresentations were uniform and [2] no material variations existed in statements made to each class member." *Chaz Concrete Co. v. Codell*, Civil Action No. 3:03-52—KKC, 2006 WL 2453302, at *9 (E.D. Ky. Aug. 23, 2006) (citing *Gibbs Props. Corp. v. Cigna Corp.*, 196 F.R.D. 430, 440 (M.D. Fla. 2000)); *see Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255 (2d Cir. 2002) (Sotomayor, J.) ("While training and the existence of scripts are relevant factors, the inquiry should remain focused on whether material variations in the misrepresentations existed."); *accord Sprague*, 133 F.3d at 398.

The sales manual, on its face, is not a 150-page script from beginning to end. Certain segments of the sales manual, however, *are* scripted. The Pencil Pitch, for example, contains specific statements and questions for sales agents to recite verbatim to prospective purchasers. *See* [Inhouse Training Manual, Doc. 221, at pgs. 39–46; *id*. at pgs. 43, 45 (instructing the sales agents to ask certain questions and to give certain responses to customers' answers: "Allow the customer time to answer, then say," "Wait for the customer's response, and then say," and "Once the customer answers, say")]. And, importantly, the verbal misrepresentation that Plaintiffs maintain to be uniform—i.e., that purchasers have the "same rights of ownership as a home," [Pls.' Mem., Doc. 237, at pg. 7]—appears as a scripted statement in the Pencil Pitch: "[L]ike a home, you enjoy the same rights of ownership. You can use it, loan it out . . . rent it out . . . sell it[.]" [Inhouse Training Manual, Doc. 221, at pg. 43]. Adding to the evidence that this statement is a scripted part of the pre-sale presentation for all sales agents, Mr. Brown, Westgate's general manager for sales, testified that sales agents are trained to follow the sales manual "to a T" and that their presentations are "the same" apart from "minor differences." [Brown Dep., Doc. 234-5, at 116:12–13]. And in stride with his testimony, Ms. Moore, Mr. Gallegos, and Ms. Gilliland all testified that sales agents assured them they could use their units any time they wanted to use them. [Moore Dep., Doc. 228-14, at 67:17–18; Gallegos Dep., Doc. 228-16, at 216:11–12; Gilliland Dep., Doc. 228-15, at 25:16–17, 96:15–16, 112:5–6; Gallegos Dep., Doc. 234-50, at 82:23–24]. So far, so good for Plaintiffs in their effort to establish that the sales manual and the alleged oral misrepresentations that originated from the sales manual were uniform and were without variation.

Westgate, however, argues otherwise, insisting that the evidence shows "variations in what sales representatives say." [Defs.' Resp., Doc. 234, at pg. 12]; *see Nissan*, 122 F.4th at

21

247 ("The court must consider opposing arguments to ensure that plaintiffs 'actually prove' a common answer exists." (citing *Halliburton*, 573 U.S. at 275). Westgate cites Mrs. Spados's testimony, specifically her statement that no sales agent expressly told her when she and her husband could or could not use their unit or that a reservation would be subject to availability. [Laura Spado Dep., Doc. 234-17, at 20:4–6, 20:7–10].

> Q: Were you given any information about when the periods of time were that you could make reservations?
>
> A: No.
>
> Q. Were you given any information to the effect that you making a reservation was subject to availability?
>
> A: No

[*Id.* at 20:4–10]. Her testimony shows that while segments of the sales manual may have been uniform on paper, and perceived as uniform in the minds of at least some of Westgate's general managers like Mr. Brown, they were not always uniform in practice. Mr. Brown, in fact, acknowledged that sales agents do not always follow the sales manual and have to participate in retraining as a consequence. [Brown Dep., Doc. 228-9, at 64:3–11]. According to Mr. Brown, these sales agents "don't get it the first time," "take a little longer to" learn how to apply the sales manual, or just "want to do things their own way." [*Id.* at 64:24–25, 65:2–3, 65:7–8]. *See Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307 (5th Cir. 1977) ("It is possible, although unlikely, that oral misrepresentations can be uniform, e.g., through use of a standardized sales pitch by all the company's salesmen.").

The evidence would therefore allow a reasonable decisionmaker to conclude that sales agents' actual application of the sales manual and the oral misrepresentations at issue were not always uniform from customer to customer and could vary based on the particular sales agent

22

doing the presenting. *See Sprague*, 133 F.3d at 398 (holding that the plaintiffs' claims lacked commonality because the statements at issue varied, in part, "based on the person making the representation"); *see also PaineWebber*, 306 F.3d at 1256–57 (Sotomayor, J.) (holding that, although "Plaintiffs provided substantial evidence of a centralized sales scheme," the evidence failed to show that the defendant's sales agents had "adopt[ed] a materially uniform approach in their individual sales presentations" and instead "show[ed] that there were, in fact, material variations in the sales pitches").

The same is true as to Plaintiffs' affirmative-misrepresentation theory. Their strongest evidence of uniformity is the scripted line, "And like a home, you enjoy the same rights of ownership," which is part of the Pencil Pitch. [Inhouse Training Manual, Doc. 221, at pg. 44]. But this statement does not bear on the issue at the heart of this case, that is, the availability of units under the floating-use plan. The problem for Plaintiffs is that the sales manual is silent on availability and reservations; it does not address what a sales agent must tell a prospective purchaser about the likelihood of securing a particular unit on a particular date. Because it is silent on availability, whatever each purchaser was told on that subject must have come from the different conversations with purchasers, not a uniform script. Mr. Brown's own testimony illustrates this point. He acknowledged that "the foundation is the same but it could be different based on who you have in front of you." [Brown Dep., Doc. 234-5, at 116:9–10]. He testified that what a purchaser is told about availability turns on which "season" the purchaser actually buys, and when a purchaser complained that he was not getting "any week that [he] wanted," Mr. Brown's response was, "[Y]ou didn't ask me about the different seasons." [*Id.* at 114:16–115:9]. And James Rushford, another manager of sales at Westgate, testified that when owners ask him how hard booking would be, he tells them, "If it's going to be busy, book early. If you

23

can book last minute, if that's how you vacation, then we'll help you with that, too." [Rushford Dep., Doc. 228-11, at 47:18–25]. These are materially different communications about the very feature that Plaintiffs say was uniformly misrepresented. Silent on availability, the sales script cannot create a uniform misrepresentation regarding availability, and the oral testimony cited confirms that what purchasers often heard depended on the agent, the season, and the questions they asked. *See Sprague*, 133 F.3d at 398 (recognizing that statements that vary "based on the person making the representation" defeat commonality). Because a reasonable decisionmaker could find that purchasers heard materially different things about availability, the affirmative-misrepresentation theory yields no cohesive yes-or-no answer for the class as a whole.

Plaintiffs' strongest evidence to the contrary does not change things. Robert Morris, a sales agent at Westgate, testified that Westgate's sales agents are "told to follow the manual to the T," that "the information that [sales agents are] trained to give is only the information that's in the manual," and that sales agents "don't give them any other information," which is "true for all the sales reps." [Morris Dep., Doc. 228-10, at 16:17–25, 21:2–17]. Taken at face value, his testimony establishes uniformity in what the sales agents are volunteering, but it does not establish uniformity about availability. Again, the sales manual is silent on availability, so an instruction to convey "only" what is in the manual does not create any uniform statement about availability. Availability is precisely the kind of subject that surfaces when a customer asks. Mr. Brown's testimony about "book early" confirms this. Uniformity in what the sales agents volunteer from a manual in no way translates to uniformity in what they say about availability when a customer asks about it.

Also, the materiality inquiry—i.e., "[w]hether, in the course of its uniform sales presentation, Westgate made *material* misrepresentations . . . about its 'floating use' timeshare

24

product," [Pls.' Mem., Doc. 237, at pg. 23 (emphasis added)]—does not support a class-wide answer. Under the TCPA, a representation or omission is deceptive only if it is material to a reasonable consumer, and a seller's duty to disclose extends only to material facts "not known or reasonably discoverable by a purchaser exercising ordinary diligence." *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009) (citations omitted). Both prongs turn on what each purchaser knew and valued, and the record establishes class-wide differences as to what each purchaser knew and valued. Mr. Gallegos, for instance, testified that he bought his unit "as an investment" and was "just looking at profits," that he did not understand the meaning of a "float unit" and made no effort to learn it, and that he signed and initialed the purchase documents—including the floating-use-plan acknowledgment—without even reading them because, in his words, "[i]t was an investment." [Gallegos Dep., Doc. 234-50, at 213:8–11, 221:14–222:2, 224:20–225:10]. On his testimony, a reasonable decisionmaker could find that availability under the floating-use plan was immaterial to a purchaser like Mr. Gallegos who bought his unit as an investment, whatever he was told about it, and at the same time material to another purchaser who bought a unit, for instance, to use for vacation.

Variation in what each purchaser valued is not the only individualized consideration; a reasonable decisionmaker could also find that a purchaser who entered a sale already aware of the availability issues was not affected by their omission in the same way as a purchaser who learned of the product for the first time. Ms. Moore, for example, testified that by the time of her upgrade in 2013 she was already "having booking issues" and that "really nothing was ever available." [Moore Depo., Doc. 228-14, at 116:24-117:8]. Mrs. Spado testified that the ability to "pick a different week each year" under the floating-use plan "was one of the things that we did like." [Laura Spado Dep., Doc. 234-17, at 42:10–13]. So whether the floating-use structure

25

was a benefit or a detriment depended on the individual purchaser's preferences and how that individual purchaser intended to use the unit.

In addition, the answer to whether sales agents "made *material . . .* omissions" about Westgate's floating-use plan during the pre-sale process would also vary from class member to class member. [Pls.' Mem., Doc. 237, at pg. 10 (emphasis added)]. For the alleged pre-sale omissions to be cohesive for all the class members—to share "glue" that binds them together, *Wal-Mart*, 564 U.S. at 352—they have to be material for all the class members, from one-time purchasers to second and third-time purchasers (i.e., the class members who upgraded). After all, Plaintiffs allege that Westgate's deceptive acts did not cease when purchasers completed their initial purchase of a unit but continued with sales agents' efforts to convince purchasers to upgrade:

> The high-pressure sales tactics do not stop once Westgate completes a sale: existing owners face constant pressure from Westgate agents and employees to upgrade to nicer units. . . . Westgate agents . . . similarly attempt to pressure timeshare owners to upgrade to a nicer property. . . . Because the profitability of Westgate's timeshare business largely depends on sales of new and upgraded units, the Resort devotes substantial resources to high-pressure sales tours, during which dozens to hundreds of prospective purchasers are brought each day through many of the nicest timeshare units at the Resort.

[Third Am. Compl., Doc. 98, ¶¶ 42–43, 48].[17] Whether an alleged omission is material is a question of fact, *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 786 (Tenn. Ct. App. 2010), and the answer to that question would vary for class members who were first-time purchasers and for class members who were second and third-time purchasers.

---

[17] Mrs. Spado testified that the successive pre-sale processes were basically the same: "I noticed over the time periods of visiting that was very similar, like they use the same strategies, you know, the piece of paper with what we call 'the big math problem' on it. Every single time you go, it was that same—you know, take the tour of the place, let's sit down and talk, here's this big math problem. I mean, it was just very generic. So it would lead me to believe that it was kind of, like, a game plan." [Laura Spado Dep., Doc. 228-21, at 67:5–13].

A peek at the evidence related to the closing process show why. That evidence firmly establishes that sales agents disclosed the floating-use plan to Ms. Moore, Ms. Gilliland, Mr. Gallegos and Ms. Campbell, and Mr. and Mrs. Spado during the closing process, and each of them acknowledged receipt of that disclosure. *See supra* pt. I at 6–8; *see also* [Ryan Spado Dep., Doc. 234-16, at 198:20–24 ("Q: And at least with respect to you, Westgate sufficiently explained the idea of a 'floating week,' correct? A: Yes."); Closing Officer Training Guide, Doc. 128, at pg. 98 ("Do you understand you have a floating use plan which allows you to float your week and unit?")]. Second and third-time purchasers like Ms. Moore and Mr. and Mrs. Spado would have therefore entered into successive pre-sale processes with an awareness of the floating-use plan that first-time purchasers entering into the pre-sale processes would not have had. *See* [Defs.' Resp., Doc. 234, at pg. 6 n.4 (arguing that Plaintiffs "ignore that Ms. Moore and others upgraded . . . and already had knowledge and experience with . . . availability"); *id.* at pg. 17 ("The Gillilands, Spados, and Moore all purchased upgraded timeshares; what they knew or did not know about availability and reservations is different from proposed class members who were first time purchasers.")].

A sales agent's failure to broach the floating-use plan in the pre-sale process may have been material to a first-time purchaser but probably not so for a second or third-time purchaser with prior knowledge of the floating-use plan. Plaintiffs would have to prove that sales agents' non-disclosure of the floating-use plan to successive purchasers during successive pre-sale processes was material to them despite their already-held knowledge of the floating-use plan. The evidence therefore would vary from class member to class member, enabling a reasonable decisionmaker to find that sales agents, during the pre-sale process, made material omissions to some class members about the floating-use plan but not others. The dissimilarities between

27

first-time purchasers and second and third-time purchasers, as they relate to the materiality of the alleged omissions about the floating-use plan, are fatal to commonality under Rule 23(a)(2). *See Wal-Mart*, 564 U.S. at 350 ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." (quotation omitted)).[18]

And narrowing the class to just first-time purchasers would not cure these deficiencies. Even a class that is confined to first-time purchasers would still fall short on the affirmative-misrepresentation theory, because, as the Court explained above, the sales manual is silent on availability, and what each prospective purchaser was told on that subject came from different conversations rather than from a uniform script. The variation in those conversations tracks the sales agent doing the presenting and the questions that each prospective purchaser asked, not the line between first-time and repeat purchasers. A narrower class definition therefore would not generate the cohesive, class-wide answer that Rule 23(a)(2) demands, and the Court need not invite further briefing on a refined class to deny certification. *See Sprague*, 133 F.3d at 398.

In sum, the Court cannot conclude that Plaintiffs' question, "Whether, in the course of its uniform sales presentation, Westgate made material misrepresentations or omissions about its 'floating use' timeshare product," is cohesive because a reasonable decisionmaker could answer yes for some of the class members and no for other class members. Plaintiffs therefore fail to meet their burden of proving commonality under Rule 23(a)(2), and they are not entitled to class certification of their claim under the TTSA.

---

[18] Plaintiffs, under Federal Rule of Civil Procedure 23(c)(5), also request the certification of a sub-class: "Tennessee Time-Share Act and Civil Conspiracy Subclass: All residents of the United States and its territories who purchased from Westgate an All Season "floating use plan" vacation timeshare property at the Westgate Smoky Mountain Resort at Gatlinburg from September 25, *2014* through January 31, 2018." [Pls.' Mot., Doc. 228, at pg. 2 (emphasis added)]. But this sub-class suffers from the same dissimilarities because some proposed class members upgraded between 2014 and 2018. *See* [Third Am. Compl., Doc. 98, ¶ 86 (alleging that Ms. Gilliland upgraded in 2016)]; *see also* [Gilliland 2016 Purchase Agreement, Doc. 234-47]. Certification of this sub-class is therefore not appropriate. *See* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").

28

## 2. *Covenant of Good Faith and Fair Dealing (Count Seven)*

Next, Plaintiffs allege that Westgate breached its purchase agreements with Plaintiffs and the proposed class—and the covenant of good faith and fair dealing, specifically—through their misrepresentations and omissions. [Third Am. Compl., Doc. 98, ¶ 224]. A claim for breach of the covenant of good faith and fair dealing is not a freestanding one in Tennessee. *Cadence Bank, N.A. v. The Alpha Tr.*, 473 S.W.3d 756, 773 (Tenn. Ct. App. 2015), so in a class-action suit for breach of the covenant, centrality depends on whether the proposed class frames its questions in a way that resolves, or at a minimum affects, the elements of a claim for breach of contract. *Clippinger*, 173 F.4th at 829–31. Those elements are: (1) the parties entered into an enforceable contract, (2) one of the parties breached that contract, and (3) the breach resulted in damages. *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

The Court begins with the issue of centrality, deciding whether Plaintiffs have come forward with a question that they can trace to one of these three elements. *Speerly*, 143 F.4th at 319. Plaintiffs have come forward with two questions:

- "Whether Westgate's uniform purchase contract adequately disclosed 'the true nature' of Westgate's floating use plan; and,

- If so,[19] whether the floating use plan reasonably protected class members' rights to receive the benefits of the agreement into which they entered."

[Pls.' Mem., Doc. 237, at pg. 25]. Plaintiffs contend that these "common question[s] can be resolved by yes-or-no answers." [*Id.* at 10]. Westgate, however, asserts that Plaintiffs' first question "does not relate to any element of a breach claim" because whether it "adequately

---

[19] Because Plaintiffs premise their second question on the outcome of the first question, the Court will treat a failure to prove centrality for the first question as dispositive for the second question.

29

disclosed the floating use plan . . . does not answer whether [it] breached—i.e., failed to provide contractually-required accommodations." [Defs.' Resp., Doc. 234, at pg. 15].

Tennessee courts recognize claims for breach of contract for a failure to disclose, *see, e.g.*, *Ingram v. Sohr*, No. M2012–00782–COA–R3–CV, 2013 WL 3968155, at *20 (Tenn. Ct. App. July 31, 2013), and courts look to the contract to decide whether it imposed an obligation on a party to disclose the information at issue, *see id.* at *20–21; *see also E-Poch Props., LLC v. TRW Auto. U.S., LLC*, 286 F. App'x 276, 279–80 (6th Cir. 2008); *White Consol. Indus., Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403, 408–09 (6th Cir. 1999). The Court therefore starts with the purchase agreement's terms—terms that, according to Plaintiffs, were "materially identical" for members of the proposed class—to decide whether Westgate had a contractual obligation to disclose the floating-use plan's "true nature." [Pls.' Mem., Doc. 237, at pg. 25]. *See Clippinger*,173 F.4th at 829 ("To decide whether the [proposed class's] question will automatically prove a 'breach' of the policy for every class member, we must consider the policy's terms." (citations omitted)); *id.* at 831 (examining the policy's terms to determine what the defendant "promised"); *see also* [Pls.' Mem., Doc. 237, at pgs. 25–26 (proposing that the "answers to [Plaintiffs'] questions" on the breach-of-contract claim "can be determined" from "the terms and conditions of Westgate's uniform sales contract")].

The purchase agreement contains one principal, material promise: Westgate promised purchasers "ownership in fee simple," with "possession of an Assigned Unit pursuant to the Reservation System [as] set forth in the [Timeshare] Plan." [Moore 2012 Purchase Agreement, Doc. 234-34, at pg. 2]. If Westgate failed to provide purchasers with a fee-simple ownership right according to the Timesharing Plan's terms,[20] then it breached the purchase agreements.

---

[20] The Timesharing Plan states that "it is the express intent of this [document], which intent is consented to by each Owner through acceptance of a conveyance of a Floating Unit Week hereunder, that certain Unit Weeks shall

Plaintiffs, however, do not allege that Westgate breached the purchase agreements by failing to provide purchasers with a fee-simple ownership right according to the Timesharing Plan's terms. Instead, they allege that Westgate breached the purchase agreements by failing "to adequately disclose . . . that [it] artificially restricted the availability of timeshare units." [Third Am. Compl., Doc. 98, ¶ 230].

No provision in the purchase agreement imposes a duty on Westgate to disclose the workings of the floating-use plan. *See Clippinger*, 173 F.4th at 829 (observing that "no language in the policy" imposed a duty on the defendant to use a "typical-negotiation adjustment" method when calculating fair-market value and concluding that the proposed class's question therefore "has a centrality problem" on the element of breach of contract). Plaintiffs neither allege that the purchase agreement contains such a provision nor identify any such provision under which this duty arises, whether implicitly or explicitly. And the implied duty of good faith does not permit parties to graft obligations into a contract that are not there. *Id.* at 831 ("Tennessee courts do not recognize an independent good-faith cause of action, so parties cannot use this doctrine to add duties to a contract that do not fall within its four corners." (citations omitted)).

A jury's answer to whether Westgate's purchase agreements adequately disclosed the true nature of Westgate's floating-use plan does not resolve or affect whether Westgate was *contractually obligated* to disclose the floating-use plan in the first place. Whether Westgate was contractually obligated to make this disclosure is a question of contractual formation—the first element of a breach-of-contract claim—and the common question of contractual formation that Plaintiffs should have posed is whether Westgate entered into an enforceable agreement to disclose the floating-use plan's true nature. *See id.* at 828 (inquiring, as a "contract-formation

---

be part of the Floating Use Plan." [Timesharing Plan, Doc. 234-15, at pg. 5]. It further states that, "[p]ursuant to the Floating Use Plan," units are available on a "'first-come, first-served'" basis. [*Id.*].

31

question," whether "State Farm enter[ed] an enforceable contract to pay the 'actual cash value' to class members when an accident destroyed their vehicles?"). This question would generate a common answer of "no" for all class members—because, again, Plaintiffs do not identity any provision requiring disclosure of the floating-use plan's true nature in the purchase agreement, and they do not allege that such a provision is part of the purchase agreement. *See* [Defs.' Resp., Doc. 234, at pg. 21 (contending that "the only contractual duty owed was to comply with the Timesharing Plan" and that "Plaintiffs seek to graft onto that an implied covenant to 'adequately describe the true nature' of the floating use plan")]. But Plaintiffs do not ask this question, and the Court cannot ask it for them. *See Nissan*, 122 F.4th at 246 ("Civil Rule 23(a) requires *the plaintiff* to identify 'questions of law or fact common to the class.'" (emphasis added) (quoting Fed. R. Civ. P. 23(a)); *see also Speerly*, 143 F.4th at 319 ("*The plaintiffs* must tie th[e] debated question to 'the relevant elements' of th[e] claim[.]") (emphasis added)).

While Plaintiffs' failure to ask this common question of contractual formation does not by itself upend commonality, *see Speerly*, 143 F.4th at 319 (stating that the class plaintiffs must "identify only *one* question suitable for common proof" for each claim (citing *Wal-Mart*, 564 U.S. at 359)), Plaintiffs' failure to point to any contractual provision that mandates Westgate's disclosure of the floating-use plan's true nature *does* upend it. Without any evidence of such a provision, a jury cannot answer either yes or no to Plaintiffs' breach-related question, i.e., "Whether Westgate's uniform purchase contract *adequately* disclosed 'the true nature' of Westgate's floating use plan." [Pls.' Mem., Doc. 237, at pg. 25 (emphasis added)]; *see Clippinger*, 173 F.4th at 828 ("Without a contract, State Farm had nothing to breach." (citing *Winters*, 354 S.W.3d at 291)).

Their breach-related question, therefore, does not drive the resolution of their claim, and neither can their follow-up question, which they premise on the first. Having failed to identify a question that is central to the validity of their claim, Plaintiffs do not satisfy their burden of proving commonality, and they are not entitled to class certification of this claim.[21]

### 3. *Civil Conspiracy (Count Nine)*

Lastly, Plaintiffs allege that Westgate participated in a civil conspiracy to sell timeshare units to them and to the proposed class members without adequately disclosing that they were purchasing a floating-use plan. [Third Am. Compl., Doc. 98, ¶ 238]. Plaintiffs seek certification of their civil-conspiracy claim with a one-paragraph argument, in which they do not attempt to identify any common questions or to trace those questions to the elements of their claim. Instead, they argue that their claim "presents common questions by its nature." [Pls.' Mem., Doc. 237, at pgs. 26–27].

A "[c]ivil conspiracy must have a predicate tort committed as part of the conspiracy." *Franklin Constr. Grp., LLC v. Shore*, 793 F. Supp. 3d 928, 947 (M.D. Tenn. 2025) (citing *Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1019–20 (E.D. Tenn. 2022)). Because Plaintiffs' conspiracy claim rests on the same misrepresentations and omissions that underlie their TTSA and contract claims, and because Plaintiffs have failed to prove commonality on those claims, the conspiracy claim built on the same conduct necessarily fails commonality for the same reasons.[22]

---

[21] Plaintiffs request the certification of a sub-class for their claim for breach of the covenant of good faith and fair dealing: "Breach of Contract (Covenant of Good Faith and Fair Dealing) . . . All residents of the United States and its territories who purchased from Westgate an All Season "floating use plan" vacation timeshare property at the Westgate Smoky Mountain Resort at Gatlinburg from September 25, 2012 through January 31, 2018." [Pls.' Mot. Doc. 228-1 at 19]. This sub-class, however, suffers from the same deficiencies in commonality as the originally proposed class. Certification of this sub-class is therefore not appropriate.

[22] Plaintiffs request the certification of a sub-class for their claim for civil conspiracy: "Civil Conspiracy Subclass: All residents of the United States and its territories who purchased from Westgate an All Season "floating

In any event, Plaintiffs effectively call on the Court to "[c]ertify[] now" and "winnow[] later, betray[ing] the Supreme Court's imperative that plaintiffs 'actually *prove*'" commonality. *Speerly*, 143 F.4th at 329 (quoting *Halliburton*, 573 U.S. at 275). Again, Rule 23's requirements are "stringent," *Nissan*, 122 F.4th at 246, command "precision across the board," *Ford*, 86 F.4th at 726, and place a burden on Plaintiffs to "affirmatively demonstrate" that they have satisfied those requirements, *Halliburton*, 573 U.S. at 275 (quotation omitted). All of this is to say that Rule 23(a) "*requires*" Plaintiffs to identify a question of law or fact common to the proposed class, *Nissan*, 122 F.4th at 246 (emphasis added), and then "[t]he class *must* trace the question to a legally salient element in each cause of action and show common proof will provide yes-or-no answer to that factual/legal question," *Speerly*, 143 F.4th at 319 (emphasis added) (citation omitted).

Plaintiffs fail to do any of these things for their civil-conspiracy claim, relying instead on their contention that this claim satisfies commonality "by its nature." [Pls.' Mem., Doc. 237, at pg. 27]. Because "actual . . . conformance with Rule 23(a)" is "indispensable," and not merely optional, this contention cannot suffice to satisfy Rule 23(a)(2)'s stringent requirements. *Falcon*, 457 U.S. at 161. Plaintiffs are therefore not entitled to class certification of this claim.

## IV. CONCLUSION

Plaintiffs fail to satisfy their burden of proving commonality for each of their claims. They therefore fail to satisfy Rule 23(a)(2), and their Renewed Motion for Class Certification and Appointment of Class Counsel [Doc. 228] is **DENIED**.

---

use plan" vacation timeshare property at the Westgate Smoky Mountain Resort at Gatlinburg from September 25, 2012 through January 31, 2018." [Pls.' Mot. at 2]. This sub-class, however, suffers from the same deficiencies in commonality as the originally proposed class. Certification of this sub-class is therefore not appropriate.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge

35